# 16-1568

## United States Court of Appeals

*for the*

## Second Circuit

CONSTITUTION PIPELINE COMPANY, LLC,

*Petitioner,*

– v. –

BASIL SEGGOS, ACTING COMMISSIONER, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, JOHN FERGUSON, CHIEF PERMIT ADMINISTRATOR, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,

*Respondents.*

STOP THE PIPELINE, CATSKILL MOUNTAINKEEPER, INC., SIERRA CLUB, RIVERKEEPER, INC.,

*Intervenors.*

PETITION FOR REVIEW FROM THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## PROOF BRIEF FOR PETITIONER

YVONNE E. HENNESSEY, ESQ.
BARCLAY DAMON, LLP
80 State Street, 6th Floor
Albany, New York 12207
(518) 429-4293

JOHN F. STOVIAK, ESQ.
SAUL EWING LLP
Center Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102
(215) 972-1095

ELIZABETH UTZ WITMER, ESQ.
SAUL EWING LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, Pennsylvania 19087
(610) 251-5062

*Attorneys for Petitioner,*
*Constitution Pipeline Company, LLC*

**CORPORATE DISCLOSURE STATEMENT OF**
**CONSTITUTION PIPELINE COMPANY, LLC**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Constitution Pipeline Company, LLC ("Constitution") makes the following disclosures:

Constitution Pipeline Company, LLC is a limited liability natural gas pipeline company organized and existing under the laws of the State of Delaware.  The members of Constitution include Williams Partners Operating LLC (41 percent), Cabot Pipeline Holdings, LLC (25 percent), Piedmont Constitution Pipeline Company, LLC (24 percent), and WGL Midstream CP, LLC (10 percent).  Its parent corporations are Williams Partners Operating LLC, Piedmont Constitution Pipeline Company, LLC, WGL Midstream, Inc., Washington Gas Resources Corp., Williams Partners L.P., The Williams Companies, Inc., Piedmont Natural Gas Company, Inc., and WGL Holdings, Inc.  The following publicly-held corporations own 10% or more of Constitution Pipeline Company, LLC's stock:  Williams Partners L.P., The Williams Companies, Inc., Piedmont Natural Gas Company, Inc., and WGL Holdings, Inc.  Cabot Oil & Gas Corporation is an indirect, beneficial owner of a 25% membership interest through its wholly-owned subsidiary, Cabot Pipeline Holdings, LLC.  In addition, The Williams Companies

Inc. owns 10% or more of the publicly-held limited partner interest in Williams Partners, L.P.

Respectfully submitted,

/s/ John F. Stoviak

John F. Stoviak, Esq.
Elizabeth U. Witmer, Esq.
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
T: (215) 972-1095
F: (215) 972-1921
jstoviak@saul.com
ewitmer@saul.com


Yvonne E. Hennessey, Esq.
BARCLAY DAMON, LLP
80 State Street
Albany, New York  12207
T: (518) 429-4293
F: (518) 427-3472
yhennessey@barclaydamon.com

*Counsel for Petitioner Constitution Pipeline Company, LLC*

Dated:  July 12, 2016

# TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT**......................................................................1

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW** .......................3

**STATEMENT OF THE CASE**...........................................................................4

**STATEMENT OF FACTS**.................................................................................7

    I.    STATUTORY BACKGROUND.......................................................................7

    II.   FACTUAL BACKGROUND ........................................................................9

        A.    *FERC Review* ......................................................................9

        B.    *NYSDEC Review* ..............................................................13

            *(a)   Constitution's Intensely Interactive Permit Review Process with*

            *NYSDEC* ..........................................................................13

            *(b)   NYSDEC Ready to Issue Certification*...................................20

        C.    *NYSDEC's Denial* ..............................................................21

        D.    *USACE Review* ..................................................................22

**SUMMARY OF THE ARGUMENT** ................................................................24

**ARGUMENT** ..................................................................................................26

**POINT I**..........................................................................................................26

**STANDARD OF REVIEW** .............................................................................26

    I.    WAIVER OF SECTION 401 CERTIFICATION.............................................26

    II.   DENIAL OF SECTION 401 CERTIFICATION.............................................26

**POINT II**........................................................................................................29

**NYSDEC ACTED TOO LATE, MISSING DEADLINES UNDER BOTH
THE NATURAL GAS ACT AND THE CLEAN WATER ACT, REQUIRING**

**A REMAND WITH INSTRUCTIONS THAT NYSDEC MUST NOTIFY USACE WITHIN 5 DAYS THAT IT HAS WAIVED THE SECTION 401 CERTIFICATION REQUIREMENTS** ...................................................**29**

    I.    NYSDEC's Untimely Action on the Section 401 Certification is Inconsistent with the NGA ......................................................................30

    II.    NYSDEC's Untimely Action on the Section 401 Certification is Inconsistent with the CWA...................................................................32

**POINT III** ..................................................................................................**38**

**NYSDEC'S DENIAL EXCEEDS THE SCOPE OF ITS NARROWLY CIRCUMSCRIBED JURISDICTION AND IS AN IMPERMISSIBLE COLLATERAL ATTACK ON FERC'S DECISION** ......................................**38**

    I.    NYSDEC's Section 401 Jurisdiction is Narrowly Circumscribed under the CWA. .....................................................................................39

    II.    Alternative Routes....................................................................................44

    III.    Cumulative Impacts .................................................................................47

    IV.    Pipeline Depth .........................................................................................48

    V.    Blasting Plan ............................................................................................51

**POINT IV** ..................................................................................................**53**

**NYSDEC'S DENIAL IS CONTRADICTED BY RECORD EVIDENCE, NOT SUPPORTED BY LEGALLY RATIONAL BASES AND ARBITRARY AND CAPRICIOUS** ...........................................................................................**53**

    I.    Constitution Supplied Sufficient Information Regarding Stream Crossing Methods. ..................................................................................53

II. Constitution Supplied Sufficient Information Regarding Wetland Crossings. .....................................................................................61

III. NYSDEC's Application of its Regulations is in Direct Contrast to its Prior Application for Other Similarly Situated Projects. .................63

IV. NYSDEC's Prior Application of its Thermal Discharge Criteria is Contrary to its Application in the Denial. ..................................................66

**CONCLUSION**.......................................................................................**68**

# TABLE OF AUTHORITIES

**CASES**

*Aera Energy LLC v. Salazar,*
    642 F.3d 212 (D.C. Cir. 2011) ...............................................................61

*AES Sparrows Point LNG v. Wilson,*
    589 F.3d 721 (4th Cir. 2009) ...............................................26, 34, 35

*Airport Communities Coal. v. Graves,*
    280 F. Supp. 2d 1207 (W.D. Wash. 2003) ............................... 32-33, 37

*Am. Rivers, Inc. v. F.E.R.C.,*
    129 F.3d 99 (2d Cir. 1997) ...................................................26, 32

*Cellular Phone Taskforce v. F.C.C.,*
    205 F.3d 82 (2d Cir. 2000) ...................................................60

*Chasm Hydro, Inc. v. NYSDEC,*
    872 N.Y.S.2d 235 (3d Dep't 2009)............................................. 47-48

*Doyle v. Brock,*
    821 F.2d 778 (D.C. Cir. 1987)...................................................65

*E. Niagara Project Power Alliance v. NYSDEC,*
    840 N.Y.S.2d 225 (3d Dep't 2007)........................................43, 44, 48

*Ellis v. Chao,*
    336 F.3d 114 (2d Cir. 2003) ...................................................50, 65

*FPL Energy Maine Hydro LLC v. DEP,*
    926 A.2d 1197 (Me. 2007).......................................................33

*FPL Energy Maine Hydro, LLC v. DEP,*
    No. CIV.A. AP-04-50, 2006 WL 2587989 (Me. Super. May 25,
    2006), *aff'd*, 926 A.2d 1197 (Me. 2007).......................................33, 37

*Great Basin Mine Watch v. Hankins,*
    456 F.3d 955 (9th Cir. 2006) ...................................................49

*Huntington Hosp. v. Thompson,*
    319 F.3d 74 (2d Cir. 2003) ...................................................28

*I.N.S v. Yang,*
  519 U.S. 26 (1996).................................................................................28

*Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.,*
  482 F.3d 79 (2d Cir. 2006) ...............................................................passim

*Massachusetts v. Envtl. Prot. Agency,*
  549 U.S. 497 (2007)................................................................................61

*Matter of Erie Blvd. Hydropower, L.P. v. Stuyvesant Falls Hydro
  Corp.,* 816 N.Y.S.2d 224 (3d Dep't 2006) ........................................48

*Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,*
  No. C4-97-1676, 1998 WL 481933 (Minn. Ct. App. Aug. 18,
  1998) .............................................................................................33, 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
  Co.,* 463 U.S. 29 (1983)....................................................................27, 28

*Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n,*
  894 F.2d 571 (2d Cir. 1990) ...........................................................45, 67

*Niagara Mohawk Power Corp. v. NYSDEC,*
  187 A.D.2d 7 (3d Dep't 1993), *aff'd,* 82 N.Y.2d 191 (N.Y. 1993).............42, 43

*Niagara Mohawk Power Corp. v. State Dep't of Envtl. Conservation,*
  82 N.Y.2d 191 (N.Y. 1993), *cert denied,* 511 U.S. 1141 (1994) ...............passim

*Or. Natural Desert Ass'n v. USFS,*
  550 F.3d 778 (9th Cir. 2008) ................................................................49

*Petroleum Commc'ns, Inc. v. F.C.C.,*
  22 F.3d 1164 (D.C. Cir. 1994)......................................................... 60-61

*PUD No. 1 v. Wash. Dep't of Ecology,*
  511 U.S. 700 (1994).................................................................................43

*Puerto Rico Sun Oil Co. v. EPA,*
  8 F.3d 73 (1st Cir. 1993)....................................................................32, 37

*Schneidewind v. ANR Pipeline Co.,*
  485 U.S. 293 (1988)..........................................................................7, 26, 45

*Sierra Club v. FERC*,
   --- F.3d ---, No. 14–1249, 2016 WL 3525562 (D.C. Cir. June 28, 2016) ..................................................................................38

*Sierra Club v. FERC*,
   --- F.3d ---, No. 14-1275, 2016 WL 3524262 (D.C. Cir. June 28, 2016) ..................................................................................48

*U.S. Army Corps of Eng'rs v. Hawkes Co, Inc.*,
   136 S. Ct. 1807, 2016 WL 3041052 (May 31, 2016) ...........................................48

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
   589 F.3d 458 (1st Cir. 2009) ...............................................45

*Williams Nat. Gas Co. v. City of Oklahoma City*,
   890 F.2d 255 (10th Cir. 1989) ...............................................26

*Yi Lin v. U.S. Citizenship & Immigration Servs.*,
   246 F. App'x 68 (2d Cir. 2007) ...............................................60

*Zhao v. U.S. Dep't of Justice*,
   265 F.3d 83 (2d Cir. 2001) ...............................................44, 67

STATUTES

5 U.S.C. § 706(2)(A)...............................................27

15 U.S.C. § 717 *et seq.*...............................................7

15 U.S.C. § 717b...............................................7, 26

15 U.S.C. § 717b(d)...............................................8, 31

15 U.S.C. § 717f(c)(1)(A)...............................................7

15 U.S.C. § 717f(e)...............................................7

15 U.S.C. § 717n(b)(1)...............................................9, 30

15 U.S.C. § 717n(b)(2)...............................................30

15 U.S.C. § 717n(c)...............................................13, 31

15 U.S.C. § 717r(a)...............................................38

15 U.S.C. § 717r(b) ..................................................................................38

15 U.S.C. § 717r(d)(1) ....................................................................1, 14, 27

15 U.S.C. § 717r(d)(2) ........................................................................30, 31

15 U.S.C. § 717r(d)(3) ........................................................................27, 32

33 U.S.C. § 1251(d) ................................................................................26

33 U.S.C. § 1341(a)(1) ........................................................................passim

33 U.S.C. § 1341(d) ................................................................................32

33 U.S.C. § 1344(a) ..................................................................................4

42 U.S.C. § 7172(a)(1) ..............................................................................7

Energy Policy Act of 2005, Pub. L. No. 109–58, § 313(b), 119 Stat.
     594, 689–90 (2005) ............................................................................8

Environmental Conservation Law § 3-0301 ............................................47

## OTHER AUTHORITIES

18 C.F.R. § 380.12(d)(2) ..........................................................................67

33 C.F.R. § 325.2(b)(1)(ii) ..................................................................34, 37

49 C.F.R. Part 192 ..................................................................................49

6 NYCRR § 621.10(a)(2) ........................................................................35

6 NYCRR § 621.10(a)(3) ........................................................................35

6 NYCRR § 700.1 ..................................................................................67

6 NYCRR § 704.2 ..................................................................................67

6 NYCRR § 704.3 ..................................................................................66

6 NYCRR §704.5 ..................................................................................66

16 NYCRR § 1000.8 ..........................................................................35, 37

# JURISDICTIONAL STATEMENT

This Court has original and exclusive jurisdiction to review the New York State Department of Environmental Conservation's ("NYSDEC") April 22, 2016 denial ("Denial") of Constitution Pipeline Company, LLC's ("Constitution") application for a water quality certification under Section 401 of the Clean Water Act ("Section 401 Certification"). SPA1-14, SPA36-40. The Natural Gas Act ("NGA") provides:

> ***The United States Court of Appeals*** for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated ***shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a*** Federal agency (other than the Commission) or ***State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval*** (hereinafter collectively referred to as "permit") ***required under Federal law***, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

15 U.S.C. § 717r(d)(1), SPA25 (emphasis added). This petition, filed on May 16, 2016, challenges the decision of a state administrative agency (NYSDEC) denying a certification under Section 401 of the Clean Water Act ("CWA"), which is a required approval under federal law triggered by Constitution's application to the U.S. Army Corps of Engineers ("USACE") for a Section 404 permit under the CWA for the Constitution Pipeline Project ("Interstate Project"), as approved by

1

the Federal Energy Regulatory Commission ("FERC") and subject to Section 717f

of the NGA.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Whether NYSDEC acted too late under the NGA and CWA, and inconsistent with federal law, when it took more than two years and eight months from submission of the application to issue the Denial despite twice determining that Constitution had submitted a complete application (in December 2014 and April 2015), and confirming in July 2015 that Constitution had submitted all necessary application-related information, but then waiting *eight* additional months – until Earth Day, April 22, 2016 – to issue the Denial alleging Constitution's failure to provide necessary information, such that Constitution's application should be remanded to NYSDEC with instructions that NYSDEC must notify USACE that it has waived the Section 401 Certification requirements.

2.      Whether NYSDEC's Denial intrudes upon FERC's exclusive jurisdiction over interstate natural gas pipeline projects, such as the Interstate Project, including routing determinations, and whether NYSDEC's Denial exceeds its narrow authority under Section 401 of the CWA, constituting an impermissible collateral attack on FERC's Certificate of Public Convenience and Necessity authorizing the Interstate Project.

3.      Whether NYSDEC's Denial is inconsistent with federal law, not supported by any legally rational basis, contradicted by record evidence, and arbitrary, capricious, and an abuse of discretion given that NYSDEC:

a. ignored record evidence and relied on outdated submissions;

b. applied its water quality standards in a manner that is fundamentally different than how it has applied them in issuing Section 401 certifications for other interstate natural gas pipeline projects; and

c. misapplied approved state water quality standards.

**STATEMENT OF THE CASE**

This case concerns NYSDEC's Denial of Constitution's application for a Section 401 Certification for a 124-mile interstate natural gas pipeline project from Pennsylvania to New York.[1] On December 2, 2014, FERC issued a Certificate of Public Convenience and Necessity ("Certificate"), authorizing the Interstate Project and determining that it would serve the national public interest by transporting necessary supplies of natural gas to markets in New York and New England. JA____.

Constitution's Section 401 Certification application was triggered by its application to the USACE for a permit under Section 404 of the CWA. 33 U.S.C. § 1344(a), SPA40. Under Section 401, any applicant for a Section 404 permit to construct or operate a facility that may result in a discharge must provide the

---

[1] Approximately 99 miles of the Interstate Project are located in New York State; 25 miles are located in Pennsylvania.

USACE with "a certification from the State in which the discharge originates . . . that any such discharge will comply with" applicable state water quality standards. 33 U.S.C. § 1341(a)(1), SPA36-37.

Starting in April 2012 with its pre-filing process, FERC undertook a complete environmental review of the Interstate Project. NYSDEC actively participated in the FERC review process, submitting nine detailed comment letters to FERC between November 2012 and May 2014. FERC issued a Draft Environmental Impact Statement ("DEIS"), received and considered thousands of comments, and then issued a 450-page Final Environmental Impact Statement ("FEIS") in October 2014. Two months later, on December 2, 2014, FERC issued its Certificate. FERC continues to regulate the Interstate Project by, among other things, monitoring Constitution's compliance with the Certificate's environmental conditions. NYSDEC's review, based solely on the matter of water quality, took even longer.

Pennsylvania issued its Section 401 Certification on September 5, 2014, but NYSDEC, by contrast, delayed its decision until April 22, 2016 when it issued its Denial in a letter signed by John Ferguson, NYSDEC's Chief Permit Administrator. SPA1-14. Constitution submitted its Section 401 Certification application to NYSDEC on August 22, 2013, the same day it submitted its Section 404 permit application to USACE following pre-application consultations with

5

NYSDEC in 2012-2013. Two years and eight months later, following a multitude of detailed technical submissions to NYSDEC, including a comprehensive summary responding to over 15,000 public comments related to Constitution's application, and after NYSDEC twice publicly acknowledged that Constitution had submitted a complete application, NYSDEC denied Constitution's application on grounds that it did not "contain sufficient information to determine" whether Constitution's proposed activities demonstrate compliance with New York's water quality standards.

On May 11, 2016, USACE denied Constitution's application for a Section 404 permit without prejudice, based solely on Constitution's failure to provide a Section 401 Certification for the Interstate Project.[2] Absent a waiver determination from this Court, or a Section 401 Certification from NYSDEC, the Interstate Project, which FERC found to be in the public convenience and necessity pursuant to the NGA,[3] cannot proceed. Constitution seeks a remand to NYSDEC with instructions requiring NYSDEC to notify USACE that NYSDEC has waived the Section 401 Certification requirements or a remand requiring NYSDEC to issue a

---

[2]   Letter from Stephan A. Ryba (USACE) to Lynda Schubring (Constitution) (May 11, 2016), included in the Addendum hereto, ADD15-16.

[3]   Certificate ¶¶ 3, 29, JA___, ___.

Section 401 Certification consistent with the Certification prepared and ready for final signature in July/August 2015, if the Court determines that waiver has not occurred.

## STATEMENT OF FACTS

### I. Statutory Background

This case involves the approval process for an interstate natural gas pipeline governed by the NGA, 15 U.S.C. § 717 *et seq.* The NGA *comprehensively* regulates the transportation and sale of natural gas in interstate commerce. 15 U.S.C. § 717b, SPA15-18; *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01 (1988). Natural gas companies are subject to the *exclusive jurisdiction* of FERC. 42 U.S.C. § 7172(a)(1), SPA51. Pursuant to Section 7 of the NGA, a natural gas company must obtain from FERC a "certificate of public convenience and necessity" before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce. 15 U.S.C. § 717f(c)(1)(A), SPA19. FERC is required to issue a certificate of public convenience and necessity if it finds that the proposed project "is or will be required by the present or future public convenience and necessity," and FERC may attach "to the issuance of the certificate . . . such reasonable terms and conditions as the public convenience and necessity may require." *Id.* § 717f(e), SPA20.

The NGA was amended by the Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109–58, § 313(b), 119 Stat. 594, 689–90 (2005), "to provide natural gas companies with a cause of action in federal court to challenge an agency's order, action, or failure to act with respect to permits necessary for the construction or operation of natural gas projects." *Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 85 (2d Cir. 2006). The EPAct's legislative history shows that Congress acted in response to the difficulty applicants were encountering obtaining required state agency permits for their projects. *Id.* (citing, *inter alia*, Natural Gas Symposium: Symposium Before the S. Comm. on Energy & Natural Res., 109th Cong. 41 (2005)). Indeed, Mark Robinson, Director, Office of Energy Projects, FERC, observed that, prior to the enactment of the EPAct, NGA applicants were subject to "*a series of sequential administrative and State court and Federal court appeals that [could] kill a project with a death by a thousand cuts just in terms of the time frames associated with going through all those appeal processes.*" *Id*. (emphasis added).

The NGA provides that "[e]xcept as specifically provided in" the NGA, "nothing in this chapter affects the rights of States under . . . the [CWA]." 15 U.S.C. § 717b(d), SPA16. Thus, in conjunction with FERC's review of an interstate natural gas project application, FERC requires that the project comply with the requirements of all relevant federal laws, including the CWA. *Islander E.*

*Pipeline Co.*, 482 F.3d at 84.  The NGA establishes FERC as the lead agency for "coordinating all applicable Federal authorizations."   15 U.S.C. § 717n(b)(1), SPA21-22.

One of the federal authorizations required for the Interstate Project is a permit under Section 404 of the CWA, which triggers the requirement for the Section 401 Certification.   33 U.S.C. § 1341(a)(1), SPA36-37.   Section 401 provides a specific and *limited role for states* to address the narrow question of compliance with a state's *federally-approved* water quality standards.

## II.  Factual Background

The Interstate Project is designed to provide up to 650,000 dekatherms per day of clean-burning natural gas and *its capacity is fully subscribed*.  Certificate ¶¶ 1, 8, JA___, ___.   Constitution has made a substantial investment on the Interstate Project, expending more than $396 million to date.[4]

### A.  FERC Review

After conducting an extensive review for more than two years and seven months, FERC issued a Certificate on December 2, 2014, which approved the

---

[4]  Declaration of Lynda Schubring ("Schubring Declaration"), included in the Addendum hereto, ¶ 6, ADD18.  At the time it issued the Certificate to Constitution, FERC found that the Interstate Project represented a $683 million investment by Constitution.  *Id.* ¶ 5, ADD17-18.  Given the passage of time, the Interstate Project now represents a $925 million investment.  *Id.*

9

Interstate Project of approximately 124 miles of 30-inch diameter natural gas pipeline and associated equipment and facilities in Pennsylvania and New York, subject to conditions, including obtaining necessary federal authorizations. Certificate at 45, 51 (Environmental Condition 8) JA___, ____.

At Constitution's request for a pre-filing review, FERC began its comprehensive review and analysis of the proposed Interstate Project in April 2012 through its pre-filing proceeding (FERC Docket No. PF12-9-000) and certificate application review process (FERC Docket No. CP13-499-000). As the lead federal agency under the National Environmental Policy Act ("NEPA"), FERC considered extensive environmental data on the Interstate Project's potential impacts as part of the environmental impact statement process. FERC issued a 400-page DEIS on February 12, 2014. On October 24, 2014, FERC staff issued a 450-page FEIS, which concluded that *any adverse environmental impacts that would result from the Interstate Project "would be reduced to less than significant levels with the implementation of Constitution's . . . proposed mitigation and the additional measures recommended by staff in the final EIS."* FEIS at 1, JA___ (emphasis added).

FERC's FEIS evaluated the Interstate Project's anticipated impact on, among other things: geology; soils; *water resources*; *wetlands*; vegetation; wildlife and *aquatic resources*; special status species; land use, recreation, special

10

interest areas, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; and potential ***cumulative impacts***. *See generally* FEIS, JA____. FERC's FEIS also considered alternative routes for the Interstate Project, compliance and mitigation measures, and other permitting and approval requirements. *Id.*

In its Certificate, FERC adopted the FEIS conclusions and found that "if constructed and operated in accordance with applicable laws and regulations, the projects will result in some adverse environmental impacts, but . . . ***these impacts will be reduced to less-than-significant levels with the implementation of Constitution's and Iroquois'[5] proposed mitigation and staff's recommendations (now adopted as conditions in the attached Appendix A of the order)***." Certificate ¶ 3, JA___ (emphasis added).

NYSDEC actively participated in the FERC proceedings as an intervenor, submitting nine separate comment letters. NYSDEC commented on the Interstate

---

[5] Iroquois Gas Transmission System, L.P. ("Iroquois") filed an application with FERC (Docket No. CP13-502-000) for authorization to construct and operate compression facilities and modify existing facilities at its Wright Compressor Station (the "Wright Interconnection Project"). Certificate ¶ 2, JA___. Iroquois also sought authorization to abandon by lease to Constitution incremental capacity associated with the Interstate Project. *Id.* The Certificate also issued a certificate of public convenience and necessity for the Wright Interconnection Project.

Project during FERC's pre-filing process by letters dated November 7, 2012, March 29, 2013, and May 28, 2013, and commented on the certificate application by letters dated July 17, 2013 and September 25, 2013.[6] NYSDEC commented on the DEIS by letters dated: March 24, 2014; April 7, 2014; April 30, 2014; and May 14, 2014.[7] NYSDEC's submissions requested FERC to consider issues of stormwater runoff and erosion, cumulative impacts, stream and wetland crossing methods, geotechnical feasibility studies, blasting, pipeline depth, and potential impacts to wetlands and streams, all issues raised in NYSDEC's later Denial. NYSDEC also requested that FERC evaluate specific route alternatives, including a routing alternative preferred by NYSDEC.

Importantly, in its comment letters, NYSDEC twice admitted that it "intends to rely upon the federal environmental review prepared pursuant to [NEPA] *to determine if the Project will comply with the applicable New York standards*."[8]

---

[6]   JA___, ___, ___, ___, ___.

[7]   JA___, ___, ___, ___.

[8]   Letter from Patricia J. Desnoyers (NYSDEC) to Kimberly D. Bose (FERC) (Nov. 7, 2012), at 1-2, JA____; Letter from Patricia J. Desnoyers (NYSDEC) to Kimberly D. Bose (FERC) (July 17, 2013), at 1, JA___ (emphasis added).

Pursuant to its authority under 15 U.S.C. § 717n(c), *FERC required all federal authorizations related to the Interstate Project to be issued by January 22, 2015.*

**B.    NYSDEC Review**

**(a)    Constitution's Intensely Interactive Permit Review Process with NYSDEC**

Separately and *in addition to FERC's comprehensive review of the Interstate Project*, Constitution went through an extensive review with NYSDEC as part of its application.  Beginning with initial discussions with NYSDEC back in 2012, Constitution's application to NYSDEC was part of an intensely interactive multi-year process with numerous meetings, conference calls, and field visits.  In the fall of 2014, Constitution and NYSDEC began having regular weekly conference calls, and between December 2, 2014 and July 8, 2015, Constitution had no less than *forty* meetings, conference calls, and field visits with NYSDEC, reflecting significant cooperation and collaboration between Constitution and *all* levels of NYSDEC staff, including its permitting chief, major project manager, and general counsel.[9]  These meetings reflected a clear momentum toward issue resolution and support for NYSDEC's statements to Constitution that it was prepared to issue a permit in July or early August 2015 (see below).

---

[9]    Silliman Declaration ¶ 27, ADD48-49.

13

Prior to Constitution's application, NYSDEC advised Constitution that it would not process the Section 401 Certification application unless Constitution applied for what NYSDEC determined to be necessary state permits.[10] On May 9, 2014, at NYSDEC's request, Constitution withdrew and resubmitted its application. On July 3, 2014, NYSDEC issued a memorandum to Constitution with recommendations for revised materials in support of Constitution's application. Constitution revised its application format as requested and continued to supplement its application to provide additional details to NYSDEC. On November 13, 2014, Constitution and NYSDEC discussed the remaining items to be provided to ensure that the application was complete. Although NYSDEC shared a draft Notice of Complete Application ("NOCA") with Constitution in

---

[10]    *See* Letter from Patricia J. Desnoyers (NYSDEC) to Kimberly D. Bose (FERC) (Nov. 7, 2012), at 1, JA____ ("The Project Sponsor will also be expected to apply for applicable State Law permits as relevant to the resources impacted by the project proposal."). Accordingly, Constitution filed a Joint Application for a Section 401 Certification and other state-based permits on August 22, 2013. On May 16, 2016, concurrently with filing its petition for review with this Court, Constitution filed an action in the United States District Court for the Northern District of New York, Docket No. 16-CV-0568, seeking a declaration that (1) certain New York state permits are preempted by federal law, and (2) Constitution is exempt from NYSDEC's State Pollutant Discharge Elimination System ("SPDES") General Permit. Constitution's claims with respect to preemption and exemption arise under federal law, but they are not encompassed by the special jurisdictional provisions of the NGA that govern the instant action. *See* 15 U.S.C. § 717r(d)(1). Constitution's preemption and exemption claims therefore do not fall within the jurisdiction of this Court.

November 2014, it did not publish a NOCA until December 24, 2014 due to delays in getting approval from the Governor's office.[11]

NYSDEC held three public hearings on Constitution's application in January 2015. The comment period, originally set to close on January 30, 2015, was thereafter extended such that comments were accepted on the Interstate Project through February 27, 2015.

On April 21, 2015, NYSDEC allowed Constitution to review the draft permit that NYSDEC had prepared.[12] Around the same time, NYSDEC reported that it needed additional time to review Constitution's application. NYSDEC assured Constitution that it did not need an additional year to review, but rather only a couple additional months.[13] Accordingly, NYSDEC requested that Constitution withdraw and refile its application, and Constitution again withdrew and resubmitted its Section 401 Certification application to NYSDEC on April 27, 2015.

---

[11] Declaration of Keith Silliman ("Silliman Declaration"), included in the Addendum hereto, ¶¶ 7-9, ADD44; NYSDEC Notice of Complete Application (Dec. 24, 2014), JA___.

[12] Silliman Declaration ¶ 12, ADD45.

[13] Silliman Declaration ¶ 13, ADD45.

Two days later, on April 29, 2015, NYSDEC published a second NOCA informing the public that the "re-submitted application incorporates all application materials previously provided," and that public comments that were previously submitted to NYSDEC did not need to be re-submitted.[14] That same day, NYSDEC issued a press release confirming that Constitution's withdrawal and resubmission of its application would not delay its review.[15]

An additional comment period ensued, closing on May 21, 2015. NYSDEC received written public comments during the two separate comment periods, which Constitution and NYSDEC considered in coordination with ongoing discussions regarding Constitution's applications. Pursuant to guidance from NYSDEC, Constitution prepared a draft Responsiveness Summary, which addressed comments related to water quality, stream crossings, wetlands, pipeline burial depth, alternatives, cumulative impacts, and blasting.[16] Thereafter, NYSDEC told Constitution that it had everything it needed to respond to public comments given Constitution's substantial supplements to its application, including extensive

---

[14]     NYSDEC, Notice of Complete Application (Apr. 29, 2015), JA___.

[15]     NYSDEC, Press Release (Apr. 29, 2015), JA___ ("***DEC's review of the application is ongoing and the applicant's withdrawal and resubmission is not expected to unduly delay the agency's final determination***.") (emphasis added).

[16]     Draft Responsiveness Summary (June 2, 2015), JA___.

additional information regarding streams and wetlands, an updated environmental construction plan, a wetland mitigation plan, geotechnical investigation materials, a trenchless feasibility study,[17] and an analysis of "Alternative Route M" along and near I-88.

Stream crossings were a particular point of emphasis during NYSDEC's review of the Interstate Project. Though already addressed during FERC's review,[18] Constitution had multiple discussions with NYSDEC on stream crossings and potential permit conditions. In March 2015, NYSDEC provided to Constitution a list of twenty streams that it wanted to be crossed via trenchless

---

[17]    The term "trenchless" refers to a method of boring under a stream bed or wetland in order to avoid in-stream or wetland impacts. Horizontal directional drilling ("HDD") is a type of trenchless crossing method. Conversely, dry open-cut crossing methods involve diverting stream flow through flume pipes, dams and pumps, or cofferdams to allow for the excavation of a trench in the dry stream bed. The Certificate is conditioned on the use of both trenchless and dry crossing methods. *None* of the Interstate Project's stream crossings are proposed under wet open cut conditions, which involve trenching within the waterbody under flowing conditions. FEIS at ES-4, 2-16, and 2-20 through 2-22, JA___, ___, ____; Certificate ¶¶ 77-78, JA___.

[18]    Certificate ¶¶ 77-78, JA___ (noting that Constitution's proposal to use trenchless crossing methods for 21 waterbodies "will avoid or adequately minimize impacts on surface water resources"); Certificate at 52 (Environmental Condition 14), JA___.

crossing methods.[19]  An ongoing dialogue regarding stream and wetland crossings continued through July 2015, during which time Constitution continued to work with NYSDEC through multiple conference calls, meetings, and dozens of field visits.  The number of NYSDEC proposed trenchless crossings grew to 26 streams by April 2015 following additional negotiations with NYSDEC.[20]

On May 5, 6 and 20th of 2015, Constitution met with NYSDEC to further discuss stream crossing methods and draft permit conditions,[21] and again on June 11, 2015 and June 22, 2015 to discuss Constitution's proposed trenchless crossings.[22]  Based on proposed re-routes and NYSDEC's agreement to remove certain streams from consideration, the number of streams for analysis was narrowed to 21.[23] Constitution committed to using trenchless crossing methods for those streams to the extent feasible as set forth in a permit condition developed with NYSDEC.  On June 30, 2015, Constitution submitted a Stream Crossing

---

[19]    Email from Chris Hogan (NYSDEC) to Keith Silliman (Constitution) (Mar. 17, 2015), JA___.

[20]    Email from Chris Hogan (NYSDEC) to Keith Silliman (Constitution) (Apr. 20, 2015), JA___.

[21]    Silliman Declaration ¶ 14, ADD45.

[22]    Silliman Declaration ¶ 18, ADD46.

[23]    Email from Stephen Tomasik (NYSDEC) to Lynda Schubring (Constitution) (May 22, 2015), JA___.

Feasibility Analysis matrix evaluating the technical feasibility of using trenchless methods on 21 streams, including four streams where Constitution recommended a dry open-cut[24] due to feasibility concerns.[25] On July 8, 2015, NYSDEC indicated that the matrix was sufficient for review.[26]

Extensive negotiations regarding wetland impact avoidance and mitigation also occurred. To address NYSDEC's concerns regarding wetlands mitigation and in response to NYSDEC's request, Constitution purchased for $475,000 a 70-acre shoreline parcel along Canadarago Lake that was under threat of development in order to preserve, in perpetuity, the high quality wetlands that existed at the site.[27] Constitution also agreed, at NYSDEC's urging, to a 2.9 mile reroute of the pipeline in Delaware County, New York, expending $3,540,000 in order to avoid a particular wetland complex of significant value to NYSDEC, a fact not acknowledged in the Denial.[28] Constitution later submitted a 770-page Wetland Mitigation Plan that NYSDEC neither commented on nor questioned.

---

[24] *See* note 17, *supra*.

[25] NYSDEC Feasibility Assessment Matrix, submitted by Constitution to NYSDEC (June 30, 2015), JA____.

[26] Silliman Declaration ¶ 20, ADD47.

[27] Schubring Declaration ¶¶ 8-9, ADD18.

[28] Schubring Declaration ¶¶ 10-11, ADD18.

### (b) NYSDEC Ready to Issue Certification

By July 2015, it appeared Constitution had satisfied all remaining NYSDEC concerns and the agency was prepared to issue the Section 401 Certification. On July 8, 2015, NYSDEC told Constitution that it expected to issue its permits by the end of July 2015,[29] and on July 28, 2015, NYSDEC advised that having no unresolved substantive issues, it hoped to issue permits to Constitution on August 7, 2015.[30] On August 3, 2015, NYSDEC reiterated it had no remaining issues, and, on August 7, 2015, indicated that although NYSDEC was ready to issue the permits, the Governor's office was not.[31] On August 18, 2015, Constitution was told that the permit had been signed and was merely waiting approval from the Governor's office to be dated and issued.[32] *On August 28, 2015, NYSDEC reported that a public notice for permit issuance had been drafted.*[33]

Despite these statements and representations, and repeated inquiries from Constitution regarding whether there were any outstanding issues, NYSDEC shut

---

[29] Silliman Declaration ¶¶ 19-21, ADD47.

[30] Declaration of Pamela S. Goodwin ("Goodwin Declaration"), included in the Addendum hereto, ¶ 6, ADD20-21.

[31] Silliman Declaration ¶¶ 22-23, ADD47.

[32] Silliman Declaration ¶ 24, ADD48.

[33] Silliman Declaration ¶ 25, ADD48.

down substantive communications with Constitution and took no action for eight additional months until its Denial.[34]

## C. NYSDEC's Denial

Incredibly, NYSDEC's Denial claims that it lacked sufficient information to render a decision regarding potential impacts from Constitution's proposed stream and wetlands crossings even though Constitution had submitted to NYSDEC *tens of thousands of pages, comprising more than 40 gigabytes of information*, in support of Constitution's application. NYSDEC's Denial pretextually claims that it lacked sufficient information regarding:

- construction methods and site-specific project plans for stream crossings (Denial at 8-11, SPA8-11);

- alternative routes (*Id*. at 11, SPA11);

- pipeline burial depth in stream beds (*Id*. at 12-13, SPA12-13);

- procedures and safety measures Constitution would follow in the event that blasting is required (*Id*. at 13, SPA13);

- Constitution's plans to avoid, minimize, or mitigate discharges to navigable waters and wetlands (*Id.* at 13-14, SPA13-14); and

---

[34] Silliman Declaration ¶ 26, ADD48.

21

- cumulative impacts (*Id.* at 3, 5, 7, 14, SPA3, 5, 7, 14).

Yet, NYSDEC did not raise any of these issues in its last substantive call with Constitution in July 2015, nor did it make any additional requests for information in the eight months before its Denial despite repeated inquiries from Constitution on whether any additional information was needed.[35] To the contrary, Constitution representatives were told the application was complete and that NYSDEC had the necessary information, had a permit drafted, and was merely awaiting sign-off by the Governor's office.

### D. USACE Review

Constitution's application to NYSDEC was part of a joint application that was simultaneously submitted to USACE for a Section 404 permit under the CWA. USACE published notice of Constitution's application on March 4, 2014. Although Constitution withdrew and resubmitted its Section 401 Certification application, its application for a Section 404 permit from USACE has been pending since August 2013.

---

[35]    *See* Silliman Declaration ¶ 26, ADD48.

On April 20, 2016, USACE confirmed that it received all of the information it had requested in prior permit review correspondence and that it was waiting only for the Section 401 Certification from NYSDEC.[36]

On May 11, 2016, following NYSDEC's Denial, USACE denied Constitution's application for a Section 404 permit *without prejudice* to the right of Constitution to reinstate USACE's review of the application with submission of a Section 401 Certification from NYSDEC, or the determination of NYSDEC's waiver of the Section 401 requirements.[37]

---

[36] *See* Letter from Stephan A. Ryba (USACE) to Timothy Powell (Constitution) (Apr. 20, 2016), JA____.

[37] Letter from Stephan A. Ryba (USACE) to Lynda Schubring (Constitution) (May 11, 2016), ADD15-16.

## SUMMARY OF THE ARGUMENT

NYSDEC waived its right to take action on Constitution's Section 401 Certification application by failing to act within a reasonable period of time under the CWA and pursuant to the federal authorization deadline established by FERC under the NGA. Despite informing Constitution that it had all the information it needed to issue the permit by July/August 2015, and Constitution's demonstrated commitment to address any and all NYSDEC concerns, NYSDEC waited eight additional months to issue the Denial.

Even if the Court determines that NYSDEC did not waive its right to act, NYSDEC's denial is arbitrary and capricious and an abuse of discretion on several grounds, requiring a remand to take action on Constitution's Section 401 Certification within 5 days.[38] First, it is an impermissible collateral attack on FERC's exclusive jurisdiction over interstate natural gas pipeline projects. *NYSDEC's jurisdiction under Section 401 of the CWA is narrowly circumscribed to consider only the Interstate Project's potential impacts on federally-approved water quality standards* and does not include an opportunity for NYSDEC to

---

[38] In the event the Court determines that waiver has not occurred, at most NYSDEC has 5 days left to act on Constitution's application since NYSDEC issued the Denial 359 days after Constitution resubmitted its application in April 2015.

effectively reconsider and veto FERC's determination regarding routing alternatives, cumulative impacts, stream crossing methods, pipeline burial depth, and blasting.

FERC had already considered alternative routing concerns, including NYSDEC's comments, and determined the final route for the Interstate Project on the basis of many factors including water quality. NYSDEC is now using its 401 certification review as *an impermissible veto of FERC's alternatives decision* and in direct contravention of the NGA. With respect to cumulative impacts, pipeline burial depth, and blasting, NYSDEC not only seeks to second guess FERC's analysis and determination, but it also improperly relies on state statutes and regulations that are not federally-approved water quality standards.

NYSDEC's application of its federally-approved water quality standards also is arbitrary and capricious in that it is fundamentally different than NYSDEC's processing of other applications, contradicted by overwhelming record evidence, and not supported by any legally rational basis.

Indeed, NYSDEC's Denial was not based on any genuine assessment as to whether the Interstate Project met federally-approved state water quality standards. Rather, the Denial constitutes an impermissible veto of FERC's determination under the NGA and exceeds the narrowly prescribed limits of NYSDEC's jurisdiction under Section 401 of the CWA.

25

## ARGUMENT

## POINT I

## STANDARD OF REVIEW

### I.     Waiver of Section 401 Certification

NYSDEC does not administer the CWA and is not entitled to deference on whether it waived its "right" to issue or deny a Section 401 Certification by failing to act within a reasonable period of time.  33 U.S.C. § 1251(d), SPA27; *see also AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 729 (4th Cir. 2009) (a case considering the waiver provision of Section 401 in the context of the NGA, relying on USACE's regulations implementing Section 401 of the CWA "[b]ecause the [USACE] is charged with determining whether to issue … a § 404 permit").  The Court exercises *de novo* review over this issue.  *See Am. Rivers, Inc. v. F.E.R.C.*, 129 F.3d 99, 107 (2d Cir. 1997).

### II.    Denial of Section 401 Certification

The NGA comprehensively regulates the transportation or sale of natural gas in interstate commerce, including the determination whether the construction of interstate pipeline facilities is in the public convenience and necessity.  15 U.S.C. § 717b, SPA15-18; *Schneidewind*, 485 U.S. at 300-01; *Williams Nat. Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 262 (10th Cir. 1989).  Under the NGA, judicial review of a state administrative agency decision to deny an approval

26

required under federal law contemplates whether the agency action "*is inconsistent with the Federal law governing such permit*," and whether the action "would prevent the construction" of an interstate natural gas facility. 15 U.S.C. § 717r(d)(1), (3), SPA24-25 (emphasis added).

In determining whether a state agency action is inconsistent with federal law, the Second Circuit in *Islander E. Pipeline Co.* adopted a two-step approach. First, the court reviews *de novo* whether the agency complied with the requirements of relevant federal law. 482 F.3d at 94. Here, that means determining whether NYSDEC properly applied New York State's water quality standards to Constitution's application. 33 U.S.C. § 1341, SPA36-40. "'If no illegality is uncovered during such a review,' the court then analyzes the state agency's factual determinations" under the arbitrary and capricious standard. *Islander E. Pipeline Co.,* 482 F.3d at 94, 103 (citing *Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir. 2003)); 5 U.S.C. § 706(2)(A), SPA15.

In reviewing an agency's factual determinations, courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). "Additionally, 'courts may not accept appellate

counsel's *post hoc* rationalizations for agency action.'" *Islander E. Pipeline Co.,* 482 F.3d at 95 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 50).

An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Additionally, "if [the agency] announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy . . . could constitute action that must be overturned." *I.N.S v. Yang*, 519 U.S. 26, 32 (1996); *see also Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2003) (finding "[w]hile an agency is not locked into the first interpretation of a statute it embraces, it cannot simply adopt inconsistent positions without presenting some reasoned analysis") (quotation and citation omitted).

**POINT II**

**NYSDEC ACTED TOO LATE, MISSING DEADLINES UNDER BOTH THE NATURAL GAS ACT AND THE CLEAN WATER ACT, REQUIRING A REMAND WITH INSTRUCTIONS THAT NYSDEC MUST NOTIFY USACE WITHIN 5 DAYS THAT IT HAS WAIVED THE SECTION 401 CERTIFICATION REQUIREMENTS**

NYSDEC issued the Denial on April 22, 2016:

- thirty-two months after Constitution submitted its original application;

- sixteen months after NYSDEC publicly noticed its determination that Constitution's application was complete;

- fifteen months after the FERC federal authorization deadline;

- 359 days after NYSDEC reaffirmed its determination that Constitution's application was complete in response to NYSDEC's second request for resubmission; and

- eight months after NYSDEC reported to Constitution that it had everything it needed to issue a Section 401 Certification.

The NGA and the CWA have separate deadlines applicable to NYSDEC's action on Constitution's application, both of which NYSDEC missed. Because NYSDEC acted too late, it waived its right to provide conditions to be included with the USACE 404 Permit, and USACE may exercise its discretion in determining what conditions ought to be applied to the 404 Permit.

## I. NYSDEC's Untimely Action on the Section 401 Certification is Inconsistent with the NGA

The NGA establishes FERC as the lead agency for "coordinating *all* applicable Federal authorizations" to avoid the problems of sequential review and "death by a thousand cuts" that large interstate projects had been subject to previously. 15 U.S.C. § 717n(b)(1), SPA21-22 (emphasis added). Congress made FERC's role clear:

> *Each* Federal and *State agency* considering an aspect of an application for Federal authorization *shall cooperate with the Commission and comply with the deadlines established by the Commission*.

15 U.S.C. § 717n(b)(2), SPA22 (emphasis added).

As lead agency, FERC set a schedule for federal authorizations on August 18, 2014, noting it would issue the FEIS on October 24, 2014 (which it did), and the *decision deadline for all federal authorizations was January 22, 2015*.[39] Because the Section 404 Permit was part of these federal authorizations, and it in turn was dependent upon state 401 certifications being issued, Pennsylvania and New York were required under federal law to meet the January 22, 2015 federal

---

[39] *See* Notice of Revised Schedule for Environmental Review of the Constitution Pipeline and Wright Interconnect Projects (Aug. 18, 2014), JA___.

authorizations deadline.  Pennsylvania issued its Section 401 Certification for the Interstate Project in accordance with that schedule.[40]  New York did not.

NYSDEC's failure to act on Constitution's Section 401 Certification application by the federal authorization deadline of January 22, 2015 violates the NGA and is "inconsistent with Federal law."  15 U.S.C. § 717r(d)(2), SPA25.  "[T]he failure of an agency to take action on a permit required under Federal law *… in accordance with the Commission schedule* established pursuant to Section 717n(c) of this title *shall be considered inconsistent with Federal law for the purposes" of judicial review*, unless the permit is required under the Coastal Zone Management Act.[41]  15 U.S.C. § 717r(d)(2), SPA25 (emphasis added).  The NGA provides a remedy in this situation:

> If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or

---

[40]   44 Pa. Bull. 6287 (Oct. 4, 2014).

[41]   The Coastal Zone Management Act does not apply here.  Further, although § 717b(d) of the NGA provides that nothing in the Act affects the rights of states under the CWA, Clean Air Act, and Coastal Zone Management Act, that carve out does not apply where "*specifically provided in this chapter*." *Id.*, SPA16 (emphasis added).

31

action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

15 U.S.C. § 717r(d)(3), SPA25.

## II.  NYSDEC's Untimely Action on the Section 401 Certification is Inconsistent with the CWA

The deadline in FERC's schedule for federal authorizations does not exempt the Section 401 Certification from NYSDEC, and the ***CWA itself requires a state to make a decision "within a reasonable period of time," not to exceed one year*** or else "the certification requirements of [Section 401] shall be waived."  33 U.S.C. § 1341(a)(1), SPA36-37.  Under Section 401(d) of the CWA, a state may issue a Section 401 certification subject to certain conditions, which "shall become a condition on any Federal license or permit" if it acts within a reasonable period of time.  33 U.S.C. § 1341(d), SPA40; *see also Am. Rivers, Inc.*, 129 F.3d at 102.  Where a state waives its right to act by delaying its decision beyond "a reasonable period of time[,]" the agency responsible for issuing the "Federal license or permit," here the USACE, imposes its own conditions unconstrained by any further conditions of the state.  33 U.S.C. § 1341(a)(1), SPA36-37; *see Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 79 (1st Cir. 1993) ("[T]he price of failing to meet the deadlines is that the state agency waives its right to dictate permit terms that go beyond what" a federal agency "would do on its own."); *see also Airport*

32

*Communities Coal. v. Graves*, 280 F. Supp. 2d 1207, 1215 (W.D. Wash. 2003) (noting "clear congressional intent that federal agencies only be bound by state certification conditions issued within" reasonable period of time); *FPL Energy Maine Hydro, LLC v. DEP*, No. CIV.A. AP-04-50, 2006 WL 2587989, at *8 (Me. Super. May 25, 2006), *aff'd*, 926 A.2d 1197 (Me. 2007) (interpreting *Graves* and stating that "federal agencies are not bound by the decisions when the state fails or refuses to act on a request for certification within a reasonable period of time") (internal quotations omitted); *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, No. C4-97-1676, 1998 WL 481933 (Minn. Ct. App. Aug. 18, 1998) (determining that a 401 certification issued after the deadline had no legal effect).[42]

NYSDEC's argument in its Denial that Constitution's withdrawal and resubmission of the application (done twice at the request of NYSDEC) extended the deadline for action by NYSDEC under the CWA by one year ignores the 60

---

[42]   The legislative history of Section 401 indicates Congressional intent to avoid lengthy delays. *See FPL Energy Maine Hydro LLC v. DEP*, 926 A.2d 1197, 1202 (Me. 2007) (citing sponsor Congressman Edmonson's statement that, without the provision, a state "does not have any particular pressure to compel certification," but with the provision the state must "do away with dalliance or unreasonable delay"); *see also* 115 Cong. Rec. 9259, 9264 (1969). Likewise, Congressman Holifield stated that the provision prevents the state from "simply sit[ting] on its hands and do[ing] nothing." *See FPL Energy Maine Hydro LLC*, 926 A.2d at 1202 (quoting 115 Cong. Rec. 9259, 9265).

day deadline in the regulations implementing the CWA.[43]    33 C.F.R. § 325.2(b)(1)(ii) ("A waiver . . . will be deemed to occur if the certifying agency fails or refuses to act on a request for certification *within sixty days after receipt of such a request . . . .*") (emphasis added); *see also AES Sparrows*, 589 F.3d at 729.

On August 22, 2013, Constitution applied for a Section 401 Certification for the Interstate Project.  At NYSDEC's request, on May 9, 2014, Constitution withdrew and resubmitted its application, after notice from NYSDEC that failure to do so would result in a denial.  NYSDEC then publicly noticed its NOCA for Constitution's application on December 24, 2014.  Approximately three and a half months after issuance of the NOCA, a two month public comment period and three public hearings, NYSDEC again requested that Constitution withdraw and resubmit its application to give NYSDEC additional time to complete its review "due to the extended winter."[44]  In response to NYSDEC's request, Constitution

---

[43]    Denial at 5, SPA5.

[44]    NYSDEC stated the following in an April 29, 2015 press release:

> Due to the extended winter preventing necessary field work by staff, DEC requested additional time to complete its review of any potential impacts on wetlands and water quality. As requested and to continue the substantial progress reviewing the application and supporting

withdrew and resubmitted its application on April 27, 2015. NYSDEC then published a second NOCA on April 29, 2015. This second NOCA did not treat the submission as a *new* application but rather characterized it as a measure to accommodate the agency's ongoing review.

Under the CWA, beginning at the very latest on April 27, 2015, NYSDEC had a "reasonable period of time" – no more than 60 days – to act on Constitution's application. *See AES Sparrows*, 589 F.3d at 729.[45] Here, more than 60 days elapsed after Constitution's valid request for a Section 401 Certification

---

documents that has been made to date, the applicant withdrew and subsequently resubmitted its application with no changes or modifications. DEC's review of the application is ongoing and the applicant's withdrawal and resubmission ***is not expected to unduly delay the agency's final determination***.

(emphasis added), JA___.

[45] Although not applicable to the Interstate Project, NYSDEC's own regulations establish 60 days to make a final decision on a permit application for major projects where a public hearing has been held. 6 NYCRR § 621.10(a)(3), SPA97. The most time that NYSDEC permit application procedures provide, for major projects where no public hearing has been held, is 90 days from the date an application has been deemed complete. *Id.* at § 621.10(a)(2), SPA97; *see also* 16 NYCRR § 1000.8, SPA279-81 (review period under another New York agency's regulations commences after filing of application for Section 401 certification).

without any request from NYSDEC to USACE for additional time.[46] Constitution's resubmission of its application in April 2015 was done at NYSDEC's request, with "no changes or modifications" solely to avoid denial based on NYSDEC's request for "additional time to complete its review." NYSDEC Press Release (Apr. 29, 2015), JA____.[47]

More than two years and eight months transpired since Constitution submitted its original application and sixteen months transpired since NYSDEC publicly announced that it had deemed Constitution's application complete. Furthermore, here the record is clear that NYSDEC assured Constitution it would act within a couple months of the April resubmittal, and itself reported to Constitution that NYSDEC possessed all of the information and data it needed as of early August 2015. Despite this fact, NYSDEC took almost a full year (359

---

[46] Although Constitution supplemented its application in September 2015 to provide additional details, those supplements were based on Constitution obtaining, for the first time, access to certain parcels based on judicial condemnation proceedings. Schubring Declaration ¶ 12, ADD19. The application supplements were made to conform Constitution's site-specific plans to survey data obtained from those sites and resulted in a decrease of 308.38 acres in impacts from the original August 2013 application. *Id.* ¶¶ 12-14, ADD19. NYSDEC did not provide any response, feedback, or questions regarding these supplements. NYSDEC's silence during this period reflects the state's now-revealed desire to improperly delay and then deny the Interstate Project.

[47] Silliman Declaration ¶ 13, ADD45.

days) following Constitution's resubmission to act. Such an extensive time, including eight months of silence in the face of repeated inquiries by Constitution, is well beyond any logical interpretation of "a reasonable period of time." 33 C.F.R. § 325.2(b)(1)(ii), SPA76 (providing that more than 60 days will be permitted *only* if the circumstances so require); *see also* 16 NYCRR § 1000.8(a), SPA279-80 ("When an applicant . . . has requested both a water quality certification from the board and permits from the [USACE] . . ., the board . . . will provide information to the district engineer . . . as to whether circumstances require a period of time longer than the period specified in applicable Federal regulations for the certifying agency to act on the request for certification in order to avoid a waiver.").

In this case, because NYSDEC waived its right to deny or impose binding conditions on the Section 401 Certification by failing to act within the prescribed time period under the CWA, the appropriate remedy is to remand to NYSDEC with instructions that NYSDEC must notify USACE within 5 days that it has waived the Section 401 Certification requirements. USACE may consider NYSDEC's untimely Denial, but is under no obligation to do so.[48]

---

[48] *See, e.g., Airport Communities Coal.*, 280 F. Supp. 2d at 1217; *Puerto Rico Sun Oil Co.*, 8 F.3d at 79; *Minn. Ctr. for Envtl. Advocacy*, 1998 WL 481933; *FPL Energy Maine Hydro, LLC*, 2006 WL 2587989, at *8; Army Corps

**POINT III**

**NYSDEC'S DENIAL EXCEEDS THE SCOPE OF ITS NARROWLY CIRCUMSCRIBED JURISDICTION AND IS AN IMPERMISSIBLE COLLATERAL ATTACK ON FERC'S DECISION**

NYSDEC abused its discretion and acted arbitrarily and capriciously by using its narrowly circumscribed jurisdiction to, in effect, veto a federally approved interstate pipeline project. NYSDEC intervened as a party in the FERC certificate process, submitted comments to FERC, and specifically requested that FERC take certain factors into account in determining whether to approve the Interstate Project. FERC thoroughly considered NYSDEC's concerns in the FEIS and the Certificate.

The *exclusive* mechanism for a party to challenge FERC's issuance of a Certificate of Public Convenience and Necessity is to seek rehearing with FERC, and if dissatisfied with the result, file a petition for review with the United States Court of Appeals. 15 U.S.C. § 717r(a)-(b), SPA23-24; *Sierra Club v. FERC*, --- F.3d ---, No. 14–1249, 2016 WL 3525562, at *6 (D.C. Cir. June 28, 2016). *NYSDEC failed to do either.*

Instead, NYSDEC has collaterally attacked FERC's decision by second guessing FERC's determinations on:

Regulatory Guidance Letter No. 87-03 (Apr. 14, 1987) (http://www.usace.army.mil/Portals/2/docs/civilworks/RGLS/rgl87-03.pdf).

38

- pipeline routing through streams and wetlands;

- stream and wetland crossings methodology;

- cumulative impacts;

- pipeline burial depth; and

- blasting.

In order to illustrate the improper overlap of NYSDEC's review, Constitution includes a Chart in the Addendum to this Brief which identifies where and when NYSDEC raised comments[49] regarding issues already addressed by FERC. ADD50-55.

## I. NYSDEC's Section 401 Jurisdiction is Narrowly Circumscribed under the CWA.

The scope of NYSDEC's jurisdiction to review the Interstate Project, and the basis for its decision to ultimately deny the Section 401 Certification, are limited to the confines of Section 401(a) of the CWA:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into navigable waters, shall provide the licensing or permitting agency a certification from the State . . . that any such discharge will comply with the

---

[49] NYSDEC's comment letters, the FEIS, and the Certificate appear in the Joint Appendix at JA__, __, __, __, __, __, ___, ___, ___, ___, ___.

> applicable provisions of sections 1311, 1312, 1313, 1316,
> and 1317 of this title.

33 U.S.C. §1341(a)(1), SPA36-37.[50] Section 401 limits NYSDEC's jurisdiction to addressing the narrow question of compliance with the state's water quality standards in what is otherwise a "Federally filled universe." *Niagara Mohawk Power Corp. v. State Dep't of Envtl. Conservation*, 82 N.Y.2d 191, 197 (N.Y. 1993), *cert denied*, 511 U.S. 1141 (1994).[51] Despite this narrowly circumscribed authority, NYSDEC grossly exceeded its authority by claiming that Constitution failed to adequately address routing alternatives, cumulative impacts, pipeline depth, and blasting, all of which are within the exclusive jurisdiction of FERC and outside of NYSDEC's jurisdiction under Section 401 of the CWA. Not only are these bases for denial inconsistent with federal law, but they are also arbitrary and capricious.[52]

---

[50] The reference to Sections 1311, 1312, 1313, 1316, and 1317 in Section 401(a)(1) of the CWA refer to provisions of the CWA that are used in establishing a state's water quality standards.

[51] *See also Islander E. Pipeline Co.*, 482 F.3d at 104 (addressing Connecticut's concession that reliance on a state statute was not grounded in the state's water quality standards).

[52] The fact that the basis for the Denial is preceded by speculation about what may occur in the future as a result of global climate change and other impacts that could occur if Constitution fails to follow FERC-required plans underscores the capriciousness with which NYSDEC denied the Section 401 Certification. Denial at 3, 4, 8, 12, 13, SPA3, 4, 8, 12, 13.

The New York Court of Appeals has held, in a case directly on point, that NYSDEC's Section 401 review is limited to those water quality standards approved by the United States Environmental Protection Agency ("EPA"). *Niagara Mohawk*, 82 N.Y.2d at 197.[53] In *Niagara Mohawk*, NYSDEC argued that its jurisdiction under Section 401 extended beyond New York's EPA-approved water quality standards to include application of New York's Environmental Conservation Law ("ECL") in connection with the FERC licensing of hydroelectric dams under the Federal Power Act,[54] 82 N.Y.2d at 195, but the New York Court of Appeals resoundingly rejected NYSDEC's position stating:

> Settled law in New York has consistently supported the view that section 401 gives the State regulatory entity only a limited role of review, based on requirements affecting water quality, not on all State water quality provisions. Review by State agencies that would overlap or duplicate the Federal purview and prerogatives was not contemplated and would infringe on and potentially conflict with an area of the law dominated by the nationally uniform Federal statutory scheme.

---

[53] New York's EPA-approved water quality standards are limited to 6 NYCRR Parts 700-706, SPA101-278 (https://www.epa.gov/wqs-tech/water-quality-standards-regulations-new-york).

[54] These ECL provisions establish standards regarding the State Environmental Quality Review Act (Article 8); fish and wildlife (Article 11); disturbance of stream beds, dam construction, excavation or fill, dam safety, and reservoir release (Article 15); and freshwater wetlands (Article 24).

*Id.* at 196.  The New York Court of Appeals recognized that allowing NYSDEC to apply other state laws as part of its review would require an "applicant to supply information only indirectly related to water quality," and concluded that NYSDEC's review is limited to compliance with EPA-approved water quality standards.  *Id*. at 198, 201; *see also id.* at 200 (noting that NYSDEC conceded that its approved water quality standards are "linked and found only in 6 NYCRR Parts 701 to 704").

Here, NYSDEC claims that it lacks information regarding routing alternatives, cumulative impacts, pipeline burial depth, and blasting, improperly relying on regulations and New York State laws that are ***not*** EPA-approved water quality standards.  This attempt to exercise a "veto power" over federal determinations (here, FERC) was expressly rejected by the lower court decision affirmed in *Niagara Mohawk*:

> When the actual provisions of the ECL which DEC seeks to invoke are examined, it is clear that they address the very matters that have been reserved by the [Federal Power Act] for determination at the Federal level . . . . [E]nvironmental and conservation factors of concern to a State are to be weighed at the Federal level; to allow them to serve as a predicate for a State 'veto' of the project is indefensible for it would effectively undermine the intent of Congress.

*Niagara Mohawk Power Corp. v. NYSDEC*, 187 A.D.2d 7, 11 (3d Dep't 1993), *aff'd*, 82 N.Y.2d 191 (N.Y. 1993).

Just as NYSDEC cannot assert jurisdiction under Section 401 as a backdoor to undermine the outcome of FERC's review and approval of the Interstate Project, it cannot use Section 401(d) to apply other State laws in its review, even those generally related to water quality. In *Niagara Mohawk*, where the question was the scope of NYSDEC's jurisdiction to review the application (as opposed to conditioning a Certification), the Court of Appeals held that Section 401(d) did not apply. *Niagara Mohawk*, 82 N.Y.2d at 199-200.

The United States Supreme Court addressed the limits of Section 401(d) in *PUD No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700 (1994), where it held the State of Washington under Section 401(d) had the authority to ***condition***, as opposed to apply state laws during its review of, a water quality certification to ensure compliance with state water quality standards. *Id*. at 710. NYSDEC agrees, since it has argued, post-*PUD*, that the Supreme Court's decision did not change the state of the law under *Niagara Mohawk*. *See* Brief for Respondent (submitted by then-Attorney General Andrew Cuomo), *E. Niagara Project Power Alliance v. NYSDEC*, 840 N.Y.S.2d 225 (3d Dep't 2007), included in the Addendum hereto, at 24, ADD11 ("There is nothing in [the *PUD*] decision suggesting that state review authority in issuing [Section 401 certifications] extends beyond issues related to water quality."). The New York State Supreme Court (Appellate Division) also agreed, finding that NYSDEC's jurisdiction is limited to considering New York's

EPA-approved water quality standards. *E. Niagara Project Power Alliance v. NYSDEC*, 840 N.Y.S.2d 225, 228 (3d Dep't 2007).

Thus, not only is NYSDEC's stated position here inconsistent with federal law, it also is arbitrary and capricious because it directly contradicts NYSDEC's previous positions taken in other courts. *See Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 95 (2d Cir. 2001) (inconsistent application of agency standards to similar situations "evinces such a lack of rationality as to be arbitrary and capricious").

## II. Alternative Routes

NYSDEC inaccurately claims that Constitution failed to substantively analyze alternative routes and that it "repeatedly asked Constitution to analyze alternative routes" but Constitution "failed to substantively address these concerns." Denial at 2-3, n.5, 11, SPA2-3, 11.[55] The Denial references "Alternative M" which was specifically rejected by FERC.[56] NYSDEC never challenged FERC's determination.

---

[55] These claims by NYSDEC are wholly inaccurate as demonstrated below on pages 46-47, *infra*.

[56] "Constitution's unwillingness to adequately explore the Alternative M route alternative … means that the Department is unable to determine whether an alternative route is actually more protective of water quality standards." Denial at 11, SPA11; *see* FEIS, Volume 3, Appendix S, Part 2, SA4-2, JA___.

44

NYSDEC's Denial is inconsistent with federal law in that it seeks to misuse the Section 401 Certification to circumvent FERC's exclusive authority to route an interstate natural gas pipeline project. *Schneidewind*, 485 U.S. at 300-01; *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472 (1st Cir. 2009); *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*, 894 F.2d 571, 579 (2d Cir. 1990).

NYSDEC claims that its staff "conducted a review that found that Alternative M could reduce overall impacts to water bodies and wetlands when compared to Constitution's preferred route," Denial at 2-3, n.5, SPA2-3, which is the same comment it made to FERC.[57] FERC specifically rejected NYSDEC's comments (*see* FEIS, Volume 3, Appendix S, Part 2, SA4-2, JA___), articulating why it did not find Alternative M to be preferable to the proposed route, and noting that FERC "completed numerous in-field reviews of the topographical constraints associated with Alternative M on foot, by car along I-88, and by helicopter." *Id.* FERC concluded that comparison of impacts on waterbodies and wetlands "was one of several environmental parameters supporting our conclusion that the Alternative M segments were not preferable to the proposed route segments." *Id.*

---

[57] Comment letter from NYSDEC to FERC (Sept. 25, 2013), at 1-2, JA___; Comment letter from NYSDEC to FERC (Apr. 7, 2014), at 1-5, JA___.

at SA4-3, JA___. Both the New York State Department of Transportation and the Federal Highway Administration also strongly voiced their safety and operational concerns associated with the Alternative M routing advocated by NYSDEC.[58]

In addition, the record belies NYSDEC's claim that Constitution failed to substantively analyze alternative routes. Constitution submitted to NYSDEC a 582-page analysis of Alternative M, addressing NYSDEC's request that Constitution analyze Alternative M's constructability and environmental impact, in June 2014.[59] ***NYSDEC never commented on this submission to either Constitution or FERC, and did not seek rehearing of FERC's Certificate.*** Rather, it waited until the Denial, almost two years later, to unjustifiably claim that Constitution was "unwilling" to "adequately explore the Alternative M route alternative," and thus "the Department is unable to determine whether an alternative route is actually more protective of water quality standards." Denial at 11, SPA11. Thus, the Denial is an impermissible collateral attack and the claims in

---

[58] *See* Letter from Lynda Schubring (Constitution) to Patricia J. Desnoyers (NYSDEC) (Oct. 22, 2013), JA___ (describing routing constraints associated with Alternative M and enclosing agency correspondence).

[59] *See* Constitution's Response to NYSDEC's Scope of Work (June 16, 2014), JA___.

NYSDEC's Denial regarding failure to analyze alternatives are contradicted by the record.

## III. Cumulative Impacts

NYSDEC's Denial inaccurately states that Constitution did not supply adequate information to assess the cumulative impact of the Interstate Project. Denial at 3, 5, 7, 12, 14, SPA3, 5, 7, 12, 14. NYSDEC asserts that it "is guided by statute" to "take into account the cumulative impact to water quality of the full complement of affected water resources" in reviewing an application for a water quality certification, relying solely on ECL § 3-0301(1)(b). Denial at 7, 14, SPA7, 14.

NYSDEC's Denial on this basis is without legal or factual support. First, NYSDEC's reliance on ECL § 3-0301 is impermissible because it is not an EPA-approved water quality standard. New York's limited jurisdiction under Section 401 is to certify that any discharge related to a necessary federal license or permit will comply with New York's **water quality standards**. 33 U.S.C. § 1341(a)(1), SPA36-37. Otherwise, the comprehensive and preemptive federal regulation under the NGA would be rendered meaningless. **New York State courts agree**.[60] *See*

---

[60] *Niagara Mohawk Power Corp. v. NYSDEC*, 82 N.Y.2d 191, 193-94 (N.Y. 1993) *affirming Niagara Mohawk Power Corp. v. NYSDEC*, 592 N.Y.S.2d 141 (3d Dep't 1993); *Chasm Hydro, Inc. v. NYSDEC*, 872 N.Y.S.2d 235,

*also U.S. Army Corps of Eng'rs v. Hawkes Co, Inc.*, 136 S. Ct. 1807, 2016 WL 3041052, at \*8 (May 31, 2016) (Kennedy, J., concurring) ("[T]he reach and systemic consequences of the Clean Water Act remain a cause for concern.").

Second, the review of cumulative impacts associated with interstate projects "is a task assigned to the special competency of" FERC. *Sierra Club v. FERC*, --- F.3d ---, No. 14-1275, 2016 WL 3524262, at \*9 (D.C. Cir. June 28, 2016). FERC directly, and extensively, considered cumulative impacts in making its decision to issue the Certificate. *See* Certificate ¶¶ 72, 102-07, JA__, ____; FEIS Section 4.13, JA___; Chart, ADD55.

## IV. Pipeline Depth

Despite the record, which contains plans showing depth of cover for *every* stream crossing, NYSDEC claims in its Denial that Constitution "only provided a limited analysis of burial depth for 21 of the 251 New York streams" despite the fact that NYSDEC "requested that Constitution provide a comprehensive and site-specific analysis of depth of pipeline burial," without identifying when or where that request was made. Denial at 13, SPA13. NYSDEC asserts that "[w]ithout a site-specific analysis for the potential for vertical movement of each stream

---

236 (3d Dep't 2009); *E. Niagara Project Power Alliance v. NYSDEC*, 840 N.Y.S.2d 225, 228 (3d Dep't 2007); *Matter of Erie Blvd. Hydropower, L.P. v. Stuyvesant Falls Hydro Corp.*, 816 N.Y.S.2d 224, 227 (3d Dep't 2006).

crossing to justify a burial depth, NYSDEC is unable to determine whether the depth of pipe is protective of State water quality standards and applicable State statutes and standards." *Id*.

NYSDEC does not cite to any particular water quality standard that forms the basis for its concern, nor is there any apparent relevance to NYSDEC's water quality standards, since an exposed pipe would not be a "discharge." *See Or. Natural Desert Ass'n v. USFS*, 550 F.3d 778, 783-84 (9th Cir. 2008); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 963 (9th Cir. 2006). NYSDEC's regulations do not require a specific pipe burial depth, nor could they, since burial depths are set by the U.S. Department of Transportation and FERC. *See* Certificate ¶ 97, JA\_\_\_; 49 C.F.R. Part 192 (Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards); *see also* FEIS at 4-55, JA\_\_\_. For that reason, NYSDEC addressed its comments regarding burial depth to FERC.[61] Constitution's application sets forth the specifications for depth of cover, *see* Joint Permit Application, Table 2.2-1, and Constitution's alignment

---

[61] Letter from Patricia J. Desnoyers, Esq. (NYSDEC) to Kimberly D. Bose (FERC) (Nov. 7, 2012), at 4, n.3, JA\_\_\_\_ ("NYSDEC has witnessed pipeline installations where pipeline became exposed …"); Letter from Patricia J. Desnoyers, Esq. (NYSDEC) to Kimberly D. Bose (FERC) (May 28, 2013), at 2, JA\_\_\_; Letter from Patricia J. Desnoyers, Esq. (NYSDEC) to Kimberly D. Bose (FERC) (July 17, 2013), at 4, JA\_\_\_.

49

sheets depict the route of the pipeline, show the depth of cover for *all pipe locations* and include site-specific plan and profile drawings *for each crossing*. Further, Constitution's proposal to bury the pipeline a minimum of 60 inches in soil below streams and rivers is the same depth associated with another FERC-regulated pipeline project recently certified under Section 401 by NYSDEC.[62] An agency bears a heavy burden when it departs from prior precedent. *Ellis v. Chao*, 336 F.3d 114, 126 (2d Cir. 2003). NYSDEC makes no effort to explain how Constitution's application is different than the other FERC-regulated pipeline project for which it issued a Section 401 Certification.

In addition to being outside of its narrowly circumscribed Section 401 jurisdiction, NYSDEC's claim that it did not have sufficient information related to burial depth is contradicted by record evidence, rendering its reliance on this claim also arbitrary and capricious and inconsistent with federal law. *Islander E. Pipeline Co.*, 482 F.3d at 102.

---

[62] *See* NYSDEC Environmental Bulletin Notice for Tuscarora Pipeline (Empire Pipeline, Inc.) (Aug. 27, 2014) ("Pipe will be buried under streams to a minimum depth of 5 feet."), available at http://www.dec.ny.gov/enb/20140827_reg8.html#846990006400001. NYSDEC issued its Section 401 water quality certification for the Tuscarora Pipeline project on October 3, 2014.

## V.  Blasting Plan

Without citation to any water quality standard, NYSDEC claims that "[d]ue to the lack of specific blasting information needed for review with respect to associated water bodies, NYSDEC is unable to determine whether [Constitution's Blasting] Plan is protective of State water quality standards and in compliance with applicable State statutes and standards."  Denial at 13, SPA13.

NYSDEC fails to identify any water quality standard that applies to potential blasting activities because there is none.  Article 15, NYSDEC's self-described basis for regulating blasting, is not an EPA-approved water quality standard.  NYSDEC also fails to acknowledge that FERC directly considered, and addressed in a condition, NYSDEC's request for site-specific blasting plans ***prior to*** commencement of construction:

> ***Prior to in-stream blasting at any waterbody crossing***, Constitution shall file with the Secretary for review and approval of the Director of OEP, a site-specific Blasting Plan that provides protocols for in-stream blasting and the protection of the fisheries and aquatic resources and habitat. These plans shall be developed in consultation with applicable state resource agencies.

Certificate at 54 (Environmental Condition 27), JA___ (emphasis in original); *see* Chart, ADD54.

Constitution has already developed a general blasting plan that outlines the procedures and safety measures required in the event that blasting is required.[63] Constitution's FERC-required approach to blasting on a site-specific basis is consistent with the interactive consultation during this review process. As NYSDEC's Fisheries Manager, stated:

> [W]e will allow blasting if needed in dewatered trenches in our Art 15 permits given the following stipulation: We will want to witness the first blasting to confirm that minimal impact to biota is occurring. If we find anything that needs changing, we would hope to be able to work together to make any needed operational changes.[64]

Thus, not only does the Denial exceed NYSDEC's authority since there is no EPA-approved water quality standard related to blasting, it is in conflict with the approach approved by FERC, and it directly contradicts the record evidence. Therefore, NYSDEC's denial on this basis is without jurisdiction, inconsistent with federal law, arbitrary and capricious, and an abuse of discretion.

---

[63] Environmental Construction Plan, Section 4.9 and Attachment 10 (Blasting Plan), JA___, ___.

[64] Email from Chris Van Maaren (NYSDEC) to Chris Newhall (consultant for Constitution) (Mar. 3, 2014), JA___.

**NYSDEC'S DENIAL IS CONTRADICTED BY RECORD EVIDENCE, NOT SUPPORTED BY LEGALLY RATIONAL BASES AND ARBITRARY AND CAPRICIOUS**

**I.     Constitution Supplied Sufficient Information Regarding Stream Crossing Methods.**

NYSDEC claims that Constitution failed to provide "required site-specific information for each of the 251 streams impacted by the Project" (Denial at 8, SPA8), adding "that **all** 251 stream crossings must be evaluated for environmental impacts" and "that trenchless technology was the preferred method for stream crossing," despite the fact that FERC had considered, and rejected, requiring trenchless crossings for each stream. Denial at 8, SPA8; FEIS, 4.3.3.4, 4.3.3.5, 4.3.3.6, 4.13.6.2, JA___, ____, ___, ___.[65] The Denial included a table that NYSDEC asserts "identified the need to provide information so that [NYSDEC] could evaluate trenchless stream installation methods." Denial at 8-10, SPA8-10. The last entry, from February 5, 2015, misleadingly states that Constitution's analysis excludes "streams up to 30 feet wide from analysis and did not provide

---

[65]     The Denial incorrectly refers to 251 as the number of streams to be crossed, which is outdated and not reflective of the application in NYSDEC's possession, which identifies 268 surveyed pipe crossings and 2 access road crossings. *See* Joint Permit Application, Attachment J, Waterbody and Wetland Impacts Master Table, JA___. Further, NYSDEC fails to point out that of the streams to be crossed, 103 are "road ditches or … are unsuitable for aquatic life propagation." FEIS at 4-92, JA___.

detailed information of the majority of streams." Denial at 10, SPA10. These bases for the Denial are contradicted by the record and are so fundamentally untrue as to constitute an abuse of discretion by NYSDEC.

NYSDEC's claims ignore FERC's findings regarding trenchless crossings, and the three-year-plus dialogue between Constitution and NYSDEC that began in 2012, and included weekly meetings, numerous field visits, written correspondence, emails, and conference calls, all in accordance with NYSDEC's historical and standard practice for processing applications. At NYSDEC's request, in 2013, Constitution prepared a Waterbody Table identifying specific information on waterbody crossings based on the route alignment at that time and to the extent those crossings were accessible. Again in 2014, at NYSDEC's request, Constitution submitted additional information in Appendix J of the supplemental Joint Application, which consisted of an analysis for all waterbody crossings at the time, including conceptual drawings of trenchless crossings. This Wetland and Waterbody Impact Master Table included the information NYSDEC requested, identified specific wetland and stream resources by latitude and longitude, cross-referenced the site-specific USACE drawings and Constitution's

detailed alignment sheets, and identified specific NYSDEC best management practices to be implemented during construction and restoration.[66]

By the end of 2014 and early 2015, as additional access on private property was obtained, Constitution began the development of a series of analyses of trenchless feasibility for stream crossings identified by NYSDEC. Constitution met with NYSDEC staff to discuss not only technical feasibility considerations, but also environmental considerations for trenchless construction, particularly the increased amount of clearing required compared to the traditional dry open-cut method. Ultimately, a three-phase analysis was provided to NYSDEC in February 2015, that narrowed down the number of streams for consideration based on a sequential series of factors, including, among other things, whether the stream's width justified the amount of additional clearing required for trenchless installation.

Following this analysis and additional dialogue, on March 17, 2015, NYSDEC's Project Management Chief sent an email to a Constitution consultant

---

[66] Joint Permit Application, Attachment J, Waterbody and Wetland Impacts Master Table, JA___; *see also* Memorandum from Stephen Tomasik (NYSDEC) to Greg Hufnagel (Constitution) (July 3, 2014), JA___ (regarding NYSDEC recommendations for Constitution to prepare revised application materials).

identifying 20 crossings to be conducted via a specific trenchless crossing method:[67]

> As we discussed **attached is the list [*of*] streams that the Department wants crossed via HDD** [horizontal directional drilling].  While the attachment indicates the streams must be crossed via HDD the Department is still expecting an evaluation as to whether an HDD is technically feasible for each of these streams.[68]

This number of streams increased to 26 streams in a second email on April 20, 2015.[69]  Two months later, on May 22, 2015, based on Constitution's submissions, including a draft analysis of all 26 streams identified by NYSDEC, additional dialogue, and field visits, NYSDEC agreed to remove four streams from consideration for trenchless construction.[70]  An additional stream was removed

---

[67]    See note 17, *supra*.

[68]    Email from Chris Hogan (NYSDEC) to Keith Silliman (Constitution) (Mar. 17, 2015), JA___ (emphasis added); Silliman Declaration ¶ 11, ADD45.

[69]    Email from Chris Hogan (NYSDEC) to Keith Silliman (Constitution) (Apr. 20, 2015), JA___.

[70]    *See* email from Stephen Tomasik (NYSDEC) to Lynda Schubring (Constitution) (May 22, 2015), JA___ ("As a follow-up to our meeting Wednesday and receipt of the Trenchless Feasibility Assessment, please be advised that as a result of field visits conducted on May 12, 2015, including staff from Constitution, DEC and USACE, **DEC agrees to eliminate the following streams for further consideration for trenchless crossing methods**.") (emphasis added).

from consideration due to a reroute of the pipeline, bringing the total number of streams for consideration down to 21.

Further negotiations resulted in an agreement between NYSDEC and Constitution, whereby Constitution agreed, despite FERC's finding that trenchless crossings were not required, to perform trenchless crossings at great additional expense at the 21 streams identified by NYSDEC where it was feasible to do so, taking into account construction, environmental, and safety concerns. This agreement was codified in a draft permit condition, negotiated between Constitution and NYSDEC and which required additional geotechnical analysis to confirm feasibility, which Constitution would submit, post-permit issuance.[71]

On June 30, 2015, Constitution submitted to NYSDEC a Stream Crossing Feasibility Analysis matrix of the remaining 21 streams and the recommended crossing methods based on Constitution's technical feasibility analysis.[72] The

---

[71] Silliman Declaration ¶ 17, ADD46.

[72] *See* NYSDEC Feasibility Assessment Matrix, submitted by Constitution to NYSDEC (June 30, 2015), JA____. The Certificate required Constitution to use trenchless crossing methods at 21 locations. Certificate ¶ 77, JA___; Certificate at 52 (Environmental Condition 14), JA___; FEIS, Appendix K, JA___. Of the 21 streams identified by NYSDEC and reflected in the Feasibility Assessment Matrix, only 3 were identified by FERC as requiring additional feasibility analysis. Thus, Constitution agreed, pursuant to the negotiated permit condition, to analyze and implement where feasible trenchless crossing methods at 18 additional streams.

matrix set forth Constitution's basis for each recommended stream-specific crossing method and articulated Constitution's site-specific analysis, including site-specific safety concerns. During a conference call between NYSDEC and Constitution on July 8, 2015, NYSDEC's Project Manager reported that the *matrix was sufficient for review*, and that NYSDEC had no comments on the Responsiveness Summary.[73]

During this process, NYSDEC also proposed a permit condition that would have set conditions for temporary stream crossing bridges and the depth of abutments in stream banks, which Constitution accepted. This accepted condition, together with Constitution's alignment sheets, which include site-specific details for the entire route of the pipeline, directly contradict NYSDEC's assertion that Constitution did not address the specific location of access roads, temporary crossings, and the depth of abutments in streams, among other details identified in these site-specific alignment sheets.[74] In addition, Constitution's Environmental

---

[73] Silliman Declaration ¶ 20, ADD47.

[74] Email from Chris Hogan (NYSDEC) to Keith Silliman (Constitution consultant) (July 29, 2015), JA___; Email from Keith Silliman to Chris Hogan (July 30, 2015), JA___ ("the temporary bridging conditions are fine"); *see also* Joint Permit Application, Attachment C, Full Size Project Drawings, including drawings 35 and 36 (depicting access road locations), JA___.

Construction Plan ("ECP"), filed with FERC, is based on NYSDEC's Standards and Specifications for Erosion and Sediment Control (a/k/a the "Bluebook"). The ECP includes Constitution's Stormwater Pollution Prevention Plan ("SWPPP") and outlines the Best Management Practices ("BMPs") that Constitution will implement before, during, and after construction to minimize erosion of disturbed soils and transportation of sediment outside of the construction right-of-way and into environmentally sensitive areas such as wetlands and streams.[75] This includes site-specific drawings that depict the location and configuration of the Interstate Project workspace and specific Bluebook BMPs. Significantly, compliance with the Bluebook standards "*will control discharges necessary to meet applicable water quality standards*." *See* NYSDEC SPDES General Permit for Stormwater Discharges, Part 1.D, http://www.dec.ny.gov/chemical/43133.html#Permit (emphasis added).

Remarkably, the Denial *makes no reference to Constitution's site-specific plans and drawings associated with the SWPPP*, which Constitution incorporated into its ECP. These plans and drawings, which are designed to ensure that all applicable water quality standards are met, including the protection of the best

---

[75] *See* Constitution's Environmental Construction Plan (updated Sept. 15, 2015).

usages of affected waters, directly contradict NYSDEC's assertions. NYSDEC's failure to even acknowledge these plans and drawings demonstrates that NYSDEC's Denial is arbitrary and capricious and an abuse of discretion. *Islander E. Pipeline Co.*, 482 F.3d at 97 (finding agency's failure to respond to contradictory data in the record arbitrary and capricious).

Following these submissions in July 2015, and NYSDEC's statements that it had all of the information it needed to render a decision, NYSDEC then ceased any meaningful communications with Constitution until eight months later when it issued the Denial. Even NYSDEC's submitted record for this proceeding with respect to trenchless crossings effectively ends in July 2015, the same time NYSDEC officials indicated a permit was ready for issuance. *See* Statement of Facts, *infra*.

NYSDEC's Denial conveniently ignores the fact that NYSDEC did not seek any further information from Constitution after July 2015. Instead, NYSDEC reverts to an impermissible collateral attack on the FERC-approved route. *See* Denial at 11, SPA11. This political decision, essentially driven by the Governor's office, is not based on New York's water quality standards. As such, this decision is arbitrary and capricious. *Yi Lin v. U.S. Citizenship & Immigration Servs.*, 246 F. App'x 68, 69 (2d Cir. 2007); *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 89 (2d Cir. 2000); *Petroleum Commc'ns, Inc. v. F.C.C.*, 22 F.3d 1164, 1172 (D.C. Cir.

1994); *see also Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 533-34 (2007) (agency action must be justified by science and not political influences); *see also Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011) ("[S]ometimes political pressure crosses the line and prevents an agency from performing its statutorily prescribed duties.").

## II. Constitution Supplied Sufficient Information Regarding Wetland Crossings.

Ignoring a 770-page Wetland Mitigation Plan and hundreds of additional pages of plan drawings that provide site-specific data for each wetland along the pipeline route, including the delineation of each wetland, calculations for temporary and permanent impacts to wetlands, and mitigation for unavoidable temporary and permanent impacts,[76] NYSDEC claims, without citation to the record, that "Constitution's Application does not demonstrate that wetland crossings will be performed in a manner that will avoid or minimize discharges to navigable waters that would violate water quality standards, including turbidity," and contends that "[a]bsent detailed information for each wetland crossing that demonstrates Constitution properly avoided, minimized and mitigated impacts to

---

[76] *See* Wetland Mitigation Plan, New York (updated September 2015), JA___; Environmental Construction Plan, Attachment E (Waterbody and Wetland Crossing Site Specific Drawings).

wetland and adjacent areas, the Application does not supply the Department with adequate information to assure that streams and water bodies will not be subject to discharges that do not comply with applicable water quality standards." Denial at 13-14, SPA13-14.

The Wetland Mitigation Plan notes that "[n]o fill or permanent loss of NYSDEC wetlands or waterbodies is proposed" and that "[c]onsidering the nature of the proposed impacts and the onsite measures proposed, the offsite mitigation is expected to result in net functional lift of NYSDEC wetlands." *See* Wetland Mitigation Plan, Section 6.0, JA____.

This final Wetland Mitigation Plan was the subject of significant discussion and negotiation with both NYSDEC and USACE. The USACE was satisfied with the information Constitution provided for purposes of its review under Section 404 of the CWA.[77] Further, NYSDEC indicated that Constitution's Wetland Mitigation Plan would adequately mitigate against potential impacts through Constitution's agreement to purchase and preserve a 70-acre shoreline property along Canadarago

---

[77] *See* Letter from Stephan A. Ryba (USACE) to Timothy Powell (Constitution) (Apr. 20, 2016), JA___.

Lake in Otsego County.[78]  Constitution also agreed to a 2.9 mile reroute of the

pipeline at NYSDEC's urging, costing $3,540,000, in order to avoid a particular

wetlands complex, a fact not mentioned in NYSDEC's Denial.[79]

Tellingly, NYSDEC never commented on the final Wetland Mitigation Plan.

Instead, NYSDEC waited until it issued the Denial to claim that Constitution's

application lacked sufficient information.  NYSDEC's Denial is contradicted by

the record, completely unsupported by the facts or the law, and is arbitrary and

capricious and an abuse of discretion.

### III.  NYSDEC's Application of its Regulations is in Direct Contrast to its Prior Application for Other Similarly Situated Projects.

NYSDEC's denial of Constitution's application is arbitrary and capricious

because NYSDEC applied its standards in a fundamentally different manner than

in prior determinations, including the processing of other applications for Section

401 certifications for other natural gas pipeline infrastructure projects where

NYSDEC issued Section 401 certifications.

---

[78]  Silliman Declaration ¶¶ 15-16, ADD46; Memorandum from Lynda Schubring (Constitution) to Stephen Tomasik (NYSDEC) (June 16, 2015) at 2, JA___.

[79]  Letter from Lynda Schubring (Constitution) to Stephen Tomasik (NYSDEC) (July 8, 2015), JA___.

On May 5, 2015, NYSDEC approved a 401 certification for the FERC-regulated Algonquin Incremental Market Project, which involved crossing 34 streams and 77 wetlands.[80] In so doing, NYSDEC approved the use of dry open-cut crossing methods for 33 of 34 stream crossings.[81] Similarly, on October 3, 2014, NYSDEC approved open trench crossing methods for 17 of the 19 streams crossed by the FERC-regulated Empire Pipeline Tuscarora Lateral Project.[82] NYSDEC also approved dry-open cut crossing methods for 15 of the 17 streams in connection with the FERC-regulated Empire Pipeline Tioga County Extension Project.[83]

Here, by contrast, the Denial is based on a claimed preference for trenchless crossing methods *at every stream crossing*, despite FERC's contrary findings and NYSDEC's approach with other pipeline projects. Denial at 8, SPA8; FEIS,

---

[80] *See* NYSDEC Permit issued to Algonquin Gas Transmission LLC (Permit ID 3-9903-00099/00003) (May 5, 2015), included in the Addendum hereto, ADD22-30.

[81] NYSDEC Environmental Notice Bulletin, Algonquin Gas Transmission, LLC, Dec. 31, 2014 (available at http://www.dec.ny.gov/enb/20141231_not3.html).

[82] *See* NYSDEC Permit issued to Empire Pipeline Inc. (Permit ID 8-4699-00064/00002) (Oct. 3, 2014), included in the Addendum hereto, ADD31-42.

[83] Environmental Notice Bulletin, Empire Pipeline, Inc., August 27, 2014 (available at http://www.dec.ny.gov/enb/20140827_reg8.html).

4.3.3.4, 4.3.3.5, 4.3.3.6, 4.13.6.2, JA\_\_\_, \_\_\_, \_\_\_, \_\_\_. NYSDEC fails to explain how Constitution's application, which included detailed, site-specific alignment sheets and construction drawings and associated site-specific erosion and sedimentation controls, differed from these other interstate pipeline projects for which NYSDEC issued a Section 401 certification.[84]

NYSDEC bears a heavy burden to explain why its departure from prior precedents is rational, given the high level of site-specific detail presented in Constitution's application. *See Ellis v. Chao*, 336 F.3d 114, 126 (2d Cir. 2003); *Doyle v. Brock*, 821 F.2d 778, 783 (D.C. Cir. 1987). NYSDEC's failure to support its claims by record evidence, and failure to explain why the submissions made by Constitution did not supply "the Department with the necessary information for decision making" despite NYSDEC's approval of other recent FERC-regulated interstate pipeline projects, is arbitrary and capricious and an abuse of discretion. *Islander E. Pipeline Co.*, 482 F.3d at 97, 103.

---

[84] *See, e.g.*, Waterbody / Wetland Feature-Specific Support Documentation for Unnamed Tributary to Limekiln Creek and Associated Wetlands at Milepost 113.35 (Sept. 2014), JA\_\_\_.

**IV. NYSDEC's Prior Application of its Thermal Discharge Criteria is Contrary to its Application in the Denial.**

NYSDEC asserts that Constitution must demonstrate compliance with New York's Part 704 "thermal discharge criteria," and contends that changes to thermal conditions may occur "due to clearing of riparian vegetation," and that "the loss of shade provided by mature riparian vegetation may be exacerbated in the long term by climate change …." Denial at 4, 7, 14, SPA4, 7, 14.

To the extent NYSDEC relies on its water quality standards governing thermal discharges, such reliance is inconsistent with the plain language of New York's water quality standards and is contrary to NYSDEC's long-standing application of those standards. NYSDEC's characterization of natural heating from increased sunlight as a "thermal discharge" grossly mischaracterizes NYSDEC's standards.

NYSDEC's criteria governing thermal discharges regulates "mixing zones" for point source discharges and sets standards for "intake structures." *See* 6 NYCRR §§ 704.3, 704.5, SPA249-51. The criteria further establish that "[l]arge day-to-day temperature fluctuations due to heat of artificial origin shall be avoided," and that "routine shut down of an entire thermal discharge at any site shall not be scheduled during the period from December through March." 6

66

NYCRR § 704.2, SPA246-49.[85]  These references demonstrate that the standard is intended to apply in the context of power plants and other industries with cooling water intakes or other discharges of industrial process waters, not the potential heating of a water body from increased sunlight.  *See, e.g.*, NYSDEC, *Dynegy Northeast Generation, Inc. (Danskammer Generating Station) – Ruling*, March 25, 2004.  Furthermore, there is no precedent or rational basis for applying Part 704 in the context of natural heating related to vegetation clearing, making NYSDEC's use of such criteria in this context arbitrary and capricious.[86]  *See Zhao*, 265 F.3d at 95 (agency's decision is arbitrary and capricious when it contradicts the agency's previous position).

---

[85]  *See also* 6 NYCRR § 700.1, SPA103 (defining "heat of artificial origin" to mean "all heat from other than natural sources").

[86]  Further still, FERC ***directly considered*** Constitution's construction corridor through wetlands and waterbodies, generally limiting it to 75 feet, consistent with FERC's regulations and its Wetland and Waterbody Construction and Mitigation Procedures.  *See* 18 C.F.R. § 380.12(d)(2), SPA58.  NYSDEC cannot collaterally attack the width of vegetative clearing that is to occur at wetland and waterbody crossings, since that issue lies exclusively with FERC.  *See Nat'l Fuel Gas*, 894 F.2d at 575-76.

## CONCLUSION

Constitution respectfully requests that the Court: (1) grant the Petition for Review; (2) vacate the Denial; and (3) remand to NYSDEC with instructions that NYSDEC must either (a) notify USACE within 5 days that it has waived the Section 401 Certification requirements, or (b) otherwise act within 5 days on Constitution's application for the Section 401 Certification by issuing a Section 401 Certification consistent with the Certification prepared and ready for final signature in July/August 2015, if the Court determines that waiver has not occurred.

Respectfully submitted this 12th day of July, 2016.

By: /s/ John F. Stoviak

| | |
|---|---|
| Yvonne E. Hennessey, Esq. | John F. Stoviak, Esq. |
| BARCLAY DAMON, LLP | Elizabeth U. Witmer, Esq. |
| 80 State Street | SAUL EWING LLP |
| Albany, New York 12207 | 1500 Market Street, 38th Floor |
| T: (518) 429-4293 | Philadelphia, PA 19102 |
| F: (518) 427-3472 | T: (215) 972-1095 |
| yhennessey@barclaydamon.com | F: (215) 972-1921 |
| | jstoviak@saul.com |
| | ewitmer@saul.com |

*Counsel for Petitioner Constitution Pipeline Company, LLC*

68

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,767 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: July 12, 2016

<u>/s/ John F. Stoviak</u>
John F. Stoviak, Esq.
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
T: (215) 972-1095
F: (215) 972-1921
jstoviak@saul.com

*Counsel for Petitioner Constitution Pipeline Company, LLC*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

I.      Brief for Respondent (submitted by then-Attorney General Andrew Cuomo), *E. Niagara Project Power Alliance v. NYSDEC*, 840 N.Y.S.2d 225 (3d Dep't 2007) ............................ ADD1

II.     Letter from Stephan A. Ryba (USACE) to Lynda Schubring (Constitution) (May 11, 2016) ...................................................... ADD15

III.    Declaration of Lynda Schubring .................................................. ADD17

IV.    Declaration of Pamela S. Goodwin ............................................ ADD20

V.     NYSDEC Permit issued to Algonquin Gas Transmission LLC (Permit ID 3-9903-00099/00003) (May 5, 2015) ................ ADD22

VI.    NYSDEC Permit issued to Empire Pipeline Inc. (Permit ID 8-00064/00002) (Oct. 3, 2014).................................. ADD31

VII.   Declaration of Keith Silliman........................................................ ADD43

VIII.  Chart – FERC Consideration of NYSDEC Comments ................ ADD50

2007 WL 5097047 (N.Y.A.D. 3 Dept.) (Appellate Brief)
Supreme Court, Appellate Division, Third Department, New York.

In the Matter of the Application of THE EASTERN NIAGARA PROJECT POWER ALLIANCE,
Barker Csd, City of Lockport, City of North Tonawanda, Lockport CSD, Newfane CSD,
North Tonawanda CSD, Royalton-hartland CSD, Starpoint CSD, Town of Cambria, Town
of Hartland, Town of Lockport, Town of Newfane, Town Pendleton, Town of Royalton,
Town of Somerset, Village of Barker, Village of Middleport, Wilson CSD, Petitioners,
v.
THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION and the New York Power Authority, Respondents.

No. 502106.
May 2, 2007.

Karen R. Kaufmann
Estimated Time: 10 Min.

**Brief for Respondent New York State Department of Environmental Conservation**

Andrew M. Cuomo, Attorney General of the State of New York, Attorney for Respondent New York State Department of Environmental Conservation, The Capitol, Albany, New York 12224, (518) 486-4551.

Barbara D. Underwood, Solicitor General.

Andrew D. Bing, Assistant Solicitor General.

Karen R. Kaufmann, Assistant Attorney General, Of Counsel.

**\*i TABLE OF CONTENTS**

| | |
|---|---|
| TABLE OF AUTHORITIES | iii |
| PRELIMINARY STATEMENT | 1 |
| QUESTIONS PRESENTED | 2 |
| STATUTE AND REGULATIONS INVOLVED | 3 |
| STATEMENT OF THE CASE | 5 |
| A. Factual Background | 5 |
| 1. NYPA's Relicensing of the Project Involved Extensive Public Participation | 5 |
| 2. Appellants Did Not Participate Actively in the ALP | 8 |
| 3. DEC Participated in the ALP Before Issuing the WQC | 9 |
| 4. DEC Responded to ENPPA's Draft WQC Issues | 10 |
| B. The Decision Below | 10 |
| ARGUMENT | |
| POINT I | |
| DEC WAS NOT REQUIRED TO CONDUCT AN ADJUDICATORY HEARING PRIOR TO THE ISSUANCE OF THE WATER QUALITY CERTIFICATION | 13 |
| A. ENPPA's Comments Did Not Raise Substantive and Significant Issues | 15 |
| B. ENPPA's Concerns About Process Also Did ot Raise Substantive and Significant Issues | 20 |
| **\*ii** POINT II | |
| DEC WAS NOT AUTHORIZED OR REQUIRED TO CONSIDER ISSUES UNRELATED TO WATER QUALITY | 22 |
| POINT III | |

ADD1

FEDERAL LAW DOES NOT PERMIT SEQRA REVIEW OF THE WQC ................. 26

POINT IV

APPELLANTS' OTHER CHALLENGES TO DEC'S DETERMINATION ARE 30
MERITLESS ..................................................................................................

A. DEC's Determination Not to Conduct an Adjudicatory Hearing Did Not Violate §401 30
of the Clean Water Act ................................................................................

B. DEC Did Not Violate the Procedural Notice Requirements of ECF §70-0119 ............ 31

CONCLUSION ................................................................................................ 32

ADDENDUM

Order on Offer of Settlement and Issuing New License (Selected Pages)

RESPONDENT'S APPENDIX

Municipal Resolutions in Support of Alternative Licensing Process (Silliman Aff. Exh. RA-1
B) ..............................................................................................................

Water Quality Certification for Niagara Power Project ..................................... RA-12

Relicensing Settlement Agreement ................................................................ RA-21

## *iii TABLE OF AUTHORITIES

CASES

*American Rivers, Inc. v. FERC,* 129 F.3d 99 (2c Cir. 1997) .............. 24

*Chemical Specialties Manufactures Association, Matter of v.* 13
*Jorling,* 85 N.Y.2d 382 (1995) ..........................................................

*Citizens for Clean Air, Matter of v. DEC,* 135 A.D.2d 256 (3d Dept. 14
1988), *appeal dismissed, lv denied,* 72 N.Y.2d 853 (1988). ...............

*City of Rensselaer, Matter of v. DEC,* 266 A.D.2d 657 (3d Dept 14
1999) ..............................................................................................

*Concerned Citizens Against Crosagates v. Flacke,* 89 A.D.2d 759 15, 20
(3d Dept. 1982), *affirmed,* 58 N.Y.2d 919 (1983) ..............................

*Flacke v. Onondaga Landfill Systems, Inc.* 69 N.Y.2d 355 (1987) ..... 14

*Fourth Branch Associates v. DEC,* 146 Misc. 2d 334 (Sup. Ct. 26
Albany Co. 1989) ............................................................................

*Erie Blvd. Hydropower, Matter of v. Stuyvesant Falls Hydro Corp.,* 27
30 A.D.3d 641 (3d Dept. 2006) *app. dismissed* 7 N.Y.3rd 843, lv.
denied 7 N.Y.3rd 718 (2006) ...........................................................

*Green Island Power Authority, Matter of v. DEC,* Supreme Court, 27
Albany County Index No. 6900-06, February 6, 2007 ....................

*Niagara Mohawk Power Corp., Matter of v. DEC* 82 N.Y.2d 191 L2, 22, 26
(1993), *cert. denied,* 511 U.S. 1141 (1994) .......................................

*Pell. Matter of v. Board of Education,* 34 N.Y.2d 222 (1974) ........... 14

**iv* *PUD No.1 of Jefferson Co. v. Washington Department of* 12, 24
*Ecology,* 511 U.S. 700 (1994) ...........................................................

*Regional Action Group for the Environment, Matter of v. DEC,* 245 14
A.D.2d 798 (3d Dept. 1997), *lv. denied,* 91 N.Y.2d 811 (1998) .........

*S.D. Warren Co. v. Maine Board of Environmental Protection,* 126 12, 23
S. Ct. 1843 (2006) ...........................................................................

*Summit Hydropower Partnership v. Commissioner of Environmental* 29
*Protection,* 629 A.2d 367 (1993) .......................................................

FEDERAL STATUTES

33 USC §1313 ................................................................................. 24

33 USC §1341 ................................................................................. 27

33 USC §1341 (a) ........................................................................... 9, 30

33 USC §1341(d) ............................................................................ 23

33 USC §1362(19) .......................................................................... 25

42 USC §4321 ................................................................................. 8

FEDERAL REGULATIONS

18 CFR §4.34(i) (2) (i) ..................................................................... 6

STATE STATUTES

ECL Article 8 ................................................................................. 28

ECL Article 70 ............................................................................... 3

ADD2

ECL §70-0119(1) .............................................. passim
ECL §70-0119(2) .............................................. 31
ECL §70-0103(4) .............................................. 22
**\*v STATE REGULATIONS**
6 NYCRR Part 621 .............................................. 30
6 NYCRR Part 624 .............................................. 30
6 NYCRR §608.7(b) .............................................. 28
6 NYCRR §608.8 .............................................. 28
6 NYCRR §621.7 .............................................. n.3
6 NYCRR §621.8 .............................................. n.3
6 NYCRR §621.8(b) .............................................. 3, 16
6 NYCRR §621.8(d) .............................................. 4, 12, 16, 18
6 NYCRR §624.1(a) (1) .............................................. 17
6 NYCRR §624.4(c) (1) (iii) .............................................. 4
6 NYCRR §624.4(c) (2) .............................................. 18, 19
6 NYCRR §624.4 (c) (3) .............................................. 18
6 NYCRR §624.4(c) (4) .............................................. 5, 20
STATE ADMINISTRATIVE DECISIONS
In re Application of Superintendent of Fish Culture, (Deputy Commissioner Interim Decision) 1999 N.Y. ENV LEXIS 29 .......... 14
*In re Application of Consolidated Edison Company of New York to Repower its East River Generating Station,* (Article X Siting Board Procedural Decision 2001 N.Y. ENV LEXIS 2C ........................... 15
*Gilmartin v. Jorling,* (Freshwater Wetlands Appeals Board Decision and Order) 1992 N.Y. ENV LEXIS 104 ........................................ 15
*Matter of the Application of Erie Boulevard Hydropower, L.P.,* 2005 N.Y. ENV LEXIS 72 ....................................................... 27
*Walkill Citizen's Coalition v. Jorling* (Freshwater Wetlands Appeals Board Decision and Order), 1991 N.Y. ENV LEXIS 100 .............. 15, 20
**\*vi MISCELLANEOUS ADMINISTRATIVE PROCEEDINGS**
Hydroelectric Licensing Under the Federal Power Act, Order No. 2002, 68 Fed. Reg. 51,070, 51,095-96 (Aug. 25, 2003) .................... 29
FERC, Order on Offer of Settlement and Issuing New License, 118 FERC ¶ .61206 (March 15, 2007) ........................................... 8
Rulemaking ID No. ENV-46-05-00010-C ..................................... n.3

## \*1 PRELIMINARY STATEMENT

This is an appeal from a letter decision of Supreme Court, Albany County (Bradley, J.), dated October 16, 2006, and entered in the Albany County Clerk's office on November 2, 2006 (A123- A128).[1] The judgment dismissed a CPLR article 78 petition seeking to annul the issuance by the New York State Department of Environmental Conservation ("DEC") of a Water Quality Certification ("WQC") to respondent New York Power Authority ("NYPA") in conjunction with NYPA's application for relicensing of the Niagara Power Project (the "Project") by the Federal Energy Regulatory Commission ("FERC").

The petitioners (appellants here) are municipalities and school districts located in Niagara County several miles east of the Project and the Eastern Niagara Project Power Alliance ("ENPPA"), an organization that includes several of the other petitioners.[2] The petition alleged that DEC's determination not to conduct an adjudicatory hearing prior to issuing the WQC was arbitrary and capricious and in violation of lawful procedure. Supreme Court upheld DEC's determination, finding that petitioners had not "rais[ed] substantive and significant issues" **\*2** requiring a hearing under the governing statute and regulations.

 

ADD3

In this appeal, appellants present no arguments justifying a reversal of the judgment below. The judgment dismissing the petition should be affirmed, and respondent DEC's determination not to conduct an adjudicatory hearing should be upheld.

## QUESTIONS PRESENTED

1. Whether appellants raised substantive and significant issues in their comment letter dated October 28, 2005, requiring the conduct of a hearing.

The Court below answered this question in the negative.

2. Whether appellants were required to present factual support for the issues raised in their comment letter.

The Court below answered this question in the affirmative.

3. Whether the question of whether substantive and significant issues had been raised was itself required to be decided in an adjudicatory hearing.

The Court below answered this question in the negative.

4. Whether DEC was authorized or required to consider factors unrelated to water quality in issuing the Water Quality Certificate.

The Court below held that DEC was authorized, but not obligated, to consider issues unrelated to water quality.

5. Whether DEC was required to conduct a SEQRA review prior to issuing the Water Quality Certificate.

**\*3** The Court below answered this question in the negative.

## STATUTE AND REGULATIONS INVOLVED

Article 70 of the Environmental Conservation Law ("ECL") sets forth the Uniform Procedures Act, which establishes uniform procedures and time periods for the processing of permit applications, including the WQC at issue in this proceeding. ECL §70-0119(1) establishes the standard for requiring a hearing prior to the issuance of a permit:

After evaluating an application for a permit and any comments of department staff, other state agencies or units of government or members of the public, the department shall ... determine whether or not to conduct a public hearing on the application ... Such determination shall be based on whether the evaluation or comments raise substantive and significant issues relating to any findings or determinations the department is required to make pursuant to this chapter, including the reasonable likelihood that a permit applied for will be denied or can be granted only with major modifications to the project because the project as proposed may not meet statutory or regulatory criteria or standards; provided, however, where any comments received from members of the public or otherwise raise substantive and significant issues relating to the application and resolution of any such issue may result in denial of the permit or the imposition of significant conditions thereon, the department shall hold a public hearing on the application.

6 NYCRR §621.8(b), [3] the regulation implementing §70-0119(1), **\*4** contains substantially similar language:


ADD4

The determination to hold an adjudicatory public hearing shall be based on whether the department's review raises substantive and significant issues relating to any findings or determinations the department is required to make pursuant to the Environmental Conservation Law, including the reasonable likelihood that a permit applied for will be denied or can be granted only with major modifications to the project because the project, as proposed, may not meet statutory or regulatory criteria or standards. In addition, where any comments received from members of the public or other interested parties raise substantive and significant issues relating to the application and resolution of any such issue may result in denial of the permit application, or the imposition of significant conditions thereon, the department shall hold an adjudicatory public hearing on the application.

6 NYCRR §624.4(c) (1) (iii) provides that an issue advanced by an individual is adjudicable only if it is raised by a potential party and is both substantive and significant."

6 NYCRR §§624.4(c)(2), (3) defines the terms "substantive" and "significant" as follows:

(2) An issue is substantive if there is sufficient doubt about the applicant's ability to meet statutory or regulatory criteria applicable to the project, such that a reasonable person would require further inquiry.

(3) An issue is significant if it has the potential to result in the denial of a permit, a major modification to the proposed project or the imposition of significant permit conditions in addition to those proposed in the draft permit.

6 NYCRR §621.8(d) provides that:

Mere expressions of general opposition to a project are insufficient grounds for holding an adjudicatory hearing on a permit application. In order to raise substantive and significant issues, written comment expressing objection or opposition to an application **\*5** must explain the basis of that opposition and identify the specific grounds which could lead the department to deny or impose significant conditions on the permit.

Finally, 6 NYCRR §624.4(c) (4) provides that, where DEC finds that the applicant's project, "as proposed or as conditioned by the draft permit, conforms to all applicable requirements of statute and regulation, the burden of persuasion is on the potential party proposing any issue related to that component to demonstrate that it is both substantive and significant."

## STATEMENT OF THE CASE

### A. Factual Background

### 1. NYPA's Relicensing of the Project Involved Extensive Public Participation.

In March 2002, NYPA began a multi-year public process leading to its FERC application to relicense the Niagara Power Project, a hydroelectric power facility located on the Niagara River in western New York (A110). NYPA's existing license for the Project was scheduled to expire on August 31, 2007. Pursuant to federal regulations, NYPA selected a relicensing process known as the Alternative Licensing Process ("ALP"). The ALP promotes the sharing of information with the public, FERC, and other federal and state agencies in order to settle any outstanding issues regarding the Project's potential environmental impacts, including the negotiation of any mitigation or enhancement provisions (A110-11). The ALP's stated purpose is to "[c]ombine **\*6** into a single process the pre-filing consultation process, the environmental review process under the National Environmental Policy Act and administrative processes associated with the Clean Water Act and other statutes," 18 CPR §4.34 (i)(2)(i).


ADD5

NYPA's ALP involved extensive negotiations between NYPA and interested public agencies including DEC, municipalities, advocacy groups and members of the public, regarding the identification of potential impacts of the proposed relicensing, reviews of technical studies, and a review and comment process for the proposed conditions of the relicensing. In December 2002, NYPA sent out notices to 447 potential stakeholders, including several of the municipal appellants (A110-11). NYPA also established a procedure to reimburse stakeholders for some of their ALP participation costs (A112). NYPA then held numerous meetings with interested stakeholders over a three-year period (Alll-13). These meetings helped to identify stakeholder concerns about the Project's continued operation. *Id.* The meetings also facilitated the drafting of the scopes of forty separate studies that investigated those stakeholder concerns and allowed NYPA to share the results of the draft and final study reports with the stakeholders and the general public. Id. The studies addressed, among other things, aquatic resources, climate and geology, land management and aesthetics, recreational resources, socioeconomic resources, terrestrial resources, water **\*7** use and quality, and cultural resources (A112).

To keep the larger public informed, NYPA created a public relicensing website, held a public meeting at Niagara Falls High School, and periodically sought public comment (A111-14). Over a six-month period (August 2004 to January 2005), NYPA held several public settlement discussions that resulted in four separate settlement agreements (A113). One of the four settlement agreements involved the seven entities that comprise the Project's "host communities," which are the county, city, towns, and school districts where the Project is actually located (A113- 14). That agreement provided for the establishment of several funds for the benefit of the host communities, and allocated 25 megawatts of Project power for sale to these communities. *Id.*

NYPA filed its FERC License Application and an Environmental Assessment on August 18, 2005, six months after it had released draft versions of both documents for public review and comment, Id. NYPA responded to, resolved, or incorporated the public comments into its final application and assessment. *Id.*

The ALP remained open to public involvement after NYPA filed its formal relicense application. FERC issued several documents that specifically solicited public comments (A114-15). For example, on February 7, 2006, FERC issued a "Notice of Application Ready for Environmental Assessment" (A114). FERC received and analyzed public comments pursuant to that notice. **\*8** See FERC, Order on Offer of Settlement and Issuing New License, 118 FERC ¶61, 206 (March 15, 2007), at pp. 4-5. [4] FERC then issued a draft Environmental Impact Statement (EIS) for the project pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., and received and reviewed public comments thereon before issuing the final EIS on December 29, 2006. *Id.* p. 5. On March 15, 2007, while this appeal was pending, FERC issued the new license for the Project, effective September 1, 2007, for a fifty-year term. [5]

**2. Appellants Did Not Participate Actively in the ALP.**

Appellants chose not to participate actively in any stage of NYPA's relicensing process, although they were aware of it and of their opportunities to participate in it. Some of the appellants submitted letters and/or resolutions supporting NYPA's relicensing procedure, including the cities of North Tonawanda and Lockport, the Towns of Newfane, Pendleton, Somerset, Cambria, and the Village of Barker (A111; RA1-11). [6] Others were directly **\*9** notified of the start of the ALP process, including the City of North Tonawanda, Wilson School District, and the towns of Cambria, Middleport, Pendleton, and Somerset (A111). Appellant ENPPA was not even formed until late 2005, more than three years after NYPA began its relicensing effort and months after NYPA filed its formal FERC license application (A109).

**3. DEC Participated in the ALP Before Issuing the WQC.**



ADD6

As explained in detail in the affirmation of William G. Little, Esq., Associate Attorney at DEC ("Little Aff.") (A69-101), DEC actively participated in the ALP, fulfilling its role as the agency responsible for issuing NYPA's WQC. Specifically, section 401 of the federal Clean Water Act (CWA) requires that an applicant for a federal license for an activity that may involve a discharge into navigable waters obtain a certification from the State that such discharge will comply with state water quality standards. See 33 USC §1341(a). By participating in virtually every aspect of the ALP, DEC was able to ensure that state water quality and natural resource issues, including the results of numerous and extensive technical studies, were properly addressed and that the negotiated settlement of the conditions of the relicensing included terms to ensure compliance with state water quality standards, enabling DEC to issue the WQC required under federal law.

**\*10** 4. DEC Responded to ENPPA's Draft WQC Issues.

DEC released a draft WQC for public comment in September 2005. In response, appellant ENPPA submitted a comment letter (A47-60) purporting to raise issues requiring the conduct of an adjudicatory public hearing. By letter dated January 27, 2006 (A30-45) DEC responded in detail to each of the procedural, legal and environmental concerns raised in ENPPA's comment letter. DEC found that ENPPA had offered no evidence or factual support to raise doubt about NYPA's ability to meet state water quality standards under the proposed conditions of the WQC, and that several of the issues purportedly raised fell outside the scope of DEC's authority in reviewing and issuing a WQC. DEC's response letter also pointed to the numerous studies that had been conducted with stakeholder input during the ALP process that addressed most of ENPPA's concerns. Thus, DEC concluded that ENPPA had not raised substantive and significant issues requiring the conduct of an adjudicatory hearing prior to the issuance of the final WQC. DEC issued the WQC on January 31, 2006 (RA12-20).

**B. The Decision Below**

Appellants commenced this Article 78 proceeding against DEC and NYPA challenging DEC's determination not to conduct an adjudicatory hearing as arbitrary and capricious and contrary to law (A5-23). DEC and NYPA each answered and submitted a substantial record documenting every relevant aspect of the **\*11** relicensing and WQC process (A61-68; 102-07).

On October 16, 2006, Supreme Court issued a revised letter decision dismissing the petition (A123-A128). [7] The court found no merit in any of petitioners' arguments requiring the conduct of an adjudicatory hearing. Preliminarily, the court rejected NYPA's assertion that appellants lacked standing to bring the proceeding. Turning to the merits, the court first outlined the statutory and regulatory provisions under which DEC determined not to hold a hearing. The Court observed that ECL §70-0119(1) provides that "the department shall ... determine whether or not to conduct a public hearing on the application." The court further noted that DEC's determination must be based on whether the comments raise subsequent and significant issues, that the burden is on the hearing applicant to show that a relevant issue is both substantive and significant and that "mere expressions of general opposition" are not enough to require a hearing. (A125).

The court noted that ENPPA's concerns lack factual support and rejected its arguments that the regulations do not require that ENPPA must support its comments with evidence. The court pointed out that the regulations require that ENPPA must "explain the basis for [its] opposition and identify the specific grounds" **\*12** that could lead DEC to deny or condition the WQC. See 6 NYCRR §621.8(d). The court also rejected ENPPA's argument that a hearing must be held to determine whether or not to hold a hearing, i.e., whether ENPPA's comments raise substantive and significant issues, and concluded that it is not arbitrary or irrational for DEC staff to make this determination.

The court also rejected ENPPA's challenge to the process leading to DEC's issuance of the WQC, concluding that ENPPA's concerns were adequately and openly addressed in the ALP. The court also found that the concerns set forth


ADD7

in the comments were either unrelated to water quality standards or were unsubstantiated. While the court agreed with ENPPA that under the Supreme Court's recent decision in *S.D. Warren Co. v. Maine Bd. of Env. Prot.,* 126 S. Ct. 1843 (2006), DEC was authorized to consider factors and to impose conditions unrelated to water quality, the court stated that DEC was not obligated to do so.

The court also rejected ENPPA's claim that SEQRA applies to applications for water quality certifications under section 401 of the CWA. The court relied on the Court of Appeals' decision in *Matter of Niagara Mohawk Power Corp. v. DEC,* 82 N.Y.2d 191 (1993), cert.denied, 511 U.S. 1141 (1994) and held that the U.S. Supreme Court did not modify that rule in *P?D No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700 (1994). Finally, the court held that under ECL §70-0119(1), DEC was not **\*13** required to give notice of a decision not to hold a hearing.

ARGUMENT

POINT I

**DEC WAS NOT REQUIRED TO CONDUCT AN ADJUDICATORY HEARING PRIOR TO THE ISSUANCE OP THE WATER QUALITY CERTIFICATION**

The court below correctly determined that DEC's determination not to conduct a hearing in connection with the issuance of the WQC to NYPA was rational and not arbitrary and capricious. The court's holding is reinforced by the fact the DEC issued the WQC only after the conclusion of the ALP, an extensive, multi-year process of consultation, study, and public participation in consideration of the impacts of the relicensing of the Niagara Power Project, including the claimed impacts raised by ENPPA's comment letter. Contrary to appellants' arguments in this Court, DEC was not required by state or federal law to conduct an adjudicatory hearing to address appellants' comments before issuing the WQC.

Preliminarily, in reviewing DEC's determination that ENPPA's comments did not require a hearing, the Court's review is limited. The Court does not "determine if the agency action was correct or ... substitute its judgment for that of the agency, but rather ... determine[s] if the action taken by the agency was reasonable." *Matter of Chemical Specialties Manufactures Ass'n v. Jorling,* 85 N.Y.2d 382 386 (1995), citing *Matter of Pell v.* **\*14** *Board of Education,* 34 N.Y.2d 222, 230 (1974). Where "the judgment of the agency involves factual evaluations in the area of the agency's expertise and is supported by the record, such judgment must be accorded great weight and judicial deference." *Flacke v. Onondaga Landfill Systems, Inc.,* 69 N.Y.2d 355, 363 (1987). Thus, here, DEC's decision not to conduct an adjudicatory hearing, involving an evaluation of a substantial record in the area of its expertise, must be accorded great weight and judicial deference. *See Matter of Regional Action Group for the Enironment v. DEC,* 245 A.D.2d 798, 800 (3rd Dept. 1997), *leave denied,* 91 N.Y.2d 811 (1998), citing *Flacke, supra; Matter of City of Rensselaer v. DEC,* 266 A.D.2d 657, 659 (3rd Dept. 1999).

Moreover, judicial and administrative decisions interpreting the applicable statute and regulations establish that commenters must satisfy a significant burden before a hearing will be required. Thus, hearing claimants must provide a clear explanation of the issues sought to be adjudicated and not merely make obscure references to matters which should be considered," *Matter of Citizer plea Air v. DEC,* 135 A.D.2d 256 (3rd Dept. 1988), *lv. denied,* 72 N.Y.2d 853 (1988); accord, In re Application of Superintent of Fish Culture (Deputy Commissioner Interim Decision), 1999 N.Y. ENV LEXIS 29. "To be substantive, the issue cannot be based merely on speculation but **\*15** on facts that can be subjected to adjudication." In re Application of Consolidated Edison Company of new York to Repower its East River Generating State (Article X Siting Board Procedural Decision), 2001 N.Y. ENV LEXIS 20. "[B]road allegations of potential harm" do not "rise to the level required by the regulations" to compel a hearing. Gilmartin v. Jorling (Freshwater Wetlands Appeals Board Decision and Order), 1992 N.Y. ENV LEXIS 104. Moreover, it is entirely rational for DEC to determine that issues that have previously been the subject of public hearing and comment do not amount to "substantive and significant" issues requiring the conduct of a further hearing. *Walkill Citizen's Coalition v. Jorling ( Freshwater Wetlands*



*Appeals Board Decision and Order),* 1991 N.Y. ENV LEXIS 100; *Concerned Citizens Against Crossgates v. Flacke,* 89 A.D.2d 759, 760 (3rd Dept. 1982), aff'd., N.Y.2d 919 (1983).

**A. ENPPA's Comments Did Not Raise Substantive and Significant Issues.**

The Court below properly held that because appellants' comment letter failed to raise "substantive and significant" issues, appellants failed to establish that they were entitled to an adjudicatory hearing (A126). On appeal, appellants misstate the applicable statutory and regulatory standards for conducting an adjudicatory hearing.

Appellants make two preliminary arguments that are wholly **\*16** meritless. Br. at 29-34. First, appellants assert that they can compel DEC to conduct an adjudicatory hearing without presenting any evidence in their comment letter establishing that the identified issues are substantive and significant. The Court below correctly noted that this contention is at direct odds with the statute's plain language" which requires commenters to "raise substantive and significant issues" rather than merely the "possibility" of such issues (A126). In addition, the regulations specifically require that the "written comment ... must explain the basis of that opposition and identify the specific grounds which could lead the department to deny or impose significant conditions on the permit." 6 NYCRR §621.8(d). Accordingly, appellants were required to document in their comments the evidence supporting their claims.

Second, appellants contend that they were entitled to a hearing to enable an Administrative Law Judge (ALJ) to determine whether their comments raised substantive and significant issues. This claim is mistaken. The statute provides the "the department" shall determine whether to hold a hearing. ECL §70-0119(1). Similarly, the regulations provide that the "determination to hold an adjudicatory public hearing shall be based on whether the department's review raises substantive and significant issues," and do not require that an ALJ make this decision following a hearing. 6 NYCRR §621.8(b). The hearing **\*17** regulations make clear that DEC staff, and not an ALJ, makes the determination. The regulations state that they apply to "a determination by the department staff to hold an adjudicatory hearing pursuant to section 621.8(b) of this Title (on identification by department staff of substantive and significant issues)." 6 NYCRR §624.1(a)(1). Under appellants' misguided theory, the mere submission of any comments would require the conduct of a hearing. [8] But this is not the law. In this case, DEC staff were authorized to determine whether the issues identified in appellants comments warranted a hearing.

Appellants' challenges to the merits of DEC staff's determination fare no better. Contrary to appellants' claims, their comment letter (A46-60) failed to raise substantive and significant issues requiring DEC to conduct an adjudicatory hearing. Apart from complaints about the relicensing process, the letter did little more than list 12 potential environmental and socioeconomic concerns without any evidentiary support demonstrating that such issues were "substantive and significant." For example, the letter stated that "changing water levels may have serious environmental impacts" and that **\*18** "[w]ater level fluctuation in the Lewiston Reservoir may increase the amount of mercury which is available for biological uptake into aquatic species," (A56) (emphasis added). In addition, the letter warned that "[o]ther potential environmental issues involve the possibility of supersaturation of atmospheric gases in the lower Niagara River." (A57) (emphasis added).

In determining that an adjudicatory hearing was not warranted by such vague and undocumented concerns, DEC rationally found that such matters were neither substantive, because they did not "raise doubt about the applicant's ability to meet statutory or regulatory criteria;" 6 NYCRR §624.4(c) (2), nor significant, because they did not have "the potential to result in the denial of a permit, a major modification ... or the imposition of significant permit conditions ..., " 6 NYCRR §624 (c) (3). ENPPA's general assertions of possible environmental harm were no more than "[m]ere expressions of general opposition to a project," that were "insufficient grounds for holding an adjudicatory public hearing on a permit application." 6 NYCRR §621.8(d).



ADD9

In its response letter (A29-45), DEC responded to each of the environmental issues mentioned by ENPPA and documented its determination that none of them raised a substantive and significant issue. Most of the issues had already been the subject of technical study and public review during the ALP **\*19** process. In any event, none of these purported issues raised "doubt about the applicant's ability to meet statutory or regulatory criteria" or had "the potential to result in the denial of a permit, a major modification ... or the imposition of significant permit conditions ...." 6 NYCRR §624.4 (c) (2), (3). See generally. Little Aff. (A69-101).

Moreover, appellants mistakenly claim that their comments are by definition rendered "substantive and significant" by the sheer magnitude of the Niagara Power Project. Br. at 25. They cite the lengthy and exhaustive relicensing review process as proof that the Project is a "major undertaking." In support of their claim they ask this Court to take judicial notice that the Project's impacts are comparable to those of the multiple Tennessee Valley Authority projects, but this comparison is not relevant or warranted. Appellants cite two cases in which the impact of a project was a factor in deciding that a hearing was required, Br. at 26, but neither case involved a permit application that had already been the subject of exhaustive review, as this project was, prior to the request for a hearing.

Finally, appellants mistakenly assert that DEC's issuance of a permit without a hearing is a departure from standard procedure, as shown by the purported absence of reported cases upholding the issuance of a permit without a hearing. Br. at 26. To the contrary, the issuance cf a permit without conducting a **\*20** hearing has been repeatedly upheld at the judicial and administrative levels where DEC determined that comments received did not raise substantive and significant issues. *E.g., Concerned Citizens against Crossgates v. Flacke,* 89 A.D.2d 759, 760 (3rd Dept. 1982), *affd.,* 58 N.Y.2d 919 (1983) hearing required to adjudicate issues raised in comments on newly- submitted data in permit reapplications); *Walkill Citizen's Coalition v. Jorling* (Freshwater Wetlands Appeals Board Decision and Order), 1991 N.Y. ENV LEXIS 100(upholding DEC issuance of wetlands permit without hearing where issues raised had been aired during SEQRA process, citing *Crosgates, supra*); *accord, Gilmartin v. Jorling* (Freshwater Wetlands Appeals Board Decision and Order), 1992 N.Y. ENV LEXIS 104.

Accordingly, the record amply supports Supreme Court's determination that DEC rationally and reasonably determined that appellants failed to meet their burden to demonstrate that issues raised were substantive and significant. 6 NYCRR §624.4 (c) (4).

**B. ENPPA's Concerns About Process Also Did Not Raise Substantive and Significant Issues.**

The Court below correctly upheld DEC's finding that appellants' concerns about the process leading up to the issuance of the draft WQC, which occupied the largest portion of their comment letter, did not raise substantive and significant issues requiring an adjudicatory hearing (A126-27). Appellants again **\*21** assert that the content and conditions of the WQC were predetermined by a "secret" negotiation process leading up to execution of the Relicensing Settlement Agreement (RSA, Br. at 12, even though, as the court below pointed out, appellants admitted in the petition itself that the RSA would not bind the terms of the WQC in the case of "a material change in applicable law or the collection or discovery of new information by NYDEC though the public process, environmental review, or other further actions... " (RA30-31). Thus, the relicensing settlement process expressly provided that DEC could later adapt the terms of the WQC to any substantive comments on the proposed certificate that it received.

Moreover, as the Court below properly found, the negotiations leading up to execution of the RSA were hardly secret; in fact, appellants had full notice and opportunity to participate in that process (Alll). Their brief mistakenly alleges that the comment period following DEC's release of the draft WQC "was the first, and only, opportunity for the public to offer any input about the project." Br. at 13. Quite to the contrary, as explained in detail in the affidavit of Keith Silliman, NYPA's Niagara Project Relicensing Director (A108-22), and as detailed in the Statement of the Case above at pp. 5-10, there were many opportunities for public comment and participation in the relicensing process.

ADD10

**\*22** In view of this extensive record, it was entirely reasonable for DEC to conclude that, where ENPPA's comments identified concerns that had already been fully studied and reviewed, such concerns did not amount to substantive and significant issues and the conduct of an adjudicatory hearing would be duplicative. The purpose of the Uniform Procedures Act, "to encourage public participation in government review and decision-making processes and to promote public understanding of all government activities," had already been entirely fulfilled. ECL §70-0103 (4). Accordingly, these matters were not required to be heard again.

**POINT II**

**DEC WAS NOT AUTHORIZED OR REQUIRED TO**
**CONSIDER ISSUES UNRELATED TO WATER QUALITY**

DEC correctly found in its response letter to ENPPA's comments (A29-45) that at least six issues raised by ENPPA (the ice boom, the transfer of project lands, bird mortality associated with transmission lines, recreational facilities, power allocation and socioeconomic impacts) were beyond DEC's authority to consider in issuing a water quality certification. The Federal Power Act, pursuant to which hydroelectric facilities are licensed, "essentially preempts State regulation," with the narrow exception provided for state issuance of a water quality certification pursuant to section 401. *See Matter of Niagara* **\*23** *Mohawk Power Corp. v. DEC,* 82 N.Y.2d 191, 196 (1993), *cert. denied,* 511 U.S. 1141 (1994).

The Court below mistakenly concluded that, following the United States Supreme Court decision in *S.D. Warren Co. v. Maine Board of Environmental Protection,* 126 S.Ct. 1843 (2006), DEC has authority to consider factors unrelated to water quality when issuing a WQC, although the lower court correctly recognized that DEC was not required to consider such factors. The Court did not explain its mistaken conclusion regarding DEC's authority, but appellants have seized upon it to identify a purported trend of jurisprudential expansion of state review authority beyond issues related to water quality. Br. at 35-41.

Appellants' theory is not supported by the cited cases, including *S.D. Warren,* or the language of the Clean Water Act itself. Pursuant to §401 of the CWA, States are authorized to ensure that the holder of a State Water Quality Certification

> will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification ....

33 USC §341(d). The cross-referenced sections of the CWA in this provision refer to state-established numerical standards for water conditions such as discharge of pollutants and effluent **\*24** limitations. The phrase "other appropriate requirement of state law" is properly interpreted as invoking other state water quality standards not enumerated.

*PUD No.l of Jefferson Co. v. Washington Dept. of Ecology,* 511 U.S. 700 (1994), is not to the contrary. There, the Court upheld Washington's imposition on a water quality certification of streamf low requirements arising from state water quality standards adopted by the State pursuant to section 303 of the Clean Water Act, 33 U.S.C. §1313. Such requirements, not otherwise itemized in the above language, were held to come within "any other appropriate requirement of State law." 511 U.S. at 715. There is nothing in that decision suggesting that state review authority in issuing WQCs extends beyond issues related to water quality.

Contrary to appellants' argument (Br. at 39), the Second Circuit decision in *American Rivers, Inc. v. FERC,* 129 F.3d 99 (2d Cir. 1997) does not support an expansion of the scope of state review authority. Rather, the court there held that, under the plain language of section 401(d) of the CWA, a state water quality certification becomes a condition of the federal license and FERC is without authority to reject any certificate conditions that it finds to be beyond state

ADD11

authority. Instead, its remedy in such a case is to decline to issue the license. 129 F.3d at 111. The conditions at issue in *American Rivers* were **\*25** in fact all related to water quality, and the Court expressly affirmed that state review authority is limited to water quality issues, citing *PUD No. 1.* Id. at 107.

Appellants further assert that state review authority pursuant to section 401 was expanded by the Supreme Court's observation in *S.D. Warren, supra,* that "[s]tate certifications under §401 are essential in the scheme to preserve state authority to address the broad range of pollution." 126 S.Ct. at 1853. But read in context, this statement refers only to water pollution. In Part IV of the opinion, [9] in which the quoted language is found, the Court reasserted the goal of the Clean Water Act: to "achieve '*water* quality ... ,' S.Ct. at 1852 (emphasis added, citing 33 USC §1251 [a] [2]). The Court cited the Act's definition of "pollution":

the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water

*Id.,* citing 33 USC §1362(19). Thus, the S.D. Warren decision does not support the expansion of state review authority beyond issues related to water quality.

 **\*26** Contrary to the conclusion of the court below, and to appellants' claims here, the scope of a state's review of the federal licensing of a hydroelectric facility remains limited to issues of water quality compliance. The concerns that ENPPA raised in its comments that were not related to water quality were beyond DEC's review authority, and the lower Court's conclusion to the contrary (A127) was error.

While erroneously holding that DEC had authority to consider issues not related to water quality, Supreme Court did correctly hold that DEC was not required to consider such issues in this case. Id. Like appellants' water quality concerns, these issues were also identified in ENPPA's comment letter without any factual support and thus did not raise substantive and significant issues requiring the conduct of a hearing. Thus, regardless of the scope of DEC's review authority, there is no basis for the remand to DEC requested by appellants. Br. at 41.

## POINT III

### FEDERAL LAW DOFS NOT PERMIT SEQRA REVIEW OF THE WQC

It is well-settled in New York that SEQRA does not apply to applications for Water Quality Certifications under section 401 of the federal Clean Water Act. *Matter of Niagara Mohawk Power Corp. v. DEC,* 82 N.Y.2d 191 11993, *cert. denied,* 511 U.S. 1141 [1994]); **\*27** *Fourth Branch Assoc. v. DEC,* 146 Misc. 2d 334 (Sup. Ct. Albany Co. 1989). This principle has been repeatedly reconfirmed, even after the federal decisions which Appellants argue expanded state review authority.

In *Matter of the Application of Erie Boulevard Hydropower, L.P.,* 2005 N.Y. ENV LEXIS 72, ALJ Casutto reconsidered New York judicial and administrative decisions holding that the Federal Power Act preempts state application of SEQRA, in light of the subsequent U.S. Supreme Court decision in *PUD No. 1, supra,* which was perceived as broadening the scope of state review in water quality certification applications. ALJ Casutto properly found that the *PUD No. 1* decision did not broaden the scope of state review to the point of including SEQRA review (slip op. at 9-10). New York courts have twice reconfirmed preemption of SEQRA by FERC jurisdiction over hydroelectric facilities. *Matter of Erie Blvd. Hydropower v. Stuyvesant Falls Hydro Corp.,* 30 A.D.3d 641 (3rd Dept. 2006), *app dismissed* 7 N.Y.3d 843 (2006), *lv denied,* 7 N.Y.3d 718 (2006) (New York cases "all confirm that the provisions of the Federal Water Pollution Control Act [33 U.S.C. §1341] provide the *only exclusion* from the otherwise comprehensive scheme of preemption authorized by the Federal Power Act," 30 A.D.3d at 645 [emphasis in original]); *Matter of Green Island Power Authority v, DEC,* Index No. 6900-06 (Sup. Ct. Albany Co. February 6, 2007) (attached to Appellants' Brief as Addendum A) ("federal law preempts state licensing and permit functions; **\*28** the only exception being the state's authority to ensure compliance with its applicable water quality standards," slip op. at 5, citing *Matter of Erie Blvd. Hydropower, supra*). Moreover,

ADD12

appellants' allegation that "DEC's own regulations require a SEQRA review," Br. at 44, is belied by the text of the regulations appellants cite. In issuing a permit, the regulations specify the environmental impacts of a proposal" as an example of issues that DEC may consider "consistent with standards contained in section 608.8 of this Part." 6 NYCRR §608.7(b). Section 608.8, in turn, provides three specific standards for the issuance of a permit:

(a) the proposal is reasonable and necessary;

(b) the proposal will not endanger the health, safety or welfare of the people of the State of New York; and

(c) the proposal will not cause unreasonable, uncontrolled or unnecessary damage to the natural resources of the State, including soil, forests, water fish, shellfish, crustaceans and aquatic and land- related environment.

6 NYCRR §608.8. Nothing in these provisions invokes the procedural mechanisms of Article 8 of the ECL (SEQRA). Moreover, even if the text of the regulations did support appellants' reading, the regulations could not supplant the rule embodied in the federal statute and the court decisions thereunder. Appellants' reliance on California practice is irrelevant to the New York rule. Br. at 45. In any event, such practice does not actually entail the independent state environmental quality **\*29** review presumably sought by appellants here. This is revealed by FERC's guidance on hydroelectric licensing that Appellants cite in their Brief. *Hydroelectric Licensing Under the Federal Power Act,* Order No. 2002. 68 Fed. Reg. 51,070, 51,095-96 (Aug. 25, 2003) (Br. at 45, fn 1). In developing the sequence of deadlines for licensing, the state of California recomme:.ded that the schedule allow for the state's adoption of the federal environmental document prepared pursuant to the National Environmental Policy Act (NEPA), and the incorporation of public comments received thereon, to satisfy the requirements of state law. Thus the purported requirement for state environmental quality review simply duplicates FERC's review of applications for federal licenses under NEPA. As DEC explained in its response to ENPPA's comments, preemption of state SEQRA is not detrimental to the public interest because FERC performs an environmental assessment of all aspects of the license application, including water quality impacts, under NEPA (A31).

Appellants' reliance on the Connecticut Supreme Court decision in *Summit Hydropower Partnership v. Comm'r of Environmental Protection,* 629 A.2d 367 (1993), Br. at 45-46, is also misplaced. That case did not mention state environmental quality review, and in fact dealt only with state requirements for the conduct of a hearing, finding none to be required.

Thus, New York decisions finding SEQRA preempted by the **\*30** Federal Power Act remain controlling law. Appellants have presented no arguments that would compel disturbance of this rule, and DEC was correct in finding that their desire to seek reconsideration of this issue did not amount to a substantive and significant issue requiring an adjudicatory hearing.

## POINT IV

### APPELLANTS' OTHER CHALLENGES TO DEC'S DETERMINATION ARE MERITLESS

**A. DEC's Determination Not to Conduct an Adjudicatory Hearing Did Not Violate § 401 of the Clean Water Act.**

As the Court below correctly held (A127), Section 401 of the Clean Water Act did not require DEC to conduct an adjudicatory hearing in this case. The section only requires that DEC "establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, *procedures for* public hearings in connection with specific applications." 33 U.S.C. § 1341(a) ( mphasis supplied). DEC's regulations comply with this requirement by establishing procedures for the conduct of hearings on water quality certifications where applicable prerequisites are

ADD13

met. 6 NYCRR Parts 621, 624. Nothing in section 401 imposes a requirement that DEC provide adjudicatory hearings in all cases of water quality certification applications.

**\*31  B. DEC Did Not Violate the Procedural Notice Requirements of ECL § 70-0119**

The Court below also properly interpreted the notice requirement of ECL §70-0119(1) (A128). That provision requires DEC to "determine whether or not to conduct a public hearing on the application and mail written notice to the applicant of a *determination to hold hearing."* (Emphasis supplied.) There is no requirement to give notice of a determination not to hold a hearing. The purpose of the notice requirement is so that "[r]easonable notice of the hearing shall be given to the applicant, and to persons who have made a written request to participate in it." ECL §70-0119(2). Thus, DEC did not violate the notice requirement of this section.

**\*32  CONCLUSION**

the Judgment below dismissing the petition should be affirmed. It is also respectfully requested that this Court correct the lower Court's erroneous ruling that DEC is authorized to consider issues other than water quality when issuing a Water Quality Certification.

Date: May 2, 2007 Albany, New York

**Appendix not available.**

Footnotes

1    Parenthetical references marked "A" followed by a page number refer to pages in appellants' appendix; those marked "RA" refer to pages in respondent's appendix attached to this brief.

2    Most but not all of the individually named appellants are members of ENPPA (A47, fn 1).

3    Former 6 NYCRR §21.7, cited in the proceedings below, was renumbered 621.8 effective Sept. 6, 2006. Rulemaking I.D. No. ENV-46-05-00010-C, published at
http://www.dos.state.ny.us/info/register/2006/sep6/pdfs/rules.pd

4    Selected pages from the FERC Order are attached to Respondent's Brief as an Addendum.

5    The Order is available in its entirety at http:// elibrary.ferc.gov/idmws/file_list.asp?accession_num= 15-3013

6    The letters comprising pages Al-11 of Respondent's Appendix were attached as Exhibit B to the Affidavit of Keith G. Silliman below. See Record on Appeal at 336-47.

7    The October 16 revised letter decision superseded Justice Bradley's October 4 letter decision, which was nearly identical but was issued before the Court received NYPA's submissions (A123).

8    Appellants have yet to allege that any specific evidence or factual support for their concerns even exists. Their claim that they need only present evidentiary support at an adjudicatory hearing essentially concedes that their comment letter presented none.

9    As Appellants concede, Part IV of the opinion was essentially dicta, the remainder of the opinion having been devoted to the only question the Court was called upon to decide: whether the discharge of river water from a hydroelectric dam back into the river after the generation of electricity was included in the Act's definition of "discharge," thus requiring compliance with state water quality standards. The Court answered in the affirmative.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.


ADD14



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS, NEW YORK DISTRICT
JACOB K. JAVITS FEDERAL BUILDING
26 FEDERAL PLAZA
NEW YORK NY 10278-0090

Regulatory Branch

MAY 1 1 2016

Subject:  Permit Application Number NAN-2012-00449-UBR by Constitution Pipeline Company, LLC To Fill Approximately 109 Acres of Regulated Waters and Wetlands in NY and Penn to Enable Construction of a New 125-Mile-Long Natural Gas Pipeline

Constitution Pipeline Company, LLC
Attn:  Lynda Schubring, PMP
Environmental Project Manager
P.O. Box 1396
Houston, Texas 77251-1396

Dear Ms. Schubring:

Reference is made to the subject permit application and the April 22, 2016 New York State Department of Environmental Conservation's denial, copy enclosed, of the applicant's requested Section 401 of the Clean Water Act water quality certificate.

In accordance with Title 33 of the Code of Regulations Part 320.4(j)(1), the subject permit application is hereby denied without prejudice because Title 33 of the Code of Federal Regulations Part 325.2(b)(1) requires a water quality certification or waiver be issued for the issuance of a Department of the Army permit involving discharge activities that are regulated under Section 404 of the Clean Water Act.

The administrative record for the subject permit application will be maintained for only the next 12 months, during which time there will be no prejudice to the right of the permit applicant to reinstate review of the subject application, subject to then applicable laws and regulations, with submittal of a New York State Department of Environmental Conservation issued Section 401 of the Clean Water Act water quality certificate, or written wavier of same by that agency.

Be advised that Department of the Army regulated activities cannot be initiated without the required Department of the Army permit.  If any questions should arise concerning this matter, please contact me at (917) 790- 8512.

Sincerely,

Stephan A. Ryba
Chief, Regulatory Branch

Enclosure

ADD15

Regulatory Branch
Subject:  Permit Application Number NAN-2012-00449-UBR by Constitution Pipeline
Company, LLC To Fill Approximately 109 Acres of Regulated Waters and Wetlands in
NY and Penn to Enable Construction of a New 125-Mile-Long Natural Gas Pipeline


Copies furnished:
NYSDEC (S. Tomasik)
FERC (K. Bowman)
USEPA (J. Cantilli)
USFWS (T. Sullivan)
AECOM (G. Hufnagel)

CF:
CENAD-PSD-OR (J. Haggerty)
CELRD-PSD-OR (S. Chubb)
CELRB-Auburn (J. Robinson)
CENAB-OP-RPA (M. Dombroskie)
CENAN-OC (L. Lee)
CENAN-OC (C. Kelly)
CENAN-OC (M. Logan)
CENAN-PA (K. Wells)

# DECLARATION OF LYNDA SCHUBRING

Lynda Schubring, of full age, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I make this Declaration for the purpose of setting forth certain facts in support of Constitution Pipeline Company, LLC's ("Constitution's") petition for review of the New York State Department of Environmental Conservation's ("NYSDEC's") denial of Constitution's application for a water quality certification under Section 401 of the Clean Water Act ("Section 401 Certification").

2. Constitution is a limited liability natural gas pipeline company organized and existing under the laws of the State of Delaware. The members of Constitution include Williams Partners Operating LLC, Cabot Pipeline Holdings, LLC, Piedmont Constitution Pipeline Company, LLC, and WGL Midstream CP, LLC.

3. I am employed by Transcontinental Gas Pipe Line Company, LLC, an affiliate of Williams Partners Operating, LLC, as an Environmental Specialist and I am the Environmental Project Manager for the Constitution Pipeline Project ("Interstate Project").

4. I have personal knowledge of the facts contained in this Declaration.

5. The Federal Energy Regulatory Commission found at the time of its issuance of a Certificate of Public Convenience and Necessity ("Certificate") to

237955.1 07/07/2016

ADD17

Constitution on December 2, 2014 that the Interstate Project represents a $683 million investment by Constitution in new pipeline infrastructure and associated facilities. Certificate ¶ 6. Given the passage of time, the Interstate Project now represents a $925 million investment by Constitution.

6. As of May 16, 2016, Constitution has incurred approximately $396 million in development of the Interstate Project.

7. On May 26, 2015, Constitution met with NYSDEC to discuss Constitution's wetland mitigation plan. Constitution and NYSDEC continued its discussions regarding the wetland mitigation plan on June 11, 2015.

8. To address NYSDEC's concerns regarding wetlands, at NYSDEC's request, Constitution purchased a 70-acre shoreline parcel along Canadarago Lake in Otsego County, New York that was under threat of development in order to preserve, in perpetuity, the high quality wetlands that exist at the site.

9. Constitution purchased the Canadarago Lake property for $475,000.

10. In order to avoid a particular wetland complex of significant value to NYSDEC, Constitution agreed, at NYSDEC's urging, to a 2.9 mile reroute of the Interstate Project.

11. The land rights associated with the 2.9 mile reroute cost Constitution $3,540,000.

237955.1 07/07/2016

ADD18

12. As Constitution obtained survey access to certain parcels as a result of judicial condemnation proceedings, Constitution revised its site-specific plans to conform those plans with the survey data obtained from those parcels.

13. Based on these surveys, Constitution revised its original, generally overstated, estimates of impacted areas to reflect actual conditions on the ground.

14. Total impacts of the Interstate Project, as reflected in Constitution's revisions, show a decrease of 308.38 acres in impacts from Constitution's original August 2013 application for the Section 401 Certification.

15. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July __7__, 2016

_____
LYNDA SCHUBRING

237955.1 07/07/2016

ADD19

# DECLARATION OF PAMELA S. GOODWIN

PAMELA S. GOODWIN, of full age, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an attorney and partner at the law firm Saul Ewing LLP, counsel for Constitution Pipeline Company, LLC ("Constitution").

2. I have personal knowledge of the facts contained in this Declaration.

3. I make this Declaration for the purpose of setting forth certain facts in support of Constitution's petition for review of the New York State Department of Environmental Conservation's ("NYSDEC's") denial of Constitution's application for a water quality certification under Section 401 of the Clean Water Act ("Section 401 Certification").

4. In my role as counsel for Constitution, I assisted Constitution with applying for environmental permits and approvals for the Project, including the Section 401 Certification.

5. I participated in telephone calls with representatives of NYSDEC during the time when NYSDEC was considering Constitution's application for the Section 401 Certification.

6. During a telephone call on July 28, 2015, Edward McTiernan, then-General Counsel for NYSDEC, indicated to me that there were no unresolved substantive issues with Constitution's application for the Section 401 Certification

1885422.2

and that NYSDEC was hoping to issue permits, including the Section 401 Certification, to Constitution on August 7, 2015.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July **8**, 2016

_Pamela S. Goodwin_
PAMELA S. GOODWIN

1885422.2



# PERMIT
## Under the Environmental Conservation Law (ECL)

| Permittee and Facility Information |
|---|

**Permit Issued To:**
ALGONQUIN GAS TRANSMISSION LLC

PO BOX 1642

HOUSTON, TX 77251-1642
(617) 560-1419

**Facility:**
ALGONQUIN INCREMENTAL MARKET (AIM) PROJECT
MULTIPLE TOWNS IN PUTNAM, ROCKLAND & WESTCHESTER COUNTIES
MULTIPLE, NY

**Facility Location:** in SEVERAL COUNTIES in THIS REGION
**Facility Principal Reference Point:** NYTM-E:     NYTM-N:
                Latitude:    Longitude:

**Authorized Activity:**
Construction of 15.7 miles of 42-inch diameter replacement pipeline in existing ROW's and the installation of approximately 2.9 miles of new 42-inch diameter pipeline in a new ROW that will cross the Hudson River via a 0.91 mile horizontal directional drill ("HDD").

The project will affect 34 surface waterbodies including 16 perennial and 18 intermittent streams. Twenty-one (21) of these 34 surface waterbodies are "protected streams" as defined 6 NYCRR Part 608, Use and Protection of Waters. With the exception of the Hudson River crossing, all stream crossings will involve dry crossing construction methods and range in width from 0.5 feet to 30 feet.

The Hudson River will be crossed using a horizontal directional drill ("HDD") method. The HDD length under the river is approximately 4,080 feet and is located in the area of Tompkins Cove in Rockland County and Verplanck in Westchester County.

The project will cross a total of 77 wetlands both within and outside of the existing maintained ROW's. Four (4) of these wetlands are regulated Freshwater Wetlands (FWW) (P-3, P-1, A-35 and A-10) as per ECL Article 24. In addition, the regulated adjacent area of FWW A-36 will be impacted by the pipeline and the regulated adjacent area of FWW BR-36 will be impacted along the western edge of the existing Southeast Compressor Station. The remainder of the wetlands are federally regulated wetlands.

| Permit Authorizations |
|---|

**Freshwater Wetlands - Under Article 24**
Permit ID 3-9903-00099/00002
    New Permit           Effective Date: <u>5/5/2015</u>         Expiration Date: <u>12/31/2022</u>
**Water Quality Certification - Under Section 401 - Clean Water Act**
Permit ID 3-9903-00099/00003
    New Permit           Effective Date: <u>5/5/2015</u>         Expiration Date: <u>12/31/2022</u>

**Page 1 of 9**

ADD22



**Stream Disturbance - Under Article 15, Title 5**
Permit ID 3-9903-00099/00004

| New Permit | Effective Date: <u>5/5/2015</u> | Expiration Date: <u>12/31/2022</u> |

---

### NYSDEC Approval

---

By acceptance of this permit, the permittee agrees that the permit is contingent upon strict compliance with the ECL, all applicable regulations, and all conditions included as part of this permit.

Permit Administrator: MICHAEL T HIGGINS, Deputy Chief Permit Administrator
Address:        NYSDEC HEADQUARTERS
              625 BROADWAY
              ALBANY, NY 12233

Authorized Signature: _____    Date <u>05/ 05/ 2015</u>

---

### Distribution List

---

HEATHER GIERLOFF
LARRY ECKHAUS
US ARMY CORPS OF ENGINEERS - NY DISTRICT
MIKE TYRRELL, TRC

---

### Permit Components

---

NATURAL RESOURCE PERMIT CONDITIONS

WATER QUALITY CERTIFICATION SPECIFIC CONDITION


GENERAL CONDITIONS, APPLY TO <u>ALL</u> AUTHORIZED PERMITS

NOTIFICATION OF OTHER PERMITTEE OBLIGATIONS

---

### NATURAL RESOURCE PERMIT CONDITIONS - Apply to the Following Permits: FRESHWATER WETLANDS; WATER QUALITY CERTIFICATION; STREAM DISTURBANCE

---

**1. Conformance With Plans** All activities authorized by this permit must be in strict conformance with the approved plans submitted by the applicant or applicant's agent as part of the permit application. Such approved plans were prepared by Spectra Energy Partners and are further identified in Condition 2.

**Page 2 of 9**

ADD23



**2. Approved Plans and Documents**  The activities authorized by this permit must be in strict conformance with the following approved plans and/or documents submitted as part of the permit application:

**a)** Algonquin Incremental Market Project - Application for: 401 Water Quality Certification; Freshwater Wetlands Permit and Protection of Waters Permit, prepared by Spectra Energy Partners, dated April 2014;

**b)** Erosion and Sedimentation Control Plan (E&SCP), prepared by Environmental Construction Permitting for the Algonquin Incremental Market Project, revised on October 8, 2013;

**c)** Response to the June 5, 2014 NYSDEC 401 Environmental Data Request, Algonquin Incremental Market Project, dated July 15, 2014;

**d)** Supplemental Filing, Section 401 Water Quality Certification, Freshwater Wetlands and Protection of Waters Permits, dated October 23, 2014;

**e)** Algonquin Incremental Market Project, Algonquin Gas Transmission, LLC, Final Wetland Mitigation Plan, Revised December 2014.

**3. Conditions Prevail Over Plans**  If any condition of this permit conflicts with the approved plans, the permit condition shall prevail over the plans.

**NOTIFICATIONS AND POSTINGS**

**4. Notify DEC 48 Hrs Prior to Work**  The permittee or a representative must contact by telephone Heather Gierloff in the Bureau of Habitat at (845) 256-3086 or via email at heather.gierloff@dec.ny.gov at least 48 hours prior to the commencement of the project authorized herein.

**EROSION CONTROLS**

**5. Install, Maintain Erosion Controls**  Necessary erosion control measures, i.e., straw bales, silt fencing, etc., are to be placed on the downslope edge of any disturbed area.  This sediment barrier is to be put in place immediately following clearing activities, but prior to any grading activities and is to be maintained in good and functional condition until thick vegetative cover is established.

**6. Control Erosion During Construction**  Provisions shall be made to minimize erosion during the construction of the project and to prevent increased sedimentation in any water body on or adjacent to the project.

**7. Minimize Stream Bed/Bank Disturbance**  Disturbance to the bed and banks of the stream shall be kept to the minimum necessary to complete the project.

**CONSTRUCTION REQUIREMENTS**

**8. Precautions Against Contamination of Waters**  All necessary precautions shall be taken to preclude contamination of any wetland or waterway by suspended solids, sediments, fuels, solvents, lubricants, epoxy coatings, paints, concrete, leachate or any other environmentally deleterious materials associated with the project.

**9. Maintain Sufficient Flow**  During periods of work activity, sufficient flow of water shall be maintained at all times to sustain aquatic life downstream.

ADD24



**10. Water Clarity**  Stream reaches downstream of construction areas shall always remain as clear (non-turbid) as the reaches upstream of the construction areas.

**11. Stream Trenching**  All stream trenching activities shall comply with the following:

**a)** all trenching of streams shall be undertaken using a dry construction method;

**b)** excavated trench material shall be used to backfill the trench and to restore the stream bed to the original channel composition;

**c)** stump removal shall be limited to those areas directly in the trench location; and

**d)** all trench backfilling must restore the area to the original grade.

**12. In-stream Work Windows**  In-stream work is prohibited as follows: in cold water trout fisheries (all waters classified under New York State ECL Article 15 with a designation of "T" or "TS"), work is prohibited between October 1st and May 31st;

**13. Stream Bank Restoration**  Stream bank restoration activities shall be completed as soon as possible after construction activities have been completed. Stream bank restoration shall be accomplished using mulch, jute thatching and/or biodegradable material. Use of rip-rap shall be minimized to the greatest extent possible.

**14. Seed, Mulch Stream Banks**  All disturbed stream banks and upland areas from which soil could erode into the stream shall be seeded and mulched immediately upon project completion.

**15. Freshwater Wetland Trenching Operations**  Trenching operations conducted within NYS regulated Freshwater Wetlands must comply with the following requirements:

**a)** the top one foot of topsoil removed from trenching operations must be segregated and stockpiled and subsequently replaced in the same profile/location during backfilling operations;

**b)** when backfilling, the trench shall not be crowned. All areas shall be graded to match the elevations which existed prior to trenching/construction;

**c)** wetland vegetation that is cleared for staging or construction must be cut off at ground level; and

**d)** if wetland soils are inundated or saturated at the surface, pipeline trenchs shall be excavated by equipment supported on timber mats to minimize disturbance to wetland soils.

**16. Use of Timber Matting**  Disturbance to wetlands, streams and other waterbodies by construction equipment shall be minimized through the use of timber mats and low ground weight construction.

**17. Removal of Timber Mats**  Timber mats shall be removed in all work areas as soon as construction has been completed and such areas shall be immediately seeded and mulched as appropriate.

**18. Invasive Species**  The permitte shall comply with the provisions of all applicable NYSDEC and NYS Ag & Markets regulations and associated quarantine orders as such requirements pertain to ash trees or any other invasive species.

**19. Storage of Fluids**  All hazardous materials, chemicals, lubricating oils, solvents, or bulk fuel storage used during construction shall be stored in upland areas at minimum of 100 feet from regulated Freshwater Wetlands (FWW), regulated FWW adjacent areas and all waterbodies.

ADD25



**20. Authorized Mulch** All mulch used to stabilize the soil shall consist of weed-free straw, wood fiber hydro mulch or biodegradable erosion control fabric.

**21. Disposal of Brush Debris and Wood Chips** After clearing and cutting activities all trees, vegetation and brush debris shall be immediately removed from regulated wetlandsand regulated adjacent areas. Any wood chips generated from the cutting and clearing activities shall not be placed within a any regulated wetland or regulated adjacent areas or placed within 50 feet of any stream or waterway.

**22. Horizontal Directional Drilling** Construction of the pipeline across the Hudson River shall be completed by a Horizontal Directional Drilling (HDD) method and adhere to the following requirements:

**a)** the best drilling practices cited in the *Best Drilling Practices, Monitoring and Clean-up of Horizontal Directional Drilling Inadvertent returns for the AIM project dated February 2014;*

**b)** drill cuttings from drilling processes which utilize any oil-based mud or polymer-based mud containing mineral oil lubricant are considered to be contaminated and can only be disposed of at municipal solid waste (MSW) landfills. Similarly, dewatered drilling muds including any oil-based mud or polymer-based mud containing mineral oil lubricant can only be disposed of at MSW landfills; and

**NOTE: Requests for exemptions to the above requirements must be submitted in writing to the Deputy Permit Administrator for review and approval.**

**c)** staging areas will be restored as soon as practicable following HDD completion.

**23. Hydrostatic Pipe Testing Discharges** If hydrostatic pipe test water is discharged to ground surfaces including wetlands, streams or other water bodies, such water shall only be discharged to heavily-vegetated and well stabilized areas or adequately sized filter bags that will not result in any soil erosion, sedimentation or turbid waters. Discharge rates shall not exceed 1,200 gpm and discharges shall employ energy dissipation devices, and sediment barriers, as necessary, to prevent erosion, sedimentation, turbidity and stream bed scour.

**MONITORING**

**24. Final Wetland Mitigation Monitoring Reports** All disturbed/impacted wetlands shall be monitored for five (5) years following the completion of construction for the purposes of measuring the success of the reestablishment of native vegetation. Monitoring reports shall be submitted to the NYSDEC Bureau of Habitat, Region 3, Attention: Heather Gierloff, 21 South Putt Corners Road, New Paltz, NY 12561 by no later than December 31st of each year.

The mitigation monitoring reports shall include:
a) a summary of results;
b) representative photographs;
c) a description of management activities; and
d) the identification of any proposed corrective actions to attain performance standards.

ADD26

25. **Post Construction Monitoring**  All post-construction monitoring shall be conducted in those areas of the project that have been disturbed by the installation and construction of the pipeline. Monitoring shall commence during the first growing season following the final restoration of the project. All wetland areas and streambanks shall be monitored on an annual basis for a total of five (5) growing seasons following pipeline construction and ROW restoration.

Post-construction monitoring reports shall include the following:
  **a)** brief statement of findings based on the previous year's report;
  **b)** a summary report addressing: restoration, invasive species status, including treatments applied in the previous year (if applicable);
  **c)** the current year's findings;
  **d)** representative photographs and
  **e)** any recommended follow-up action.

All monitoring reports shall be sent to the NYSDEC Bureau of Habitat, Region 3, Attention: Heather Gierloff, 21 South Putt Corners Road, New Paltz, NY 12561 by no later than December 31st of each year.

If any pesticide or herbicide is needed to be applied to any wetland such application will require a separate Freshwater Wetland permit and appropriate Aquatic Pesticide Control permit from the Department. Further application of any pesticide or herbicide to any waterbody will require an Aquatic Pesticide Control permit.

**GENERAL REQUIREMENTS**

26. **State May Require Site Restoration**  If upon the expiration or revocation of this permit, the project hereby authorized has not been completed, the applicant shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may lawfully require, remove all or any portion of the uncompleted structure or fill and restore the site to its former condition.  No claim shall be made against the State of New York on account of any such removal or alteration.

27. **State May Order Removal or Alteration of Work**  If future operations by the State of New York require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Department of Environmental Conservation it shall cause unreasonable obstruction to the free navigation of said waters or flood flows or endanger the health, safety or welfare of the people of the State, or cause loss or destruction of the natural resources of the State, the owner may be ordered by the Department to remove or alter the structural work, obstructions, or hazards caused thereby without expense to the State, and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owners, shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable and flood capacity of the watercourse. No claim shall be made against the State of New York on account of any such removal or alteration.

ADD27



**28. State Not Liable for Damage**  The State of New York shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the State for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

## WATER QUALITY CERTIFICATION SPECIFIC CONDITIONS

**1. Water Quality Certification**  The NYS Department of Environmental Conservation hereby certifies that the subject project will not contravene effluent limitations or other limitations or standards under Sections 301, 302, 303, 306 and 307 of the Clean Water Act of 1977 (PL 95-217) provided that all of the conditions listed herein are met.

## GENERAL CONDITIONS - Apply to ALL Authorized Permits:

**1. Facility Inspection by The Department**  The permitted site or facility, including relevant records, is subject to inspection at reasonable hours and intervals by an authorized representative of the Department of Environmental Conservation (the Department) to determine whether the permittee is complying with this permit and the ECL.  Such representative may order the work suspended pursuant to ECL 71- 0301 and SAPA 401(3).

The permittee shall provide a person to accompany the Department's representative during an inspection to the permit area when requested by the Department.

A copy of this permit, including all referenced maps, drawings and special conditions, must be available for inspection by the Department at all times at the project site or facility.  Failure to produce a copy of the permit upon request by a Department representative is a violation of this permit.

**2. Relationship of this Permit to Other Department Orders and Determinations**  Unless expressly provided for by the Department, issuance of this permit does not modify, supersede or rescind any order or determination previously issued by the Department or any of the terms, conditions or requirements contained in such order or determination.

**3. Applications For Permit Renewals, Modifications or Transfers**  The permittee must submit a separate written application to the Department for permit renewal, modification or transfer of this permit.  Such application must include any forms or supplemental information the Department requires. Any renewal, modification or transfer granted by the Department must be in writing.  Submission of applications for permit renewal, modification or transfer are to be submitted to:

> Deputy Chief Permit Administrator
> NYSDEC HEADQUARTERS
> 625 BROADWAY
> ALBANY, NY 12233

**Page 7 of 9**

ADD28



**4. Submission of Renewal Application** The permittee must submit a renewal application at least 30 days before permit expiration for the following permit authorizations: Freshwater Wetlands, Stream Disturbance, Water Quality Certification.

**5. Permit Modifications, Suspensions and Revocations by the Department** The Department reserves the right to exercise all available authority to modify, suspend or revoke this permit. The grounds for modification, suspension or revocation include:

    a. materially false or inaccurate statements in the permit application or supporting papers;

    b. failure by the permittee to comply with any terms or conditions of the permit;

    c. exceeding the scope of the project as described in the permit application;

    d. newly discovered material information or a material change in environmental conditions, relevant technology or applicable law or regulations since the issuance of the existing permit;

    e. noncompliance with previously issued permit conditions, orders of the commissioner, any provisions of the Environmental Conservation Law or regulations of the Department related to the permitted activity.

**6. Permit Transfer** Permits are transferrable unless specifically prohibited by statute, regulation or another permit condition. Applications for permit transfer should be submitted prior to actual transfer of ownership.

## NOTIFICATION OF OTHER PERMITTEE OBLIGATIONS

**Item A: Permittee Accepts Legal Responsibility and Agrees to Indemnification**
The permittee, excepting state or federal agencies, expressly agrees to indemnify and hold harmless the Department of Environmental Conservation of the State of New York, its representatives, employees, and agents ("DEC") for all claims, suits, actions, and damages, to the extent attributable to the permittee's acts or omissions in connection with the permittee's undertaking of activities in connection with, or operation and maintenance of, the facility or facilities authorized by the permit whether in compliance or not in compliance with the terms and conditions of the permit. This indemnification does not extend to any claims, suits, actions, or damages to the extent attributable to DEC's own negligent or intentional acts or omissions, or to any claims, suits, or actions naming the DEC and arising under Article 78 of the New York Civil Practice Laws and Rules or any citizen suit or civil rights provision under federal or state laws.

**Item B: Permittee's Contractors to Comply with Permit**
The permittee is responsible for informing its independent contractors, employees, agents and assigns of their responsibility to comply with this permit, including all special conditions while acting as the permittee's agent with respect to the permitted activities, and such persons shall be subject to the same sanctions for violations of the Environmental Conservation Law as those prescribed for the permittee.

ADD29



**Item C: Permittee Responsible for Obtaining Other Required Permits**
The permittee is responsible for obtaining any other permits, approvals, lands, easements and rights-of-way that may be required to carry out the activities that are authorized by this permit.

**Item D: No Right to Trespass or Interfere with Riparian Rights**
This permit does not convey to the permittee any right to trespass upon the lands or interfere with the riparian rights of others in order to perform the permitted work nor does it authorize the impairment of any rights, title, or interest in real or personal property held or vested in a person not a party to the permit.

ADD30

# New York State Department of Environmental Conservation
Division of Environmental Permits, Region 8
6274 East Avon-Lima Road, Avon, New York 14414-9519
Phone: (585) 226-5400 • Fax: (585) 226-2830
Website: www.dec.ny.gov

**FILE COPY**



Joe Martens
Commissioner

## IMPORTANT NOTICE TO ALL PERMITTEES

The permit you requested is enclosed. **Please read it carefully and note the conditions that are included in it**. The permit is valid for only those activities expressly authorized therein. Work beyond the scope of the permit and the approved project plans may be considered a violation of the law and be subject to appropriate enforcement action. Granting of this permit does not relieve the permittee of the responsibility of obtaining any other permission, consent, or approval from any other Federal, State or local government which may be required.

**PLEASE NOTE**: You must submit a Notice of Intent to Commence Work (attached) prior to starting work and similar notification must also be made upon completion of project as noted in the permit conditions. If a Permit Notice Sign is enclosed, you must post it at the work site with appropriate weather protection, as well as a copy of the permit per General Condition #1.

Please note the expiration date of the permit. If you need additional time to complete your project, you must submit your request for permit renewal, in writing, prior to expiration of the permit (minimum of 30 days) and submitted to the Regional Permit Administrator at the above address. Provide an explanation of why additional time is needed and how much additional time you are requesting. Please refer to the general conditions listed in the permit for specific instructions. For SPDES, solid Waste and Hazardous Waste Permits, renewal applications must be made at least 180 days prior to the expiration date.

The DEC permit number & Program ID number noted on page 1 under "Permit Authorization" of the permit are important and should be retained for your records. These numbers should be referenced on all correspondence related to the permit, and on any future applications for permits associated with this facility/project area.

If the permit is associated with a project that will entail construction of new water pollution control facilities or modifications to existing facilities, plan approval for the system design will be required from the appropriate Department's regional Division of Water or delegated local Health Department, as specified in the State Pollutant Discharge Elimination System (SPDES) permit.

For many projects involving work in and around streams, lakes and wetlands the US Army Corps of Engineers (ACOE) may have regulatory authority in addition to this Department. If you have not already done so, you should contact their Buffalo District Regulatory Branch office at 716-879-4330 to obtain any required federal authorizations prior to commencing work.

If you have any questions on the extent of the work authorized or your obligations under the permit, please feel free to contact me at 585-226-5399.

Sincerely,

*Peggy Norry*

Peggy Norry
Environmental Analyst

Last Modified 09/14/14

ADD31

ADD32



# PERMIT
## Under the Environmental Conservation Law (ECL)

| Permittee and Facility Information |
|---|

**Permit Issued To:**
EMPIRE PIPELINE INC
6363 MAIN ST
BUFFALO, NY 14221-5887
(716) 857-7536

**Facility:**
TUSCARORA PIPELINE
TUSCARORA TO CANTON
TUSCARORA/LINDLEY/CATON, NY

**Facility Application Contact:**
JAMES B PIPPIN
HALEY & ALDRICH, INC.
200 TOWN CENTRE DRIVE, SUITE 2
ROCHESTER, NY 14623-4264
(585) 321-4212

**Facility Location:** In MULTIPLE TOWNS in STEUBEN COUNTY
**Facility Principal Reference Point:** NYTM-E: 309.13    NYTM-N: 4660.23
                              Latitude: 42°04'15.4"  Longitude: 77°18'25.9"
**Project Location:** Tuscarora, Lindley & Caton, NY
**Authorized Activity:**

Permit to install approximately 17 miles of new gas pipeline, requiring clearing of vegetation within State Freshwater Wetland CT-11 and CT-12 and their 100-foot adjacent area and crossing of nineteen (19) streams. Two (2) streams will be crossed using directional drill method and the remainder will be cross via open trench method. All work will be done per the plans referenced in Natural Resources Condition No. 1.

| Permit Authorizations |
|---|

**Water Quality Certification - Under Section 401 - Clean Water Act**
Permit ID 8-4699-00064/00002
    New Permit          Effective Date: 10/3/2014          Expiration Date: 12/31/2016
**Freshwater Wetlands - Under Article 24**
Permit ID 8-4699-00064/00001                    (Freshwater Wetland ID CT-11)
    New Permit          Effective Date: 10/3/2014          Expiration Date: 12/31/2016

Page 1 of 6

ADD33



## NYSDEC Approval

**By acceptance of this permit, the permittee agrees that the permit is contingent upon strict compliance with the ECL, all applicable regulations, and all conditions included as part of this permit.**

Permit Administrator: THOMAS P HALEY, Deputy Regional Permit Administrator
Address:             NYSDEC REGION 8 HEADQUARTERS
                  6274 E AVON-LIMA RD
                  AVON, NY 14414

Authorized Signature: _Thomas P. Haley_       Date _10 / 31 / 2014_

## Distribution List

JAMES B PIPPIN
Habitat
US ARMY CORPS OF ENGINEERS - BUFFALO DISTRICT
Eric Tomasi, FERC

## Permit Components

NATURAL RESOURCE PERMIT CONDITIONS

WATER QUALITY CERTIFICATION SPECIFIC CONDITION

GENERAL CONDITIONS, APPLY TO ALL AUTHORIZED PERMITS

NOTIFICATION OF OTHER PERMITTEE OBLIGATIONS

## Permit Attachments

Notice of Intent to Commence Work
Permit Sign

ADD34



## NATURAL RESOURCE PERMIT CONDITIONS - Apply to the Following Permits: WATER QUALITY CERTIFICATION; FRESHWATER WETLANDS

**1. Conformance With Plans** All activities authorized by this permit must be in strict conformance with the approved plans submitted by the applicant or applicant's agent as part of the permit application. Such approved plans were prepared by Haley & Aldrich received with application on March 25, 2014, including:
1)Figures;
2)Erosion & Sedimentation Control & Agricultural Mitigation Plan (ESCAMP) Rev. October 2013; and
3)Horizontal Directional Drilling (HDD) Frac Out Contingency Plan.

**2. Notice of Intent to Commence Work** The permittee shall submit a Notice of Intent to Commence Work to Bureau of Habitat at least 48 hours in advance of the time of commencement and shall also notify him/her promptly in writing of the completion of work.

**3. Post Permit Sign** The permit sign enclosed with this permit shall be posted in a conspicuous location on the worksite and adequately protected from the weather.

**4. Prior Approval of Changes** If the Permittee desires to make any changes in construction techniques, species to be planted, the site plan, any mitigation plan, scheduling or staging of construction, or any other aspect of this project, the Permittee shall submit a written request to the Regional Permit Administrator to make such proposed changes and shall not make such changes unless authorized in writing by the Department.

**5. Install and Maintain Erosion Controls** The erosion control measures specified in the referenced plans must be put in place before any disturbance of the ground occurs and is to be maintained in a functional condition over the life of construction and revegetation phase.

**6. Precautions Against Contamination of Waters** All necessary precautions shall be taken to preclude contamination of any wetland or waterway by suspended solids, sediments, fuels, solvents, lubricants, epoxy coatings, paints, concrete, leachate or any other environmentally deleterious materials associated with the project.

**7. Work Within Area Depicted on Plans** All construction activity, including operation of machinery, excavation, filling, grading, clearing of vegetation, disposal of waste, street paving and stockpiling of material must take place within the project site as depicted on the project plans referenced by this permit. Construction activity is prohibited within areas to be left in a natural condition or areas not designated by the subject permit.

**8. Wetland Work Limited to Area Shown on Work Plan** Disturbance to the wetland and its regulated adjacent area shall be strictly limited to the work area identified in the work plan.

**9. No Equipment in the Water** Heavy equipment operation in the water is prohibited. With backhoes and similar heavy equipment, the bucket may enter the water.

**10. Disposal Locations** All excavated materials, excess and waste materials, spoil, or debris from the project site shall be disposed of in accordance with the plans referenced by this permit. These materials must be disposed of in accordance with all local, state, and federal statutes, regulations, or ordinances.

**Page 3 of 6**

*10-3-14*

ADD35

**11. State Not Liable for Damage** The State of New York shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the State for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

**12. State May Order Removal or Alteration of Work** If future operations by the State of New York require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Department of Environmental Conservation it shall cause unreasonable obstruction to the free navigation of said waters or flood flows or endanger the health, safety or welfare of the people of the State, or cause loss or destruction of the natural resources of the State, the owner may be ordered by the Department to remove or alter the structural work, obstructions, or hazards caused thereby without expense to the State, and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owners, shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable and flood capacity of the watercourse. No claim shall be made against the State of New York on account of any such removal or alteration.

**13. State May Require Site Restoration** If upon the expiration or revocation of this permit, the project hereby authorized has not been completed, the applicant shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may lawfully require, remove all or any portion of the uncompleted structure or fill and restore the site to its former condition. No claim shall be made against the State of New York on account of any such removal or alteration.

## WATER QUALITY CERTIFICATION SPECIFIC CONDITIONS

**1. Water Quality Certification** The NYS Department of Environmental Conservation hereby certifies that the subject project will not contravene effluent limitations or other limitations or standards under Sections 301, 302, 303, 306 and 307 of the Clean Water Act of 1977 (PL 95-217) provided that all of the conditions listed herein are met.

## GENERAL CONDITIONS - Apply to ALL Authorized Permits:

**1. Facility Inspection by The Department** The permitted site or facility, including relevant records, is subject to inspection at reasonable hours and intervals by an authorized representative of the Department of Environmental Conservation (the Department) to determine whether the permittee is complying with this permit and the ECL. Such representative may order the work suspended pursuant to ECL 71- 0301 and SAPA 401(3).

The permittee shall provide a person to accompany the Department's representative during an inspection to the permit area when requested by the Department.

**Page 4 of 6**

ADD36



A copy of this permit, including all referenced maps, drawings and special conditions, must be available for inspection by the Department at all times at the project site or facility. Failure to produce a copy of the permit upon request by a Department representative is a violation of this permit.

**2. Relationship of this Permit to Other Department Orders and Determinations** Unless expressly provided for by the Department, issuance of this permit does not modify, supersede or rescind any order or determination previously issued by the Department or any of the terms, conditions or requirements contained in such order or determination.

**3. Applications For Permit Renewals, Modifications or Transfers** The permittee must submit a separate written application to the Department for permit renewal, modification or transfer of this permit. Such application must include any forms or supplemental information the Department requires. Any renewal, modification or transfer granted by the Department must be in writing. Submission of applications for permit renewal, modification or transfer are to be submitted to:

> Regional Permit Administrator
> NYSDEC REGION 8 HEADQUARTERS
> 6274 E AVON-LIMA RD
> AVON, NY14414

**4. Submission of Renewal Application** The permittee must submit a renewal application at least 30 days before permit expiration for the following permit authorizations: Water Quality Certification, Freshwater Wetlands.

**5. Permit Modifications, Suspensions and Revocations by the Department** The Department reserves the right to exercise all available authority to modify, suspend or revoke this permit. The grounds for modification, suspension or revocation include:

a. materially false or inaccurate statements in the permit application or supporting papers;

b. failure by the permittee to comply with any terms or conditions of the permit;

c. exceeding the scope of the project as described in the permit application;

d. newly discovered material information or a material change in environmental conditions, relevant technology or applicable law or regulations since the issuance of the existing permit;

e. noncompliance with previously issued permit conditions, orders of the commissioner, any provisions of the Environmental Conservation Law or regulations of the Department related to the permitted activity.

**6. Permit Transfer** Permits are transferrable unless specifically prohibited by statute, regulation or another permit condition. Applications for permit transfer should be submitted prior to actual transfer of ownership.

*10-3-14*

ADD37



## NOTIFICATION OF OTHER PERMITTEE OBLIGATIONS

**Item A: Permittee Accepts Legal Responsibility and Agrees to Indemnification**
The permittee, excepting state or federal agencies, expressly agrees to indemnify and hold harmless the Department of Environmental Conservation of the State of New York, its representatives, employees, and agents ("DEC") for all claims, suits, actions, and damages, to the extent attributable to the permittee's acts or omissions in connection with the permittee's undertaking of activities in connection with, or operation and maintenance of, the facility or facilities authorized by the permit whether in compliance or not in compliance with the terms and conditions of the permit. This indemnification does not extend to any claims, suits, actions, or damages to the extent attributable to DEC's own negligent or intentional acts or omissions, or to any claims, suits, or actions naming the DEC and arising under Article 78 of the New York Civil Practice Laws and Rules or any citizen suit or civil rights provision under federal or state laws.

**Item B: Permittee's Contractors to Comply with Permit**
The permittee is responsible for informing its independent contractors, employees, agents and assigns of their responsibility to comply with this permit, including all special conditions while acting as the permittee's agent with respect to the permitted activities, and such persons shall be subject to the same sanctions for violations of the Environmental Conservation Law as those prescribed for the permittee.

**Item C: Permittee Responsible for Obtaining Other Required Permits**
The permittee is responsible for obtaining any other permits, approvals, lands, easements and rights-of-way that may be required to carry out the activities that are authorized by this permit.

**Item D: No Right to Trespass or Interfere with Riparian Rights**
This permit does not convey to the permittee any right to trespass upon the lands or interfere with the riparian rights of others in order to perform the permitted work nor does it authorize the impairment of any rights, title, or interest in real or personal property held or vested in a person not a party to the permit.

ADD38

# New York State Department of Environmental Conservation
**Environmental Permits, Region 8**
6274 East Avon-Lima Rd, Avon NY 14414-9519
Phone: (585) 226-5400 • Fax: (585) 226-2830
Website: www.dec.ny.gov



Joe Martens
Commissioner

## NOTICE OF INTENT TO COMMENCE WORK

Date: _____

NYS Department of Environmental Conservation
Bureau of Habitat
6274 East Avon-Lima Road
Avon NY 14414

Re: DEC Permit No. *8-4699-00064/00001*_____

In accordance with Condition #*2* of the referenced permit, I hereby serve notice to commence work on or about _____, 20___. Notice of project completion will be submitted within one week after termination of all work.

This is also to certify that, having read in entirety the permit, I am fully aware of and understand the general, supplemental and special conditions, and agree to comply in all respects to those requirements. I further understand that prior to undertaking any modification to the authorized project, I must seek and receive the written approval of the Regional Permit Administrator.

**WARNING**
The Permittee and the contractor (if any) are required to follow all permit conditions. Violation of permit conditions may lead to Legal action, including the imposition of Substantial monetary fines and corrective work.

_____
Signature of Permittee

_____
Signature of Contractor (if any)

_____
Contractor's Address

_____
Contractor's Telephone Number

_____
Signature of Landowner(s)

Attention Permittee and/or Contractor: Please fold as noted on the back and return.

ADD39

(Fold #2)

Place
Stamp
Here

NYS Department of Environmental Conservation
Attn: Bureau of Habitat
6274 E Avon-Lima Rd
Avon NY  14414

(Fold #1 – Staple here)

ADD40

95-20-1 (8/87)—9d

# New York State
# Department of Environmental Conservation

ADD41

## ◑ **NOTICE** ◑

The Department of Environmental Conservation (DEC) has issued permit(s) pursuant to the Environmental Conservation Law for work being conducted at this site. For further information regarding the nature and extent of work approved and any Departmental conditions on it, contact the Regional Permit Administrator listed below. Please refer to the permit number shown when contacting the DEC.

Permit No. *8-4699-00064/00001*

Expires *12-31-2016*   Regional Permit Administrator *Tom Haley*
*585-226-5393*

NOTE: This notice is **NOT** a permit.

ADD42

## DECLARATION OF KEITH SILLIMAN

KEITH SILLIMAN, of full age, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Director of Energy and Environmental Services with VHB Engineering, Surveying and Landscape Architecture, P.C., an environmental consulting firm.

2. I have personal knowledge of the facts contained in this Declaration.

3. I make this Declaration for the purpose of setting forth certain facts in support of Constitution Pipeline Company, LLC's ("Constitution's") petition for review of the New York State Department of Environmental Conservation's ("NYSDEC's") denial of Constitution's application for a water quality certification under Section 401 of the Clean Water Act ("Section 401 Certification").

4. Through AECOM, another environmental consulting firm, and subsequently VHB, I was retained as a Consultant by Constitution to assist Constitution with applying for NYSDEC permits and approvals for the Project, including the Section 401 Certification.

5. I participated in telephone calls and meetings with representatives of NYSDEC concerning Constitution's application for the Section 401 Certification beginning in 2012.

1885907.4 07/11/2016

ADD43

6. Constitution filed a Joint Application for a Section 401 Certification and other state-based permits on August 22, 2013.

7. On November 13, 2014, Constitution and NYSDEC discussed additional items Constitution should submit to ensure that its application was complete, and around this time, NYSDEC shared a draft Notice of Complete Application with Constitution.

8. On November 18, 2014, I received a call from Christopher Hogan, the Chief of the Major Project Management Unit in the Division of Environmental Permits at NYSDEC, who informed me that NYSDEC was targeting November 26, 2014 for issuance of the Notice of Complete Application and Public Hearing.

9. During a conference call on December 3, 2014 with representatives of Constitution, NYSDEC, which had still not published the Notice of Complete Application, indicated that it was waiting on the Governor's office for authorization to issue the Notice of Complete Application.

10. On December 31, 2014, I had an in-person meeting with Christopher Hogan, Stephen Tomasik, the Project Manager for NYSDEC's Major Projects Management Section, and Joshua Thiel, NYSDEC's Stream Protection Program Manager, to discuss stream crossings and potential permit conditions, and those discussions continued through the following months.

ADD44

11. In March 2015, following additional submissions regarding proposed stream crossing methods, Christopher Hogan of NYSDEC provided to me and Constitution via e-mail a list of twenty streams that it wanted to be crossed via trenchless crossing methods.

12. NYSDEC prepared and shared with me and other representatives of Constitution draft permit conditions in April 2015.

13. On April 21, 2015, I, along with other representatives of Constitution, met with Patricia Desnoyers, counsel for NYSDEC, Stephen Tomasik, and Roy "JR" Jacobson, NYSDEC's Division of Fish, Wildlife and Marine Resources, Bureau of Habitat, Landscape Conservation Section Head, to review draft permit conditions that NYSDEC had prepared. During the meeting, NYSDEC's representatives reported that NYSDEC needed additional time to review Constitution's application, and asked Constitution to withdraw and resubmit its permit applications. NYSDEC's representatives stated that NYSDEC did not need an additional year to review, but rather that it only needed a couple additional months in connection with its permit review process.

14. On May 5, 2015, May 6, 2015, and May 20, 2015, I, along with other representatives of Constitution, met with Christopher Hogan, Stephen Tomasik, William Little, counsel for NYSDEC, and other representatives of NYSDEC to again discuss stream crossing methods and draft permit conditions.

3

ADD45

15. On May 26, 2015, I met with representatives of NYSDEC to discuss Constitution's wetland mitigation plan and NYSDEC's request that Constitution purchase a 70-acre shoreline parcel along Canadarago Lake in Otsego County that was under threat of development in order to preserve, in perpetuity, the high quality wetlands that existed at the site.

16. The final Wetland Mitigation Plan was the subject of significant negotiation, and, per a call I had with Christopher Hogan and Stephen Tomasik of NYSDEC on May 28, 2015, was deemed appropriate based on the best management practices proposed by Constitution and Constitution's agreement to purchase and preserve a 70-acre shoreline property along Canadarago Lake in Otsego County that was under threat of development.

17. Negotiations resulted in an agreement between NYSDEC and Constitution whereby the crossing methodology for the streams remaining on the list would be governed by a permit condition requiring Constitution to submit, post-permit issuance, additional geotechnical analysis in order to determine whether a trenchless crossing of each listed stream was feasible.

18. I met with representatives of NYSDEC on June 11, 2015 and June 22, 2015 to discuss Constitution's proposed trenchless crossings, permit conditions, and wetland mitigation.

4

ADD46

19. On July 8, 2015, I had a discussion with Christopher Hogan, during which Mr. Hogan indicated that he expected NYSDEC to issue permits to Constitution by the end of July 2015.

20. On July 8, 2015, during a conference call between NYSDEC representatives, including Christopher Hogan, Stephen Tomasik, and Patricia Desnoyers, and Constitution representatives, including myself, Lynda Schubring, and others, Mr. Tomasik stated that the trenchless crossing matrix was sufficient for review, and that NYSDEC had no comments on the Responsiveness Summary.

21. On July 29, 2015, I spoke with Christopher Hogan who stated that then acting Commissioner of the NYSDEC Marc Gerstman and upper level management with NYSDEC had signed off on Constitution's permits and had directed them for issuance that Friday, July 31, 2015. The Section 401 Certification included conditions related to temporary stream crossing bridges and the depth of abutments in stream banks that were proposed by the NYSDEC and accepted by Constitution.

22. On August 3, 2015, Christopher Hogan reiterated to me that NYSDEC had no remaining issues with respect to Constitution's application.

23. On August 7, 2015, Christopher Hogan indicated to me that although NYSDEC was ready to issue the permits, the Governor's Office was not.

5

ADD47

24. On August 18, 2015, Christopher Hogan informed me that he had signed the signature page for the permits and left same with Stephen Tomasik, in case NYSDEC received approval to issue the permits from the Governor's office.

25. Subsequently, on August 28, 2015, Christopher Hogan informed me that NYSDEC had drafted an Environmental Notice Bulletin regarding permit issuance.

26. Thereafter, I periodically contacted Christopher Hogan regarding the status of the permits up until NYSDEC's Denial Letter on April 22, 2016. He indicated each time that no further action had been taken concerning the Section 401 Certification. At no time did he inform me that NYSDEC was waiting for additional information from Constitution.

27. Constitution's application to NYSDEC was part of an interactive multi-year process with numerous meetings, conference calls, and field visits. In the fall of 2014, Constitution and NYSDEC began having regular weekly conference calls, and between December 2, 2014 and July 8, 2015, Constitution had no less than forty meetings, conference calls, and field visits with NYSDEC. This included meetings and calls with NYSDEC's permitting chief (Christopher Hogan), major project manager (Stephen Tomasik), and general counsel (Ed McTiernan), among other NYSDEC staff. This included three meetings in December 2014, three meetings in January 2015, three meetings in February 2015,

6

ADD48

four meetings in March 2015, six meetings in April 2015, eleven meetings and three field visits in May 2015, five meetings in June 2015, and a meeting on July 1 and July 8, 2015.

28. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July  11  , 2016

KEITH SILLIMAN

7

ADD49

**Addendum – FERC Consideration of NYSDEC Comments**

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **ROUTING – ALTERNATIVE M** | Sept. 25, 2013 Letter at 1-2<br><br>Apr. 7, 2014 Letter at 1-5 | FEIS, Sections 3.4; 3.4.1.2<br><br>FEIS, Section 5.1.14<br><br>FEIS, Appendix S, S-110 to S-115<br><br>Certificate Order ¶ 108<br><br>Certificate Order ¶ 110 | Denial Letter at 1 |
| **STREAM CROSSINGS** | Nov. 7, 2012 Letter at 3-4<br><br>Mar. 29, 2013 Letter at 3, 6<br><br>May 28, 2013 Letter at 1-2<br><br>July 17, 2013 Letter at 3-4<br><br>Mar. 24, 2014 Letter at 1-2 | FEIS, Sections 2.3; 2.3.1; 2.3.2<br><br>FEIS, Section 2.3.2.2<br><br>FEIS, Sections 4.1.1.2; 4.2.4; 4.3.3.4; 4.3.3.5; 4.3.3.6<br><br>FEIS, Sections 4.6.2.3; 4.6.2.4<br><br>FEIS, Section 5.1.3<br><br>Certificate Order ¶¶ 77-79 | Denial Letter at 8-11 |

ADD50

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **WETLANDS CROSSINGS** | Nov. 7, 2012 Letter at 3; July 17, 2013 Letter at 3<br><br>Mar. 24, 2014 Letter at 1-2 | FEIS, Sections 2.2.1.2; 2.3; 2.3.2; 2.3.2.1<br><br>FEIS, Sections 4.1.1.2; 4.2.4; 4.4.1; 4.4.1.4; 4.4.1.5; 4.4.1.9; 4.4.2; 4.4.3; 4.4.4; 4.4.5; 4.4.6<br><br>FEIS, Section 5.1.4<br><br>Certificate Order ¶¶ 77-79 | Denial Letter at 13-14 |

ADD51

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **METHODS FOR STREAM AND WETLANDS CROSSING** | Nov. 7, 2012 Letter at 3-4<br><br>May 28, 2013 Letter at 1-2<br><br>July 17, 2013 Letter at 3-4<br><br>Mar. 24, 2014 Letter at 1-2 | FEIS, Sections 2.3; 2.3.1; 2.3.2.2<br><br>FEIS, Section 4.1.1.2<br><br>FEIS, Section 4.3.3.4; 4.3.4<br><br>FEIS, Sections 4.3.3.5; 4.3.3.6<br><br>FEIS, Section 4.4.3<br><br>FEIS, Sections 4.6.2.2; 4.6.2.3; 4.6.2.4<br><br>FEIS, Section 5.1.3; 5.1.6<br><br>FEIS, Appendix S, S-96<br><br>Certificate Order ¶¶ 77-79 | Denial Letter at 8-13 |

ADD52

**Addendum – FERC Consideration of NYSDEC Comments**

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **DEPTH OF PIPE** | Nov. 7, 2012 Letter at 4<br><br>May 28, 2013 Letter at 2<br><br>July 17, 2013 Letter at 4 | FEIS, Sections 2.3.1; 4.3.2.1<br><br>FEIS, Section 4.1.5<br><br>FEIS, Sections 4.3.3.6; 4.3.4; 4.12.1; 5.1.1<br><br>Certificate Order ¶ 97 | Denial Letter at 12-13 |

ADD53

# Addendum – FERC Consideration of NYSDEC Comments

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **BLASTING** | Mar. 24, 2014 Letter at 2<br><br>Apr. 7, 2014 Letter at 7 | FEIS, Sections 2.3.1; 4.1.3.8; 4.4.3; 5.1.1<br><br>FEIS, Sections 4.3.3.6<br><br>FEIS, Sections 4.6.1.4; 4.7.3<br><br>FEIS, Sections 4.6.2.3; 4.6.2.4<br><br>FEIS, Section 5.1.6<br><br>FEIS, Appendix S, S-96 to S-97<br><br>Certificate Order ¶ 75<br><br>Environmental Condition ¶ 27 | Denial Letter at 13 |

ADD54

**Addendum – FERC Consideration of NYSDEC Comments**

| Issue | NYSDEC Comment to FERC | FERC Addressed | Basis for NYSDEC Denial |
|---|---|---|---|
| **CUMULATIVE IMPACTS** | Nov. 7, 2012 Letter at 6<br><br>Mar. 29, 2013 Letter at 4-6<br><br>July 17, 2013 Letter at 6<br><br>Apr. 7, 2014 Letter at 6 | FEIS, Sections 4.13; 4.13.6.2; 4.13.6.10; 4.13.7<br><br>FEIS Section 5.1.13<br><br>Certificate Order ¶¶ 102-07 | Denial Letter at 3, 5, 7, 12, 14 |

ADD55

<u>CERTIFICATE OF FILING AND SERVICE</u>

I, Robyn Cocho, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

July 12, 2016 the foregoing Proof Brief for Petitioner was filed through the

CM/ECF system and served electronically on all parties in the case:

Frederick A. Brodie, Esq.
Brian Lusignan, Assistant Attorney General
New York State Office of the Attorney General
Division of Appeals & Opinions
The Capitol
Albany, NY 12224
(518) 776-2317

Anne Marie Garti, Esq.
P.O. Box 15
Bronx, NY 10471
(718) 601-9618

Todd D. Ommen, Esq.
Pace University School of Law
Pace Environmental Law Clinic
78 North Broadway
White Plains, NY 10603
(914) 422-4343

Moneen Susan Nasmith, Esq., Staff Attorney
Christine Ernst, Esq.
Deborah Goldberg, Esq.
Earthjustice
48 Wall Street
New York, NY 10005
212-845-7385

<u>/s/ Robyn Cocho</u>
Robyn Cocho