# 16-1568

# United States Court of Appeals

*for the*

# Second Circuit

CONSTITUTION PIPELINE COMPANY, LLC,

*Petitioner,*

– v. –

BASIL SEGGOS, ACTING COMMISSIONER, NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL CONSERVATION, JOHN
FERGUSON, CHIEF PERMIT ADMINISTRATOR, NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL CONSERVATION, NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,

*Respondents.*

STOP THE PIPELINE, CATSKILL MOUNTAINKEEPER, INC., SIERRA
CLUB, RIVERKEEPER, INC.,

*Intervenors.*

PETITION FOR REVIEW FROM THE NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## SPECIAL APPENDIX

YVONNE E. HENNESSEY, ESQ.
BARCLAY DAMON, LLP
80 State Street, 6th Floor
Albany, New York 12207
(518) 429-4293

JOHN F. STOVIAK, ESQ.
SAUL EWING LLP
Center Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102
(215) 972-1095

ELIZABETH UTZ WITMER, ESQ.
SAUL EWING LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, Pennsylvania 19087
(610) 251-5062

*Attorneys for Petitioner,*
*Constitution Pipeline Company, LLC*

# TABLE OF CONTENTS

**Page**

**DECISION APPEALED FROM**

I.    New York State Department of Environmental Conservation's April 22, 2016 Denial of Constitution Pipeline Company, LLC's application for a water quality certification under Section 401 of the Clean Water Act for the Constitution Pipeline Project ................................................................ SPA1

**STATUTES AND REGULATIONS**

I.    Administrative Procedure Act, 5 U.S.C. § 706 ........................... SPA15

II.    Natural Gas Act, 15 U.S.C. § 717b ................................. SPA15

III.    Natural Gas Act, 15 U.S.C. § 717f.............................. SPA18

IV.    Natural Gas Act, 15 U.S.C. § 717n ............................. SPA21

V.    Natural Gas Act, 15 U.S.C. § 717r.............................. SPA23

VI.    Navigation and Navigable Waters, 33 U.S.C. § 1251................. SPA26

VII.    Navigation and Navigable Waters, 33 U.S.C. § 1313................. SPA28

VIII.    Navigation and Navigable Waters, 33 U.S.C. § 1341................. SPA36

IX.    Navigation and Navigable Waters, 33 U.S.C. § 1344................. SPA40

X.    Public Health and Welfare, 42 U.S.C. § 7172 ........................... SPA51

XI.    Conservation of Power and Water Resources, 18 CFR § 380.12 SPA54

XII.    Navigation and Navigable Waters, 33 CFR § 325.2................... SPA71

XIII.    NEPA Implementing Regulations, 40 CFR § 131.11 ................. SPA82

XIV.   NY Environmental Conservation Law § 3-0301 ........................ SPA83

XV.    NY Environmental Conservation Law § 70-0103 ...................... SPA96

XVI.   6 NYCRR § 621.10 ................................................................... SPA96

XVII. 6 NYCRR § 621.14................................................................... SPA99

XVIII. 6 NYCRR § 700.1 ................................................................. SPA101

XIX.   6 NYCRR § 700.2 ................................................................. SPA110

XX.    6 NYCRR § 700.3 ................................................................. SPA111

XXI.   6 NYCRR § 700.4 ................................................................. SPA111

XXII.  6 NYCRR § 701.1 ................................................................. SPA111

XXIII. 6 NYCRR § 701.2 ................................................................. SPA112

XXIV. 6 NYCRR § 701.3 ................................................................. SPA112

XXV.  6 NYCRR § 701.4 ................................................................. SPA113

XXVI. 6 NYCRR § 701.5 ................................................................. SPA113

XXVII. 6 NYCRR § 701.6 ................................................................. SPA114

XXIII. 6 NYCRR § 701.7 ................................................................. SPA114

XXIX. 6 NYCRR § 701.8 ................................................................. SPA114

XXX. 6 NYCRR § 701.9................................................................. SPA114

XXXI. 6 NYCRR § 701.10................................................................. SPA115

XXXII. 6 NYCRR § 701.11 ................................................................. SPA115

XXXIII. 6 NYCRR § 701.12 ................................................................. SPA115

XXXIV. 6 NYCRR § 701.13 ................................................................. SPA115

XXXV. 6 NYCRR § 701.14 ................................................................. SPA116

XXXVI. 6 NYCRR § 701.15................................................................. SPA116

XXXVII. 6 NYCRR § 701.16 ........................................................... SPA116

XXXVIII. 6 NYCRR § 701.17 .......................................................... SPA116

XXXIX. 6 NYCRR § 701.18 ........................................................... SPA117

XL.    6 NYCRR § 701.19 ........................................................... SPA117

XLI.   6 NYCRR § 701.20 ........................................................... SPA117

XLII. 6 NYCRR § 701.21 ............................................................... SPA118

XLIII. 6 NYCRR § 701.22 .............................................................. SPA119

XLIV. 6 NYCRR § 701.23 .............................................................. SPA119

XLV. 6 NYCRR § 701.24 ............................................................... SPA119

XLVI. 6 NYCRR § 701.25 .............................................................. SPA120

XLVII. 6 NYCRR § 701.26 ............................................................. SPA120

XLVIII. 6 NYCRR § 702.1 ............................................................. SPA120

XLIX. 6 NYCRR § 702.2 ............................................................... SPA121

L.      6 NYCRR § 702.3 ............................................................. SPA122

LI.    6 NYCRR § 702.4 ............................................................. SPA122

LII.    6 NYCRR § 702.5 ............................................................. SPA124

LIII.   6 NYCRR § 702.6 ............................................................. SPA126

LIV.   6 NYCRR § 702.7 ............................................................. SPA126

LV.    6 NYCRR § 702.8 ............................................................. SPA127

LVI.   6 NYCRR § 702.9 ............................................................. SPA127

LVII. 6 NYCRR §§ 702.10 to 702.11 ....................................... SPA128

LVIII. 6 NYCRR § 702.12 ............................................................. SPA128

LIX.   6 NYCRR § 702.13 ........................................................... SPA129

LX.    6 NYCRR § 702.14................................................................ SPA129

LXI.  6 NYCRR § 702.15................................................................ SPA130

LXII. 6 NYCRR § 702.16................................................................ SPA132

LXIII.6 NYCRR § 702.17 ............................................................... SPA133

LXIV.6 NYCRR § 702.18 ............................................................... SPA137

LXV. 6 NYCRR § 702.19................................................................ SPA137

LXVI.6 NYCRR § 702.20 ............................................................... SPA138

LXVII.6 NYCRR § 702.21 .............................................................. SPA139

LXIII.6 NYCRR § 702.22 ............................................................... SPA140

LXIX.6 NYCRR § 703.1 ................................................................. SPA140

LXX. 6 NYCRR § 703.2................................................................. SPA140

LXXI.6 NYCRR § 703.3 ................................................................. SPA142

LXXII.6 NYCRR § 703.4 ................................................................ SPA144

LXXIII.6 NYCRR § 703.5................................................................ SPA146

LXXIV.6 NYCRR § 703.6 ............................................................... SPA238

LXXV.6 NYCRR § 703.7................................................................. SPA246

LXXVI.6 NYCRR §§ 703.8 to 703.11 ............................................. SPA246

LXXVII.6 NYCRR § 704.1 .............................................................. SPA246

LXXVIII.6 NYCRR § 704.2 ............................................................. SPA246

LXXIX.6 NYCRR § 704.3 ............................................................... SPA249

LXXX.6 NYCRR § 704.4................................................................ SPA250

LXXXI.6 NYCRR § 704.5 ............................................................... SPA251

LXXXII.6 NYCRR § 704.6 .............................................................. SPA251

LXXXIII. 6 NYCRR § 704.7 ............................................................ SPA252

LXXXIV. 6 NYCRR § 705.1 ............................................................ SPA252

LXXXV. 6 NYCRR § 705.2 ............................................................ SPA252

LXXXVI. 6 NYCRR § 705.3 ............................................................ SPA253

LXXXVII. 6 NYCRR § 705.4 ............................................................ SPA253

LXXXVIII. 6 NYCRR § 706.1 ............................................................ SPA253

LXXXIX. 6 NYCRR § 706.2 ............................................................ SPA278

XC.   16 NYCRR § 1000.8 ............................................................ SPA279

# NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

Division of Environmental Permits & Pollution Prevention
625 Broadway, 4th Floor, Albany, New York 12233-1750
P: (518) 402-9167 I F: (518) 402-9168 I deppermitting@dec.ny.gov
www.dec.ny.gov

April 22, 2016

Lynda Schubring, PMP
Environmental Project Manager
Constitution Pipeline Company, LLC
2800 Post Oak Boulevard
P.O. Box 1396
Houston, Texas 77251-1396

Re: <u>Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial</u>

Dear Ms. Schubring,

On April 27, 2015, Constitution Pipeline Company, LLC (Constitution) submitted to the New York State Department of Environmental Conservation (NYSDEC or Department) a Joint Application (Application)[1] to obtain a Clean Water Act[2] Section 401 Water Quality Certification (WQC) for the proposed Project and New York State Environmental Conservation Law (ECL) Article 15, Title 5 (Protection of Waters) and Article 24, Title 23 Freshwater Wetlands permits. Based on a thorough evaluation of the Application as well as supplemental submissions, the Department hereby provides notice to Constitution that in accordance with Title 6 New York Codes Rules and Regulation (NYCRR) Part 621, the Application fails in a meaningful way to address the significant water resource impacts that could occur from this Project and has failed to provide sufficient information to demonstrate compliance with New York State water quality standards. Constitution's failure to adequately address these concerns limited the Department's ability to assess the impacts and conclude that the Project will comply water quality standards. Accordingly, Constitution's request for a WQC is denied.[3] As required by 6 NYCRR §621.10, a statement of the NYSDEC's rationale for denial is provided below.

## BACKGROUND

The Federal Energy Regulatory Commission (FERC) issued a certificate approving construction and operation of the pipeline on December 2, 2014, conditioning

---

[1] New York State and U.S. Army Corps of Engineers Joint Application, Constitution Pipeline, August, 2013. Constitution initially submitted its WQC application on August 28, 2013. With the Department's concurrence Constitution subsequently withdrew and re-submitted the WQC application on May 9, 2014 and April 27, 2015, each time extending the period for the Department to review the application by up to one year.

[2] *See* 33 U.S.C.A. Section 1341.

[3] The other permits sought by Constitution in the Joint Application remain pending before the Department and are not the subject of this letter.

NEW YORK STATE OF OPPORTUNITY | Department of Environmental Conservation

SPA1

its approval on Constitution first obtaining all other necessary approvals. Accordingly, Constitution's Application for a WQC pending with the Department must be approved before construction may commence. Constitution's Application was reviewed by NYSDEC in accordance with ECL Article 70 (Uniform Procedures Act or UPA) and its implementing regulations at 6 NYCRR Part 621, which provide a review process for applications received by NYSDEC.

Despite FERC conditioning its approval on Constitution's need to obtain a WQC, the Department has received reports that tree felling has already occurred in New York on the Project's right of way. This tree cutting, both clear cutting and selective cutting, has occurred notwithstanding the fact that Constitution has right-of-way agreements with the property owners where this cutting has occurred. The tree felling was conducted near streams and directly on the banks of some streams, and in one instance has resulted in trees and brush being deposited directly in a stream, partially damming it. As described below, this type of activity, if not properly controlled, can severely impact the best usages of the water resource.

Concurrent with its review, the Department received a Clean Air Act Title V application[4] for the Wright Compressor Station (Wright Compressor Station) from Iroquois Gas Transmission System, Inc. Additionally, Constitution is obligated to obtain coverage from NYSDEC under the SPDES Stormwater General Permit for Construction Activities (GP-0-15-002) and prepare a Stormwater Pollution Prevention Plan (SWPPP) prior to Project construction.

**Proposed Project Description and Environmental Impacts**

Constitution proposes construction of approximately 124.14 miles of new interstate natural gas transmission originating in northeastern Pennsylvania, proceeding into New York State through Broome, Chenango, Delaware, and Schoharie Counties, terminating at the existing Wright Compressor Station in Schoharie County. In New York State, the Project, rather than co-locating a significant portion of the pipeline on an existing New York State Department of Transportation (NYSDOT) Interstate I-88 access area[5], proposes to include new right-of-way (ROW) construction of approximately 99

---

[4] Minor Source Air Permit Modification, Wright Compressor Station, Town of Wright, Schoharie County, NY, Iroquois Gas Transmission System, July 26, 2013.

[5] On September 25, 2013, NYSDEC provided FERC with comments on Constitution's Environmental Report dated June 13, 2013, supplemented in July, 2013 that concurred with the United States Army Corps of Engineers' (ACOE) comments and supported ACOE's request to FERC for additional details and documentation to support the reasons why all or some of the Project route could not be routed with the New York State Department of Transportation (NYSDOT) Interstate I-88 control of access area. On April 7, 2014, the Department provided FERC with preliminary comments on the DEIS which extensively analyzed the environmental benefits of utilizing Interstate I-88 (also referred to as Alternative "M") regarding stream, wetland, and interior forest habitats.

In June 2014, Constitution provided information about Alternative M which Department Staff found did not contain sufficient analysis to determine whether Alternative M would generate fewer impacts than Constitution's preferred route. However, using Constitution's information, as well as publicly available information, Department Staff

2

SPA2

miles of new 30-inch diameter pipeline, temporary and permanent access roads and additional ancillary facilities.

Although the Department repeatedly asked Constitution to analyze alternative routes that could have avoided or minimized impacts to an extensive group of water resources, as well as to address other potential impacts to these resources, Constitution failed to substantively address these concerns. Constitution's failure to adequately address these concerns limited the Department's ability to assess the impacts and conclude that the Project will comply with water quality standards. Project construction would impact a total of 251 streams, 87 of which support trout or trout spawning. Cumulatively, construction would include disturbance to 3,161 linear feet of streams resulting in a total of 5.09 acres of stream disturbance impacts. Furthermore, proposed Project construction would cumulatively impact 85.5 acres of freshwater wetlands and result in impacts to regulated wetland adjacent areas totaling 4,768 feet for crossings, 9.70 acres for construction and 4.08 for acres for Project operation. Due to the large amount of new ROW construction, the Project would also directly impact almost 500 acres of valuable interior forest. Cumulatively, within such areas, as well as the ROW generally, impacts to both small and large streams from the construction and operation of the Project can be profound and could include loss of available water body habitat, changes in thermal conditions, increased erosion, and creation of stream instability and turbidity.

The individual quality and integrity of streams form the primary trophic levels that support many aquatic organisms and enable the provision of stream ecosystems at large. Under the Project's proposal, many of the streams to be crossed present unique and sensitive ecological conditions that may be significantly impacted by construction and jeopardize best usages. For a number of reasons, streams that support trout and other cold water aquatic species are typically the most sensitive. The physical features of these streams include dense riparian vegetation often composed of old-growth trees which are free of invasive species and that shade and cool streams while also maintaining the integrity of adjacent banks or hillslopes. Undisturbed spring seeps provide clean, cold water and stable yet sensitive channel forms maintain the integrity of the stream itself and further preserve water quality. Biologically, these streams are vital in providing complex habitat for foraging, spawning and nursery protection by wild reproducing trout.

Impacts to these streams are exacerbated as the cumulative negative effects of multiple crossings are added. Demonstrating this, the trout stream Clapper Hollow Creek and its tributaries would be crossed 11 times by the project. Likewise, Ouleout Creek and its tributaries will be crossed 28 times. Many of these streams are part of tributary networks that are dependent upon the contributing quality of connected streams to supply and support the physical and biological needs of a system. This is especially true in supporting the viability of wild trout populations.

---

conducted a review that found that Alternative M could reduce overall impacts to water bodies and wetlands when compared to Constitution's preferred route.

3

SPA3

Initially, 100 per cent loss of stream and riparian habitat will occur within the ROW as it is cleared and the pipeline trenched across streams. The trenching of streams will destroy all in-stream habitat in the shorter term and in some cases could destroy and degrade specific habitat areas for years following active construction. For example, highly sensitive groundwater discharge areas within streams could be disturbed, resulting in loss or degradation to critical spawning and nursery habitat. In addition, physical barriers will temporarily prevent the movement of aquatic species during active construction and changes to the stream channel will persist beyond the active construction period, creating physical and behavioral barriers to aquatic organism passage.

Changes to thermal conditions will also likely occur due to clearing of riparian vegetation. Because of the need to maintain an accessible ROW, subsequent revegetation will take considerable time to replace what was lost, notably long-lived, slow growing forest trees. Loss of riparian vegetation that shades streams from the warming effects of the sun will likely increase water temperatures, further limiting habitat suitability for cold-water aquatic species such as brook trout. The loss of shade provided by mature riparian vegetation may be exacerbated in the long term by climate change and thus be more significant since small changes in the thermal loading of cold water trout streams could result in the long term loss of trout populations.

NYSDEC Staff's extensive experience and technical reviews have shown that destabilization of steep hillslopes and stream banks will likely occur and may result in erosion and failure of banks, causing turbid inputs to waterbodies. Specifically, Project construction would include approximately 24 miles of steep slope or side slope construction. Cumulatively, this would amount to roughly 24 per cent of the new cleared right-of-way. Exposed hillslopes can become less stable and, when appropriate stormwater controls are not properly implemented, erosion can result in increased sediment inputs to streams and wetlands. If these events occur they can affect the water quality and habitat quality of these streams.

Trenching of streams can also destabilize the stream bed and such conditions can temporarily cause an exceedance of water quality standards, notably turbidity. Turbidity and sediment transport caused as a result of construction can negatively impact immediate and downstream habitat, can smother or kill sensitive aquatic life stages and reduce feeding potential of all aquatic organisms. More specifically, visual predators such as brook trout find food using visual cues. Thus, reductions in clear water conditions may reduce feeding success that can ultimately result in impacts on aquatic species' propagation and survival and corresponding reductions in the attainment of the waters' best usages.

As a result of chronic erosion from disturbed stream banks and hill slopes, consistent degradation of water quality may occur. Changes in rain runoff along ROW may change flooding intensity and alter stream channel morphology. Disturbed stream channels are at much greater risk of future instability, even if the actual work is conducted under dry conditions; long ranging stream erosion may occur up and

4

SPA4

downstream of disturbed stream crossings well beyond the time of active construction. This longer term instability and erosion can result in the degradation of spawning beds and a decrease in egg development. The loss of spawning potential in some cold headwater streams may significantly reduce the long-term viability of these streams to support trout. Constitution proposes to cross 50 known trout spawning streams which will likely result in cumulative impacts on the trout populations in these streams. More specifically, and by way of an example of cumulative impacts to a water body, Constitution proposes to cross Ouleout Creek and its tributaries a total of 28 times with 15 of these crossings occurring in trout spawning areas.

Finally, at the landscape level, impacts to streams from the ROW construction are analogous to the cumulative impacts from roads. There is an established negative correlation between road miles per watershed area and stream quality. Thus, increases in the crossings of streams by linear features such as roads and the pipeline ROW can have cumulative impacts beyond the individual crossings. In the case of the 1 mile corridor surrounding the proposed Constitution pipeline, the pre-construction crossing/area ratio for the New York section is 2.28 crossings/square mile. However, the post-construction ratio will increase 44 per cent to 3.29 crossings/square mile. In specific basins this ratio will be higher and may cause a permanent degradation in stream habitat quality and likewise affect associated natural resources, including aquatic species' propagation and survival.

## NYSDEC Application Reviews

On August 21, 2013, Constitution submitted the Application to obtain a CWA §401 WQC and NYSECL Article 15 and Article 24 permits to the Department. Due to insufficient information, NYSDEC issued a Notice of Incomplete Application on September 12, 2013, indicating that the Application was not complete for commencing review. On May 9, 2014, Constitution simultaneously withdrew and resubmitted its WQC request to the NYSDEC. Constitution supplemented the Application a number of times in 2014. A Notice of Complete Application for public review was published by NYSDEC in the Environmental Notice Bulletin (ENB) and local newspapers on December 24, 2014.

This notice commenced a public comment period ending on January 30, 2015 which was subsequently extended to February 27, 2015. To afford the Applicant time to respond to NYSDEC's requests for information based on thousands of public comments, and to extend the time period by which NYSDEC was required to issue the WQC and associated permits, Constitution submitted its second request to withdraw and resubmit the WQC on April 27, 2015. This resubmission initiated an additional UPA comment period until May 21, 2015. A total of 15,035 individual comments were received during the two comment periods. Most of these comments related to issues surrounding the Project applications; a relative handful were related to issues specific to the Compressor Station application.

5

SPA5

Since August 21, 2013, Constitution supplemented its Application numerous times in response to additional information requests by the Department; Table 1 below provides an easy reference of the requests and submittals associated with the Application over the past several years.

| Table 1 | | |
|---|---|---|
| Prepared by | Date | Summary |
| DEC | June 21, 2012 | Summary of Pre-Application Meeting |
| DEC | May 30, 2013 | Sample Matrix for Linear Projects |
| Constitution | August 28, 2013 | 401 WQC and related NYS Joint Permit application/documentation received by DEC |
| DEC | September 12, 2013 | Notice of Incomplete Application |
| Constitution | November 27, 2013 | Joint Permit Application - Supplemental Information |
| Constitution | May 9, 2014 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | July 3, 2014 | DEC Recommendations for Revised Joint Application |
| Constitution | August 13, 2014 | Joint Permit Application - Supplemental Information # 2 |
| Constitution | November 17, 2014 | Additional Information Submittal |
| Constitution | November 17, 2014 | Responses to Wetland Mitigation Plan Deficiencies |
| Constitution | November 24, 2014 | Updated and Revised Information |
| Constitution | December 1, 2014 | Response to Request for Additional Clarification of Wetland Impacts |
| DEC | December 24, 2014 | Notice of Complete Application |
| DEC | December 31, 2014 | NY Stream Crossing Feasibility Analysis Information Request |
| Constitution | January 22, 2015 | Summary of Changes Trenchless Locations |
| Constitution | February 2, 2015 | Revised Wetland Mitigation Plan |
| Constitution | February 6, 2015 | Phase I Stream Analysis/Open Cut |
| DEC | February 19, 2015 | DEC Proposed Wetland Re-route |
| Constitution | March 27, 2015 | Joint Permit Application - Supplemental Information |
| Constitution | April 24, 2015 | Response to DEC Preferred List of Trenchless Stream Crossings |
| Constitution | April 27, 2015 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | April 27, 2015 | Notice of Complete Application - WQC Withdrawal and Re-submittal |

SPA6

| Constitution | May 13, 2015 | Wetland Mitigation Area - Application for Pesticide Permit |
|---|---|---|
| Constitution | May 20, 2015 | Supplemental Information - Trenchless Crossings |
| DEC | June 1, 2015 | Notice of Incomplete Application - Pesticide Permit |
| Constitution | June 19, 2015 | Canadarago Lake Mitigation Area Update |
| Constitution | June 30, 2015 | Updated Trenchless Crossing Matrix |
| Constitution | July 8, 2015 | Joint Permit Application - Supplemental Information - Wetland Re-route |
| Constitution | July 14, 2015 | Additional Information Submittal - Wetland Impacts and Mitigation |
| Constitution | August 5, 2015 | Response to Notice of Incomplete Application - Pesticide Permit |
| Constitution | September 15, 2015 | Joint Permit Application - Supplemental Information |
| DEC | October 2, 2015 | Acknowledgement of NOI - SPDES MS GP - Contractor Yard 5B |
| Constitution | January 6, 2016 | Wetland Mitigation Area - Application for Pesticide Permit - Betty Brook |
| DEC | February 26, 2016 | Acknowledgement of NOT - SPDES MS GP - Contractor Yard 5B |
| | | |

## STATEMENT OF REASONS FOR DENIAL

The Department, in accordance with CWA §401, is required to certify that a facility meets State water quality standards prior to a federal agency issuing a federal license or permit in conjunction with its proposed operation. An applicant for a water quality certification must provide the Department sufficient information to demonstrate compliance with the water quality regulations found at 6 *NYCRR Section 608.9 (Water Quality Certifications)*. Pursuant to this regulation, the Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701,702,703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[6] Denial of a WQC may occur when an application fails to contain sufficient information to determine whether the application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations due to insufficient information. The Department is guided by statute to take into account the cumulative impact upon all resources in making a determination in connection with any license, order, permit or certification, which in this case includes being able to evaluate the cumulative water quality impacts of ROW construction and operation on the numerous water bodies mentioned in this letter.[7]

---

[6] 6 NYCRR §608.9 (2) and (6).
[7] ECL 3-0301(1)(b).

7

SPA7

As noted above, Constitution supplemented its Application in response to information requests issued to it by the Department but has not supplied sufficient information for the Department to be reasonably assured that the State's water quality standards would be met during construction and operation of the proposed pipeline. As a result the Department cannot be assured that the aforementioned adverse impacts to water quality and associated resources will be avoided or adequately minimized and mitigated so as not to materially interfere with or jeopardize the best usages of affected water bodies. The following are the Department's reasons for denial of Constitution's Application based on applicable sections of the New York State environmental laws, regulations or standards related to water quality.

## Stream Crossings

Project construction would disturb a total of 251 streams under New York State's jurisdiction, 87 of which support trout or trout spawning. Cumulatively, construction would disturb a total of 3,161 linear feet of streams and result in a combined total of 5.09 acres of temporary stream disturbance impacts. From inception of its review of the Application, NYSDEC directed Constitution to demonstrate compliance with State water quality standards and required site-specific information for each of the 251 streams impacted by the Project. NYSDEC informed Constitution that *all 251* stream crossings must be evaluated for environmental impacts and that trenchless technology was the preferred method for stream crossing. This information was conveyed to Constitution and FERC on numerous occasions since November 2012; however, Constitution has not supplied the Department with the necessary information for decision making.

### Deficient Trenchless Stream Crossings Information and Lack of Specific Stream Crossings Details

Staff's review of the Application includes an analysis of adverse stream crossing impacts, specifically the suitability of open trenching versus trenchless techniques or subsurface boring methods. Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanently cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource. Because alternative trenchless techniques exist for this Project, the Department requested additional information from Constitution to evaluate their feasibility and to determine if the Application provides enough information to demonstrate compliance with water quality standards.

Since NYSDEC's most protective method for stream crossings is some form of a trenchless technology, NYSDEC directed Constitution to determine whether a trenchless technology was constructible for each stream crossing.[8] On a number of occasions NYSDEC identified the need to provide information so that it could evaluate trenchless stream installation methods (see Table 2, below); however, Constitution has not provided sufficient information to enable the Department to determine if the

---

[8] NYSDEC Comments to FERC, November 7, 2012.

8

SPA8

Application demonstrates compliance with 6 NYCRR Part 703, including, but not limited to, standards for turbidity and thermal impacts (6 NYCRR §703.2), and 6 NYCRR Part 701 (best usages).

| | Table 2 | |
|---|---|---|
| Prepared by | Date | Summary |
| NYSDEC | June 21, 2012 | In a summary of the initial pre-application meeting with Constitution, which took place on June 7, 2012, NYSDEC stated in a letter to Constitution that for protected streams and wetlands, trenchless technology is the preferred method for crossing and should be considered for *all* such crossings (emphasis added). |
| NYSDEC | November 7, 2012 | In comments to FERC, NYSDEC stated that for streams and wetlands the preferred method for crossing is trenchless technology. The draft EIS should evaluate cases where other methods are proposed and Constitution should explain why trenchless crossing technology will not work or is not practical for that specific crossing. |
| FERC | April 9, 2013 | FERC's Environmental Information Request (EIR) directed Constitution to address all of the comments filed in the public record by other agencies regarding the draft Resource Reports including all comments from the NYSDEC. |
| NYSDEC | May 28, 2013 | Meeting with Constitution and NYSDEC staff at the DEC Region 4 office to review stream crossings. NYSDEC reiterates that acceptable trenchless technology was the preferred installation method and that stream crossings should be reviewed for feasibility of using those technologies. |
| NYSDEC | July 17, 2013 | NYSDEC comments to FERC reiterates that trenchless technology is preferred method for stream crossings. The DEIS should evaluate cases where other methods are proposed and the Project Sponsor should explain why trenchless technology will not work or is not practical for that specific crossing. |
| NYSDEC and Constitution staff | July - August 2013 | Field visits of proposed stream crossings prior to permit applications to the Department. At each crossing, NYSDEC emphasized to |

9

SPA9

| | | Constitution staff that trenchless technology is preferred/most protective. |
|---|---|---|
| Constitution | November 2013 | Trenchless Feasibility Study provided by Constitution that described its choices of stream crossing techniques. Upon review, document and justifications found insufficient and all streams less than 30' wide were arbitrarily eliminated from any consideration for trenchless crossing methods. |
| NYSDEC and Constitution staff | December 31, 2014 | Meeting conducted with Constitution staff in which NYSDEC indicated that the Trenchless Feasibility Study was inadequate, *e.g.* provided insufficient justification and removed all streams less than 30 feet in width from analysis. |
| NYSDEC | December 31, 2014 | To aid in an appropriate review of stream crossing techniques and compliance with water quality standards, an informational request table including required technical information was developed by NYSDEC and provided to Constitution. |
| US Army Corps of Engineers | January 13, 2015 | U.S. Army Corps of Engineers letter reiterates a request for a feasibility analysis of trenchless crossings. |
| Constitution and NYSDEC | January 23, 2015 | Meeting between Constitution and NYSDEC staff wherein Constitution stated it was unable to complete the table (described above on December 31, 2014). NYSDEC staff indicated that the justification for stream crossing methods was insufficient and that appropriate site specific information must be provided. |
| Constitution and NYSDEC | January 28, 2015 | Conference call: NYSDEC reiterated its request for a site specific analysis of trenchless stream crossings for all streams including those under 30 feet wide. |
| Constitution | February 5, 2015 | Constitution provided an updated example of a trenchless feasibility study but that example continued to exclude streams up to 30 feet wide from analysis and did not provide detailed information of the majority of streams. |

Constitution submitted a Trenchless Feasibility Study (Study) to FERC in November of 2013 which the Department has analyzed for the purpose of reviewing Constitution's WQC application. This Study did not include the information that FERC directed Constitution to supply to NYSDEC (and others) in its April 9, 2013 EIR, which incorporated NYSDEC's information requests, including NYSDEC's request to

10

SPA10

Constitution dated November 7, 2012. Moreover, the Study did not include information that NYSDEC specifically requested in meetings and site visits with Constitution throughout 2013 and did not provide a reasoned analysis to enable the Department to determine if the Project demonstrates compliance with water quality standards.

Of the 251 streams to be impacted by the Project, Constitution's Study evaluated only 87 streams, in addition to the Schoharie Creek, as part of the Phase I desktop analysis[9] which Constitution used to determine if surface installation methods warranted consideration for a trenchless design. Of the 87 streams reviewed, Constitution automatically eliminated 41 streams from consideration for trenchless crossing because those streams were 30 feet wide or less. Constitution further eliminated 10 more streams from the Study because although they were in the proposed ROW, they would not be crossed by the Project. Accordingly, a total of 24 streams were subsequently analyzed in the Study's Phase II analysis which evaluated construction limiting factors including available workspace, construction schedules and finances. Using its review criteria, Constitution's Study finally concluded that only 11 stream crossings of the 251 displayed preliminary evidence in support of a potentially successful trenchless design and were chosen for the Phase III geotechnical field analysis. Department staff consistently told Constitution that its November 2013 Trenchless Feasibility Study was incomplete and inadequate (See Table 2).

Constitution's continued unwillingness to provide a complete and thorough, Trenchless Feasibility Study required Department staff to engage in a dialogue with Constitution on potential trenchless crossings for a limited number of streams. On April 24, 2015, Constitution's consultant produced a revised draft list of 29 trenchless stream crossings and an example of plans that would be provided for each crossing on the proposed list. Subsequently, in May 2015, Constitution provided detailed project plans for 25 potential trenchless crossings, but only two of those plans were based on full geotechnical borings that are necessary to evaluate the potential success of a trenchless design. Detailed project plans including full geotechnical borings for the remaining stream crossings have not been provided to the Department. From May through August 2015, NYSDEC engaged in a dialogue with Constitution on potential trenchless methods for 19 streams, although NYSDEC did not form a conclusion on a crossing method for the remaining streams, including the vast majority of trout and trout spawning streams. Furthermore, as noted above, Constitution's unwillingness to adequately explore the Alternative M route alternative, with the prospect of potentially fewer overall impacts to water bodies and wetlands when compared to Constitution's preferred route, means that the Department is unable to determine whether an alternative route is actually more protective of water quality standards. The Department therefore does not have adequate information to assure that sufficient impact avoidance, minimization or mitigation measures were considered as to each of the more than 200 streams proposed for trenched crossings.

---

[9] Constitution described the Phase I analysis as "a general evaluation of Project locations meeting the basic criteria for trenchless construction methods such as crossing distances, feature classifications and potential associated impacts."

11

Due to the lack of detailed project plans, including geotechnical borings, the Department has determined to deny Constitution's WQC Application because the supporting materials supplied by Constitution do not provide sufficient information for each stream crossing to demonstrate compliance with applicable narrative water quality standards for turbidity and preservation of best usages of affected water bodies. Specifically, the Application lacks sufficient information to demonstrate that the Project will result in no increase that will cause a substantial visible contrast to natural conditions.[10]

Furthermore, the Application remains deficient in that it does not contain sufficient information to demonstrate compliance with 6 NYCRR Part 701 setting forth conditions applying to best usages of all water classifications. Specifically, "the discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of the discharge and at other locations that may be affected by such discharge."[11]

Cumulatively, impacts to both small and large streams from the construction and operation of the Project can be profound and include loss of available habitat, changes in thermal conditions, increased erosion, creation of stream instability and turbidity, impairment of best usages, as well as watershed-wide impacts resulting from placement of the pipeline across water bodies in remote and rural areas (See Project Description and Environmental Impacts Section, above). Because the Department's review concludes that Constitution did not provide sufficient detailed information including site specific project plans regarding stream crossings (*e.g.* geotechnical borings) the Department has determined to deny Constitution's WQC Application for failure to provide reasonable assurance that each stream crossing will be conducted in compliance with 6 NYCRR §608.9.

In addition, the Application lacks required site-specific information for each of the 251 stream crossings including, but not limited to the specific location of access roads, definite location of temporary stream crossing bridges, details of temporary bridges including depth of abutments in stream banks, details of proposed blasting and the location of temporary coffer dams for stream crossings. Absent this information and the information described above, the Department cannot determine whether additional water quality impact avoidance, minimization or mitigation measures must be taken to ensure compliance with water quality standards in water bodies associated with this infrastructure.

<u>Insufficient Site-Specific Information on Depth of Pipe</u>

NYSDEC received numerous public comments regarding the necessary depth for pipeline burial in stream beds that would prevent inadvertent exposure of the pipe. Historically, Department staff has observed numerous and extensive vertical

---

[10] 6 NYCRR §703.2.
[11] 6 NYCRR §701.1.

12

SPA12

movements of streams in New York State that have led to pipe exposure and subsequent remedial projects to rebury the pipe and armor the stream channel. These subsequent corrective actions caused severe negative impacts on water quality and seriously impacted the stability and ecology of the stream that could have been avoided with a deeper pipe. Department staff requested that Constitution provide a comprehensive and site-specific analysis of depth for pipeline burial, but Constitution provided only a limited analysis of burial depth for 21 of the 251 New York streams.[12] Without a site-specific analysis of the potential for vertical movement of each steam crossing to justify a burial depth, NYSDEC is unable to determine whether the depth of pipe is protective of State water quality standards and applicable State statutes and standards.

In addition to impacts to water quality described above and without proper site-specific evaluations, future high flow events could expose the pipeline, resulting in risks to the health, safety, and welfare of the people of New York State. Pipe exposure would require more extensive stabilization measures and in stream disturbances resulting in addition degradation to environmental quality. We note that flooding conditions from extreme precipitation events are projected to increase on the operational span of the pipeline due to climate change.

Deficient Blasting Information

Constitution's Blasting Plan, dated August, 2014, outlines the procedures and safety measures to which Constitution would adhere in the event that blasting is required for Project installation. The Blasting Plan does not provide site-specific information where blasting will occur but instead provides a list of potential blasting locations based on the presence of shallow bedrock. In New York alone, Constitution identifies 42.77 total miles where shallow bedrock occurs, or approximately 44 per cent of the route, involving 84 wetlands crossings and 27 waterbody crossings. Constitution indicates that a final determination on the need for blasting will be made at the time of construction in waterbodies and wetlands. Due to the lack of specific blasting information needed for review with respect to associated water bodies, NYSDEC is unable to determine whether this Plan is protective of State water quality standards and in compliance with applicable State statutes and standards.

## Wetlands Crossings

Wetlands provide valuable water quality protection by retaining and cleansing surface runoff to water bodies. Constitution's Application does not demonstrate that wetland crossings will be performed in a manner that will avoid or minimize discharges to navigable waters that would violate water quality standards, including turbidity. Absent detailed information for each wetland crossing that demonstrates Constitution properly avoided, minimized and mitigated impacts to wetland and adjacent areas, the Application does not supply the Department with adequate information to assure that

---

[12] See, Trout Stream Restoration Report, dated August 2014.

13

**SPA13**

streams and water bodies will not be subject to discharges that do not comply with applicable water quality standards.

## NYSDEC Denial

Constitution was required to submit an Application providing sufficient information to demonstrate compliance with the regulations found at 6 NYCRR §608.9, Water Quality Certifications. Pursuant to this regulation, an Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701,702,703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[13] The Department must also take into account the cumulative impact to water quality of the full complement of affected water resources in making any determination in connection with any license, order, permit or certification.[14] For the reasons articulated above, the Department hereby denies Constitution's WQC Application because it does not supply adequate information to determine whether the Application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations.

This notice of denial serves as the Department's final determination. Should Constitution wish to address the above deficiencies, a new WQC application must be submitted pursuant to 6 NYCRR §608.9 and 6 NYCRR Part 621. Uniform Procedures Regulations, 6 NYCRR §621.10 provide that that an applicant has a right to a public hearing on the denial of a permit, including a §401 WQC. A request for hearing must be made in writing to me within 30 days of the date of this letter.

Sincerely,

John Ferguson
Chief Permit Administrator

Cc:
T. Berkman
W. Little
P. Desnoyers
S. Tomasik
D. Merz
F. Bifera
Y. Hennessey
K. Bowman

---

[13] 6 NYCRR §608.9 (2) and (6).
[14] ECL 3-0301 (1)(b).

14

SPA14

# I. Administrative Procedure Act, 5 U.S.C. § 706

## § 706 Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# II. Natural Gas Act, 15 U.S.C. § 717b

## § 717b Exportation or Importation of Natural Gas; LNG Terminals

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may

from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) Free trade agreements
With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and
(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) Expedited application and approval process
For purposes of subsection (a) of this section, the importation of the natural gas referred to in subsection (b) of this section, or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Construction with other laws
Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);
(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or
(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(e) LNG terminals
(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.
(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--
(A) set the matter for hearing;
(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG

terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)

(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find (sic) necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not--

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on--

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

(f) Military installations

(1) In this subsection, the term "military installation"--

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult (sic) with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

### III. <u>Natural Gas Act, 15 U.S.C. § 717f</u>

**§ 717f Construction, Extension, or Abandonment of Facilities**

(a) Extension or improvement of facilities on order of court; notice and hearing Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: Provided, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

(b) Abandonment of facilities or services; approval of Commission
 No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

(c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: Provided, however, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: Provided, however, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

(d) Application for certificate of public convenience and necessity
Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Granting of certificate of public convenience and necessity
 Except in the cases governed by the provisos contained in subsection (c) (1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

(f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

(g) Certificate of public convenience and necessity for service of area already being served

 Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

(h) Right of eminent domain for construction of pipelines, etc.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

## IV.    Natural Gas Act, 15 U.S.C. § 717n

**§ 717n Process Coordination; Hearings; Rules of Procedure**

(a) Definition
 In this section, the term "Federal authorization"--
> (1) means any authorization required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title; and
> (2) includes any permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title.

(b) Designation as lead agency
> (1) In general

The Commission shall act as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2) Other agencies

Each Federal and State agency considering an aspect of an application for Federal authorization shall cooperate with the Commission and comply with the deadlines established by the Commission.

(c) Schedule

(1) Commission authority to set schedule

The Commission shall establish a schedule for all Federal authorizations. In establishing the schedule, the Commission shall--

(A) ensure expeditious completion of all such proceedings; and

(B) comply with applicable schedules established by Federal law.

(2) Failure to meet schedule

If a Federal or State administrative agency does not complete a proceeding for an approval that is required for a Federal authorization in accordance with the schedule established by the Commission, the applicant may pursue remedies under section 717r(d) of this title.

(d) Consolidated record

The Commission shall, with the cooperation of Federal and State administrative agencies and officials, maintain a complete consolidated record of all decisions made or actions taken by the Commission or by a Federal administrative agency or officer (or State administrative agency or officer acting under delegated Federal authority) with respect to any Federal authorization. Such record shall be the record for--

(1) appeals or reviews under the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), provided that the record may be supplemented as expressly provided pursuant to section 319 of that Act; or

(2) judicial review under section 717r(d) of this title of decisions made or actions taken of Federal and State administrative agencies and officials, provided that, if the Court determines that the record does not contain sufficient information, the Court may remand the proceeding to the Commission for further development of the consolidated record.

(e) Hearings; parties

Hearings under this chapter may be held before the Commission, any member or members thereof, or any representative of the Commission designated by it, and appropriate records thereof shall be kept. In any proceeding before it, the

Commission in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

(f) Procedure
All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

## V.    Natural Gas Act, 15 U.S.C. § 717r

**§ 717r Rehearing and Review**

(a) Application for rehearing; time
Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission order
The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(d) Judicial review

(1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

(3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title , the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

(4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

(5) Expedited review
The Court shall set any action brought under this subsection for expedited consideration.

## VI.  <u>Navigation and Navigable Waters, 33 U.S.C. § 1251</u>

**§ 1251 Congressional Declaration of Goals and Policy**

(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as

to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

(c) Congressional policy toward Presidential activities with foreign countries

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

(d) Administrator of Environmental Protection Agency to administer chapter

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

(e) Public participation in development, revision, and enforcement of any regulation, etc.

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the

SPA27

Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

(f) Procedures utilized for implementing chapter

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

(g) Authority of States over water

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

## VII.  <u>Navigation and Navigable Waters, 33 U.S.C. § 1313</u>

**§ 1313 Water Quality Standards and Implementation Plans**

(a) Existing water quality standards
(1) In order to carry out the purpose of this chapter, any water quality standard applicable to interstate waters which was adopted by any State and submitted to, and approved by, or is a waiting (sic) approval by, the Administrator pursuant to this Act as in effect immediately prior to October 18, 1972, shall remain in effect unless the Administrator determined that such standard is not consistent with the applicable requirements of this Act as in effect immediately prior to October 18, 1972. If the Administrator makes such a determination he shall, within three months after October 18, 1972, notify the State and specify the changes needed to meet such requirements. If such changes are not adopted by the State within ninety days after the date of such notification, the Administrator shall promulgate such changes in accordance with subsection (b) of this section.

(2) Any State which, before October 18, 1972, has adopted, pursuant to its own law, water quality standards applicable to intrastate waters shall submit such standards to the Administrator within thirty days after October 18, 1972. Each such standard shall remain in effect, in the same manner and to the same extent as any other water quality standard established under this chapter unless the Administrator determines that such standard is inconsistent with the applicable requirements of this Act as in effect immediately prior to October 18, 1972. If the Administrator makes such a determination he shall not later than the one hundred and twentieth day after the date of submission of such standards, notify the State and specify the changes needed to meet such requirements. If such changes are not adopted by the State within ninety days after such notification, the Administrator shall promulgate such changes in accordance with subsection (b) of this section.

(3)     (A) Any State which prior to October 18, 1972, has not adopted pursuant to its own laws water quality standards applicable to intrastate waters shall, not later than one hundred and eighty days after October 18, 1972, adopt and submit such standards to the Administrator.
(B) If the Administrator determines that any such standards are consistent with the applicable requirements of this Act as in effect immediately prior to October 18, 1972, he shall approve such standards.
(C) If the Administrator determines that any such standards are not consistent with the applicable requirements of this Act as in effect immediately prior to October 18, 1972, he shall, not later than the ninetieth day after the date of submission of such standards, notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the Administrator shall promulgate such standards pursuant to subsection (b) of this section.

(b) Proposed regulations
(1) The Administrator shall promptly prepare and publish proposed regulations setting forth water quality standards for a State in accordance with the applicable requirements of this Act as in effect immediately prior to October 18, 1972, if--

(A) the State fails to submit water quality standards within the times prescribed in subsection (a) of this section.
(B) a water quality standard submitted by such State under subsection (a) of this section is determined by the Administrator not to be consistent with the applicable requirements of subsection (a) of this section.
(2) The Administrator shall promulgate any water quality standard published in a proposed regulation not later than one hundred and ninety days after the date he publishes any such proposed standard, unless prior to such promulgation, such State has adopted a water quality standard which the Administrator determines to be in accordance with subsection (a) of this section.

(c) Review; revised standards; publication
(1) The Governor of a State or the State water pollution control agency of such State shall from time to time (but at least once each three year period beginning with October 18, 1972) hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards. Results of such review shall be made available to the Administrator.
(2)    (A) Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

(B) Whenever a State reviews water quality standards pursuant to paragraph (1) of this subsection, or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this title for which criteria have been published under section 1314(a) of this title, the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses.

Such criteria shall be specific numerical criteria for such toxic pollutants. Where such numerical criteria are not available, whenever a State reviews water quality standards pursuant to paragraph (1), or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8) of this title. Nothing in this section shall be construed to limit or delay the use of effluent limitations or other permit conditions based on or involving biological monitoring or assessment methods or previously adopted numerical criteria.

(3) If the Administrator, within sixty days after the date of submission of the revised or new standard, determines that such standard meets the requirements of this chapter, such standard shall thereafter be the water quality standard for the applicable waters of that State. If the Administrator determines that any such revised or new standard is not consistent with the applicable requirements of this chapter, he shall not later than the ninetieth day after the date of submission of such standard notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the Administrator shall promulgate such standard pursuant to paragraph (4) of this subsection.

(4) The Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved--
 (A) if a revised or new water quality standard submitted by such State under paragraph (3) of this subsection for such waters is determined by the Administrator not to be consistent with the applicable requirements of this chapter, or
 (B) in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter.

The Administrator shall promulgate any revised or new standard under this paragraph not later than ninety days after he publishes such proposed standards, unless prior to such promulgation, such State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter.

(d) Identification of areas with insufficient controls; maximum daily load; certain effluent limitations revision

(1)

    (A) Each State shall identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters.

    (B) Each State shall identify those waters or parts thereof within its boundaries for which controls on thermal discharges under section 1311 of this title are not stringent enough to assure protection and propagation of a balanced indigenous population of shellfish, fish, and wildlife.

    (C) Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

    (D) Each State shall estimate for the waters identified in paragraph (1)(B) of this subsection the total maximum daily thermal load required to assure protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife. Such estimates shall take into account the normal water temperatures, flow rates, seasonal variations, existing sources of heat input, and the dissipative capacity of the identified waters or parts thereof. Such estimates shall include a calculation of the maximum heat input that can be made into each such part and shall include a margin of safety which takes into account any lack of knowledge concerning the development of thermal water quality criteria for such protection and propagation in the identified waters or parts thereof.

(2) Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this

subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

(3) For the specific purpose of developing information, each State shall identify all waters within its boundaries which it has not identified under paragraph (1)(A) and (1)(B) of this subsection and estimate for such waters the total maximum daily load with seasonal variations and margins of safety, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation and for thermal discharges, at a level that would assure protection and propagation of a balanced indigenous population of fish, shellfish, and wildlife.

(4) Limitations on revision of certain effluent limitations
    (A) Standard not attained
    For waters identified under paragraph (1)(A) where the applicable water quality standard has not yet been attained, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section may be revised only if (i) the cumulative effect of all such revised effluent limitations based on such total maximum daily load or waste load allocation will assure the attainment of such water quality standard, or (ii) the designated use which is not being attained is removed in accordance with regulations established under this section.
    (B) Standard attained
    For waters identified under paragraph (1)(A) where the quality of such waters equals or exceeds levels necessary to protect the designated use for such waters or otherwise required by applicable water quality standards, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section, or any water quality standard established under this section, or any other permitting standard may be revised only if such revision is subject to

and consistent with the antidegradation policy established under this section.

(e) Continuing planning process

(1) Each State shall have a continuing planning process approved under paragraph (2) of this subsection which is consistent with this chapter.

(2) Each State shall submit not later than 120 days after October 18, 1972, to the Administrator for his approval a proposed continuing planning process which is consistent with this chapter. Not later than thirty days after the date of submission of such a process the Administrator shall either approve or disapprove such process. The Administrator shall from time to time review each State's approved planning process for the purpose of insuring that such planning process is at all times consistent with this chapter. The Administrator shall not approve any State permit program under subchapter IV of this chapter for any State which does not have an approved continuing planning process under this section.

(3) The Administrator shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such State, which include, but are not limited to, the following:

(A) effluent limitations and schedules of compliance at least as stringent as those required by section 1311(b)(1), section 1311(b)(2), section 1316, and section 1317 of this title, and at least as stringent as any requirements contained in any applicable water quality standard in effect under authority of this section;

(B) the incorporation of all elements of any applicable area-wide waste management plans under section 1288 of this title, and applicable basin plans under section 1289 of this title;

(C) total maximum daily load for pollutants in accordance with subsection (d) of this section;

(D) procedures for revision;

(E) adequate authority for intergovernmental cooperation;

(F) adequate implementation, including schedules of compliance, for revised or new water quality standards, under subsection (c) of this section;

(G) controls over the disposition of all residual waste from any water treatment processing;

(H) an inventory and ranking, in order of priority, of needs for construction of waste treatment works required to meet the applicable requirements of sections 1311 and 1312 of this title.

(f) Earlier compliance

 Nothing in this section shall be construed to affect any effluent limitation, or schedule of compliance required by any State to be implemented prior to the dates set forth in sections 1311(b)(1) and 1311(b)(2) of this title nor to preclude any State from requiring compliance with any effluent limitation or schedule of compliance at dates earlier than such dates.

(g) Heat standards

 Water quality standards relating to heat shall be consistent with the requirements of section 1326 of this title.

(h) Thermal water quality standards

 For the purposes of this chapter the term "water quality standards" includes thermal water quality standards.

(i) Coastal recreation water quality criteria
    (1) Adoption by States
        (A) Initial criteria and standards
        Not later than 42 months after October 10, 2000, each State having coastal recreation waters shall adopt and submit to the Administrator water quality criteria and standards for the coastal recreation waters of the State for those pathogens and pathogen indicators for which the Administrator has published criteria under section 1314(a) of this title.

        (B) New or revised criteria and standards
        Not later than 36 months after the date of publication by the Administrator of new or revised water quality criteria under section 1314(a)(9) of this title, each State having coastal recreation waters

shall adopt and submit to the Administrator new or revised water quality standards for the coastal recreation waters of the State for all pathogens and pathogen indicators to which the new or revised water quality criteria are applicable.

(2) Failure of States to adopt
(A) In general
If a State fails to adopt water quality criteria and standards in accordance with paragraph (1)(A) that are as protective of human health as the criteria for pathogens and pathogen indicators for coastal recreation waters published by the Administrator, the Administrator shall promptly propose regulations for the State setting forth revised or new water quality standards for pathogens and pathogen indicators described in paragraph (1)(A) for coastal recreation waters of the State.

(B) Exception
If the Administrator proposes regulations for a State described in subparagraph (A) under subsection (c)(4)(B) of this section, the Administrator shall publish any revised or new standard under this subsection not later than 42 months after October 10, 2000.

(3) Applicability
Except as expressly provided by this subsection, the requirements and procedures of subsection (c) of this section apply to this subsection, including the requirement in subsection (c)(2)(A) of this section that the criteria protect public health and welfare.

## VIII. Navigation and Navigable Waters, 33 U.S.C. § 1341

### § 1341 Certification

(a) Compliance with applicable requirements; application; procedures; license suspension

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the

discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such

agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the

operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

(b) Compliance with other provisions of law setting applicable water quality requirements

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

(d) Limitations and monitoring requirements of certification

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

## IX.   Navigation and Navigable Waters, 33 U.S.C. § 1344

**§ 1344 Permits for Dredged or Fill Material**

(a) Discharge into navigable waters at specified disposal sites

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

(b) Specification for disposal sites

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the

SPA40

territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

(c) Denial or restriction of use of defined areas as disposal sites

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

(d) "Secretary" defined

The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

(e) General permits on State, regional, or nationwide basis
   (1) In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.


   (2) No general permit issued under this subsection shall be for a period of more than five years after the date of its issuance and such general permit

may be revoked or modified by the Secretary if, after opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

(f) Non-prohibited discharge of dredged or fill material
 (1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material--
  (A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;
  (B) for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;
  (C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;
  (D) for the purpose of construction of temporary sedimentation basins on a construction site which does not include placement of fill material into the navigable waters;
  (E) for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized;
  (F) resulting from any activity with respect to which a State has an approved program under section 1288(b)(4) of this title which meets the requirements of subparagraphs (B) and (C) of such section, is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

 (2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the

flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

(g) State administration

(1) The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

(2) Not later than the tenth day after the date of the receipt of the program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

(3) Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

(h) Determination of State's authority to issue permits under State program; approval; notification; transfers to State program

(1) Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine,

taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

> (A) To issue permits which--
>> (i) apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;
>> (ii) are for fixed terms not exceeding five years; and
>> (iii) can be terminated or modified for cause including, but not limited to, the following:
>>> (I) violation of any condition of the permit;
>>> (II) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;
>>> (III) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

> (B) To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

> (C) To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

> (D) To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

> (E) To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the

Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

(F) To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

(G) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

(H) To assure continued coordination with Federal and Federal-State water-related planning and review processes.

(2) If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State--

(A) has the authority set forth in paragraph (1) of this subsection, the Administrator shall approve the program and so notify (i) such State and (ii) the Secretary, who upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

(B) does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

(3) If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g)(1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section

for activities with respect to which a permit may be issued by such State.

(4) After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

(5) Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

(i) Withdrawal of approval

Whenever the Administrator determines after public hearing that a State is not administering a program approved under subsection (h)(2)(A) of this section, in accordance with this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days after the date of the receipt of such notification, the Administrator shall (1) withdraw approval of such program until the Administrator determines such corrective action has been taken, and (2) notify the Secretary that the Secretary shall resume the program for the issuance of permits under subsections (a) and (e) of this section for activities with respect to which the State was issuing permits and that such authority of the Secretary shall continue in effect until such time as the Administrator makes the determination described in clause (1) of this subsection and such State again has an approved program.

(j) Copies of applications for State permits and proposed general permits to be transmitted to Administrator

Each State which is administering a permit program pursuant to this section shall transmit to the Administrator (1) a copy of each permit application received by such State and provide notice to the Administrator of every action related to the

consideration of such permit application, including each permit proposed to be issued by such State, and (2) a copy of each proposed general permit which such State intends to issue. Not later than the tenth day after the date of the receipt of such permit application or such proposed general permit, the Administrator shall provide copies of such permit application or such proposed general permit to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. If the Administrator intends to provide written comments to such State with respect to such permit application or such proposed general permit, he shall so notify such State not later than the thirtieth day after the date of the receipt of such application or such proposed general permit and provide such written comments to such State, after consideration of any comments made in writing with respect to such application or such proposed general permit by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, not later than the ninetieth day after the date of such receipt. If such State is so notified by the Administrator, it shall not issue the proposed permit until after the receipt of such comments from the Administrator, or after such ninetieth day, whichever first occurs. Such State shall not issue such proposed permit after such ninetieth day if it has received such written comments in which the Administrator objects (A) to the issuance of such proposed permit and such proposed permit is one that has been submitted to the Administrator pursuant to subsection (h)(1)(E) of this section, or (B) to the issuance of such proposed permit as being outside the requirements of this section, including, but not limited to, the guidelines developed under subsection (b)(1) of this section unless it modifies such proposed permit in accordance with such comments. Whenever the Administrator objects to the issuance of a permit under the preceding sentence such written objection shall contain a statement of the reasons for such objection and the conditions which such permit would include if it were issued by the Administrator. In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

(k) Waiver

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of

subsection (j) of this section at the time of the approval of a program pursuant to subsection (h)(2)(A) of this section for any category (including any class, type, or size within such category) of discharge within the State submitting such program.

(l) Categories of discharges not subject to requirements

The Administrator shall promulgate regulations establishing categories of discharges which he determines shall not be subject to the requirements of subsection (j) of this section in any State with a program approved pursuant to subsection (h)(2)(A) of this section. The Administrator may distinguish among classes, types, and sizes within any category of discharges.

(m) Comments on permit applications or proposed general permits by Secretary of the Interior acting through Director of United States Fish and Wildlife Service

Not later than the ninetieth day after the date on which the Secretary notifies the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service that (1) an application for a permit under subsection (a) of this section has been received by the Secretary, or (2) the Secretary proposes to issue a general permit under subsection (e) of this section, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such application or such proposed general permit in writing to the Secretary.

(n) Enforcement authority not limited

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

(o) Public availability of permits and permit applications

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or portion thereof, shall further be available on request for the purpose of reproduction.

(p) Compliance

Compliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title.

(q) Minimization of duplication, needless paperwork, and delays in issuance; agreements

Not later than the one-hundred-eightieth day after December 27, 1977, the Secretary shall enter into agreements with the Administrator, the Secretaries of the Departments of Agriculture, Commerce, Interior, and Transportation, and the heads of other appropriate Federal agencies to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section. Such agreements shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section.

(r) Federal projects specifically authorized by Congress

The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

(s) Violation of permits

(1) Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.

(2) A copy of any order issued under this subsection shall be sent immediately by the Secretary to the State in which the violation occurs and other affected States. Any order issued under this subsection shall be by personal service and shall state with reasonable specificity the nature of the violation, specify a time for compliance, not to exceed thirty days, which the Secretary determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection is issued to a corporation, a copy of such order shall be served on any appropriate corporate officers.

(3) The Secretary is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such acton (sic) shall be given immediately to the appropriate State.

(4) Any person who violates any condition or limitation in a permit issued by the Secretary under this section, and any person who violates any order issued by the Secretary under paragraph (1) of this subsection, shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

(t) Navigable waters within State jurisdiction

Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements.

SPA50

This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

### X.  Public Health and Welfare, 42 U.S.C. § 7172

**§ 7172 Jurisdiction of Commission**

(a) Transfer of functions from Federal Power Commission

(1) There are transferred to, and vested in, the Commission the following functions of the Federal Power Commission or of any member of the Commission or any officer or component of the Commission:

(A) the investigation, issuance, transfer, renewal, revocation, and enforcement of licenses and permits for the construction, operation, and maintenance of dams, water conduits, reservoirs, powerhouses, transmission lines, or other works for the development and improvement of navigation and for the development and utilization of power across, along, from, or in navigable waters under part I of the Federal Power Act [16 U.S.C.A. § 791a et seq.];

(B) the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including determinations on construction work in progress, under part II of the Federal Power Act [16 U.S.C.A. § 824 et seq.], and the interconnection, under section 202(b), of such Act [16 U.S.C.A. § 824a(b) ], of facilities for the generation, transmission, and sale of electric energy (other than emergency interconnection);

(C) the establishment, review, and enforcement of rates and charges for the transportation and sale of natural gas by a producer or gatherer or by a natural gas pipeline or natural gas company under sections 1, 4, 5, and 6 of the Natural Gas Act [15 U.S.C.A. §§ 717, 717c to 717e];

(D) the issuance of a certificate of public convenience and necessity, including abandonment of facilities or services, and the establishment of physical connections under section 7 of the Natural Gas Act [15 U.S.C.A. § 717f];

(E) the establishment, review, and enforcement of curtailments, other than the establishment and review of priorities for such curtailments, under the Natural Gas Act [15 U.S.C.A. § 717 et seq.]; and

(F) the regulation of mergers and securities acquisition under the Federal Power Act [16 U.S.C.A. § 791a et seq.] and Natural Gas Act [15 U.S.C.A. § 717 et seq.].

(2) The Commission may exercise any power under the following sections to the extent the Commission determines such power to be necessary to the exercise of any function within the jurisdiction of the Commission:

(A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act [16 U.S.C.A. §§ 797, 825, 825a, 825e to 825h, 825k to 825o]; and

(B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act [15 U.S.C.A. §§ 717g, 717h, 717l to 717p, 717s, 717t].

(b) Repealed. Pub.L. 103-272, § 7(b), July 5, 1994, 108 Stat. 1379

(c) Consideration of proposals made by Secretary to amend regulations issued under section 753 of Title 15; exception

(1) Pursuant to the procedures specified in section 7174 of this title and except as provided in paragraph (2), the Commission shall have jurisdiction to consider any proposal by the Secretary to amend the regulation required to be issued under section 753(a) of Title 15 which is required by section 757 or 760a of Title 15 to be transmitted by the President to, and reviewed by, each House of Congress, under section 6421 of this title.

(2) In the event that the President determines that an emergency situation of overriding national importance exists and requires the expeditious promulgation of a rule described in paragraph (1), the President may direct the Secretary to assume sole jurisdiction over the promulgation of such rule, and such rule shall be transmitted by the President to, and reviewed by, each House of Congress under section 757 or 760a of Title 15, and section 6421 of this title.

(d) Matters involving agency determinations to be made on record after agency hearing

The Commission shall have jurisdiction to hear and determine any other matter arising under any other function of the Secretary--

(1) involving any agency determination required by law to be made on the record after an opportunity for an agency hearing; or

(2) involving any other agency determination which the Secretary determines shall be made on the record after an opportunity for an agency hearing,

except that nothing in this subsection shall require that functions under sections 6213 and 6214 of this title shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

(e) Matters assigned by Secretary after public notice and matters referred under section 7174 of this title

In addition to the other provisions of this section, the Commission shall have jurisdiction over any other matter which the Secretary may assign to the Commission after public notice, or which are required to be referred to the Commission pursuant to section 7174 of this title.

(f) Limitation

No function described in this section which regulates the exports or imports of natural gas or electricity shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

(g) Final agency action

The decision of the Commission involving any function within its jurisdiction, other than action by it on a matter referred to it pursuant to section 7174 of this title, shall be final agency action within the meaning of section 704 of Title 5 and shall not be subject to further review by the Secretary or any officer or employee of the Department.

(h) Rules, regulations, and statements of policy

The Commission is authorized to prescribe rules, regulations, and statements of policy of general applicability with respect to any function under the jurisdiction of the Commission pursuant to this section.

# XI. Conservation of Power and Water Resources, 18 CFR § 380.12

## § 380.12 Environmental Reports for Natural Gas Applications

(a) Introduction.

(1) The applicant must submit an environmental report with any application that proposes the construction, operation, or abandonment of any facility identified in § 380.3(c)(2)(i). The environmental report shall consist of the thirteen resource reports and related material described in this section.

(2) The detail of each resource report must be commensurate with the complexity of the proposal and its potential for environmental impact. Each topic in each resource report shall be addressed or its omission justified, unless the resource report description indicates that the data is not required for that type of proposal. If material required for one resource report is provided in another resource report or in another exhibit, it may be incorporated by reference. If any resource report topic is required for a particular project but is not provided at the time the application is filed, the environmental report shall explain why it is missing and when the applicant anticipates it will be filed.

(3) The appendix to this part contains a checklist of the minimum filing requirements for an environmental report. Failure to provide at least the applicable checklist items will result in rejection of the application unless the Director of the Office of Energy Projects determines that the applicant has provided an acceptable reason for the item's absence and an acceptable schedule for filing it. Failure to file within the accepted schedule will result in rejection of the application.

(b) General requirements. As appropriate, each resource report shall:

(1) Address conditions or resources that might be directly or indirectly affected by the project;

(2) Identify significant environmental effects expected to occur as a result of the project;

(3) Identify the effects of construction, operation (including maintenance and malfunctions), and termination of the project, as well as cumulative effects resulting from existing or reasonably foreseeable projects;

(4) Identify measures proposed to enhance the environment or to avoid, mitigate, or compensate for adverse effects of the project;

(5) Provide a list of publications, reports, and other literature or communications, including agency contacts, that were cited or relied upon to

SPA54

prepare each report. This list should include the name and title of the person contacted, their affiliations, and telephone number;

(6) Whenever this section refers to "mileposts" the applicant may substitute "survey centerline stationing" if so desired. However, whatever method is chosen should be used consistently throughout the resource reports.

(c) Resource Report 1—General project description. This report is required for all applications. It will describe facilities associated with the project, special construction and operation procedures, construction timetables, future plans for related construction, compliance with regulations and codes, and permits that must be obtained. Resource Report 1 must:

(1) Describe and provide location maps of all jurisdictional facilities, including all aboveground facilities associated with the project (such as: meter stations, pig launchers/receivers, valves), to be constructed, modified, abandoned, replaced, or removed, including related construction and operational support activities and areas such as maintenance bases, staging areas, communications towers, power lines, and new access roads (roads to be built or modified). As relevant, the report must describe the length and diameter of the pipeline, the types of aboveground facilities that would be installed, and associated land requirements. It must also identify other companies that must construct jurisdictional facilities related to the project, where the facilities would be located, and where they are in the Commission's approval process.

(2) Identify and describe all nonjurisdictional facilities, including auxiliary facilities, that will be built in association with the project, including facilities to be built by other companies.

(i) Provide the following information:

(A) A brief description of each facility, including as appropriate: Ownership, land requirements, gas consumption, megawatt size, construction status, and an update of the latest status of Federal, state, and local permits/approvals;

(B) The length and diameter of any interconnecting pipeline;

(C) Current 1:24,000/1:25,000 scale topographic maps showing the location of the facilities;

(D) Correspondence with the appropriate State Historic Preservation Officer (SHPO) or duly authorized Tribal Historic Preservation Officer (THPO) for tribal lands regarding whether properties eligible for listing on the National Register of Historic Places (NRHP) would be affected;

SPA55

(E) Correspondence with the U.S. Fish and Wildlife Service (and National Marine Fisheries Service, if appropriate) regarding potential impacts of the proposed facility on federally listed threatened and endangered species; and

(F) For facilities within a designated coastal zone management area, a consistency determination or evidence that the owner has requested a consistency determination from the state's coastal zone management program.

(ii) Address each of the following factors and indicate which ones, if any, appear to indicate the need for the Commission to do an environmental review of project-related nonjurisdictional facilities.

(A) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(B) Whether there are aspects of the nonjurisdictional facility in the immediate vicinity of the regulated activity which uniquely determine the location and configuration of the regulated activity.

(C) The extent to which the entire project will be within the Commission's jurisdiction.

(D) The extent of cumulative Federal control and responsibility.

(3) Provide the following maps and photos:

(i) Current, original United States Geological Survey (USGS) 7.5–minute series topographic maps or maps of equivalent detail, covering at least a 0.5–mile–wide corridor centered on the pipeline, with integer mileposts identified, showing the location of rights-of-way, new access roads, other linear construction areas, compressor stations, and pipe storage areas. Show nonlinear construction areas on maps at a scale of 1:3,600 or larger keyed graphically and by milepost to the right-of-way maps.

(ii) Original aerial images or photographs or photo-based alignment sheets based on these sources, not more than 1 year old (unless older ones accurately depict current land use and development) and with a scale of 1:6,000 or larger, showing the proposed pipeline route and location of major aboveground facilities, covering at least a 0.5 mile–wide corridor, and including mileposts. Older images/photographs/alignment sheets should be modified to show any residences not depicted in the original. Alternative formats (e.g., blue-line prints of acceptable resolution) need prior approval by the environmental staff of the Office of Energy Projects.

(iii) In addition to the copy required under § 157.6(a)(2) of this chapter, applicant should send two additional copies of topographic maps and aerial images/photographs directly to the environmental staff of the Office of Energy Projects.

(4) When new or additional compression is proposed, include large scale (1:3,600 or greater) plot plans of each compressor station. The plot plan should reference a readily identifiable point(s) on the USGS maps required in paragraph (c)(3) of this section. The maps and plot plans must identify the location of the nearest noise-sensitive areas (schools, hospitals, or residences) within 1 mile of the compressor station, existing and proposed compressor and auxiliary buildings, access roads, and the limits of areas that would be permanently disturbed.

(5)

(i) Identify facilities to be abandoned, and state how they would be abandoned, how the site would be restored, who would own the site or right-of-way after abandonment, and who would be responsible for any facilities abandoned in place.

(ii) When the right-of-way or the easement would be abandoned, identify whether landowners were given the opportunity to request that the facilities on their property, including foundations and below ground components, be removed. Identify any landowners whose preferences the company does not intend to honor, and the reasons therefore.

(6) Describe and identify by milepost, proposed construction and restoration methods to be used in areas of rugged topography, residential areas, active croplands, sites where the pipeline would be located parallel to and under roads, and sites where explosives are likely to be used.

(7) Unless provided in response to Resource Report 5, describe estimated workforce requirements, including the number of pipeline construction spreads, average workforce requirements for each construction spread and meter or compressor station, estimated duration of construction from initial clearing to final restoration, and number of personnel to be hired to operate the proposed project.

(8) Describe reasonably foreseeable plans for future expansion of facilities, including additional land requirements and the compatibility of those plans with the current proposal.

(9) Describe all authorizations required to complete the proposed action and the status of applications for such authorizations. Identify environmental mitigation requirements specified in any permit or proposed in any permit application to the extent not specified elsewhere in this section.

SPA57

(10) Provide the names and mailing addresses of all affected landowners specified in § 157.6(d) and certify that all affected landowners will be notified as required in § 157.6(d).

(d) *Resource Report 2—Water use and quality.* This report is required for all applications, except those which involve only facilities within the areas of an existing compressor, meter, or regulator station that were disturbed by construction of the existing facilities, no wetlands or waterbodies are on the site and there would not be a significant increase in water use. The report must describe water quality and provide data sufficient to determine the expected impact of the project and the effectiveness of mitigative, enhancement, or protective measures. Resource Report 2 must:

(1) Identify and describe by milepost perennial waterbodies and municipal water supply or watershed areas, specially designated surface water protection areas and sensitive waterbodies, and wetlands that would be crossed. For each waterbody crossing, identify the approximate width, state water quality classifications, any known potential pollutants present in the water or sediments, and any potable water intake sources within 3 miles downstream.

(2) Compare proposed mitigation measures with the staff's current "Wetland and Waterbody Construction and Mitigation Procedures," which are available from the Commission Internet home page or the Commission staff, describe what proposed alternative mitigation would provide equivalent or greater protection to the environment, and provide a description of site-specific construction techniques that would be used at each major waterbody crossing.

(3) Describe typical staging area requirements at waterbody and wetland crossings. Also, identify and describe waterbodies and wetlands where staging areas are likely to be more extensive.

(4) Include National Wetland Inventory (NWI) maps. If NWI maps are not available, provide the appropriate state wetland maps. Identify for each crossing, the milepost, the wetland classification specified by the U.S. Fish and Wildlife Service, and the length of the crossing. Include two copies of the NWI maps (or the substitutes, if NWI maps are not available) clearly showing the proposed route and mileposts directed to the environmental staff. Describe by milepost, wetland crossings as determined by field delineations using the current Federal methodology.

(5) Identify aquifers within excavation depth in the project area, including the depth of the aquifer, current and projected use, water quality and average yield, and known or suspected contamination problems.

(6) Describe specific locations, the quantity required, and the method and rate of withdrawal and discharge of hydrostatic test water. Describe suspended or dissolved material likely to be present in the water as a result of contact with the pipeline, particularly if an existing pipeline is being retested. Describe chemical or physical treatment of the pipeline or hydrostatic test water. Discuss waste products generated and disposal methods.

(7) If underground storage of natural gas is proposed:

(i) Identify how water produced from the storage field will be disposed of, and

(ii) For salt caverns, identify the source locations, the quantity required, and the method and rate of withdrawal of water for creating salt cavern(s), as well as the means of disposal of brine resulting from cavern leaching.

(8) Discuss proposed mitigation measures to reduce the potential for adverse impacts to surface water, wetlands, or groundwater quality to the extent they are not described in response to paragraph (d)(2) of this section. Discuss the potential for blasting to affect water wells, springs, and wetlands, and measures to be taken to detect and remedy such effects.

(9) Identify the location of known public and private groundwater supply wells or springs within 150 feet of proposed construction areas. Identify locations of EPA or state-designated sole-source aquifers and wellhead protection areas crossed by the proposed pipeline facilities.

(e) Resource Report 3—Fish, wildlife, and vegetation. This report is required for all applications, except those involving only facilities within the improved area of an existing compressor, meter, or regulator station. It must describe aquatic life, wildlife, and vegetation in the vicinity of the proposed project; expected impacts on these resources including potential effects on biodiversity; and proposed mitigation, enhancement or protection measures. Resource Report 3 must:

(1) Describe commercial and recreational warmwater, coldwater, and saltwater fisheries in the affected area and associated significant habitats such as spawning or rearing areas and estuaries.

(2) Describe terrestrial habitats, including wetlands, typical wildlife habitats, and rare, unique, or otherwise significant habitats that might be affected by the proposed action. Describe typical species that have commercial, recreational, or aesthetic value.

(3) Describe and provide the acreage of vegetation cover types that would be affected, including unique ecosystems or communities such as remnant

prairie or old-growth forest, or significant individual plants, such as old-growth specimen trees.

(4) Describe the impact of construction and operation on aquatic and terrestrial species and their habitats, including the possibility of a major alteration to ecosystems or biodiversity, and any potential impact on state-listed endangered or threatened species. Describe the impact of maintenance, clearing and treatment of the project area on fish, wildlife, and vegetation. Surveys may be required to determine specific areas of significant habitats or communities of species of special concern to state or local agencies.

(5) Identify all federally listed or proposed endangered or threatened species and critical habitat that potentially occur in the vicinity of the project. Discuss the results of the consultation requirements listed in § 380.13(b) at least through § 380.13(b)(5)(i) and include any written correspondence that resulted from the consultation. The initial application must include the results of any required surveys unless seasonal considerations make this impractical. If species surveys are impractical, there must be field surveys to determine the presence of suitable habitat unless the entire project area is suitable habitat.

(6) Identify all federally listed essential fish habitat (EFH) that potentially occurs in the vicinity of the project. Provide information on all EFH, as identified by the pertinent Federal fishery management plans, that may be adversely affected by the project and the results of abbreviated consultations with NMFS, and any resulting EFH assessments.

(7) Describe site-specific mitigation measures to minimize impacts on fisheries, wildlife, and vegetation.

(8) Include copies of correspondence not provided pursuant to paragraph (e)(5) of this section, containing recommendations from appropriate Federal and state fish and wildlife agencies to avoid or limit impact on wildlife, fisheries, and vegetation, and the applicant's response to the recommendations.

(f) Resource Report 4—Cultural resources. This report is required for all applications. In preparing this report, the applicant must follow the principles in § 380.14 of this part. Guidance on the content and the format for the documentation listed below, as well as professional qualifications of preparers, is detailed in "Office of Energy Projects' (OEP) Guidelines for Reporting on Cultural Resources Investigations," which is available from the Commission Internet home page or from the Commission staff.

(1) Resource Report 4 must contain:

(i) Documentation of the applicant's initial cultural resources consultation, including consultations with Native Americans and other interested persons (if appropriate);

(ii) Overview and Survey Reports, as appropriate;

(iii) Evaluation Report, as appropriate;

(iv) Treatment Plan, as appropriate; and

(v) Written comments from State Historic Preservation Officer(s) (SHPO), Tribal Historic Preservation Officers (THPO), as appropriate, and applicable land-managing agencies on the reports in paragraphs (f)(1)(i)–(iv) of this section.

(2) Initial filing requirements. The initial application must include the documentation of initial cultural resource consultation, the Overview and Survey Reports, if required, and written comments from SHPOs, THPOs and land-managing agencies, if available. The initial cultural resources consultations should establish the need for surveys. If surveys are deemed necessary by the consultation with the SHPO/THPO, the survey report must be filed with the application.

(i) If the comments of the SHPOs, THPOs, or land-management agencies are not available at the time the application is filed, they may be filed separately, but they must be filed before a final certificate is issued.

(ii) If landowners deny access to private property and certain areas are not surveyed, the unsurveyed area must be identified by mileposts, and supplemental surveys or evaluations shall be conducted after access is granted. In such circumstances, reports, and treatment plans, if necessary, for those inaccessible lands may be filed after a certificate is issued.

(3) The Evaluation Report and Treatment Plan, if required, for the entire project must be filed before a final certificate is issued.

(i) The Evaluation Report may be combined in a single synthetic report with the Overview and Survey Reports if the SHPOs, THPOs, and land-management agencies allow and if it is available at the time the application is filed.

(ii) In preparing the Treatment Plan, the applicant must consult with the Commission staff, the SHPO, and any applicable THPO and land-management agencies.

(iii) Authorization to implement the Treatment Plan will occur only after the final certificate is issued.

(4) Applicant must request privileged treatment for all material filed with the Commission containing location, character, and ownership information

about cultural resources in accordance with § 388.112 of this chapter. The cover and relevant pages or portions of the report should be clearly labeled in bold lettering: "CONTAINS PRIVILEGED INFORMATION—DO NOT RELEASE."

(5) Except as specified in a final Commission order, or by the Director of the Office of Energy Projects, construction may not begin until all cultural resource reports and plans have been approved.

(g) Resource Report 5—Socioeconomics. This report is required only for applications involving significant aboveground facilities, including, among others, conditioning or liquefied natural gas (LNG) plants. It must identify and quantify the impacts of constructing and operating the proposed project on factors affecting towns and counties in the vicinity of the project. Resource Report 5 must:

(1) Describe the socioeconomic impact area.

(2) Evaluate the impact of any substantial immigration of people on governmental facilities and services and plans to reduce the impact on the local infrastructure.

(3) Describe on-site manpower requirements and payroll during construction and operation, including the number of construction personnel who currently reside within the impact area, would commute daily to the site from outside the impact area, or would relocate temporarily within the impact area.

(4) Determine whether existing housing within the impact area is sufficient to meet the needs of the additional population.

(5) Describe the number and types of residences and businesses that would be displaced by the project, procedures to be used to acquire these properties, and types and amounts of relocation assistance payments.

(6) Conduct a fiscal impact analysis evaluating incremental local government expenditures in relation to incremental local government revenues that would result from construction of the project. Incremental expenditures include, but are not limited to, school operating costs, road maintenance and repair, public safety, and public utility costs.

(h) Resource Report 6—Geological resources. This report is required for applications involving LNG facilities and all other applications, except those involving only facilities within the boundaries of existing aboveground facilities, such as a compressor, meter, or regulator station. It must describe geological resources and hazards in the project area that might be directly or indirectly affected by the proposed action or that could place the proposed facilities at risk, the potential effects of those hazards on the facility, and methods proposed to reduce the effects or risks. Resource Report 6 must:

(1) Describe, by milepost, mineral resources that are currently or potentially exploitable;

(2) Describe, by milepost, existing and potential geological hazards and areas of nonroutine geotechnical concern, such as high seismicity areas, active faults, and areas susceptible to soil liquefaction; planned, active, and abandoned mines; karst terrain; and areas of potential ground failure, such as subsidence, slumping, and landsliding. Discuss the hazards posed to the facility from each one.

(3) Describe how the project would be located or designed to avoid or minimize adverse effects to the resources or risk to itself, including geotechnical investigations and monitoring that would be conducted before, during, and after construction. Discuss also the potential for blasting to affect structures, and the measures to be taken to remedy such effects.

(4) Specify methods to be used to prevent project-induced contamination from surface mines or from mine tailings along the right-of-way and whether the project would hinder mine reclamation or expansion efforts.

(5) If the application involves an LNG facility located in zones 2, 3, or 4 of the Uniform Building Code's Seismic Risk Map, or where there is potential for surface faulting or liquefaction, prepare a report on earthquake hazards and engineering in conformance with "Data Requirements for the Seismic Review of LNG Facilities," NBSIR 84–2833. This document may be obtained from the Commission staff.

(6) If the application is for underground storage facilities:

(i) Describe how the applicant would control and monitor the drilling activity of others within the field and buffer zone;

(ii) Describe how the applicant would monitor potential effects of the operation of adjacent storage or production facilities on the proposed facility, and vice versa;

(iii) Describe measures taken to locate and determine the condition of old wells within the field and buffer zone and how the applicant would reduce risk from failure of known and undiscovered wells; and

(iv) Identify and discuss safety and environmental safeguards required by state and Federal drilling regulations.

(i) Resource Report 7—Soils. This report is required for all applications except those not involving soil disturbance. It must describe the soils that would be affected by the proposed project, the effect on those soils, and measures proposed to minimize or avoid impact. Resource Report 7 must:

(1) List, by milepost, the soil associations that would be crossed and describe the erosion potential, fertility, and drainage characteristics of each association.

(2) If an aboveground facility site is greater than 5 acres:

(i) List the soil series within the property and the percentage of the property comprised of each series;

(ii) List the percentage of each series which would be permanently disturbed;

(iii) Describe the characteristics of each soil series; and

(iv) Indicate which are classified as prime or unique farmland by the U.S. Department of Agriculture, Natural Resources Conservation Service.

(3) Identify, by milepost, potential impact from: Soil erosion due to water, wind, or loss of vegetation; soil compaction and damage to soil structure resulting from movement of construction vehicles; wet soils and soils with poor drainage that are especially prone to structural damage; damage to drainage tile systems due to movement of construction vehicles and trenching activities; and interference with the operation of agricultural equipment due to the probability of large stones or blasted rock occurring on or near the surface as a result of construction.

(4) Identify, by milepost, cropland and residential areas where loss of soil fertility due to trenching and backfilling could occur.

(5) Describe proposed mitigation measures to reduce the potential for adverse impact to soils or agricultural productivity. Compare proposed mitigation measures with the staff's current "Upland Erosion Control, Revegetation and Maintenance Plan," which is available from the Commission Internet home page or from the Commission staff, and explain how proposed mitigation measures provide equivalent or greater protections to the environment.

(j) Resource Report 8—Land use, recreation and aesthetics. This report is required for all applications except those involving only facilities which are of comparable use at existing compressor, meter, and regulator stations. It must describe the existing uses of land on, and (where specified) within 0.25 mile of, the proposed project and changes to those land uses that would occur if the project is approved. The report shall discuss proposed mitigation measures, including protection and enhancement of existing land use. Resource Report 8 must:

(1) Describe the width and acreage requirements of all construction and permanent rights-of-way and the acreage required for each proposed plant and operational site, including injection or withdrawal wells.

SPA64

(i) List, by milepost, locations where the proposed right-of-way would be adjacent to existing rights-of-way of any kind.

(ii) Identify, preferably by diagrams, existing rights-of-way that would be used for a portion of the construction or operational right-of-way, the overlap and how much additional width would be required.

(iii) Identify the total amount of land to be purchased or leased for each aboveground facility, the amount of land that would be disturbed for construction and operation of the facility, and the use of the remaining land not required for project operation.

(iv) Identify the size of typical staging areas and expanded work areas, such as those at railroad, road, and waterbody crossings, and the size and location of all pipe storage yards and access roads.

(2) Identify, by milepost, the existing use of lands crossed by the proposed pipeline, or on or adjacent to each proposed plant and operational site.

(3) Describe planned development on land crossed or within 0.25 mile of proposed facilities, the time frame (if available) for such development, and proposed coordination to minimize impacts on land use. Planned development means development which is included in a master plan or is on file with the local planning board or the county.

(4) Identify, by milepost and length of crossing, the area of direct effect of each proposed facility and operational site on sugar maple stands, orchards and nurseries, landfills, operating mines, hazardous waste sites, state wild and scenic rivers, state or local designated trails, nature preserves, game management areas, remnant prairie, old-growth forest, national or state forests, parks, golf courses, designated natural, recreational or scenic areas, or registered natural landmarks, Native American religious sites and traditional cultural properties to the extent they are known to the public at large, and reservations, lands identified under the Special Area Management Plan of the Office of Coastal Zone Management, National Oceanic and Atmospheric Administration, and lands owned or controlled by Federal or state agencies or private preservation groups. Also identify if any of those areas are located within 0.25 mile of any proposed facility.

(5) Identify, by milepost, all residences and buildings within 50 feet of the proposed pipeline construction right-of-way and the distance of the residence or building from the right-of- way. Provide survey drawings or alignment sheets to illustrate the location of the facilities in relation to the buildings.

(6) Describe any areas crossed by or within 0.25 mile of the proposed pipeline or plant and operational sites which are included in, or are designated for study for inclusion in: The National Wild and Scenic Rivers

System (16 U.S.C. 1271); The National Trails System (16 U.S.C. 1241); or a wilderness area designated under the Wilderness Act (16 U.S.C. 1132).

(7) For facilities within a designated coastal zone management area, provide a consistency determination or evidence that the applicant has requested a consistency determination from the state's coastal zone management program.

(8) Describe the impact the project will have on present uses of the affected area as identified above, including commercial uses, mineral resources, recreational areas, public health and safety, and the aesthetic value of the land and its features. Describe any temporary or permanent restrictions on land use resulting from the project.

(9) Describe mitigation measures intended for all special use areas identified under paragraphs (j)(2) through (6) of this section.

(10) Describe proposed typical mitigation measures for each residence that is within 50 feet of the edge of the pipeline construction right-of-way, as well as any proposed residence-specific mitigation. Describe how residential property, including for example, fences, driveways, stone walls, sidewalks, water supply, and septic systems, would be restored. Describe compensation plans for temporary and permanent rights-of-way and the eminent domain process for the affected areas.

(11) Describe measures proposed to mitigate the aesthetic impact of the facilities especially for aboveground facilities such as compressor or meter stations.

(12) Demonstrate that applications for rights-of-way or other proposed land use have been or soon will be filed with Federal land-management agencies with jurisdiction over land that would be affected by the project.

(k) Resource Report 9—Air and noise quality. This report is required for applications involving compressor facilities at new or existing stations, and for all new LNG facilities. It must identify the effects of the project on the existing air quality and noise environment and describe proposed measures to mitigate the effects. Resource Report 9 must:

(1) Describe the existing air quality, including background levels of nitrogen dioxide and other criteria pollutants which may be emitted above EPA–identified significance levels.

(2) Quantitatively describe existing noise levels at noise-sensitive areas, such as schools, hospitals, or residences and include any areas covered by relevant state or local noise ordinances.

(i) Report existing noise levels as the Leq (day), Leq (night), and Ldn and include the basis for the data or estimates.

(ii) For existing compressor stations, include the results of a sound level survey at the site property line and nearby noise-sensitive areas while the compressors are operated at full load.

(iii) For proposed new compressor station sites, measure or estimate the existing ambient sound environment based on current land uses and activities.

(iv) Include a plot plan that identifies the locations and duration of noise measurements, the time of day, weather conditions, wind speed and direction, engine load, and other noise sources present during each measurement.

(3) Estimate the impact of the project on air quality, including how existing regulatory standards would be met.

(i) Provide the emission rate of nitrogen oxides from existing and proposed facilities, expressed in pounds per hour and tons per year for maximum operating conditions, include supporting calculations, emission factors, fuel consumption rates, and annual hours of operation.

(ii) For major sources of air emissions (as defined by the Environmental Protection Agency), provide copies of applications for permits to construct (and operate, if applicable) or for applicability determinations under regulations for the prevention of significant air quality deterioration and subsequent determinations.

(4) Provide a quantitative estimate of the impact of the project on noise levels at noise-sensitive areas, such as schools, hospitals, or residences.

(i) Include step-by-step supporting calculations or identify the computer program used to model the noise levels, the input and raw output data and all assumptions made when running the model, far-field sound level data for maximum facility operation, and the source of the data.

(ii) Include sound pressure levels for unmuffled engine inlets and exhausts, engine casings, and cooling equipment; dynamic insertion loss for all mufflers; sound transmission loss for all compressor building components, including walls, roof, doors, windows and ventilation openings; sound attenuation from the station to nearby noise-sensitive areas; the manufacturer's name, the model number, the performance rating; and a description of each noise source and noise control component to be employed at the proposed compressor station. For proposed compressors the initial filing must include at least the proposed horsepower, type of compression, and energy source for the compressor.

SPA67

(iii) Far-field sound level data measured from similar units in service elsewhere, when available, may be substituted for manufacturer's far-field sound level data.

(iv) If specific noise control equipment has not been chosen, include a schedule for submitting the data prior to certification.

(v) The estimate must demonstrate that the project will comply with applicable noise regulations and show how the facility will meet the following requirements:

(A) The noise attributable to any new compressor station, compression added to an existing station, or any modification, upgrade or update of an existing station, must not exceed a day-night sound level (Ldn) of 55 dBA at any pre-existing noise-sensitive area (such as schools, hospitals, or residences).

(B) New compressor stations or modifications of existing stations shall not result in a perceptible increase in vibration at any noise-sensitive area.

(5) Describe measures and manufacturer's specifications for equipment proposed to mitigate impact to air and noise quality, including emission control systems, installation of filters, mufflers, or insulation of piping and buildings, and orientation of equipment away from noise-sensitive areas.

(l) Resource Report 10—Alternatives. This report is required for all applications. It must describe alternatives to the project and compare the environmental impacts of such alternatives to those of the proposal. The discussion must demonstrate how environmental benefits and costs were weighed against economic benefits and costs, and technological and procedural constraints. The potential for each alternative to meet project deadlines and the environmental consequences of each alternative shall be discussed. Resource Report 10 must:

(1) Discuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation. Provide an analysis of the relative environmental benefits and costs for each alternative.

(2) Describe alternative routes or locations considered for each facility during the initial screening for the project.

(i) For alternative routes considered in the initial screening for the project but eliminated, describe the environmental characteristics of each route or site, and the reasons for rejecting it. Identify the location of such alternatives on maps of sufficient scale to depict their location

and relationship to the proposed action, and the relationship of the pipeline to existing rights-of-way.

(ii) For alternative routes or locations considered for more in-depth consideration, describe the environmental characteristics of each route or site and the reasons for rejecting it. Provide comparative tables showing the differences in environmental characteristics for the alternative and proposed action. The location of any alternatives in this paragraph shall be provided on maps equivalent to those required in paragraph (c)(2) of this section.

(m) Resource Report 11—Reliability and safety. This report is required for applications involving new or recommissioned LNG facilities. Information previously filed with the Commission need not be refiled if the applicant verifies its continued validity. This report shall address the potential hazard to the public from failure of facility components resulting from accidents or natural catastrophes, how these events would affect reliability, and what procedures and design features have been used to reduce potential hazards. Resource Report 11 must:

(1) Describe measures proposed to protect the public from failure of the proposed facilities (including coordination with local agencies).

(2) Discuss hazards, the environmental impact, and service interruptions which could reasonably ensue from failure of the proposed facilities.

(3) Discuss design and operational measures to avoid or reduce risk.

(4) Discuss contingency plans for maintaining service or reducing downtime.

(5) Describe measures used to exclude the public from hazardous areas. Discuss measures used to minimize problems arising from malfunctions and accidents (with estimates of probability of occurrence) and identify standard procedures for protecting services and public safety during maintenance and breakdowns.

(n) Resource Report 12—PCB contamination. This report is required for applications involving the replacement, abandonment by removal, or abandonment in place of pipeline facilities determined to have polychlorinated biphenyls (PCBs) in excess of 50 ppm in pipeline liquids. Resource Report 12 must:

(1) Provide a statement that activities would comply with an approved EPA disposal permit, with the dates of issuance and expiration specified, or with the requirements of the Toxic Substances Control Act.

(2) For compressor station modifications on sites that have been determined to have soils contaminated with PCBs, describe the status of remediation efforts completed to date.

(o) Resource Report 13—Engineering and design material. This report is required for construction of new liquefied natural gas (LNG) facilities, or the recommissioning of existing LNG facilities. If the recommissioned facility is existing and is not being replaced, relocated, or significantly altered, resubmittal of information already on file with the Commission is unnecessary. Resource Report 13 must:

(1) Provide a detailed plot plan showing the location of all major components to be installed, including compression, pretreatment, liquefaction, storage, transfer piping, vaporization, truck loading/unloading, vent stacks, pumps, and auxiliary or appurtenant service facilities.

(2) Provide a detailed layout of the fire protection system showing the location of fire water pumps, piping, hydrants, hose reels, dry chemical systems, high expansion foam systems, and auxiliary or appurtenant service facilities.

(3) Provide a layout of the hazard detection system showing the location of combustible-gas detectors, fire detectors, heat detectors, smoke or combustion product detectors, and low temperature detectors. Identify those detectors that activate automatic shutdowns and the equipment that would shut down. Include all safety provisions incorporated in the plant design, including automatic and manually activated emergency shutdown systems.

(4) Provide a detailed layout of the spill containment system showing the location of impoundments, sumps, subdikes, channels, and water removal systems.

(5) Provide manufacturer's specifications, drawings, and literature on the fail-safe shut-off valve for each loading area at a marine terminal (if applicable).

(6) Provide a detailed layout of the fuel gas system showing all taps with process components.

(7) Provide copies of company, engineering firm, or consultant studies of a conceptual nature that show the engineering planning or design approach to the construction of new facilities or plants.

(8) Provide engineering information on major process components related to the first six items above, which include (as applicable) function, capacity, type, manufacturer, drive system (horsepower, voltage), operating pressure, and temperature.

(9) Provide manuals and construction drawings for LNG storage tank(s).

(10) Provide up-to-date piping and instrumentation diagrams. Include a description of the instrumentation and control philosophy, type of instrumentation (pneumatic, electronic), use of computer technology, and control room display and operation. Also, provide an overall schematic diagram of the entire process flow system, including maps, materials, and energy balances.

(11) Provide engineering information on the plant's electrical power generation system, distribution system, emergency power system, uninterruptible power system, and battery backup system.

(12) Identify all codes and standards under which the plant (and marine terminal, if applicable) will be designed, and any special considerations or safety provisions that were applied to the design of plant components.

(13) Provide a list of all permits or approvals from local, state, Federal, or Native American groups or Indian agencies required prior to and during construction of the plant, and the status of each, including the date filed, the date issued, and any known obstacles to approval. Include a description of data records required for submission to such agencies and transcripts of any public hearings by such agencies. Also provide copies of any correspondence relating to the actions by all, or any, of these agencies regarding all required approvals.

(14) Identify how each applicable requirement will comply with 49 CFR part 193 and the National Fire Protection Association 59A LNG Standards. For new facilities, the siting requirements of 49 CFR part 193, subpart B, must be given special attention. If applicable, vapor dispersion calculations from LNG spills over water should also be presented to ensure compliance with the U.S. Coast Guard's LNG regulations in 33 CFR part 127.

(15) Provide seismic information specified in Data Requirements for the Seismic Review of LNG facilities (NBSIR 84–2833, available from FERC staff) for facilities that would be located in zone 2, 3, or 4 of the Uniform Building Code Seismic Map of the United States.

## XII.  Navigation and Navigable Waters, 33 CFR § 325.2

**§ 325.2 Processing of Applications**

(a) Standard procedures.

(1) When an application for a permit is received the district engineer shall immediately assign it a number for identification, acknowledge receipt thereof, and advise the applicant of the number assigned to it. He shall

review the application for completeness, and if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information necessary for further processing.

(2) Within 15 days of receipt of an application the district engineer will either determine that the application is complete (see 33 CFR 325.1(d)(9) and issue a public notice as described in § 325.3 of this part, unless specifically exempted by other provisions of this regulation or that it is incomplete and notify the applicant of the information necessary for a complete application. The district engineer will issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal.

(3) The district engineer will consider all comments received in response to the public notice in his subsequent actions on the permit application. Receipt of the comments will be acknowledged, if appropriate, and they will be made a part of the administrative record of the application. Comments received as form letters or petitions may be acknowledged as a group to the person or organization responsible for the form letter or petition. If comments relate to matters within the special expertise of another federal agency, the district engineer may seek the advice of that agency. If the district engineer determines, based on comments received, that he must have the views of the applicant on a particular issue to make a public interest determination, the applicant will be given the opportunity to furnish his views on such issue to the district engineer (see § 325.2(d)(5)). At the earliest practicable time other substantive comments will be furnished to the applicant for his information and any views he may wish to offer. A summary of the comments, the actual letters or portions thereof, or representative comment letters may be furnished to the applicant. The applicant may voluntarily elect to contact objectors in an attempt to resolve objections but will not be required to do so. District engineers will ensure that all parties are informed that the Corps alone is responsible for reaching a decision on the merits of any application. The district engineer may also offer Corps regulatory staff to be present at meetings between applicants and objectors, where appropriate, to provide information on the process, to mediate differences, or to gather information to aid in the decision process. The district engineer should not delay processing of the application unless the applicant requests a reasonable delay, normally not to exceed 30 days, to provide additional information or comments.

SPA72

(4) The district engineer will follow Appendix B of 33 CFR part 230 for environmental procedures and documentation required by the National Environmental Policy Act of 1969. A decision on a permit application will require either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion.

(5) The district engineer will also evaluate the application to determine the need for a public hearing pursuant to 33 CFR part 327.

(6) After all above actions have been completed, the district engineer will determine in accordance with the record and applicable regulations whether or not the permit should be issued. He shall prepare a statement of findings (SOF) or, where an EIS has been prepared, a record of decision (ROD), on all permit decisions. The SOF or ROD shall include the district engineer's views on the probable effect of the proposed work on the public interest including conformity with the guidelines published for the discharge of dredged or fill material into waters of the United States (40 CFR part 230) or with the criteria for dumping of dredged material in ocean waters (40 CFR parts 220 to 229), if applicable, and the conclusions of the district engineer. The SOF or ROD shall be dated, signed, and included in the record prior to final action on the application. Where the district engineer has delegated authority to sign permits for and in his behalf, he may similarly delegate the signing of the SOF or ROD. If a district engineer makes a decision on a permit application which is contrary to state or local decisions (33 CFR 320.4(j)(2) & (4)), the district engineer will include in the decision document the significant national issues and explain how they are overriding in importance. If a permit is warranted, the district engineer will determine the special conditions, if any, and duration which should be incorporated into the permit. In accordance with the authorities specified in § 325.8 of this part, the district engineer will take final action or forward the application with all pertinent comments, records, and studies, including the final EIS or environmental assessment, through channels to the official authorized to make the final decision. The report forwarding the application for decision will be in a format prescribed by the Chief of Engineers. District and division engineers will notify the applicant and interested federal and state agencies that the application has been forwarded to higher headquarters. The district or division engineer may, at his option, disclose his recommendation to the news media and other interested parties, with the caution that it is only a recommendation and not a final decision. Such disclosure is encouraged in permit cases which have become controversial and have been the subject of

SPA73

stories in the media or have generated strong public interest. In those cases where the application is forwarded for decision in the format prescribed by the Chief of Engineers, the report will serve as the SOF or ROD. District engineers will generally combine the SOF, environmental assessment, and findings of no significant impact (FONSI), 404(b)(1) guideline analysis, and/or the criteria for dumping of dredged material in ocean waters into a single document.

(7) If the final decision is to deny the permit, the applicant will be advised in writing of the reason(s) for denial. If the final decision is to issue the permit and a standard individual permit form will be used, the issuing official will forward the permit to the applicant for signature accepting the conditions of the permit. The permit is not valid until signed by the issuing official. Letters of permission require only the signature of the issuing official. Final action on the permit application is the signature on the letter notifying the applicant of the denial of the permit or signature of the issuing official on the authorizing document.

(8) The district engineer will publish monthly a list of permits issued or denied during the previous month. The list will identify each action by public notice number, name of applicant, and brief description of activity involved. It will also note that relevant environmental documents and the SOF's or ROD's are available upon written request and, where applicable, upon the payment of administrative fees. This list will be distributed to all persons who may have an interest in any of the public notices listed.

(9) Copies of permits will be furnished to other agencies in appropriate cases as follows:

(i) If the activity involves the construction of artificial islands, installations or other devices on the outer continental shelf, to the Director, Defense Mapping Agency, Hydrographic Center, Washington, DC 20390 Attention, Code NS12, and to the National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910–3282.

(ii) If the activity involves the construction of structures to enhance fish propagation (e.g., fishing reefs) along the coasts of the United States, to the Defense Mapping Agency, Hydrographic Center and National Ocean Service as in paragraph (a)(9)(i) of this section and to the Director, Office of Marine Recreational Fisheries, National Marine Fisheries Service, Washington, DC 20235.

SPA74

(iii) If the activity involves the erection of an aerial transmission line, submerged cable, or submerged pipeline across a navigable water of the United States, to the National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910–3282.

(iv) If the activity is listed in paragraphs (a)(9)(i), (ii), or (iii) of this section, or involves the transportation of dredged material for the purpose of dumping it in ocean waters, to the appropriate District Commander, U.S. Coast Guard.

(b) Procedures for particular types of permit situations.—

(1) Section 401 Water Quality Certification. If the district engineer determines that water quality certification for the proposed activity is necessary under the provisions of section 401 of the Clean Water Act, he shall so notify the applicant and obtain from him or the certifying agency a copy of such certification.

(i) The public notice for such activity, which will contain a statement on certification requirements (see § 325.3(a)(8)), will serve as the notification to the Administrator of the Environmental Protection Agency (EPA) pursuant to section 401(a)(2) of the Clean Water Act. If EPA determines that the proposed discharge may affect the quality of the waters of any state other than the state in which the discharge will originate, it will so notify such other state, the district engineer, and the applicant. If such notice or a request for supplemental information is not received within 30 days of issuance of the public notice, the district engineer will assume EPA has made a negative determination with respect to section 401(a)(2). If EPA determines another state's waters may be affected, such state has 60 days from receipt of EPA's notice to determine if the proposed discharge will affect the quality of its waters so as to violate any water quality requirement in such state, to notify EPA and the district engineer in writing of its objection to permit issuance, and to request a public hearing. If such occurs, the district engineer will hold a public hearing in the objecting state. Except as stated below, the hearing will be conducted in accordance with 33 CFR part 327. The issues to be considered at the public hearing will be limited to water quality impacts. EPA will submit its evaluation and recommendations at the hearing with respect to the state's objection to permit issuance. Based upon the recommendations of the objecting state, EPA, and any

additional evidence presented at the hearing, the district engineer will condition the permit, if issued, in such a manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot, in the district engineer's opinion, insure such compliance, he will deny the permit.

(ii) No permit will be granted until required certification has been obtained or has been waived. A waiver may be explicit, or will be deemed to occur if the certifying agency fails or refuses to act on a request for certification within sixty days after receipt of such a request unless the district engineer determines a shorter or longer period is reasonable for the state to act. In determining whether or not a waiver period has commenced or waiver has occurred, the district engineer will verify that the certifying agency has received a valid request for certification. If, however, special circumstances identified by the district engineer require that action on an application be taken within a more limited period of time, the district engineer shall determine a reasonable lesser period of time, advise the certifying agency of the need for action by a particular date, and that, if certification is not received by that date, it will be considered that the requirement for certification has been waived. Similarly, if it appears that circumstances may reasonably require a period of time longer than sixty days, the district engineer, based on information provided by the certifying agency, will determine a longer reasonable period of time, not to exceed one year, at which time a waiver will be deemed to occur.

(2) Coastal Zone Management consistency. If the proposed activity is to be undertaken in a state operating under a coastal zone management program approved by the Secretary of Commerce pursuant to the Coastal Zone Management (CZM) Act (see 33 CFR 320.3(b)), the district engineer shall proceed as follows:

(i) If the applicant is a federal agency, and the application involves a federal activity in or affecting the coastal zone, the district engineer shall forward a copy of the public notice to the agency of the state responsible for reviewing the consistency of federal activities. The federal agency applicant shall be responsible for complying with the CZM Act's directive for ensuring that federal agency activities are undertaken in a manner which is consistent, to the maximum extent practicable, with approved CZM Programs. (See 15 CFR part 930.) If the state coastal zone agency objects to the proposed federal activity

on the basis of its inconsistency with the state's approved CZM Program, the district engineer shall not make a final decision on the application until the disagreeing parties have had an opportunity to utilize the procedures specified by the CZM Act for resolving such disagreements.

(ii) If the applicant is not a federal agency and the application involves an activity affecting the coastal zone, the district engineer shall obtain from the applicant a certification that his proposed activity complies with and will be conducted in a manner that is consistent with the approved state CZM Program. Upon receipt of the certification, the district engineer will forward a copy of the public notice (which will include the applicant's certification statement) to the state coastal zone agency and request its concurrence or objection. If the state agency objects to the certification or issues a decision indicating that the proposed activity requires further review, the district engineer shall not issue the permit until the state concurs with the certification statement or the Secretary of Commerce determines that the proposed activity is consistent with the purposes of the CZM Act or is necessary in the interest of national security. If the state agency fails to concur or object to a certification statement within six months of the state agency's receipt of the certification statement, state agency concurrence with the certification statement shall be conclusively presumed. District engineers will seek agreements with state CZM agencies that the agency's failure to provide comments during the public notice comment period will be considered as a concurrence with the certification or waiver of the right to concur or non-concur.

(iii) If the applicant is requesting a permit for work on Indian reservation lands which are in the coastal zone, the district engineer shall treat the application in the same manner as prescribed for a Federal applicant in paragraph (b)(2)(i) of this section. However, if the applicant is requesting a permit on non-trust Indian lands, and the state CZM agency has decided to assert jurisdiction over such lands, the district engineer shall treat the application in the same manner as prescribed for a non-Federal applicant in paragraph (b)(2)(ii) of this section.

(3) Historic properties. If the proposed activity would involve any property listed or eligible for listing in the National Register of Historic Places, the district engineer will proceed in accordance with Corps National Historic Preservation Act implementing regulations.

(4) Activities associated with Federal projects. If the proposed activity would consist of the dredging of an access channel and/or berthing facility associated with an authorized federal navigation project, the activity will be included in the planning and coordination of the construction or maintenance of the federal project to the maximum extent feasible. Separate notice, hearing, and environmental documentation will not be required for activities so included and coordinated, and the public notice issued by the district engineer for these federal and associated non-federal activities will be the notice of intent to issue permits for those included non-federal dredging activities. The decision whether to issue or deny such a permit will be consistent with the decision on the federal project unless special considerations applicable to the proposed activity are identified. (See § 322.5(c).)

(5) Endangered Species. Applications will be reviewed for the potential impact on threatened or endangered species pursuant to section 7 of the Endangered Species Act as amended. The district engineer will include a statement in the public notice of his current knowledge of endangered species based on his initial review of the application (see 33 CFR 325.2(a)(2)). If the district engineer determines that the proposed activity would not affect listed species or their critical habitat, he will include a statement to this effect in the public notice. If he finds the proposed activity may affect an endangered or threatened species or their critical habitat, he will initiate formal consultation procedures with the U.S. Fish and Wildlife Service or National Marine Fisheries Service. Public notices forwarded to the U.S. Fish and Wildlife Service or National Marine Fisheries Service will serve as the request for information on whether any listed or proposed to be listed endangered or threatened species may be present in the area which would be affected by the proposed activity, pursuant to section 7(c) of the Act. References, definitions, and consultation procedures are found in 50 CFR part 402.

(c) [Reserved]

(d) Timing of processing of applications. The district engineer will be guided by the following time limits for the indicated steps in the evaluation process:

SPA78

(1) The public notice will be issued within 15 days of receipt of all information required to be submitted by the applicant in accordance with paragraph 325.1.(d) of this part.

(2) The comment period on the public notice should be for a reasonable period of time within which interested parties may express their views concerning the permit. The comment period should not be more than 30 days nor less than 15 days from the date of the notice. Before designating comment periods less than 30 days, the district engineer will consider:

    (i) Whether the proposal is routine or noncontroversial,

    (ii) Mail time and need for comments from remote areas,

    (iii) Comments from similar proposals, and

    (iv) The need for a site visit. After considering the length of the original comment period, paragraphs (a)(2)(i) through (iv) of this section, and other pertinent factors, the district engineer may extend the comment period up to an additional 30 days if warranted.

(3) District engineers will decide on all applications not later than 60 days after receipt of a complete application, unless

    (i) precluded as a matter of law or procedures required by law (see below),

    (ii) The case must be referred to higher authority (see § 325.8 of this part),

    (iii) The comment period is extended,

    (iv) A timely submittal of information or comments is not received from the applicant,

    (v) The processing is suspended at the request of the applicant, or

    (vi) Information needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60–day period. Once the cause for preventing the decision from being made within the normal 60–day period has been satisfied or eliminated, the 60–day clock will start running again from where it was suspended. For example, if the comment period is extended by 30 days, the district engineer will, absent other restraints, decide on the application within 90 days of receipt of a complete application. Certain laws (e.g., the Clean Water Act, the CZM Act, the National Environmental Policy Act, the National Historic Preservation Act, the Preservation of Historical and Archeological Data Act, the Endangered Species Act, the Wild and Scenic Rivers Act, and the Marine Protection, Research and Sanctuaries Act) require procedures such as state or other federal

agency certifications, public hearings, environmental impact statements, consultation, special studies, and testing which may prevent district engineers from being able to decide certain applications within 60 days.

(4) Once the district engineer has sufficient information to make his public interest determination, he should decide the permit application even though other agencies which may have regulatory jurisdiction have not yet granted their authorizations, except where such authorizations are, by federal law, a prerequisite to making a decision on the DA permit application. Permits granted prior to other (non-prerequisite) authorizations by other agencies should, where appropriate, be conditioned in such manner as to give those other authorities an opportunity to undertake their review without the applicant biasing such review by making substantial resource commitments on the basis of the DA permit. In unusual cases the district engineer may decide that due to the nature or scope of a specific proposal, it would be prudent to defer taking final action until another agency has acted on its authorization. In such cases, he may advise the other agency of his position on the DA permit while deferring his final decision.

(5) The applicant will be given a reasonable time, not to exceed 30 days, to respond to requests of the district engineer. The district engineer may make such requests by certified letter and clearly inform the applicant that if he does not respond with the requested information or a justification why additional time is necessary, then his application will be considered withdrawn or a final decision will be made, whichever is appropriate. If additional time is requested, the district engineer will either grant the time, make a final decision, or consider the application as withdrawn.

(6) The time requirements in these regulations are in terms of calendar days rather than in terms of working days.

(e) Alternative procedures. Division and district engineers are authorized to use alternative procedures as follows:

(1) Letters of permission. Letters of permission are a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and state fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation, but without the publishing of an individual public notice. The letter of permission will not be

used to authorize the transportation of dredged material for the purpose of dumping it in ocean waters. Letters of permission may be used:

(i) In those cases subject to section 10 of the Rivers and Harbors Act of 1899 when, in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition.

(ii) In those cases subject to section 404 of the Clean Water Act after:

(A) The district engineer, through consultation with Federal and state fish and wildlife agencies, the Regional Administrator, Environmental Protection Agency, the state water quality certifying agency, and, if appropriate, the state Coastal Zone Management Agency, develops a list of categories of activities proposed for authorization under LOP procedures;

(B) The district engineer issues a public notice advertising the proposed list and the LOP procedures, requesting comments and offering an opportunity for public hearing; and

(C) A 401 certification has been issued or waived and, if appropriate, CZM consistency concurrence obtained or presumed either on a generic or individual basis.

(2) Regional permits. Regional permits are a type of general permit as defined in 33 CFR 322.2(f) and 33 CFR 323.2(n). They may be issued by a division or district engineer after compliance with the other procedures of this regulation. After a regional permit has been issued, individual activities falling within those categories that are authorized by such regional permits do not have to be further authorized by the procedures of this regulation. The issuing authority will determine and add appropriate conditions to protect the public interest. When the issuing authority determines on a case-by-case basis that the concerns for the aquatic environment so indicate, he may exercise discretionary authority to override the regional permit and require an individual application and review. A regional permit may be revoked by the issuing authority if it is determined that it is contrary to the public interest provided the procedures of § 325.7 of this part are followed. Following revocation, applications for future activities in areas covered by the regional permit shall be processed as applications for individual permits. No regional permit shall be issued for a period of more than five years.

(3) Joint procedures. Division and district engineers are authorized and encouraged to develop joint procedures with states and other Federal

agencies with ongoing permit programs for activities also regulated by the Department of the Army. Such procedures may be substituted for the procedures in paragraphs (a)(1) through (a)(5) of this section provided that the substantive requirements of those sections are maintained. Division and district engineers are also encouraged to develop management techniques such as joint agency review meetings to expedite the decision-making process. However, in doing so, the applicant's rights to a full public interest review and independent decision by the district or division engineer must be strictly observed.

(4) Emergency procedures. Division engineers are authorized to approve special processing procedures in emergency situations. An "emergency" is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures. In emergency situations, the district engineer will explain the circumstances and recommend special procedures to the division engineer who will instruct the district engineer as to further processing of the application. Even in an emergency situation, reasonable efforts will be made to receive comments from interested Federal, state, and local agencies and the affected public. Also, notice of any special procedures authorized and their rationale is to be appropriately published as soon as practicable.

## XIII.    NEPA Implementing Regulations, 40 CFR § 131.11

### § 131.11 Criteria

(a) Inclusion of pollutants:

(1) States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use. For waters with multiple use designations, the criteria shall support the most sensitive use.

(2) Toxic pollutants. States must review water quality data and information on discharges to identify specific water bodies where toxic pollutants may be adversely affecting water quality or the attainment of the designated water use or where the levels of toxic pollutants are at a level to warrant concern

and must adopt criteria for such toxic pollutants applicable to the water body sufficient to protect the designated use. Where a State adopts narrative criteria for toxic pollutants to protect designated uses, the State must provide information identifying the method by which the State intends to regulate point source discharges of toxic pollutants on water quality limited segments based on such narrative criteria. Such information may be included as part of the standards or may be included in documents generated by the State in response to the Water Quality Planning and Management Regulations (40 CFR part 130).

(b) Form of criteria: In establishing criteria, States should:

(1) Establish numerical values based on:
  (i) 304(a) Guidance; or
  (ii) 304(a) Guidance modified to reflect site-specific conditions; or
  (iii) Other scientifically defensible methods;

(2) Establish narrative criteria or criteria based upon biomonitoring methods where numerical criteria cannot be established or to supplement numerical criteria.

## XIV. <u>NY Environmental Conservation Law § 3-0301</u>

**§ 3-0301 General Functions, Powers and Duties of the Department and the Commissioner**

1. It shall be the responsibility of the department, in accordance with such existing provisions and limitations as may be elsewhere set forth in law, by and through the commissioner to carry out the environmental policy of the state set forth in section 1-0101 of this chapter. In so doing, the commissioner shall have power to:

a. Coordinate and develop policies, planning and programs related to the environment of the state and regions thereof;

b. Promote and coordinate management of water, land, fish, wildlife and air resources to assure their protection, enchancement (sic), provision, allocation, and balanced utilization consistent with the environmental policy of the state and take into account the cumulative impact upon all of such resources in making any determination in connection with any license, order, permit, certification or other similar action or promulgating any rule or regulation, standard or criterion;

bb. Prescribe the qualifications for operators of public sewage treatment plants.

c. Provide for the propagation, protection, and management of fish and other aquatic life and wildlife and the preservation of endangered species;

cc. Prescribe and certify the qualifications for operators of solid waste management facilities as defined in section 27-0701 of this chapter; provided, however, that the commissioner shall not require the certification of operators until the commissioner shall have identified or established programs of training within the state that satisfy such qualifications;

d. Provide for the care, custody, and control of the forest preserve;

e. Provide for the protection and management of marine and coastal resources and of wetlands, estuaries and shorelines;

f. Foster and promote sound practices for the use of agricultural land, river valleys, open land, and other areas of unique value;

g. Encourage industrial, commercial, residential and community development which provides the best usage of land areas, maximizes environmental benefits and minimizes the effects of less desirable environmental conditions;

gg. Develop a plan to maximize the use of telecommuting to conserve energy otherwise used by the personnel of the department in commuting to their assigned workplace. Within one year of the effective date of this paragraph, the department shall submit a report to the governor and the legislature on the impact of such plan to include, but not be limited to, energy conservation, air quality, workforce acceptance, office costs and potential cost savings.

h. Assure the preservation and enhancement of natural beauty and man-made scenic qualities;

hh. Cooperate with the office of probation and correctional alternatives by identifying appropriate worksites where persons performing community service as part of a criminal disposition may be assigned to provide cleanup and other maintenance services in order to preserve and enhance the state's natural beauty and human-made scenic qualities. Such sites may include but

are not limited to the state's shorelines, beaches, parks, roadways, historic sites and other natural or human-made resources.

i. Provide for prevention and abatement of all water, land and air pollution including, but not limited to, that related to hazardous substances, particulates, gases, dust, vapors, noise, radiation, odor, nutrients and heated liquids;

j. Promote control of pests and regulate the use, storage and disposal of pesticides and other chemicals which may be harmful to man, animals, plant life, or natural resources;

k. Promote control of weeds and aquatic growth, develop methods of prevention and eradication, and regulate herbicides;

l. Provide and recommend methods for the recovery, recycling and reuse; or, where recycling and reuse are not possible, the disposal of solid wastes, including domestic and industrial refuse, junk cars, litter and debris consistent with sound health, scenic, environmental quality, and land use practices;

m. Prevent pollution through the regulation of the storage, handling and transport of solids, liquids and gases which may cause or contribute to pollution;

n. Promote restoration and reclamation of degraded or despoiled areas and natural resources;

o. Encourage recycling and reuse of products to conserve resources and reduce waste products;

p. Administer properties having unique natural beauty, wilderness character, or geological, ecological or historical significance dedicated by law to the state nature and historical preserve;

q. Formulate guides for measuring presently unquantified environmental values and relationships so they may be given appropriate consideration along with social, economic, and technical considerations in decision-making;

r. Encourage and undertake scientific investigation and research on the ecological process, pollution prevention and abatement, recycling and reuse

of resources, and other areas essential to understanding and achievement of the environmental policy;

s. Assess new and changing technology and development patterns to identify long-range implications for the environment and encourage alternatives which minimize adverse impact;

t. Monitor the environment to afford more effective and efficient control practices, to identify changes and conditions in ecological systems and to warn of emergency conditions;

u. Encourage activities consistent with the purposes of this chapter by advising and assisting local governments, institutions, industries, and individuals;

v. Undertake an extensive public information and education program to inform and involve other public and private organizations and groups and the general public in the commitment to the principles and practices of environmental conservation and develop programs for the teaching by others of such principles and practices;

w. Cooperate with the executive, legislative and planning authorities of the United States, neighboring states and their municipalities and the Dominion of Canada in furtherance of the policy of this state as set forth in section 1-0101;

x. Exercise and perform such other functions, powers and duties as shall have been or may be from time to time conveyed or imposed by law, including, but not limited to, all the functions, powers and duties assigned and transferred to the department from the Department of Health, Conservation Department, Department of Agriculture and Markets, and Office for Local Government in the Executive Department by chapter 140 of the laws of 1970.

y. To prevent and control air pollution emergencies, as defined in subdivision 1 of section 1-0303 hereof. In exercising such prevention and control the department and the commissioner may limit the consumption of fuels and use of vehicles, curtail or require the cessation of industrial processes and limit or require the cessation of incineration and open burning, and take any other action he may deem necessary to prevent and/or control air pollution emergencies. The department and commissioner shall adopt and

SPA86

implement by rule and regulation a plan designed to prevent and control such air pollution emergencies.

z. Within amounts appropriated to the department, to contract, outside the city of New York, with federally-funded nonprofit organizations that are organized for the purpose of beautification of highways, parks and recreation areas and employ persons sixty years of age or older whose net annual income does not exceed one thousand dollars to carry out such activities. The contract shall name the organization, the amount and manner of payment for the service to be rendered, nature of such service, the rendering of a verified account of the disbursements and verified or certified vouchers therefor attached, a refund of any unused amount, and such other conditions upon the use thereof as may be deemed proper.

zz. Repealed.

2. To further assist in carrying out the policy of this state as provided in section 1-0101 of the chapter the department, by and through the commissioner, shall be authorized to:

a. Adopt, amend or repeal environmental standards, criteria and those rules and regulations having the force and effect of standards and criteria to carry out the purposes and provisions of this act. Any such environmental standard, criterion, rule or regulation or change thereto shall become effective thirty days after being filed with the Secretary of State for publication in the "Official Compilation of Codes, Rules, and Regulations of the State of New York" published pursuant to section 102 of the Executive Law. This provision shall not in any way restrict the commissioner in the exercise of any function, power or duty transferred to him or her and heretofore authorized to be exercised by any other department acting through its commissioner to promulgate, adopt, amend or repeal any standards, rules and regulations. No such environmental standards, criterion, rule or regulation or change thereto shall be proposed for approval unless a public hearing relating to the subject of such standard shall be held by the commissioner prior thereto not less than 30 days after date of notice therefor, any provision of law to the contrary notwithstanding. Notice shall be given by public advertisement of the date, time, place and purpose of such hearing.

aa. (1) A "construction emergency" is damage to or an imminent danger of failure, or the malfunction of buildings, structures or property caused by a sudden and unexpected occurrence which involves a

pressing necessity for immediate repair, reconstruction or maintenance in order to permit the safe continuation of necessary public use or function, or to protect the property of the state of New York, or the life, health or safety of any person.

(2) Whenever the commissioner determines and declares that a construction emergency exists, the commissioner may have immediate work performed to protect life, limb, property, public health or safety, or essential services by utilizing the services of a contractor selected in accordance with procedures developed by the department and approved by the state comptroller.

(3) Such procedures shall provide for consideration of solicitation of sufficient competition to the extent practicable, from responsible contractors representative of the contracting community by inviting at least five contractors who are capable of performing such work; permitting said contractors to examine the site and submit bids for the required emergency restoration work at a time and place to be determined by the commissioner; and submission of a notice of emergency award for publication in the procurement opportunities newsletter as soon as practicable after the award.

(4) Such emergency work shall reasonably be expected to be completed within a period of thirty days and emergency contracts shall be let only for work necessary to remedy or alleviate a construction emergency.

(5) If the selected contractor is already under contract to the department such work may be undertaken as additional work on the existing contract, notwithstanding the existing scope of work.

(6) The commissioner shall promptly notify the office of the state comptroller, the office of the attorney general, and the office of the division of the budget, and shall provide an estimate of the cost and duration of the emergency work.

b. Enter into contracts with any person to do all things necessary or convenient to carry out the functions, powers and duties of the department.

bb. Develop and implement an "I Love New York Fishing" passbook program to encourage additional fishing in this state. The program shall be

administered according to the provisions of subdivision five of section 11-1307 of this chapter.

c. Review and appraise programs and activities of state departments and agencies in light of the policy set forth in section 1-0101 of this chapter for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy and to make recommendations to such departments and agencies with respect thereto, including but not limited to, environmental guidelines for their use.

cc. Cooperate with the department of agriculture and markets, the environmental facilities corporation, and other state agencies and public authorities to establish methods to facilitate loans to eligible borrowers to prevent and control nonpoint source water pollution and to develop educational materials for potential borrowers, including, without limitation, members of the agricultural community, about the low-interest loans available through the water pollution control linked deposit program and to develop an application form to be provided to lenders for the linked deposit loan requests. The department may promulgate rules and regulations necessary and reasonable for the operation of the program.

d. Consult with and co-operate with:

> (1) Officials of departments and agencies of the state having duties and responsibilities concerning the environment;

> (2) Officials and representatives of any public benefit corporation in the state;

> (3) Officials and representatives of the federal government, of other states and of interstate agencies on problems affecting the environment of this state;

> (4) Persons, organizations and groups, public and private, utilizing, served by, interested in or concerned with the environment in the state;

> (5) The appropriate committee or committees of the Legislature.

e. Appear and participate in proceedings before any federal regulatory agency involving or affecting the purposes of this department.

f. Undertake any studies, inquiries, surveys or analyses it may deem relevant through the personnel of the department or in co-operation with any public or private agencies, including educational, civic and research organizations, colleges, universities, institutes or foundations, for the accomplishment of the purposes of the department.

g. Enter and inspect any property or premises for the purpose of investigating either actual or suspected sources of pollution or contamination or for the purpose of ascertaining compliance or noncompliance with any law, rule or regulation which may be promulgated pursuant to this chapter. Any information relating to secret processes or methods of manufacture shall be kept confidential.

h. Conduct investigations and hold hearings and compel the attendance of witnesses and the production of accounts, books, documents, and nondocumentary evidence by the issuance of a subpoena.

i. Advise and cooperate with municipal, county, regional and other local agencies and officials within the state, to carry out the purposes of chapter 140 of the laws of 1970.

j. Act as the official agency of the state in all matters affecting the purposes of the department under any federal laws now or hereafter to be enacted, and as the official agency of a county, town, city, village or authority in connection with the grant or advance of any federal or other funds or credits to the state or through the state to its local governing bodies for the purposes of chapter 140 of the laws of 1970.

k. Report from time to time to the Governor and make an annual report to the Governor and the Legislature.

l. Formulate and execute contracts, keep accounts, record personnel data, acquire real or personal property, including acquisition by condemnation, appropriation, gift grant, devise or bequest, adjust claims, compile statistics and engage in research opportunities; all according to the statutes or department orders and regulations in such cases made and provided.

m. Adopt such rules, regulations and procedures as may be necessary, convenient or desirable to effectuate the purposes of this chapter.

n. Study, monitor, control and regulate pollution from motor vehicle exhaust emissions.

o. When requested to do so by another state with which New York has reciprocally agreed to provide personnel and equipment, provide such personnel and equipment for use in suppression of forest fires upon lands within such other state.

p. Notwithstanding any other provision of this chapter, delegate to municipal health or environmental departments or agencies or other appropriate governmental entities including the state soil and water conservation committee and the soil and water conservation districts, any of which shall meet such qualifications relating to adequate authority, expertise, staff, funding and other matters as may be prescribed, such functions of review, approval of plans, issuance of permits, licenses, certificates or approvals required or authorized by this chapter as the commissioner may deem appropriate in order to expedite the review of matters within the jurisdiction of the department, to provide for better coordination among different levels of government or to enhance environmental protection, subject to such conditions as he may establish. The powers delegated pursuant to this part may be withdrawn by the commissioner, at any time, upon thirty days written notice to the department, agency or other governmental entity including the state soil and water conservation committee and the soil and water conservation districts holding such powers by virtue of this paragraph.

q. Require that a written instrument submitted pursuant to this chapter or a rule or regulation adopted pursuant hereto contain a form notice to the effect that false statements made therein are punishable pursuant to section 210.45 of the penal law.

r. Notwithstanding the provisions of article six of the public officers law, deny access to inspection of records which identify locations of habitats of species designated endangered pursuant to section 11-0535 of this chapter, protected pursuant to section 9-1503 of this chapter or any other species or unique combination of species of flora or fauna where the destruction of such habitat or the removal of such species therefrom would impair their ability to survive provided, however, that the commissioner may, in his discretion permit access to such inspection to persons engaged in legitimate scientific and academic research.

s. Coordinate and conduct Arbor day ceremonies on the last Friday of April in cooperation with the department of education and the department of agriculture and markets.

t. Establish a program, in consultation with the conservation fund advisory council for the sale of limited edition prints of fish and wildlife paintings with the proceeds to be credited to the conservation fund established pursuant to section eighty-three of the state finance law.

u. Notwithstanding any other provisions of this chapter, establish a program to offer for sale to the public of items symbolic of contributions made to support department activities performed as steward of lands under its jurisdiction. The terms upon which such items will be available and the relevant donations for such items shall be set forth in regulations to be promulgated by the commissioner provided, however, that no such item shall be offered unless the amount of such donation exceeds the value of the item. All receipts of the department from such contributions shall be deposited in and separately accounted for in an account in the miscellaneous state special revenue fund, expenditures from which shall be limited to the activities of the department pursuant to this paragraph and activities performed as steward of lands under its jurisdiction.

v. Except for the forest preserve which is under the care, custody and control of the department pursuant to paragraph d of subdivision one of this section and subdivision one of section 9-0105 of this chapter, administer and manage the real property under the jurisdiction of the department for the purpose of preserving, protecting and enhancing the natural resource value for which the property was acquired or to which it is dedicated, employing all appropriate management activities.

w. Shall prepare and submit to the federally appointed "Aquatic Nuisance Species Task Force" two comprehensive management plans, after notice and opportunity for public comment, for funding of New York state activities under the Federal Non-indigenous Aquatic Nuisance Prevention and Control Act of 1990, Public Law 101-646, by January 1, 1992. One such plan shall identify those areas or activities within the state, other than those related to public facilities, where technical and financial assistance is needed within the state to eliminate or reduce environmental, public health and safety risks and to mitigate the financial impact upon the state associated with non-indigenous aquatic species, particularly zebra mussels. The other plan shall be a "public facility management plan" which is limited solely to identifying those public facilities within the state for which technical and financial assistance is needed to reduce infestations of zebra mussels. Each plan shall identify the management practices and measures that will be undertaken to reduce infestations of aquatic nuisance species, especially zebra mussels,

and include the following: (1) a description of the state and local programs for environmentally sound prevention and control of the target species; (2) a description of federal activities that may be needed for environmentally sound prevention and control of aquatic nuisance species and a description of the manner in which those activities should be coordinated with state and local government activities; and (3) a schedule for implementing the plan, including a schedule of annual objectives. In developing and implementing these management plans, the department shall, to the maximum extent practicable, involve local governments, regional entities and public and private organizations that have expertise in the control of aquatic nuisance species. Copies of these plans shall also be submitted to the temporary president of the senate and the speaker of the assembly, and the department shall annually, on or before January first, submit to the temporary president of the senate and speaker of the assembly a report on the activities of the department under these plans.

x. Consistent with paragraph v of subdivision 1 of this section, offer for sale advertising or corporate sponsorship space in various departmental publications, including but not limited to "The Conservationist", the annual compilation and syllabus of laws, rules and regulations governing fish and wildlife as required by section 11-0323 of this chapter, and offer for sale informational and promotional material related to lands, facilities and resources under the jurisdiction of the department. Any proceeds realized from the sale of advertising or corporate sponsorships shall be deposited in a special revenue account to be selected by the department and the division of the budget except that proceeds from advertising or corporate sponsorship in "The Conservationist" shall be deposited in the environmental conservation special revenue fund, "The Conservationist" magazine account, and proceeds from advertising or corporate sponsorship in the annual compilation and syllabus of laws, rules and regulations governing fish and wildlife as required by section 11-0323 of this chapter shall be deposited in the conservation fund.

y. [Expires and deemed repealed Aug. 1, 2018, pursuant to L.2000, c. 122, § 3.] The department, by contract or otherwise, is hereby authorized to engage in games, contests or other promotions or advertising schemes or plans, hereinafter referred to as "an event or events," which are intended to increase, improve, stabilize or otherwise assist in development of the subscriber base of "The Conservationist" in accordance with the following:

(1) An event may include sweepstakes and other similar marketing techniques intended to heighten public awareness, interest and participation in department programs including but not limited to purchasing of subscriptions, licenses, or camping permits.

(2) The department is authorized to offer the opportunity to receive gifts, prizes or gratuities, as determined by chance, without any consideration therefor.

(3) The department shall develop a statement, which shall be included in any and all promotions of an event, which shall contain the following information:

> (i) the minimum number of entry forms to be made available;

> (ii) the minimum number of prizes that shall be included in the event;

> (iii) the proportionate opportunity of winning prizes;

> (iv) the minimum value of prizes to be made available;

> (v) the rules pertaining to the event, which shall include the period of time and the geographic area to be covered by the event and which shall not be subject to the rulemaking procedures of the state administrative procedure act; and

> (vi) such additional information as may be deemed in the best interests of the state as determined by the commissioner.

(4) The department is authorized to accept donations for the purposes of providing publicity, prizes, incentives or other inducements for participation in the event. Donations may be of goods and services, shall not exceed five thousand dollars in value, per donor per contest, and must be of a nature consistent with the purposes of the department, and in the best interests of the state as determined by the commissioner.

z. Issue and amend guidance memoranda and similar documents of general applicability which are to be relied upon by department personnel for implementation of this chapter, and rules and regulations promulgated pursuant thereto, and for guidance to the general public in complying with

the requirements of this chapter; provided, however, that (1) in no event shall any such document be issued by the department in violation of the state administrative procedure act where and to the extent that a duly promulgated rule or regulation would be required, and (2) no such document shall be implemented until thirty days after the full text, or a summary thereof, along with information on how the full text may be obtained, has been published in the environmental notice bulletin, as defined in section 70-0105 of this chapter. At a minimum, the full text of each such document shall be made available by the department on and after the date of such publication to the public upon request, and, in addition, at least one copy shall be made available in the department's main office and in each regional office for public inspection. The department shall publish and invite public comment on a draft version of any such document, unless it determines that to do so would delay or otherwise impede compliance with the underlying statute or regulation, provided that, when a document is issued without making provisions for public comment, the department shall also publish its reason or reasons for deeming such provisions inappropriate. This paragraph shall not apply to (i) declaratory rulings issued pursuant to section two hundred four of the state administrative procedure act or (ii) documents which only concern the internal management of the agency and which do not have any effect on the rights of or procedures or practices available to the public. Each January, the department shall publish in the environmental notice bulletin an index of its existing guidance documents, and indicate how the full text thereof may be obtained; provided, however, that the secretary of state may exempt the department from compliance with this publication requirement upon a determination that the department has published on its website the full text of all guidance documents on which it currently relies. The secretary of state shall publish a notice of such determination identifying the website in the state register.

3. The department shall not alter the boundaries of any of the nine administrative regions from the boundaries existing on January first, nineteen hundred seventy-seven without first holding public hearings in each region affected.

4. The commissioner shall cooperate with the commissioner of the state department of health, district attorneys and the department of law in providing assistance in the investigation and prosecution of violations of article twenty-seven of this chapter.

5. To facilitate the practice of forestry by electing to comment upon proposed local laws or ordinances that may restrict the practice of forestry.

## XV.  NY Environmental Conservation Law § 70-0103

**§ 70-0103 Legislative Findings and Declarations**

The legislature finds and declares that:

1. It is the intent of the legislature to assure the fair, expeditious and thorough administrative review of regulatory permits.

2. It is the intent of the legislature that, to the extent feasible and appropriate, statutory and regulatory procedures shall be made uniform and inconsistencies and redundancies shall be eliminated.

3. It is the intent of the legislature to establish reasonable time periods for administrative agency action on permits.

4. It is the intent of the legislature to encourage public participation in government review and decision-making processes and to promote public understanding of all government activities.

5. It is the intent of the legislature that, to the maximum extent feasible, a comprehensive project review approach shall replace separate and individual permit application reviews.

## XVI.  6 NYCRR § 621.10

**§ 621.10 Final Decisions On Applications**

(a) The department or its agent shall mail to the applicant and its representative, if applicable, a decision in the form of: a permit, a permit with conditions or a statement that the permit applied for has been denied, with an explanation for the denial. This must be done within the following time periods:

> (1) for a minor project for which no adjudicatory public hearing has been held: on or before 45 calendar days after the date the application was complete. If the permit applied for has been denied or is issued with significant conditions attached, then the decision notification must include an opportunity for an adjudicatory hearing to be held. The applicant may

request a hearing by writing to either the regional permit administrator or the chief permit administrator, as instructed in the decision notification, within 30 calendar days of the date of the mailing of either the notice of denial or the permit with conditions. The department must commence the hearing within 45 calendar days of receiving the request;

(2) for a major project for which no public hearing has been held: on or before 90 calendar days after the date the application was complete. If the permit applied for has been denied or is issued with significant conditions attached, the decision notification will state that the applicant has the right to an adjudicatory hearing. The applicant may request a hearing by writing to either the regional permit administrator or the chief permit administrator, as instructed in the decision notification, within 30 calendar days of the date of the mailing of either the notice of denial or the permit with conditions. The department must commence the hearing within 45 calendar days of receiving the request;

(3) for any application for which a public hearing has been held on or before 60 calendar days after the receipt by the department of the complete hearing record; and

(4) for a project which a lead agency has determined may have a significant impact on the environment for the purposes of SEQR, and for which the department is not the lead agency: the time periods specified in this Part shall be suspended not less than 35 days prior to the date on which a final decision is required pursuant to this Part, pending receipt from the lead agency of either a final environmental impact statement, or a determination of nonsignificance. Upon receipt of these materials the time periods shall resume.

(5) Notwithstanding the time periods established in paragraphs (2) and (3) of this subdivision, for applications for Title V facility permits, the department may not issue a final decision unless the EPA has been provided 45 calendar days to review any responsiveness summary, and the proposed permit issued by the department in accordance with subdivision (e) of this section. The public may petition the EPA to object to the issuance of the proposed permit and the EPA may bar issuance of the proposed permit (see Part 201 of this Title).

SPA97

(b) If the department or its agent fails to mail a decision within the time periods specified above, the applicant may make notice of that failure, by means of certified mail, return receipt requested, addressed to the commissioner of the Department of Environmental Conservation, attention: Chief Permit Administrator, New York State Department of Environmental Conservation, Division of Environmental Permits, 625 Broadway, Albany, NY 12233-1750. If authority to issue and deny permits has been delegated by the commissioner to another agency, notice must also be made to the chief executive of such agency. Such notice must contain the applicant's name, location of the proposed project, the office in which the application was filed, the identification numbers assigned to the application in any notice from the department and a statement that a decision is sought according to this subdivision or ECL 70-0109(3)(b). Any notice failing to provide this information will not invoke this provision.

(c) If the department or its agent fails to mail the decision to the applicant within five working days of the receipt of such notice, the application will be deemed approved and the permit deemed granted, subject to the standard terms or conditions applicable to such a permit. The provisions of this subdivision do not apply to:

    (1) delegated HWMF permits or RAPs; and

    (2) title V facility permits, unless the department has satisfied all requirements established under this Part and Part 201 of this Title regarding notice and opportunity for review of draft permits by EPA, affected states and the public; or
    (3) other federally enforceable air permits unless the department has satisfied all requirements for review of draft permits by the public.

(d) Notwithstanding the time periods for decisions specified above, the department or its agent will not be required to issue a decision on an application, nor will a permit be deemed issued, until the applicant has provided satisfactory proof of any public notice required, posted any bonds required, and paid all fees or costs assessed by the department.

(e) For delegated permits, the department will issue a responsiveness summary to relevant comments relating to such permits that were received during the public comment period or during any hearing. The provisions of this paragraph are not applicable to permits for which a final environmental impact statement otherwise satisfying the requirements of this subdivision has been prepared pursuant to section 617.9 of this Title. The responsiveness summary must:

(1) identify of any conditions in the final permit that are different from the conditions in the draft permit, and the reasons for the changes; and

(2) for Title V facility permits, be issued within 60 days of the date the application is complete except when a hearing is required. The responsiveness summary must also reference the procedures contained in Part 201 of this Title that the public must follow if they elect to petition the EPA to object to the issuance of the proposed permit.

(f) An application for a permit may be denied for failure to meet any of the standards or criteria applicable under any statute or regulation pursuant to which the permit is sought, including applicable findings required by article 8 of the ECL and its implementing regulations at Part 617 of this Title, or for any of the reasons set forth in section 621.13(a)(1)—(6) of this Part.

## XVII.     6 NYCRR § 621.14

**§ 621.14 Special Provisions**

(a) Any time period specified in this Part may be extended for good cause, by mutual written consent of the applicant and the department. The EPA must be notified in those cases where a proposed extension will exceed the time periods established in Federal regulation. This provision does not supersede the requirement that the public can request judicial review in State court if a title V permit is not issued within 18 months of the date that an application is complete.

(b) At any time during the review of an application for a new permit, modification, or renewal, the department may request in writing any additional information which is reasonably necessary to make any findings or determinations required by law. Such a request must be explicit, and must indicate the reasonable date by which the department is to receive the information. Failure to provide such information by the date specified in the request may be grounds for permit denial.

(c) The department may issue general permits to allow work to eliminate damage caused by natural disasters or extraordinary weather not unique to a particular locality, including repair or replacement in location and in kind of facilities which existed prior to the damage. Processing of such permits need not follow the full procedural requirements of this Part.

(d) General permits may also be issued by the department for projects that are determined not to have a significant impact on the environment, and that have been subjected to the full procedural requirements of this Part for major projects. General permits under the SPDES program and the air pollution control program in accordance with Part 201 of this Title may be issued for regulated activities for which the department determines that all the requirements of this subdivision have been met.

(e) The department may require as a condition to a permit, and prior to commencement of work, that the permittee post a bond or other financial assurance acceptable to the department of specified amount with the department. This is to ensure faithful compliance with the terms of the permit, and is used for the indemnification of the State for any costs which might result from failure to so comply. The bond or other financial assurance shall remain in effect until the work is completed to the satisfaction of the department.

(f) Where this Part requires exchange of written materials within specified time periods, postmark dates shall satisfy the requirements, when not otherwise specifically provided.

(g) The department may issue a research, development, and demonstration permit, where program regulations provide for such consideration, for any facility which proposes to utilize an innovative and experimental technology or process for which permit standards have not been promulgated. This permit must include terms and conditions to assure protection of human health and the environment.

> (1) Variances from permit application and issuance requirements of this Part may be granted by the department, except there may be no variance from any provisions requiring public participation.

> (2) Such permits may be issued for a period not to exceed one year and may not be renewed more than three times, with each renewal period not to exceed one year. Experimental permits may be revoked when it is determined by the department to be necessary to protect human health and the environment.

> (3) These permit applications are subject to all other procedural requirements of this Part.

## XVIII.    6 NYCRR § 700.1

## § 700.1 Definitions

(a) The terms, words, or phrases used in Parts 700-706 of this Title shall have the meanings described below.

(1) Acute toxic effect means an effect that usually occurs shortly after the administration of either a single dose or multiple doses of a chemical or other toxic pollutant.

(2) Administrator means the Administrator of the United States Environmental Protection Agency.

(3) Approved treatment as applied to water supplies means treatment accepted as satisfactory by the authorities responsible for exercising supervision over the quality of water supplies.

(4) Aquatic life or aquatic biota means fish, shellfish and those species of wildlife and plants that spend at least part of their life in water.

(5) Best usages as specified for each class of water means those uses as determined by the commissioner in accordance with the considerations prescribed by the Environmental Conservation Law.

(6) Biologially-based dose-response model means a model that describes and quantifies the key events in the molecular, cellular, tissue, or organismal responses to a chemical or other toxic pollutant across a range of doses. Model parameters should represent biological phenomena rather than arbitrary statistically-derived values such as polynomial regression coefficients. Such models, if they accurately describe the relationship between dose and response within the range of experimental observation, may provide biological justification for predicted responses at doses below the range of observation.

(7) Chronic toxic effect means an effect that is irreversible or progressive or occurs because the rate of injury is greater than the rate of repair during prolonged exposure to a chemical or other toxic pollutant.

SPA101

(8) Coastal waters mean those marine waters within the territorial limits of the State other than estuaries and enclosed bays. Long Island Sound is designated as coastal waters for the purposes of thermal discharges.

(9) Commissioner means the Commissioner of the Department of Environmental Conservation.

(10) Consolidated rock or bedrock means the compact or solid hard rock beneath or exposed at the surface of the earth or overlain by surface waters.

(11) Cooling water means water used for contact or noncontact cooling, including water used for equipment cooling, evaporative cooling tower makeup, and dilution of effluent heat content. The intended use of the cooling water is to absorb waste heat rejected from the process or processes used, or from auxiliary operations on the facility's premises.

(12) Cooling water intake structure means the total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the State. The cooling water intake structure extends from the point at which water is withdrawn from the waters of the State up to, and including, the intake pumps.

(13) Department means the New York State Department of Environmental Conservation.

(14) Disposal system means a system for disposing of sewage, industrial waste or other wastes, including sewer systems and treatment works.

(15) Effluent limitations mean any restriction on quantities, qualities, rates and concentrations of chemical, physical, biological, and other constituents of effluents that are discharged into or allowed to run from an outlet or point source or any other discharge within the meaning of section 17-0501 of the Environmental Conservation Law into surface waters, groundwater or unsaturated zones.

(16) Enclosed bays mean those marine waters within the territorial limits of New York State, other than coastal waters or estuaries, in which exchange of sea water is severely limited by barrier beaches. For the purpose of thermal discharges, the following are designated as enclosed bays: Jamaica Bay,

SPA102

Hempstead Bay, Great South Bay, Moriches Bay, Shinnecock Bay and Mecox Bay.

(17) Estuary means the tidal portion of a river or stream.

(18) Fish means all varieties of the super-class Pisces.

(19) Flow means the volume of water passing through the cross-sectional area of stream (or river) per unit of time.

(20) Fresh groundwaters mean those groundwaters having a chloride concentration equal to or less than 250 mg/L or a total dissolved solids concentration equal to or less than 1,000 mg/L.

(21) Great Lakes System means classified segments identified in Part 805; Parts 835 through 839; Parts 845 through 848; Parts 820 and 821; Parts 895 through 899; and Items 1a, 1b and 441 through 1661 of Part 910 of this Title.

(22) Groundwaters mean those waters in saturated zones.

(23) Groundwater effluent limitations mean those effluent limitations that have been adopted in section 703.6 or developed in accordance with section 702.16(c) of this Title for protection of groundwater.

(24) Guidance value means such measure of purity or quality for any waters in relation to their reasonable and necessary use as may be established by the department pursuant to sections 702.1 and 702.15 of this Title.

(25) Heat of artificial origin means all heat from other than natural sources, including but not limited to cumulative effects of multiple and proximate thermal discharges.

(26) Industrial waste means any liquid, gaseous, solid or waste substance, or a combination thereof, resulting from any process of industry, manufacturing, trade, or business or from the development or recovery of any natural resources, that may cause or might reasonably be expected to cause pollution of the waters of the State in contravention of the standards adopted pursuant to the Environmental Conservation Law, article 17.

(27) Key event means a measurable and necessary step in a mode-of-action or a measurable indicator of such a step.

(28) Land application techniques include the following three basic methods of waste discharge application: irrigation, infiltration-percolation, and overland flow.

(29) Land utilization practices entail the use of plants, the soil surface, and soil matrix for removal of certain wastewater constituents.

(30) Liner at low doses means the frequency or severity of a molecular, cellular, tissue, or organismal response (i.e., key event) to a chemical or other toxic pollutant varies proportionally with dose at human doses that are at or near the standard or guidance value for that chemical or toxic pollutant.

(31) Lowest-observed-effect level (LOEL) means the lowest dose or exposure level of a chemical or other toxic pollutant at which a statistically or biologically significant change in the frequency or severity of any effect is observed in the exposed population compared with an appropriate unexposed control population.

(32) Micrograms per liter (ug/L) means the weight in micrograms of any specific substance or substances contained in one liter of liquid.

(33) Milligrams per liter (mg/L) means the weight in milligrams of any specific substance or substances contained in one liter of liquid.

(34) Model means a mathematical function with parameters that can be adjusted so that the function closely describes a set of empirical data.

(35) Mode-of-action means a sequence of key events that provides a biologically-plausible explanation for how a chemical or other toxic pollutant interacts with a biological target in humans or experimental animals to cause a given effect.

(36) New York/New Jersey harbor means saltwater classified segments identified in Part 859; Part 864; Part 890, except Item 1 and its tributaries; Part 891; and Items 1, 2 and 3 and their tributaries of Part 935 of this Title.

(37) No-observed-effect level (NOEL) means the highest dose or exposure level of a chemical or other toxic pollutant at which there are not statistically or biologically significant changes in the frequency or severity of any observed effect in the exposed population compared with an appropriate unexposed control population.

(38) Nonlinear at low doses means the frequency or severity of a molecular, cellular, tissue, or organismal response (i.e., key event) to a chemical or other toxic pollutant does not vary proportionally with dose at human doses that are at or near the standard or guidance value for that chemical or toxic pollutant.

(39) Oncogenic effect means the induction of tumors that has been demonstrated in:
  (i) humans;
  (ii) two mammalian species;
  (iii) one mammalian species, independently reproduced;
  (iv) one mammalian species, to an unusual degree with respect to incidence, latency period, site, tumor type or age at onset;
  (v) one mammalian species, supported by positive results in short-term tests that are indicative of potential oncogenic activity; or
  (vi) one mammalian species, supported by positive results for another substance for which similar oncogenic effects are anticipated because of similarity of functional groups or metabolic or toxicologic pathways.

(40) Other wastes means garbage, refuse, decayed wood, sawdust, shavings, bark, sand, lime, cinders, ashes, offal, oil, tar, dyestuffs, acids, chemicals, leachate, sludge, salt and all other discarded matter not sewage or industrial waste that may cause or might reasonably be expected to cause pollution of the waters of the State in contravention of the standards adopted pursuant to the Environmental Conservation Law, article 17.

(41) Outlet means the terminus of a sewer system, or the point of emergence of any waterborne sewage, industrial waste or other wastes or the effluent therefrom, into the waters of the State.

(42) Pathogenic organism means any disease-producing organism.

SPA105

(43) Person or persons means any individual, public or private corporation, political subdivision, government agency, municipality, industry, co-partnership, association, firm, trust, estate or any other legal entity whatsoever.

(44) Point-of-departure means a point on a dose-reponse (sic) curve for an effect of a chemical or other toxic pollutant that is within or near the range of experimental or observational data for the effect. It shall be the lower 95 percent confidence limit on a dose for an estimated level of excess risk for an effect, or it can be a NOEL or LOEL for an effect. It is the starting point for the extrapolation from the range of observation in human or animal studies to the human doses at or near the standard or guidance value for that chemical or toxic pollutant.

(45) Point source means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft from which pollutants are or may be discharged.

(46) Pollutant means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, and industrial, municipal, and agricultural waste discharged into water.

(47) Pollution means the presence in the environment of conditions and/or contaminants in quantities of characteristics that are or may be injurious to human, plant or animal life or to property or that unreasonably interfere with the comfortable enjoyment of life and property throughout such areas of the State as shall be affected thereby.

(48) Potable waters mean those fresh waters usable for drinking, culinary or food processing purposes.

(49) Primary contact recreation means recreational activities where the human body may come in direct contact with raw water to the point of complete body submergence. Primary contact recreation includes, but is not limited to, swimming, diving, water skiing, skin diving and surfing.

SPA106

(50) Principal organic contaminant classes means the classes of organic chemicals listed below.

(i) Halogenated alkane: compound containing carbon (C), hydrogen (H) and halogen (X) where X = fluorine (F), chlorine (Cl), bromine (Br) and/or iodine (I), having the general formula $CnHyXz$, where $y + z = 2n + 2$; n, y and z are integer variables; n and z are equal to or greater than one and y is equal to or greater than zero. Specifically excluded from this class are chloroform, bromoform, bromodichloromethane and dibromochloromethane.

(ii) Halogenated ether: compound containing carbon (C), hydrogen (H), oxygen (O) and halogen (X) (where X = F, Cl, Br and/or I) having the general formula $CnHyXzO$, where $y + z = 2n + 2$; the oxygen is bonded to two carbons; n, y and z are integer variables; n is equal to or greater than two, y is equal to or greater than zero and z is equal to or greater than one.

(iii) Halobenzenes and substituted halobenzenes: derivatives of benzene which have at least one halogen atom attached to the ring and which may or may not have straight or branched chain hydrocarbon, nitrogen or oxygen substituents.

(iv) Benzene and alkyl- or nitrogen-substituted benzenes: benzene or a derivative of benzene which has either an alkyl- and/or a nitrogen-substituent.
(v) Substituted, unsaturated hydrocarbons: a straight or branched chain unsaturated hydrocarbon compound containing one of the following: halogen, aldehyde, nitrile or amide.

(vi) Halogenated nonaromatic cyclic hydrocarbons: a nonaromatic cyclic compound containing a halogen.

(51) Reference dose (RfD) means an estimate of a daily oral exposure of the human population (including sensitive subgroups) to a chemical or other toxic pollutant that is likely to be without an appreciable risk of deleterious effects during a lifetime.

(52) Saline groundwater means groundwater having a chloride concentration of more than 250 mg/L or a total dissolved solids concentration of more than 1,000 mg/L.

(53) Saline surface waters mean all waters that are so designated by the commissioner.

(54) Salmonids, see trout.

(55) Saturated zones means any extensive portion of the earth's crust that contains sufficient water to fill all interconnected voids or pore spaces.

(56) Secondary contact recreation means recreational activities where contact with the water is minimal and where ingestion of the water is not probable. Secondary contact recreation includes, but is not limited to, fishing and boating.

(57) Sewage means the water-carried human or animal wastes from residences, buildings, industrial establishments or other places, together with such groundwater infiltration and surface water as may be present.

(58) Shellfish includes oysters, scallops, clams, mussels, and other aquatic mollusks, and lobsters, shrimp, crayfish, crabs, and other aquatic crustaceans.

(59) Source of water supply for drinking, culinary or food processing purposes means any water source, either public or private, that is used for domestic consumption or used in connection with the processing of milk, beverages or food.

(60) Specific MCL means a maximum contaminant level (MCL) included in 10 NYCRR 5-1.51, 5-1.52 or 5-1.55 for either an individual substance or group of substances. A Specific MCL does not include the 10 NYCRR Part 5 MCLs for principal organic contaminants or unspecified organic contaminants.

(61) Standards mean such measures of purity or quality for any waters in relation to their reasonable and necessary use as may be established by the department pursuant to section 17-0301 of the Environmental Conservation Law.

(62) Subsurface sewage disposal system means a disposal system that discharges sewage beneath the surface of the ground.

(63) Thermal discharge means a discharge that results or would result in a temperature change of the receiving water.

(64) Toxic pollutant means those pollutants, or combination of pollutants, including disease-causing agents, that after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly through food chains, will, on the basis of information available to the department, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, including malfunctions in reproduction, or physical deformations, in such organisms or their offspring.

(65) Treatment works means any plant, disposal field, lagoon, pumping station, constructed drainage ditch or surface water intercepting ditch, incinerator, area devoted to sanitary landfills or other works not specifically mentioned here, installed for the purpose of treating, neutralizing, stabilizing or disposing of sewage, industrial waste or other wastes.

(66) Trout means any fish in the following genera: Coregonus, Oncorhynchus, Prosopium, Salmo, Salvelinus and Thymallus.

(67) Trout waters are waters that provide habitat in which trout can survive and grow within a normal range on a year-round basis, or on a year-round basis excepting periods of time during which almost all of the trout inhabiting such waters could and would temporarily retreat into and survive in adjoining or tributary waters due to natural circumstances. When these conditions exist or have been met a water may be classified as a trout water and identified with the symbol (T), appearing in an entry in the "standards" column in the classification tables of parts 800 through 941 of this Title.

(68) Trout spawning waters are trout waters in which trout eggs can be deposited and be fertilized by trout inhabiting such waters (or connecting waters) and in which those eggs can develop and hatch, and the trout hatched therefrom could survive and grow to a sufficient size and stage of development to enable them to either remain and grow to adult trout therein, or migrate into and survive in other trout waters. When these conditions

exist or have been met a water may be classified as a trout spawning water and identified with the symbol (TS), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of this Title.

(69) Unconsolidated deposits means all non- or poorly indurated soil materials above the bedrock.

(70) Waste management system includes the management of mechanical equipment, crops, irrigation and monitors as an operational unit.

(71) Water quality-based effluent limitations means effluent limitations for surface waters that are derived from water quality standards or guidance values.

(72) Wildlife means wild game and all other animal life existing in a wild state, except fish, shellfish and crustacea.

## XIX.    6 NYCRR § 700.2

**§ 700.2 Collection of Samples**

(a) The determination of compliance or noncompliance of sewage, industrial waste or other waste discharges with the requirements of Parts 700 through 705 of this Title shall be made through analytical methods or tests of groundwater, surface water or effluent samples collected in such manner as approved by the department.

(b) In selecting or approving the locations at which such samples are collected, the department shall consider all relevant factors, including but not limited to subdivisions (c) through (e) of this section.

(c) For groundwater samples:
(1) the mobility of pollutants in unsaturated zones, which, among other things, is affected by the rate of movement of percolating water; and
(2) attenuation of pollutants that may occur in passage through unsaturated and saturated zones.

(d) For surface water samples:
(1) there must be prompt mixing of the discharge with the receiving waters;
(2) mixing shall not interfere with biological communities to a degree that is damaging to the ecosystem;

SPA110

(3) the zone of mixing shall not include intakes for potable water supplies; and

(4) mixing shall not diminish other beneficial uses disproportionately.

(e) The location at which effluent samples are collected shall be at a point where the effluent emerges from a treatment works, disposal system, outlet or point source, and prior to being discharged to surface water or the ground, unless specified otherwise by a State Pollutant Discharge Elimination System (SPDES) permit issued pursuant to Parts 750-758 of this Title.

## XX.  6 NYCRR § 700.3

### § 700.3 Test or Analytical Methods

(a) Tests or analytical methods for measurement of surface water or groundwater to determine compliance with standards or guidance values shall be made in accordance with the following requirements:

(1) 40 CFR part 136, as of July 1, 1988 (see section 705.1 of this Title); or

(2) other tests or analytical methods approved by the department.

(b) Tests or analytical methods to determine compliance with effluent limitations shall be made in accordance with subdivision (a) of this section, unless a different test or analytical method is specified in a State Pollutant Discharge Elimination System permit.

## XXI.  6 NYCRR § 700.4

### § 700.4 Severability

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

## XXII.  6 NYCRR § 701.1

### § 701.1 General Conditions Applying to All Water Classifications

The discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water

classifications at the location of discharge and at other locations that may be affected by such discharge.

### XXIII. 6 NYCRR § 701.2

**§ 701.2 Class N Fresh Surface Waters**

(a) The best usages of Class N waters are the enjoyment of water in its natural condition and, where compatible, as a source of water for drinking or culinary purposes, bathing, fishing, fish propagation, and recreation. The waters shall be suitable for shellfish and wildlife propagation and survival and fish survival.

(b) There shall be no discharge of sewage, industrial wastes, or other wastes, waste effluents or any sewage effluents not having had filtration resulting from at least 200 feet of lateral travel through unconsolidated earth. A greater distance may be required if inspection shows that, due to peculiar geologic conditions, this distance is inadequate to protect the water from pollution.

(c) These waters shall contain no deleterious substances, hydrocarbons or substances that would contribute to eutrophication, nor shall they receive surface runoff containing any such substance.

(d) There shall be no alteration to flow that will impair the waters for their best usages.

### XXIV. 6 NYCRR § 701.3

**§ 701.3 Class AA-Special (AA-S) Fresh Surface Waters**

(a) The best usages of Class AA-S waters are: a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish and wildlife propagation and survival.

(b) These waters shall contain no floating solids, settleable solids, oil, sludge deposits, toxic wastes, deleterious substances, colored or other wastes or heated liquids attributable to sewage, industrial wastes or other wastes.

(c) There shall be no discharge or disposal of sewage, industrial wastes or other wastes into these waters.

(d) These waters shall contain no phosphorus and nitrogen in amounts that will result in growths of algae, weeds and slimes that will impair the waters for their best usages.

(e) There shall be no alteration to flow that will impair the waters for their best usages.

(f) There shall be no increase in turbidity that will cause a substantial visible contrast to natural conditions.

## XXV.  6 NYCRR § 701.4

### § 701.4 Class A-Special (A-S) Fresh Surface Waters

(a) The best usages of Class A-S waters are: a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish and wildlife propagation and survival.

(b) This classification may be given to those international boundary waters that, if subjected to approved treatment, equal to coagulation, sedimentation, filtration and disinfection with additional treatment, if necessary, to reduce naturally present impurities, meet or will meet New York State Department of Health drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.

## XXVI.  6 NYCRR § 701.5

### § 701.5 Class AA Fresh Surface Waters

(a) The best usages of Class AA waters are: a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish and wildlife propagation and survival.

(b) This classification may be given to those waters that, if subjected to approved disinfection treatment, with additional treatment if necessary to remove naturally present impurities, meet or will meet New York State Department of Health

drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.

## XXVII.   6 NYCRR § 701.6

**§ 701.6 Class A Fresh Surface Waters**

(a) The best usages of Class A waters are: a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish and wildlife propagation and survival.

(b) This classification may be given to those waters that, if subjected to approved treatment equal to coagulation, sedimentation, filtration and disinfection, with additional treatment if necessary to reduce naturally present impurities, meet or will meet New York State Department of Health drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.

## XXVIII.   6 NYCRR § 701.7

**§ 701.7 Class B Fresh Surface Waters**

The best usages of Class B waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival.

## XXIX.   6 NYCRR § 701.8

**§ 701.8 Class C Fresh Surface Waters**

The best usage of Class C waters is fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes.

## XXX.   6 NYCRR § 701.9

**§ 701.9 Class D. Fresh Surface Waters**

The best usage of Class D waters is fishing. Due to such natural conditions as intermittency of flow, water conditions not conducive to propagation of game

fishery, or stream bed conditions, the waters will not support fish propagation. These waters shall be suitable for fish, shellfish and wildlife survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes.

### XXXI.     6 NYCRR § 701.10

**§ 701.10 Class SA Saline Surface Waters**

The best usages of Class SA waters are shellfishing for market purposes, primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival.

### XXXII.     6 NYCRR § 701.11

**§ 701.11 Class SB Saline Surface Waters**

The best usages of Class SB waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival.

### XXXIII.     6 NYCRR § 701.12

**§ 701.12 Class SC Saline Surface Waters**

The best usage of Class SC waters is fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes.

### XXXIV.     6 NYCRR § 701.13

**§ 701.13 Class I Saline Surface Waters**

The best usages of Class I waters are secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival. In addition, the water quality shall be suitable for primary contact recreation, although other factors may limit the use for this purpose.

### XXXV.  <u>6 NYCRR § 701.14</u>

**§ 701.14 Class SD Saline Surface Waters**

The best usage of Class SD waters is fishing. These waters shall be suitable for fish, shellfish and wildlife survival. In addition, the water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes. This classification may be given to those waters that, because of natural or man-made conditions, cannot meet the requirements for fish propagation.

### XXXVI.  <u>6 NYCRR § 701.15</u>

**§ 701.15 Class GA Fresh Groundwaters**

The best usage of Class GA waters is as a source of potable water supply. Class GA waters are fresh groundwaters.

### XXXVII.  <u>6 NYCRR § 701.16</u>

**§ 701.16 Class GSA Saline Groundwaters**

The best usages of Class GSA waters are as a source of potable mineral waters, or conversion to fresh potable waters, or as raw material for the manufacture of sodium chloride or its derivatives or similar products. Class GSA waters are saline groundwaters.

### XXXVIII.  <u>6 NYCRR § 701.17</u>

**§ 701.17 Class GSB Saline Groundwaters**

The best usage of Class GSB waters is as a receiving water for disposal of wastes. Class GSB waters are saline groundwaters that have a chloride concentration in excess of 1,000 milligrams per liter or a total dissolved solids concentration in excess of 2,000 milligrams per liter.

## XXXIX. 6 NYCRR § 701.18

**§ 701.18 Assignment of Groundwater Classifications**

(a) The groundwater classifications defined in sections 701.15 and 701.16 of this Part are assigned to all the groundwaters of New York State.

(b) The Class GSB shall not be assigned to any groundwaters of the State, unless the commissioner finds that adjacent and tributary groundwaters and the best usages thereof will not be impaired by such classification.

## XL. 6 NYCRR § 701.19

**§ 701.19 Discharge Restriction Categories**

Discharge restriction categories may be assigned to surface waters or groundwaters by the department. When used, the discharge restriction category will be applied to such classified waters along with the applicable best usage and other existing standards.

## XLI. 6 NYCRR § 701.20

**§ 701.20 Purpose**

(a) The discharge restriction categories may be assigned to:
   (1) waters of particular public health concern;
   (2) significant recreational or ecological waters where the quality of the water is critical to maintaining the value for which the waters are distinguished; and
   (3) other sensitive waters where the department has determined that existing standards are not adequate to maintain water quality.

(b) Waters of particular public health concern may include:
   (1) waters within a 60-day water time-of-travel of unfiltered public water supply intake points;
   (2) public water supply watersheds with reservoirs experiencing accelerated eutrophication;
   (3) groundwaters requiring such protection as specified in watershed rules and regulations or wellhead protection programs; and
   (4) marine waters certified by the department for taking of shellfish.

(c) Significant recreational and ecological waters may include:

(1) wild and scenic rivers designated as per ECL 15-2701 and Part 666 of this Title;

(2) critical aquatic habitat for fishes, amphibians, or aquatic invertebrates listed as endangered, threatened, or of special concern in Part 182 of this Title;

(3) State park waters;

(4) State and Federal wildlife management area waters;

(5) groundwaters and surface waters tributary to and within freshwater wetlands designated class I pursuant to Part 664 of this Title;

(6) classified waters within intertidal marsh and coastal fresh marsh tidal wetlands designated as per Part 661 of this Title;

(7) waters protected under the Constitution of the State; and

(8) pristine, minimally impacted waters with a diversity of naturally reproducing aquatic species.

(d) Other sensitive waters may include:

(1) recreational waters where accelerated eutrophication threatens current and future use of the waters;

(2) waters where physical accumulation or bioaccumulation of contaminants produce water use impairments;

(3) small trout spawning streams; and

(4) waters with little assimilative capacity due to natural background conditions or human activities.

## XLII.   6 NYCRR § 701.21

### § 701.21 Criteria

(a) In assigning discharge restriction categories, the department will consider factors including the size of the waterbody, the nature of the surrounding district including the watershed, and the uses and quality of the waters. The department will also weigh the need for the additional water quality protection of the discharge restriction categories as compared with the assigned standards and best uses and the likelihood that the discharge restriction category will contribute to achieving the protection goals.

(b) As appropriate, additional consideration may be given to:

(1) the potential effects of additional discharges from new, expanded, or changed facilities or activities on the water quality value of resource;

(2) the risk to the waters or the use of the waters from unintended or incidental discharges from new facilities; and

(3) the potential effects of physical accumulation or bioaccumulation of substances not addressed by ambient standards.

(c) Substantial weight will be given to obtaining consistency with provisions of existing watershed management or protection plans adopted or certified by the State or an entity of local government.

## XLIII.    6 NYCRR § 701.22

### § 701.22 Allowable Discharges

New discharges may be permitted for waters where discharge restriction categories are assigned when such discharges result from environmental remediation projects, from projects correcting environmental or public health emergencies, or when such discharges result in a reduction of pollutants for the designated waters. In all cases, best usages and standards will be maintained.

## XLIV.    6 NYCRR § 701.23

### § 701.23 No New Discharge

For waters designated "no new discharge," no new discharges shall be permitted, and no increase in any existing discharges shall be permitted. Storm water discharges are excepted from these restrictions. Storm water discharges and nonpoint sources of pollution shall be controlled by use of management practices to minimize the impact on the designated waters and shall comply with other applicable requirements of this Title.

## XLV.    6 NYCRR § 701.24

### § 701.24 No New Discharge of a Specified Substance

For waters designated "no new discharge of a specified substance," the specified substance shall not be permitted in new discharges. No increase in the release of the specified substance shall be permitted for any existing discharges. Storm water discharges are excepted from these restrictions. Storm water discharges and nonpoint sources of pollution shall be controlled by use of management practices to minimize the release of the specified substance to the designated waters and

shall comply with other applicable requirements of this Title. The substance will be specified at the time the waters are designated.

## XLVI.    6 NYCRR § 701.25

### § 701.25 Trout Waters (T or TS)

(a) The symbol (T), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of this Title, means that the classified waters in that specific item are trout waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout or trout waters applies.

(b) The symbol (TS), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of this Title, means that the classified waters in that specific item are trout spawning waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout, trout spawning, trout waters, or trout spawning waters applies.

## XLVII.    6 NYCRR § 701.26

### § 701.26 Severability

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

## XLVIII.    6 NYCRR § 702.1

### § 702.1 Basis for Derivation of Water Quality Standards and Guidance Values

(a) The control of taste-, color- and odor-producing, toxic and other deleterious substances is implemented through the use of standards and guidance values. Standards and guidance values for such substances shall be derived according to the procedures set forth in this Part.

(b) The derivation of standards and guidance values will consider, to the extent possible, variations in natural or background conditions of waters, including but not limited to alkalinity, temperature, hardness and pH.

(c) Standards and guidance values shall be of the following Types to protect the best usages of the waters as described in Part 701 of this Title:

(1) Health (Water Source) or H(WS);
(2) Health (Fish Consumption) or H(FC);
(3) Aquatic (Chronic) or A(C);
(4) Aquatic (Acute) or A(A);
(5) Wildlife or W;
(6) Aesthetic (Water Source) or E(WS);
(7) Aesthetic (Food Source) or E(FS); and
(8) Recreation or R.

### XLIX.     6 NYCRR § 702.2

**§ 702.2 Standards and Guidance Values for Protection of Human Health and Sources of Potable Water Supplies**

(a) Standards and guidance values for protection of the best usage as a source of potable water supply shall protect human health and drinking water sources and are referred to as Health (Water Source) values.

(b) The standard or guidance value shall be the most stringent of the values derived using the procedures found in sections 702.3 through 702.7 of this Part.

(c) Standards or guidance values based on oncogenic effects that are based on the 95 percent lower confidence limit on the human dose corresponding to an excess lifetime cancer risk of one-in-one million or on chemical correlation to such effects shall be derived using age-specific water consumption rates and points-of-departure for a lifetime exposure period of 70 years if scientific evidence is sufficient to show that children may be more sensitive than adults to such oncogenic effects. If such scientific evidence is not available, a consumption rate of two liters of water per day for a lifetime exposure period of 70 years shall be used.

(d) Standards or guidance values based on oncogenic effects that are based on the human equivalent dose at the point-of-departure divided by an uncertainty factor, chronic nononcogenic effects, or chemical correlation to such effects shall be derived using age-specific water consumption rates for a childhood exposure period (18 years or less) if scientific evidence is sufficient to show that children may be more sensitive than adults to such effects. If such scientific evidence is not available, a consumption rate of two liters of water per day shall be used.

(e) Standards or guidance values based on acute nononcogenic effects or chemical correlation to acute nononcogenic effects shall be derived using a consumption rate of one liter of water per day or a different water consumption rate if deemed more appropriate based on scientific evidence.

### L.  6 NYCRR § 702.3

**§ 702.3 Procedures for Deriving Standards and Guidance Values Based on Specific MCLs and Principal Organic Contaminant Classes**

(a) The standard or guidance value shall be equal to the value of a Specific MCL unless the Specific MCL is based solely on aesthetic considerations.

(b) For a substance belonging to any of the principal organic contaminant classes and for which there is no Specific MCL, the standard or guidance value shall be 5 ug/L or a less stringent value as determined by the Commissioner of the New York State Department of Health.

### LI.  6 NYCRR § 702.4

**§ 702.4 Procedures for Deriving Standards and Guidance Values Based on Oncogenic Effects**

(a) Standards and guidance values based on oncogenic effects shall be calculated using dose-response data from scientifically valid human or animal studies. Considering factors including but not limited to route, duration and timing of exposure, species, strain, tumor types and sites, nature and severity of effects, pharmacokinetics, mode-of-action, study quality, and statistical significance, the dose-response data deemed to be the most appropriate for evaluating potential human health risks at environmental exposures shall be used as the basis of the value.

(b) Standards and guidance values shall be based on the point-of-departure for the selected dose-response data.

> (1) The point-of-departure shall be the LED10, which is the 95 percent lower confidence limit on the dose associated with 10 percent excess risk for oncogenic effects adjusted for background risk. A different level of excess risk may be used if deemed more appropriate based on scientific evidence.

(2) The point-of-departure shall be estimated using a validated, biologically-based dose-response model. If such a model does not exist, the point-of-departure shall be estimated using a mathematical model (i.e., the multistage, probit, logistic, or Weibull model) that best describes the dose-response data within the range of observation. Statistical measures, including the Chi-squared goodness-of-fit test, shall be used to determine which model best describes the data.

(3) If the selected dose-response data are not adequately described by methods in paragraph (2) of this subdivision, an alternative point-of-departure (e.g., a NOEL or LOEL) shall be used.

(c) If the point-of-departure is derived from an animal study, the human equivalent dose (milligrams of substance per kilogram of body weight per day) at the point-of-departure shall be estimated by multiplying the animal-to-human body weight ratio raised to the 0.25 power by the animal dose in milligrams of substance per kilogram of body weight per day. An alternative trans-species conversion method may be used if deemed more appropriate based on scientific evidence.
(d) The standard or guidance value shall be derived by extrapolating from the point-of-departure to the human dose at the standard or guidance value.

(1) If a validated biologically-based dose-response model is used to estimate the point-of-departure, the standard or guidance value shall be based on the 95 percent lower confidence limit on the human dose corresponding to an excess lifetime cancer risk of one-in-one million and shall be estimated using the model. If such a model is not available or is not validated for humans, the extrapolation method from the point-of-departure to the human dose at the standard or guidance value shall depend on the results of a mode-of-action analysis.

(2) If data on mode-of-action are unavailable, or if the mode-of-action analysis provides evidence of linearity at low doses or does not provide unequivocal evidence of nonlinearity at low doses, the standard or guidance value shall be based on the 95 percent lower confidence limit on the human dose corresponding to an excess lifetime cancer risk of one-in-one million. The human dose at the standard or guidance value shall be estimated by multiplying the human equivalent dose at the point-of-departure derived according to paragraphs (b)(1) and (2) of this section by a factor equal to the risk level of one-in-one million divided by the risk level at the point-of-departure.

SPA123

(3) If a mode-of-action analysis provides no evidence for linearity at low doses and provides unequivocal evidence of nonlinearity at low doses, the standard or guidance value shall be based on the human equivalent dose at the point-of-departure identified by the methods in subdivision (b) of this section divided by an uncertainty factor that will insure that the human dose at the standard or guidance value will be without appreciable risk to the human population, including children. The magnitude of this factor will generally range from 10 to 3,000. Factors that will be considered in determining the magnitude of the uncertainty factor shall include: the nature of the dose-response curve and the point-of-departure; the relative sensitivities of experimental animals and humans; the nature and extent of human variation, including age-dependent differences in sensitivity during a lifetime; and the data gaps in the toxicological database.

(e) Standards and guidance values based on the 95 percent lower confidence limit on the human dose corresponding to an excess lifetime cancer risk of one-in-one million shall be derived using age-specific body weights for a lifetime exposure period of 70 years if scientific evidence is sufficient to show that children may be more sensitive than adults to the oncogenic effect. If such evidence is not available, a body weight of 70 kilograms and a lifetime exposure period of 70 years shall be used.

(f) Standards and guidance values based on the human equivalent dose at the point-of-departure divided by an uncertainty factor shall allow no more than 20 percent of the human dose at the standard or guidance value to come from drinking water and shall be derived using age-specific body weights for a childhood exposure period (18 years or less) if scientific evidence is sufficient to show that children may be more sensitive than adults to the oncogenic effect. If such evidence is not available, a body weight of 70 kilograms shall be used.

## LII.    6 NYCRR § 702.5

**§ 702.5 Procedures for Deriving Standards and Guidance Values Based on Nononcogenic Effects**

(a) Standards and guidance values based on nononcogenic effects shall be calculated using dose-response data from scientifically valid human or animal studies. Considering factors, including but not limited to route, duration and timing of exposure, species, strain, nature and severity of effects, pharmacokinetics,

mode-of-action, study quality and statistical significance, the dose-response data deemed to be the most appropriate for evaluating potential human health risks at environmental exposures shall be used as the basis of the value.

(b) Standards and guidance values shall be based on the point-of-departure for the selected dose-response data.

(1) The point-of-departure shall be the no-observed-effect level (NOEL), expressed as a dose in milligrams of substance per kilogram of body weight per day. Where a valid NOEL is not available, a lowest-observed-effect level (LOEL) may be used.

(2) If neither a NOEL or a LOEL are available, an alternative point-of-departure, e.g., the 95 percent lower confidence limit on the dose associated with a specified percentage of excess risk (e.g., 10 percent) for a nononcogenic effect adjusted for background risk, may be used. The alternative point-of-departure shall be estimated using one of the mathematical models that are appropriate for analysis of dichotomous or continuous dose-response data (e.g., power, polynomial, or linear), and shall be the model that best describes the dose-response data within the range of experimental observation. Statistical measures, including the Chi-squared goodness-of-fit test, shall be used to determine which model best describes the data.

(c) The standard or guidance value shall be derived by extrapolating from the point-of-departure to the reference dose (RfD). The RfD shall be estimated by dividing the NOEL (or LOEL, or an alternative point-of-departure) by an uncertainty factor. The magnitude of this factor shall insure that exposures at or below the reference dose are without appreciable risk to the human population, including children, and will generally range from 10 to 3,000. It shall account for the following areas of uncertainty:

(1) LOEL to NOEL extrapolation (where necessary, to account for uncertainty where extrapolating from a LOEL to a NOEL);

(2) subchronic to chronic extrapolation (where necessary, to account for uncertainty where extrapolating from a less-than-chronic study NOEL (or LOEL, or other point-of-departure) to a chronic NOEL, LOEL, or other point-of-departure;

SPA125

(3) animal to human extrapolation (where necessary, to account for uncertainty where extrapolating from experimental animals to humans);

(4) inter-human variability (where necessary, to account for variation in sensitivity among the human population, including special consideration of the potential sensitivity of children); and

(5) data gaps (where necessary, to account for areas of scientific uncertainty in the toxicological database).

(d) Standards and guidance values based on chronic toxic effects shall allow no more than 20 percent of the reference dose to come from drinking water and shall be derived using age-specific body weights for a childhood exposure period (18 years or less) if scientific evidence is sufficient to show that children may be more sensitive than adults to such effects. If such evidence is not available, a body weight of 70 kilograms shall be used.

(e) Standards and guidance values based on acute toxic effects shall allow 20 percent of the reference dose to come from drinking water and shall be derived using a child body weight of 10 kilograms. Alternative values for percentage of reference dose or for body weight may be used if deemed more appropriate based on scientific evidence.

## LIII.    6 NYCRR § 702.6

**§ 702.6 [Repealed]**

## LIV.    6 NYCRR § 702.7

**§ 702.7 Procedure for Deriving Standards and Guidance Values Based on Chemical Correlation**

If the available data are deemed insufficient for deriving a standard or guidance value on the basis of either of sections 702.4 or 702.5 of this Part, a standard or guidance value may be based on correlation to a chemical for which a standard or guidance value has been established pursuant to those sections. Standards or guidance values based on chemical correlation may be established if similar toxic effects are anticipated because of similarity of functional groups or metabolic or toxicologic pathways.

### LV.  6 NYCRR § 702.8

**§ 702.8 Procedures for Deriving Standards and Guidance Values for Protection of Human Health From Consumption of Fish**

Standards and guidance values for the protection of the best usage of fishing shall protect the health of human consumers of fish and, for Class SA waters, human consumers of shellfish from chemicals that may bioaccumulate and are referred to as Health (Fish Consumption) values.

(a) Standards and guidance values based on bioaccumulation and human consumption of fish shall be equal to the acceptable daily intake from fish consumption divided by a fish consumption rate of 0.033 kilograms per day and by a bioaccumulation factor.

(b) The acceptable daily intake, in micrograms per day, from fish consumption shall be the more stringent of:

> (1) 20 percent of the reference dose (for nononcogenic effects) as determined from section 702.5 or 702.7 of this Part; or

> (2) the human dose at the standard or guidance value (for oncogenic effects) as determined from section 702.4 or 702.7 of this Part.

(c) The bioaccumulation factor is the ratio of the concentration of a substance in fish flesh, in micrograms per kilogram, to the concentration in water, in micrograms per liter. Bioaccumulation factors will generally be based on measured values which may be supported by bioaccumulation factors derived from octanol/water partition coefficients.

### LVI.  6 NYCRR § 702.9

**§ 702.9 Standards and Guidance Values for Protection of Aquatic Life**

(a) Protection of the best usage of fishing shall include standards and guidance values for the protection of aquatic life.

(b) Standards and guidance values for the protection of propagation of aquatic life are referred to as Aquatic (Chronic) values.

(c) Standards and guidance values for the protection of survival of aquatic life are referred to as Aquatic (Acute) values.

(d) Where the waters are to be suitable for fish, shellfish and wildlife propagation and survival, both Aquatic (Chronic) and Aquatic (Acute) standards or guidance values shall apply.

(e) Where the waters are to be suitable for fish, shellfish and wildlife survival, Aquatic (Acute) standards and guidance values shall apply.

(f) Standards and guidance values shall be derived using the procedures found in section 706.1 of this Title.

(g) If the available data are deemed insufficient for deriving a standard or guidance value on the basis of section 706.1 of this Title, a value may be based on either:

> (1) an alternative procedure if deemed appropriate based on scientific evidence; or

> (2) correlation to a chemical for which a standard or guidance value has been established pursuant to section 706.1 of this Title if similar toxic effects are anticipated because of similarity of functional groups or metabolic or toxicologic pathways.

### LVII.    6 NYCRR §§ 702.10 to 702.11

**§§ 702.10 to 702.11 [Repealed]**

### LVIII.    6 NYCRR § 702.12

**§ 702.12 Procedures for Deriving Standards and Guidance Values for Protection of Recreation**

(a) Protection of the best usage of recreation shall include standards and guidance values to protect the quality of the water for primary and secondary contact recreation, including aesthetic conditions. Such values are referred to as recreation values and derived based on an evaluation of reported levels of the pollutant (such as pathogens or pathogen indicators, nutrients or vegetation) that affect the quality of the water and its suitability for primary and secondary contact recreation.

### LIX. 6 NYCRR § 702.13

**§ 702.13 Procedures for Deriving Standards and Guidance Values for Protection of Wildlife**

(a) Protection of the best usage of fishing shall include standards and guidance values for protection of the health of wildlife consumers of aquatic life and water. Such values are referred to as Wildlife values.

(b) Standards and guidance values to protect wildlife shall be derived using levels of chemicals known to be toxic to wildlife in conjunction with a bioaccumulation factor and wildlife consumption rates of aquatic life and water.

(c) Where the available data are deemed insufficient for deriving a value on the basis of subdivision (b) of this section, a value may be based on correlation to a chemical for which a standard or guidance value has been established pursuant to that subdivision. Values based on chemical correlation may be established where similar toxic effects are anticipated because of similarity of functional groups or metabolic or toxicologic pathways.

### LX. 6 NYCRR § 702.14

**§ 702.14 Procedures for Deriving Standards and Guidance Values for Protection of Aesthetic Quality**

(a) Protection of the best usage as a source of potable water supply shall include standards and guidance values to protect the aesthetic quality of the water, including but not limited to taste, odor, and discoloration, both as a source of potable water and for other human uses such as clothes washing and showering. Such values are referred to as Aesthetic (Water Source) values and shall be derived based on an evaluation of reported levels of the substance that affect the aesthetic quality of the water. Values derived shall not exceed the value of a Specific MCL that is based on aesthetic considerations.

(b) Protection of the best usage of fishing shall include standards and guidance values to prevent tainting of aquatic food, including but not limited to taste, odor, and discoloration. Such values are referred to as Aesthetic (Food Source) values and derived based on an evaluation of reported levels of the substance that affect the aesthetic quality of the fish flesh, aquatic life, wildlife, or livestock that are

consumed by humans and that acquire such flavor, odor, or color because of habitation in, passage through, or ingestion of waters.

(c) If the available data are deemed insufficient for deriving a value based on subdivision (a) or (b) of this section, a value may be established based on chemical correlation to a chemical for which a standard or guidance value has been established pursuant to that subdivision, if similar aesthetic considerations are anticipated because of similarity of functional groups or metabolic or toxicologic pathways.

## LXI.    6 NYCRR § 702.15

### § 702.15 Derivation of Guidance Values

(a) For those substances that do not have an applicable Health (Water Source) standard in section 703.5 of this Title and that the department determines may pose a threat to human health if discharged to the waters of the State, a guidance value may be derived and shall be the most stringent of the following:

> (1) the values derived by applying the procedures from sections 702.3 through 702.7 of this Part;

> (2) a "general organic guidance value" of 50 ug/L for an individual organic substance. This paragraph does not apply if adequate and sufficient data are available to justify values greater than 50 ug/L using procedures from both sections 702.4 and 702.5 of this Part. The general organic guidance value applies only to those substances specified by the department; or

> (3) a "specific organic mixture guidance value" of 100 ug/L for a commercially available mixture of individual organic substances. This paragraph does not apply if adequate and sufficient data are available to justify values greater than 100 ug/L using procedures from both sections 702.4 and 702.5 of this Part. The derivation of this value for any specified mixture does not preclude the existence or derivation of a Health (Water Source) standard or guidance value for any individual organic substance in the mixture. The specific organic mixture guidance value applies only to those mixtures specified by the department.

(b) For those substances that do not have an applicable Health (Fish Consumption) standard in section 703.5 of this Title and that the department determines may pose

SPA130

a threat to human health if discharged to the waters of the State, a guidance value may be derived by applying the procedures from section 702.8 of this Part.

(c)

(1) For those substances that do not have an applicable Aquatic (Chronic) standard in section 703.5 of this Title and that the department determines may pose a threat to aquatic life or the environment if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.9 of this Part.

(2) For those substances that have an identified applicable Aquatic (Chronic) standard in section 703.5 of this Title, a guidance value shall be substituted where the procedures in section 702.9 of this Part yield a more stringent value. Remarks in Table 1 of section 703.5(f) of this Title identify the standards to which this paragraph applies. This paragraph applies only to the waters of the Great Lakes System.

(d)

(1) For those substances that do not have an applicable Aquatic (Acute) standard in section 703.5 of this Title and that the department determines may pose a threat to aquatic life or the environment if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.9 of this Part.

(2) For those substances that have an identified applicable Aquatic (Acute) standard in section 703.5 of this Title, a guidance value shall be substituted where the procedures in section 702.9 of this Part yield a more stringent value. Remarks in Table 1 of section 703.5(f) of this Title identify the standards to which this paragraph applies. This paragraph applies only to the waters of the Great Lakes System.

(e) For those substances that do not have an applicable Wildlife standard in section 703.5 of this Title and that the department determines may pose a threat to wildlife if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.13 of this Part.

(f) For those substances that do not have an applicable Aesthetic (Water Source) standard in section 703.5 of this Title and that the department determines may pose

SPA131

a threat to the aesthetic quality of sources of potable water if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.14 of this Part.

(g) For those substances that do not have an applicable Aesthetic (Food Source) standard in section 703.5 of this Title and that the department determines may pose a threat to the aesthetic quality of food for human consumption if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.14 of this Part.

(h) For those parameters that do not have an applicable Recreation standard in section 703.5 of this Title and that the department determines may pose a threat to the quality of the water for recreation if discharged to the waters of the State, a guidance value may be derived by applying the appropriate procedure from section 702.12 of this Part.

## LXII.    6 NYCRR § 702.16

### § 702.16 Derivation and Implementation of Effluent Limitations

(a) Standards and guidance values shall be used to control taste-, color- and odor-producing, toxic and deleterious substances, as specified in the narrative standards for fresh and saline surface waters and groundwaters and shall be the basis of water quality-based effluent limitations and groundwater effluent limitations for use in SPDES permits issued pursuant to Parts 750-758 of this Title.

(b) Surface water effluent limitations.

(1) When deriving a water quality-based effluent limitation from a surface water standard or guidance value, the department may take into account factors, including but not limited to analytical detectability, treatability, natural background levels, intermittent streamflow, wet weather events, and the waste assimilative capacity of the receiving waters.

(2) Where these factors indicate that achieving a water quality-based effluent limitation would be clearly unreasonable, the department may substitute a modified effluent limitation. Where the effluent limitation had been derived from an aquatic standard or guidance value, the department shall also require biological monitoring.

(3) A surface water effluent limitation for the total of organic substances that have a Health (Water Source) standard for surface water in Table 1 of section 703.5(f) of this Title or a guidance value for surface water derived pursuant to section 702.15(a) of this Part shall be established based on an ambient value of 100 ug/L. Where such standards or guidance values are 100 ug/L or greater, they shall not be included in the total.

(c) Groundwater effluent limitations.

(1) Groundwater effluent limitations are provided in Table 3 of section 703.6(e) of this Title. For those substances not included in Table 3 of section 703.6(e) of this Title and for which a guidance value has been derived as provided in section 702.15(a) or section 702.15(f) of this Part, the groundwater effluent limitation shall be equal to the guidance value.

(2) When implementing a groundwater effluent limitation, the department may take into account factors, including but not limited to analytical detectability and treatability.

(3) Where these factors indicate that achieving a groundwater effluent limitation as set forth in paragraphs (1) and (2) of this subdivision would be clearly unreasonable, the department may substitute a modified effluent limitation.

(4) A groundwater effluent limitation for the total of organic substances that have a groundwater standard in Table 1 of section 703.5(f) of this Title or a groundwater guidance value derived pursuant to section 702.15(a) of this Part shall be established at 100 ug/L. However, substances that have a groundwater standard or guidance value or groundwater effluent limitation of 100 ug/L or greater shall not be included in this total.

## LXIII.    6 NYCRR § 702.17

## § 702.17 Variances to Effluent Limitations Based on Standards and Guidance Values

(a) The department may grant, to an applicant for a SPDES permit or to a SPDES permittee, a variance to a water quality-based effluent limitation or groundwater effluent limitation included in a SPDES permit.

(1) A variance applies only to the permittee identified in such variance and only to the pollutant specified in the variance. A variance does not affect or require the department to modify a corresponding standard or guidance value. A variance does not affect or require the department to modify a corresponding groundwater effluent limitation for the groundwater as a whole.

(2) A variance shall not apply to a new or recommencing discharger in the Great Lakes System unless the proposed discharge is a temporary one that is necessary to alleviate an imminent and substantial danger to the public health or the environment that is greater than the danger from not achieving the standard or guidance value. For the purpose of this Part, an imminent and substantial danger to the public health or the environment shall include, but not be limited to, a significant threat to the environment as defined in Part 375 of this Title.

(3) A variance shall not be granted that would likely jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of such species' critical habitat.

(4) A variance shall not be granted if standards or guidance values will be attained by implementing effluent limits required under section 750-1.11(a) of this Title and by the permittee implementing cost-effective and reasonable best management practices for nonpoint source control.

(5) A variance term shall not exceed the term of the SPDES permit. Where the term of the variance is the same as the permit, the variance shall stay in effect until the permit is reissued, modified or revoked.

(b) A variance may be granted if the requester demonstrates that achieving the effluent limitation is not feasible because:

(1) naturally occurring pollutant concentrations prevent attainment of the standard or guidance value;

(2) natural, ephemeral, intermittent or low flow conditions or water levels prevent attainment, unless these conditions may be compensated for by the discharge of sufficient volume of effluent to enable the standard or guidance value to be met without violating water conservation requirements;

SPA134

(3) human-caused conditions or sources of pollution prevent attainment of the standard or guidance value and cannot be remedied or would cause more environmental damage to correct than to leave in place;

(4) dams, diversions or other types of hydrologic modifications preclude attainment of the standard or guidance value, and it is not feasible to restore the waterbody to its original condition or to operate such modification in a way that would result in such attainment;

(5) physical conditions related to the natural features of the waterbody, such as the lack of a proper substrate cover, flow, depth, pools, riffles, and the like, unrelated to chemical water quality, preclude attainment of the standard or guidance value; or

(6) controls more stringent than those required by section 750-1.11(a) of this Title would result in substantial and widespread economic and social impact.

(c) In addition to the requirements of subdivision (b) of this section, the requestor shall also characterize, using adequate and sufficient data and principles, any increased risk to human health and the environment associated with granting the variance compared with attainment of the standard or guidance value absent the variance, and demonstrate to the satisfaction of the department that the risk will not adversely affect the public health, safety and welfare.

(d) The requestor shall submit a written application for a variance to the department. The application shall include:

(1) all relevant information demonstrating that achieving the effluent limitation is not feasible based on subdivision (b) of this section; and

(2) all relevant information demonstrating compliance with the conditions in subdivision (c) of this section.

(e) Where a request for a variance satisfies the requirements of this section, the department shall authorize the variance through the SPDES permit. The variance request shall be available to the public for review during the public notice period for the permit. The permit shall contain all conditions needed to implement the variance. Such conditions shall, at minimum, include:

(1) compliance with an initial effluent limitation that, at the time the variance is granted, represents the level currently achievable by the requestor, and that is no less stringent than that achieved under the previous permit where applicable;

(2) that reasonable progress be made toward achieving the effluent limitation based on the standard or guidance value, including, where reasonable, an effluent limitation more stringent than the initial effluent limitation;

(3) additional monitoring, biological studies and pollutant minimization measures as deemed necessary by the department;

(4) when the duration of a variance is shorter than the duration of a permit, compliance with an effluent limitation sufficient to meet the underlying standard or guidance value, upon the expiration of the variance; and

(5) a provision that allows the department to reopen and modify the permit for revisions to the variance.

(f) The department shall deny a variance request if the requestor fails to make the demonstrations required under subdivisions (b) and (c) of this section.

(g) A variance may be renewed, subject to the requirements of this section. As part of any renewal application, the permittee shall again demonstrate that achieving the effluent limitation is not feasible based on the requirements of this section. The permittee's application shall also contain information concerning its compliance with the conditions incorporated into its permit as part of the original variance pursuant to subdivisions (b) and (c) of this section. Renewal of a variance may be denied if the permittee did not comply with the conditions of the original variance.

(h) Where the department determines that a multiple discharge variance is necessary to address widespread standard or guidance value attainment issues including the presence of a ubiquitous pollutant or naturally high levels of a pollutant in a watershed, the department, in lieu of the discharger, may conduct the variance demonstration requirements in subdivisions (b) and (c) of this section. Any permittee accepting such variance shall be subject to the provisions of subdivision (e) of this section.

(i) The department will make available to the public a list of every variance that has been granted and that remains in effect.

SPA136

**LXIV.** **6 NYCRR § 702.18**

**§ 702.18 More Stringent Groundwater Effluent Limitations**

(a) The department, after consultation with the New York State Department of Health, may establish, on a case-by-case basis, more stringent effluent limitations than those set forth in section 703.6 of this Title or established by section 702.16(c)(1) of this Part, where necessary, to prevent pollution and protect the groundwaters for their best usages. The department shall consider rules and regulations promulgated by the administrator or the New York State Department of Health in establishing such limitations. Additionally, the department shall consider action levels for compounds determined to exhibit toxic effects which are established by the Commissioner of the New York State Department of Health.

(b) Circumstances under which the department may consider more stringent effluent limitations include but are not limited to the following:

(1) a discharge to an aquifer that is the sole or principal source of potable water supply;

(2) an existing or proposed discharge that is directly on or into consolidated rock or bedrock;

(3) a discharge containing one or more substances that in combination with precipitation and/or natural soil constituents is likely to produce a toxic pollutant; or

(4) where adverse cumulative or synergistic effects can be established for constituents in a discharge.

**LXV.** **6 NYCRR § 702.19**

**§ 702.19 Modifications of Groundwater Effluent Limitations**

(a)

(1) An applicant for a SPDES permit or a SPDES permittee may make written application for a modification of a groundwater effluent limitation

SPA137

listed in Table 3 of section 703.6(e) of this Title or established pursuant to section 702.16(c)(1) of this Part.

(2) Such applicant shall have the burden of establishing to the satisfaction of the commissioner, that one or more of the effluent limitations are unnecessarily restrictive as to a particular discharge in that such modification would, notwithstanding noncompliance with such limitations, prevent pollution and protect the groundwaters for their best usages.

(b) Where a request for a modification of a groundwater effluent limitation satisfies the requirements of this section, the department shall authorize the modification through the SPDES permit. The modification request shall be available to the public for review during the public notice period for the permit. The permit shall contain all conditions needed to implement the modification.

## LXVI.    6 NYCRR § 702.20

### § 702.20 Studies and Monitoring for Discharges to Groundwater

(a) The department may require the submission of information by any person responsible for a discharge in order that the department may evaluate the short- and long-term effect the discharge may have on groundwaters of the State or for the purpose of determining additional (section 702.15[a]of this Part) or more stringent (section 702.18 of this Part) effluent limitations or modifications (section 702.19 of this Part) thereto. Such information may include but is not limited to the following:

(1) a statement of the property to be affected by a discharge and the extent to which such property is under the control of the person responsible for such discharge;

(2) a geohydrologic analysis of the aquifers that may be affected;

(3) a determination of the direction and rate of movement of the discharge and the natural groundwater;

(4) an evaluation of adverse effects a discharge may have on any aquifer, source of potable water supply, or other surface waters or groundwaters of the State; and

(5) an evaluation of the ability of unconsolidated deposits, consolidated rock or bedrock and the groundwaters to attenuate potential pollutants such that the best usage of the groundwaters is maintained.

(b) The department may require the installation and operation of monitoring facilities in order to assure compliance with effluent limitations or to evaluate the effect of the discharge on the quality of the groundwater. Specific monitoring requirements shall be established by the department on a case-by-case basis and as may be required by Part 756 of this Title.

## LXVII.    6 NYCRR § 702.21

### § 702.21 Exceptions to Groundwater Effluent Limitations

(a) Activities and conditions.

The effluent limitations set forth in section 703.6 of this Title or established pursuant to section 702.16(c)(1) of this Part for discharges to Class GA waters are not applicable to the following activities:

(1) the discharge of sewage without the admixture of industrial waste or other wastes where:

(i) a disposal system, point source or outlet consists of a subsurface sewage disposal system designed, constructed and maintained in accordance with guidelines and standards satisfactory to the department;

(ii) monitoring facilities are utilized in accordance with requirements as may be specified by the department; and

(iii) the disposal system is designed to discharge, and discharges, less than 30,000 gallons per day;

(2) normally accepted agricultural practice of utilizing chemicals and fertilizers for growing of crops for human and animal consumption; and

(3) waste management systems that employ land application techniques and have renovative capabilities provided it has been demonstrated to the satisfaction of the commissioner that:

SPA139

(i) there will be no actual or potential public health hazard;

(ii) applicable water quality standards will be met in saturated zones; and

(iii) applicable water quality standards will not be contravened in any adjacent waters of the State.

(b) Nothing contained in this section shall be construed to allow any discharge that would preclude the best usage of Class GA waters specified in section 701.15 of this Title.

## LXVIII.    6 NYCRR § 702.22

### § 702.22 Severability

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

## LXIX.    6 NYCRR § 703.1

### § 703.1 Substance Form

A water quality standard, guidance value or groundwater effluent limitation includes all (total) forms of the substance, unless indicated otherwise. Where a standard or guidance value is for a specific form of the substance, water quality-based effluent limitations for SPDES permits may include other forms of the substance to account for changes in the substance that occur in the receiving water.

## LXX.    6 NYCRR § 703.2

### § 703.2 Narrative Water Quality Standards

Narrative standards for specific water classes are provided in this section. Narrative standards for classes N and AA-Special are provided in Part 701 of this Title.

| Parameter | Classes | Standard |
|---|---|---|
| Taste-, color-, and odor-producing, toxic and other deleterious substances | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special, GA, GSA, GSB | None in amounts that will adversely affect the taste, color or odor thereof, or impair the waters for their best usages. |
| Turbidity | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | No increase that will cause a substantial visible contrast to natural conditions. |
| Suspended, colloidal and settleable solids | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | None from sewage, industrial wastes or other wastes that will cause deposition or impair the waters for their best usages. |
| Oil and floating substances | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | No residue attributable to sewage, industrial wastes or other wastes, nor visible oil film nor globules of grease. |
| Garbage, cinders, ashes, oils, sludge and other refuse | SA, SB, SC, I, SD | None in any amounts. |
| Phosphorus and nitrogen | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | None in amounts that will result in growths of algae, weeds and slimes that will impair the waters for their best usages. |
| Radioactivity | A-Special | Should be kept at the lowest practicable levels, and in any event should be controlled to the extent necessary to prevent harmful effects |

| Parameter | Classes | Standard |
| --- | --- | --- |
| | | on health. |
| Thermal discharges | GA, GSA, GSB | None in amounts that will impair the waters for their best usages. |
| Thermal discharges | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | See Part 704 of this Title. |
| Flow | AA, A, B, C, D, A-Special | No alteration that will impair the waters for their best usages. |

## LXXI.  6 NYCRR § 703.3

**§ 703.3 Water Quality Standards for pH, Dissolved Oxygen, Dissolved Solids, Odor, Color and Turbidity**

Standards for specific classes are provided in this section.

| Parameter | Classes | Standard |
| --- | --- | --- |
| pH | AA, A, B, C, AA-Special, A-Special, GA | Shall not be less than 6.5 nor more than 8.5. |
| | D | Shall not be less than 6.0 nor more than 9.5. |
| | SA, SB, SC, I, SD | The normal range shall not be extended by more than one-tenth (0.1) of a pH unit. |
| Dissolved oxygen (DO) | A-Special | In rivers and upper waters of lakes, not less than 6.0 mg/L at any time. In hypolimnetic waters, it should |

SPA142

| Parameter | Classes | Standard |
|---|---|---|
| | | not be less than necessary for the support of fishlife, particularly cold water species. |
| | AA, A, B, C, AA-Special | For trout spawning waters (TS) the DO concentration shall not be less than 7.0 mg/L from other than natural conditions. For trout waters (T), the minimum daily average shall not be less than 6.0 mg/L, and at no time shall the concentration be less than 5.0 mg/L. For nontrout waters, the minimum daily average shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/L. |
| | D | Shall not be less than 3.0 mg/L at any time. |
| | SA, SB, SC | Chronic: Shall not be less than a daily average of 4.8 mg/L* |

Remark: *The DO concentration may fall below 4.8 mg/L for a limited number of days, as defined by the formula:

$$DO_i = \frac{13.0}{2.80 + 1.84e^{-0.1t_i}}$$

where $DO_i$ = DO concentration in mg/L between 3.0-4.8 mg/L and $t_i$ = time in days. This equation is applied by dividing the DO range of 3.0-4.8 mg/L into a number of equal intervals. $DO_i$ is the lower bound of each interval (i) and $t_i$ is the allowable number of days that the DO concentration can be within that interval. The actual number of days that the measured DO concentration falls within each interval (i) is divided by the allowable number of days that the DO can fall within interval ($t_i$). The sum of the quotients of all intervals (i...n) cannot exceed 1.0: *i.e.,*

| | | | |
|---|---|---|---|
| | $n$ | $t_i$ *(actual)* | |
| | $\Sigma$ | | $<$ |

| | | | 1.0 |
| --- | --- | --- | --- |
| | $i=1$ | $t_i$ (allowed) | |

The DO concentration shall not fall below the acute standard of 3.0 mg/L at any time.

| | SA, SB, SC, SD | Acute: Shall not be less than 3.0 mg/L at any time. |
| --- | --- | --- |
| | I | Shall not be less than 4.0 mg/L at any time. |
| Dissolved solids | A-Special | Shall not exceed 200 mg/L. |
| | AA, A, B, C, AA-Special, GA | Shall be kept as low as practicable to maintain the best usage of waters but in no case shall it exceed 500 mg/L. |
| Odor | GA | Shall not exceed a threshold odor number of 3. |
| Color | GA | Shall not exceed 15 color units (platinum-cobalt method). |
| Turbidity | GA | Shall not exceed 5 nephelometric units. |

## LXXII.    6 NYCRR § 703.4

### § 703.4 Water Quality Standards for Coliforms

Total and fecal coliform standards for specific classes are provided in this section.
(a) Total coliforms (number per 100 ml).

| *Classes* | *Standard* |
| --- | --- |
| AA | The monthly median value and more than 20 percent of the samples, from a minimum of five examinations, shall |

| Classes | Standard |
|---|---|
| | not exceed 50 and 240, respectively. |
| A, B, C, D, SB, SC, I, SD | The monthly median value and more than 20 percent of the samples, from a minimum of five examinations, shall not exceed 2,400 and 5,000, respectively. |
| SA | The median most probable number (MPN) value in any series of representative samples shall not be in excess of 70. |
| A-Special | The geometric mean, of not less than five samples, taken over not more than a 30-day period shall not exceed 1,000. |
| GA | The maximum allowable limit is 50. |

(b) Fecal coliforms (number per 100 ml).

| Classes | Standard |
|---|---|
| A, B, C, D, SB, SC, I, SD | The monthly geometric mean, from a minimum of five examinations, shall not exceed 200. |
| A-Special | The geometric mean, of not less than five samples, taken over not more than a 30-day period shall not exceed 200. |

(c) The total and fecal coliform standards for classes B, C, D, SB, SC and I shall be met during all periods:

(1) when disinfection is required for SPDES permitted discharges directly into, or affecting the best usage of, the water; or

(2) when the department determines it necessary to protect human health.

## LXXIII.    6 NYCRR § 703.5

### § 703.5 Water Quality Standards for Taste-, Color- and Odor-Producing, Toxic and Other Deleterious Substances

(a) Water quality standards for specific substances or groups of substances are listed in Table 1 of subdivision (f) of this section for the applicable water classes. The substance name is listed with the associated Chemical Abstract Service Registry Number (CAS No.) where applicable. For entries in Table 1 of subdivision (f) of this section that refer to chemical groups, congeners or other expressions of multiple substances, the standard applies to the sum of the substances, unless otherwise indicated.

(b) Standards are Health (Water Source), Health (Fish Consumption), Aquatic (Chronic), Aquatic (Acute), Wildlife, Aesthetic (Water Source), Aesthetic (Food Source), or Recreation based and are respectively designated as H(WS), H(FC), A(C), A(A), W, E(WS), E(FS), or R in the column headed "Type." Where more than one Type of standard is listed for a water class, the most stringent applies.

(c) The "Basis Code" in Table 1 of subdivision (f) of this section provides a further description of the basis of the standard. A list of basis codes is found in Table 2 of subdivision (f) of this section.

(d) The standard is the maximum allowable concentration in micrograms per liter (ug/L), unless otherwise noted. A standard defined by the symbol "ND" means not detectable by the analytical tests specified or approved pursuant to Part 700 of this Title.

(e) Special interpretive remarks are provided as necessary.

(f) Tables.
Table 1
(*cf. section 703.5*)

WATER QUALITY STANDARDS SURFACE WATERS AND GROUNDWATER

SPA146

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| Acenaphthene | A, A-S, AA, AA-S | 20 | E(WS) | U |
| (83-32-9) | | | | |
| Acetaldehyde | A, A-S, AA, AA-S | 8 | H(WS) | A |
| (75-07-0) | GA | 8 | H(WS) | A |
| Acrolein | GA | * | H(WS) | J |
| (107-02-8) | | | | |

| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. |
|---|---|---|

| Acrylamide | GA | * | H(WS) | J |
|---|---|---|---|---|
| (79-06-1) | | | | |

| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. |
|---|---|---|

| Acrylonitrile | GA | * | H(WS) | J |
|---|---|---|---|---|
| (107-13-1) | | | | |

| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. |
|---|---|---|

| Alachlor | A, A-S, AA, AA-S | 0.5 | H(WS) | A |
|---|---|---|---|---|
| (15972-60-8) | GA | 0.5 | H(WS) | A |
| Aldicarb | A, A-S, AA, | 7 | H(WS) | B |

SPA147

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| | AA-S | | | |
| (116-06-3) | GA | * | H(WS) | |
| Remark: * | | Refer to standards for "Aldicarb and Methomyl." | | |
| Aldicarb and Methomyl | GA | 0.35* | H(WS) | F |
| (116-06-3; | | | | |
| 16752-77-5) | | | | |
| Remark: * | | Applies to the sum of these substances. | | |
| Aldrin | GA | ND | H(WS) | F |
| (309-00-2) | A, A-S, AA, AA-S, B, C, D | * | H(FC) | |
| | SA, SB, SC, SD | * | H(FC) | |
| Remark: * | | Refer to standards for "Aldrin and Dieldrin." | | |
| Aldrin and Dieldrin | A, A-S, AA, AA-S, B, C, D | 0.001 | H(FC) | |
| (309-00-2; 60-57-1) | SA, SB, SC, SD | 0.001 | H(FC) | |
| Remark: * | | Applies to the sum of these substances. | | |
| Alkyldimethyl | A, A-S, AA, AA-S, B, C | * | A(C) | |
| benzyl ammonium | | | | |
| chloride | | | | |
| (68391-01-5) | | | | |

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| Remark: * | Refer to standards for "Quaternary ammonium compounds." | | | |
| Allyl chloride | GA | * | H(WS) | J |
| (107-05-1) | | | | |
| Remark: * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Aluminum, ionic | A, A-S, AA, AA-S, B, C | 100* | A(C) | |
| (CAS No. Not Applicable) | | | | |
| Remark: * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Ametryn | GA | 50 | H(WS) | J |
| (834-12-8) | | | | |
| 4-Aminobiphenyl | GA | * | H(WS) | J |
| (92-67-1) | | | | |
| Remark: * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Aminocresols | A, A-S, AA, AA-S | * | E(WS) | |
| (95-84-1; | GA | * | E(WS) | |
| 2835-95-2; | A, A-S, AA, AA-S, B, C, D | ** | E(FS) | |

| SUBSTANCE | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|
| (CAS NO.) | | | (ug/L) | | CODE |
| 2835-99-6) | | | | | |
| Remarks: | * | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | ** | Refer to standards for "Phenols, total unchlorinated." | | | |
| 3-Aminotoluene | | GA | * | H(WS) | J |
| (108-44-1) | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Aminotoluene | | GA | * | H(WS) | J |
| (106-49-0) | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Ammonia and Ammonium | | A, A-S, AA, AA-S | 2,000* | H(WS) | H |
| (7664-41-7; | | GA | 2,000* | H(WS) | H |
| CAS No. | | A, A-S, AA, AA-S, B, C | ** | A(C) | |
| Not Applicable) | | D | ** | A(A) | |
| | | SA, SB, SC, I | 35*** | A(C) | |
| | | SA, SB, SC, I, SD | 230*** | A(A) | |
| Remarks: | * | $NH_3 + NH_4^+$ as N. | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | ** | | Un-ionized ammonia as $NH_3$; tables below provide the standard in ug/L at varying pH and temperature for different classes and specifications. Linear interpolation between the listed pH values and temperatures is applicable. | | | |
| | *** | | Applies to un-ionized ammonia as $NH_3$. | | | |

Classes A, A-S, AA, AA-S, B, C with the (T) or (TS) Specification

| pH | 0°C | 5°C | 10°C | 15°-30°C |
|---|---|---|---|---|
| 6.50 | 0.7 | 0.9 | 1.3 | 1.9 |
| 6.75 | 1.2 | 1.7 | 2.3 | 3.3 |
| 7.00 | 2.1 | 2.9 | 4.2 | 5.9 |
| 7.25 | 3.7 | 5.2 | 7.4 | 11 |
| 7.50 | 6.6 | 9.3 | 13 | 19 |
| 7.75 | 11 | 15 | 22 | 31 |
| 8.0-9.0 | 13 | 18 | 25 | 35 |

Classes A, A-S, AA, AA-S, B, C without the (T) or (TS) Specification

| pH | 0°C | 5°C | 10°C | 15°C | 20°-30°C |
|---|---|---|---|---|---|
| 6.50 | 0.7 | 0.9 | 1.3 | 1.9 | 2.6 |
| 6.75 | 1.2 | 1.7 | 2.3 | 3.3 | 4.7 |
| 7.00 | 2.1 | 2.9 | 4.2 | 5.9 | 8.3 |
| 7.25 | 3.7 | 5.2 | 7.4 | 11 | 15 |
| 7.50 | 6.6 | 9.3 | 13 | 19 | 26 |

SPA151

| pH | 0°C | 5°C | 10°C | 15°C | 20°-30°C |
|---|---|---|---|---|---|
| 7.75 | 11 | 15 | 22 | 31 | 43 |
| 8.0-9.0 | 13 | 18 | 25 | 35 | 50 |

Class D

| pH | 0°C | 5°C | 10°C | 15°C | 20°C | 25°-30°C |
|---|---|---|---|---|---|---|
| 6.50 | 9.1 | 13 | 18 | 26 | 36 | 51 |
| 6.75 | 15 | 21 | 30 | 42 | 59 | 84 |
| 7.00 | 23 | 33 | 46 | 66 | 93 | 131 |
| 7.25 | 34 | 48 | 68 | 95 | 140 | 190 |
| 7.50 | 45 | 64 | 91 | 130 | 180 | 260 |
| 7.75 | 56 | 80 | 110 | 160 | 220 | 320 |
| 8.0-9.0 | 65 | 92 | 130 | 180 | 260 | 370 |

WATER QUALITY STANDARDS SURFACE WATERS AND GROUNDWATER

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Aniline | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (62-53-3) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Antimony | | | A, A-S, AA, AA-S | 3 | H(WS) | B |

SPA152

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (CAS No. Not Applicable) | | | GA | 3 | H(WS) | B |
| Arsenic | | | A, A-S, AA, AA-S | 50 | H(WS) | G |
| (CAS No. | | | GA | 25 | H(WS) | F |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | 150$^*$ | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | 340$^*$ | A(A) | |
| | | | SA, SB, SC | 63$^*$ | A(C) | |
| | | | SD | 120$^*$ | A(A) | |
| Remark: | $^*$ | Dissolved arsenic form. | | | | |
| Asbestos | | | A, A-S, AA, AA-S | $^*$ | H(WS) | G |
| (CAS No. Not Applicable) | | | GA | $^*$ | H(WS) | G |
| Remark: | $^*$ | 7,000,000 fibers (longer than 10 um)/L. | | | | |
| Atrazine | | | GA | 7.5 | H(WS) | F |

SPA153

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| (1912-24-9) | | | | |
| Azinphosmethyl | GA | 4.4 | H(WS) | F |
| (86-50-0) | A, A-S, AA, AA-S, B, C | 0.005* | A(C) | |
| | SA, SB, SC | 0.01 | A(C) | |
| Remark: * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Azobenzene | GA | * | H(WS) | J |
| (103-33-3) | | | | |
| Remark: * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Barium | A, A-S, AA, AA-S | 1,000 | H(WS) | G |
| (CAS No. Not Applicable) | GA | 1,000 | H(WS) | F |
| Benefin | GA | 35 | H(WS) | F |
| (1861-40-1) | | | | |
| Benzene | A, A-S, AA, AA-S | 1 | H(WS) | A |
| (71-43-2) | GA | 1 | H(WS) | A |
| | A, A-S, AA, AA- | 10 | H(FC) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | S, B, C, D | | | |
| | | | SA, SB, SC, I, SD | 10 | H(FC) | A |
| Benzidine | | | GA | * | H(WS) | J |
| (92-87-5) | | | A, A-S, AA, AA-S, B, C | $0.1^{**}$ | A(C) | |
| | | | D | $0.1^{**}$ | A(A) | |
| Remarks: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| | ** | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | | |
| Benzo(a)pyrene | | | GA | ND | H(WS) | F |
| (50-32-8) | | | | | | |
| Beryllium | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| (CAS No. Not Applicable) | | | | | | |
| Remarks: | * | 11 ug/L when hardness is less than or equal to 75 ppm; 1,100 ug/L when hardness is greater than 75 ppm. | | | | |
| | * | For waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | |
| | | Aquatic Type | | | | |

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| | standards apply to acid-soluble form. | | | |
| 1,1'-Biphenyl (92-52-4) | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | |
| Bis(2-chloro-ethoxy)methane (111-91-1) | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | |
| Bis(2-chloro-ethyl)ether (111-44-4) | GA | 1.0 | H(WS) | F |
| Bis(chloromethyl)-ether (542-88-1) | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | |
| Bis(2-chloro-1-methyl-ethyl)ether (108-60-1) | GA | * | H(WS) | J |

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| Remark: * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Bis(2-ethyl- | A, A-S, AA, AA-S | 5 | H(WS) | A |
| hexyl)phthalate | GA | 5 | H(WS) | A |
| (117-81-7) | A, A-S, AA, AA-S, B, C | 0.6 | A(C) | |
| Boron | GA | 1,000 | H(WS) | H |
| (CAS No. | A, A-S, AA, AA-S, B, C | 10,000* | A(C) | |
| Not Applicable) | SA, SB, SC | 1,000 | A(C) | |
| Remark: * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| | Aquatic Type standards apply to acid-soluble form. | | | |
| Bromacil | GA | 4.4 | H(WS) | F |
| (314-40-9) | | | | |
| Bromobenzene | GA | * | H(WS) | J |
| (108-86-1) | | | | |
| Remark: * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Bromochloromethane | A, A-S, AA, AA-S | 5 | H(WS) | I |

| SUBSTANCE | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|
| (CAS NO.) | | | (ug/L) | | CODE |
| (74-97-5) | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Bromomethane | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (74-83-9) | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Butachlor | | GA | 3.5 | H(WS) | F |
| (23184-66-9) | | | | | |
| cis-2-Butenal | | GA | * | H(WS) | J |
| (15798-64-8) | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| trans-2-Butenal | | GA | * | H(WS) | J |
| (123-73-9) | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| cis-2-Butenenitrile | | GA | * | H(WS) | J |
| (1190-76-7) | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| trans-2-Butenenitrile | | GA | * | H(WS) | J |
| (627-26-9) | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Butylate | | | GA | 50 | H(WS) | J |
| (2008-41-5) | | | | | | |
| n-Butylbenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (104-51-8) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| sec-Butylbenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (135-98-8) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| tert-Butylbenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (98-06-6) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Cadmium | | | A, A-S, AA, AA-S | 5 | H(WS) | B,G |
| (CAS No. | | | GA | 5 | H(WS) | B,G |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A- | ** | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | S, AA, AA-S, B, C, D | | | |
| | | | SA, SB, SC, I | 7.7 | A(C) | |
| | | | SD | 21 | A(A) | |
| Remarks: | * | (0.85) exp(0.7852 [ln (ppm hardness)] - 2.715) | | | | |
| | ** | (0.85) exp(1.128 [ln (ppm hardness)] - 3.6867) | | | | |
| | | Aquatic Type standards apply to dissolved form. | | | | |
| Captan | | | GA | 18 | H(WS) | F |
| (133-06-2) | | | | | | |
| Carbaryl | | | GA | 29 | H(WS) | F |
| (63-25-2) | | | | | | |
| Carbofuran | | | A, A-S, AA, AA-S | 15 | H(WS) | B |
| (1563-66-2) | | | A, A-S, AA, AA-S, B, C | 1.0* | A(C) | |
| | | | D | 10* | A(A) | |
| Remark: | * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | determined under section 702.15(c) and (d) of this Title. | | | | |
| Carbon disulfide | | | A, A-S, AA, AA-S | 60 | H(WS) | B |
| (75-15-0) | | | GA | 60 | H(WS) | B |
| Carbon tetra- | | | GA | 5 | H(WS) | F |
| chloride | | | | | | |
| (56-23-5) | | | | | | |
| Carboxin | | | GA | 50 | H(WS) | J |
| (5234-68-4) | | | | | | |
| Chloramben | | | GA | 50$^*$ | H(WS) | J |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | Includes: related forms that convert to the organic acid upon acidification to a pH of 2 or less; and esters of the organic acid. | | | | |
| Chloranil | | | GA | * | H(WS) | J |
| (118-75-2) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Chlordane | | | A, A-S, AA, AA-S | 0.05 | H(WS) | A |
| (57-74-9) | | | GA | 0.05 | H(WS) | A |
| | | | A, A-S, AA, AA- | $2 \times 10^{-5}$ | H(FC) | A |

SPA161

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | S, B, C, D | | | |
| | | | SA, SB, SC, I, SD | $2 \times 10^{-5}$ | H(FC) | A |
| Chloride | | | A, A-S, AA, AA-S | 250,000 | H(WS) | H |
| (CAS No. Not Applicable) | | | GA | 250,000 | H(WS) | H |
| Chlorinated dibenzo-p- | | | A, A-S, AA, AA-S | $7 \times 10^{-7*}$ | H(WS) | A |
| dioxins and Chlorinated | | | GA | $7 \times 10^{-7*}$ | H(WS) | A |
| dibenzofurans | | | A, A-S, AA, AA-S, B, C, D | $6 \times 10^{-10*}$ | H(FC) | A |
| (CAS No. | | | SA, SB, SC, I, SD | $6 \times 10^{-10*}$ | H(FC) | A |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C, D | $3.1 \times 10^{-9**}$ | W | |
| | | | SA, SB, SC, I, SD | $3.1 \times 10^{-9**}$ | W | |
| Remarks: | * | | Value is for the total of the chlorinated dibenzo-p-dioxins and chlorinated dibenzofurans that are listed in the table below as equivalents of 2,3,7,8-tetrachlorodibenzo-p-dioxin (2,3,7,8-TCDD). | | | |
| | | The 2,3,7,8- | | | | |

| SUBSTANCE | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|
| (CAS NO.) | | | (ug/L) | | CODE |
| | TCDD equivalent for a congener for the H(WS) standards is obtained by multiplying the concentration of that congener by its Toxicity Equivalency Factor (TEF) from the table below. | | | | |
| | The 2,3,7,8-TCDD equivalent for a congener for the H(FC) standards is obtained by multiplying the concentration of that congener by its TEF and its Bioaccumulation Equivalency Factor (BEF) from the table below. | | | | |
| | ** | Applies only to 2,3,7,8-TCDD | | | |

| CONGENER | TEF | BEF |
|---|---|---|
| 2,3,7,8-Tetrachlorodibenzo-p-dioxin | 1 | 1 |

| SUBSTANCE | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|
| (CAS NO.) | | (ug/L) | | CODE |
| 1,2,3,7,8-Pentachlorodibenzo-p-dioxin | | | 0.5 | 0.9 |
| 1,2,3,4,7,8-Hexachlorodibenzo-p-dioxin | | | 0.1 | 0.3 |
| 1,2,3,6,7,8-Hexachlorodibenzo-p-dioxin | | | 0.1 | 0.1 |
| 1,2,3,7,8,9-Hexachlorodibenzo-p-dioxin | | | 0.1 | 0.1 |
| 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | | | 0.01 | 0.05 |
| Octachlorodibenzo-p-dioxin | | | 0.001 | 0.01 |
| 2,3,7,8-Tetrachlorodibenzofuran | | | 0.1 | 0.8 |
| 1,2,3,7,8-Pentachlorodibenzofuran | | | 0.05 | 0.2 |
| 2,3,4,7,8-Pentachlorodibenzofuran | | | 0.5 | 1.6 |
| 1,2,3,4,7,8-Hexachlorodibenzofuran | | | 0.1 | 0.08 |
| 1,2,3,6,7,8-Hexachlorodibenzofuran | | | 0.1 | 0.2 |
| 2,3,4,6,7,8-Hexachlorodibenzofuran | | | 0.1 | 0.7 |
| 1,2,3,7,8,9-Hexachlorodibenzofuran | | | 0.1 | 0.6 |
| 1,2,3,4,6,7,8-Heptachlorodibenzofuran | | | 0.01 | 0.01 |
| 1,2,3,4,7,8,9-Heptachlorodibenzofuran | | | 0.01 | 0.4 |
| Octachlorodibenzofuran | | | 0.001 | 0.02 |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Chlorine, Total | | | A, A-S, AA, AA-S, B, C | 5 | A(C) | |
| Residual | | | D | 19 | A(A) | |

SPA164

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (CAS No. | | | SA, SB, SC, I | 7.5 | A(C) | |
| Not Applicable) | | | SD | 13 | A(A) | |
| 2-Chloroaniline | | | GA | * | H(WS) | J |
| (95-51-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Chloroaniline | | | GA | * | H(WS) | J |
| (108-42-9) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Chloroaniline | | | GA | * | H(WS) | J |
| (106-47-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chlorobenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (108-90-7) | | | GA | * | H(WS) | J |
| | | | A, A-S, AA, AA-S, B, C, D | 400 | H(FC) | B |
| | | | SA, SB, SC, I, SD | 400 | H(FC) | B |
| | | | A, A-S, AA, AA-S, B, C | 5 | A(C) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | A, A-S, AA, AA-S | 20 | E(WS) | U |
| | | | D | 50 | E(FS) | V |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Chlorobenzotrifluoride | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (98-56-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1-Chlorobutane | | | GA | * | H(WS) | J |
| (109-69-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chloroethane | | | GA | * | H(WS) | J |
| (75-00-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chloroform | | | A, A-S, AA, AA-S | 7 | H(WS) | A |
| (67-66-3) | | | GA | 7 | H(WS) | A |
| Chloromethyl methyl ether | | | GA | * | H(WS) | J |
| (107-30-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2-Chloronaphthalene | | | A, A-S, AA, AA-S | 10 | E(WS) | U |
| (91-58-7) | | | | | | |
| 2-Chloronitrobenzene | | | GA | * | H(WS) | J |
| (88-73-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Chloronitrobenzene | | | GA | * | H(WS) | J |
| (121-73-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Chloronitrobenzene | | | GA | * | H(WS) | J |
| (100-00-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chloroprene | | | GA | * | H(WS) | J |
| (126-99-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chlorothalonil | | | GA | * | H(WS) | J |
| (1897-45-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| 2-Chlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (95-49-8) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Chlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (108-41-8) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Chlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (106-43-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Chloro-o-toluidine | | | GA | * | H(WS) | J |
| (95-69-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 5-Chloro-o-toluidine | | | GA | * | H(WS) | J |
| (95-79-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Chloro-1,1,1-tri- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| fluoropropane | | | GA | * | H(WS) | J |
| (460-35-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Chromium | | | A, A-S, AA, AA-S | 50 | H(WS) | G |
| (CAS No. | | | GA | 50 | H(WS) | G |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |
| Remarks: | * | | $(0.86) \exp(0.819 [\ln (\text{ppm hardness})] + 0.6848)$ | | | |
| | ** | | $(0.316) \exp(0.819 [\ln (\text{ppm hardness})] + 3.7256)$ | | | |
| Aquatic Type standards apply to dissolved form and do not include hexavalent chromium. | | | | | | |
| Chromium | | | GA | 50 | H(WS) | F |
| (hexavalent) | | | A, A-S, AA, AA-S, B, C | 11* | A(C) | |
| (CAS No. | | | A, A-S, AA, AA-S, B, C, D | 16* | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Not Applicable) | | | SA, SB, SC | 54** | A(C) | |
| | | | SD | 1,200** | A(A) | |
| Remarks: | * | Applies to dissolved form. | | | | |
| | ** | Applies to acid-soluble form. | | | | |
| Cobalt | | | A, A-S, AA, AA-S, B, C | 5* | A(C) | |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | |
| Aquatic Type standards apply to acid-soluble form. | | | | | | |
| Copper | | | A, A-S, AA, AA-S | 200 | H(WS) | H |
| (CAS No. | | | GA | 200 | H(WS) | H |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |
| | | | SA, SB, SC, I | *** | A(C) | |
| | | | SA, SB, SC, I, SD | **** | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * | | (0.96) exp(0.8545 [ln (ppm hardness)] - 1.702) | | | |
| | *<br>* | | (0.96) exp(0.9422 [ln (ppm hardness)] - 1.7) | | | |
| | *<br>*<br>* | | Standard is 3.4 ug/L except in New York/New Jersey harbor where it is 5.6 ug/L. | | | |
| | *<br>*<br>*<br>* | | Standard is 4.8 ug/L except in New York/New Jersey harbor where it is 7.9 ug/L. | | | |
| Aquatic Type standards apply to dissolved form. | | | | | | |
| Cyanide | | | A, A-S, AA, AA-S | 200 | H(WS) | B |
| (CAS No. | | | GA | 200 | H(WS) | B |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C, D | 9,000 | H(FC) | B |
| | | | SA, SB, SC, I, SD | 9,000 | H(FC) | B |
| | | | A, A-S, AA, AA-S, B, C | 5.2* | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | 22* | A(A) | |
| | | | SA, SB, SC | 1.0* | A(C) | |

SPA171

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | SD | 1.0* | A(A) | |
| Remark: | * | | As free cyanide: the sum of HCN and CN⁻ expressed as CN. | | | |
| Cyanogen bromide | | | GA | * | H(WS) | J |
| (506-68-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Cyanogen chloride | | | GA | * | H(WS) | J |
| (506-77-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Dalapon | | | GA | 50* | H(WS) | J |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | Includes: related forms that convert to the organic acid upon acidification to a pH of 2 or less; and esters of the organic acid. | | | |
| p,p′-DDD | | | A, A-S, AA, AA-S | 0.3 | H(WS) | A |
| (72-54-8) | | | GA | 0.3 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $8 \times 10^{-5}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $8 \times 10^{-5}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C, D | * | W | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | SA, SB, SC, I, SD | * | W | |
| Remark: | * | | See standard for p,p′-DDT. | | | |
| p,p′-DDE | | | A, A-S, AA, AA-S | 0.2 | H(WS) | A |
| (72-55-9) | | | GA | 0.2 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $7 \times 10^{-6}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $7 \times 10^{-6}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C, D | * | W | |
| | | | SA, SB, SC, I, SD | * | W | |
| Remark: | * | | See standard for p,p′-DDT. | | | |
| p,p′-DDT | | | A, A-S, AA, AA-S | 0.2 | H(WS) | A |
| (50-29-3) | | | GA | 0.2 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $1 \times 10^{-5}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $1 \times 10^{-5}$ | H(FC) | A |
| | | | A, A-S, AA, | $1.1 \times 10^{-5}$ * | W | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | AA-S, B, C, D | | | |
| | | | SA, SB, SC, I, SD | $1.1 \times 10^{-5*}$ | W | |
| Remark: | * | | Applies to the sum of p,p′-DDD, p,p′ -DDE and p,p′-DDT. | | | |
| Dechlorane Plus | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (13560-89-9) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Demeton | | | A, A-S, AA, AA-S, B, C | $0.1^{*}$ | A(C) | |
| (8065-48-3; | | | SA, SB, SC | 0.1 | A(C) | |
| 298-03-3; | | | | | | |
| 126-75-0) | | | | | | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Standards apply to the sum of these substances. | | | | | | |
| Diazinon | | | GA | 0.7 | H(WS) | F |
| (333-41-5) | | | A, A-S, AA, AA-S, B, C | $0.08^{*}$ | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| 1,2-Dibromobenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (583-53-9) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,3-Dibromobenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (108-36-1) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,4-Dibromobenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (106-37-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,2-Dibromo-3- | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| chloropropane | | | GA | 0.04 | H(WS) | A |
| (96-12-8) | | | | | | |
| Dibromodichloromethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (594-18-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Dibromomethane | | | GA | * | H(WS) | J |
| (74-95-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Di-n-butyl | | | GA | 50 | H(WS) | J |
| phthalate | | | | | | |
| (84-74-2) | | | | | | |
| Dicamba | | | GA | 0.44 | H(WS) | F |
| (1918-00-9) | | | | | | |
| Dichlorobenzenes | | | A, A-S, AA, AA-S | 3$^*$ | H(WS) | A |
| (95-50-1; 541-73-1; | | | GA | 3$^*$ | H(WS) | A |
| 106-46-7) | | | A, A-S, AA, AA-S, B, C | 5$^{**}$ | A(C) | |
| | | | A, A-S, AA, AA-S | 20$^{***}$/30$^{****}$ | E(WS) | U |
| | | | D | 50$^{**}$ | E(FS) | V |
| Remarks: | * | | Applies to each isomer (1,2-,1,3- and 1,4-dichlorobenzene) individually. | | | |
| | ** | | Applies to the sum of 1,2-, 1,3- and 1,4-dichlorobenzene. | | | |
| For the waters of the Great Lakes | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | | | |
| | * * * | | Applies to 1,3-dichlorobenzene only. | | | |
| | * * * * | | Applies to 1,4-dichlorobenzene only. | | | |
| 3,3′-Dichlorobenzidine | | | GA | * | H(WS) | J |
| (91-94-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,4-Dichlorobenzo- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| triflouride | | | GA | * | H(WS) | J |
| (328-84-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| cis-1,4-Dichloro-2-butene | | | GA | * | H(WS) | J |
| (1476-11-5) | | | | | | |

SPA177

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| trans-1,4-Dichloro-2-butene | | | GA | * | H(WS) | J |
| (110-57-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Dichlorodifluoromethane | | | GA | * | H(WS) | J |
| (75-71-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,1-Dichloroethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (75-34-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,2-Dichloroethane | | | A, A-S, AA, AA-S | 0.6 | H(WS) | A |
| (107-06-2) | | | GA | 0.6 | H(WS) | A |
| 1,1-Dichloroethene | | | GA | * | H(WS) | J |
| (75-35-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| cis-1,2-Dichloroethene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |

SPA178

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (156-59-2) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| trans-1,2-Dichloroethene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (156-60-5) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Dichlorofluoromethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (75-43-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dichlorophenol | | | A, A-S, AA, AA-S | 0.3* | E(WS) | U |
| (120-83-2) | | | GA | ** | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | *** | E(FS) | |
| Remarks: | * | | Also see standards for "Phenolic compounds (total phenols)." | | | |
| | ** | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | *** | | Refer to standards for "Phenols, total chlorinated." | | | |
| 2,4-Dichloro- | | | A, A-S, AA, | 50 | H(WS) | G |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | AA-S | | | |
| phenoxyacetic | | | GA | 50 | H(WS) | G |
| acid | | | | | | |
| (94-75-7) | | | | | | |
| 1,1-Dichloropropane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (78-99-9) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 1,2-Dichloropropane | | | A, A-S, AA, AA-S | 1 | H(WS) | A |
| (78-87-5) | | | GA | 1 | H(WS) | A |
| 1,3-Dichloropropane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (142-28-9) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 2,2-Dichloropropane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (594-20-7) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 1,3-Dichloropropene | | | A, A-S, AA, AA-S | 0.4* | H(WS) | A |

SPA180

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (542-75-6) | | | GA | 0.4$^*$ | H(WS) | A |
| Remark: | $*$ | | Applies to the sum of cis- and trans-1,3-dichloropropene, CAS Nos. 10061-01-5 and 10061-02-6, respectively. | | | |
| 2,3-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (32768-54-0) | | | GA | $*$ | H(WS) | J |
| Remark: | $*$ | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (95-73-8) | | | GA | $*$ | H(WS) | J |
| Remark: | $*$ | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,5-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (19398-61-9) | | | GA | $*$ | H(WS) | J |
| Remark: | $*$ | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,6-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (118-69-4) | | | GA | $*$ | H(WS) | J |
| Remark: | $*$ | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,4-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (95-75-0) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 3,5-Dichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (25186-47-4) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Dieldrin | | | A, A-S, AA, AA-S | 0.004 | H(WS) | A |
| (60-57-1) | | | GA | 0.004 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $6 \times 10^{-7}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $6 \times 10^{-7}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C | 0.056 | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | 0.24 | A(A) | |
| Di(2-ethylhexyl)adipate | | | A, A-S, AA, AA-S | 20 | H(WS) | A |
| (103-23-1) | | | GA | 20 | H(WS) | A |
| 1,2-Difluoro-1,1,2,2-tetrachloroethane | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (76-12-0) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,2-Diisopropylbenzene | | | GA | * | H(WS) | J |
| (577-55-9) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,3-Diisopropylbenzene | | | GA | * | H(WS) | J |
| (99-62-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,4-Diisopropylbenzene | | | GA | * | H(WS) | J |
| (100-18-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| N,N-Dimethylaniline | | | A, A-S, AA, AA-S | 1 | H(WS) | A |
| (121-69-7) | | | GA | 1 | H(WS) | A |
| 2,3-Dimethylaniline | | | GA | * | H(WS) | J |
| (87-59-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dimethylaniline | | | GA | * | H(WS) | J |
| (95-68-1) | | | | | | |

SPA183

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,5-Dimethylaniline | | | GA | * | H(WS) | J |
| (95-78-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,6-Dimethylaniline | | | GA | * | H(WS) | J |
| (87-62-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,4-Dimethylaniline | | | GA | * | H(WS) | J |
| (95-64-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,5-Dimethylaniline | | | GA | * | H(WS) | J |
| (108-69-0) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,3′-Dimethylbenzidine | | | GA | * | H(WS) | J |
| (119-93-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4,4′-Dimethylbibenzyl | | | GA | * | H(WS) | J |
| (538-39-6) | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4,4′-Dimethyldiphenyl- methane (4957-14-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| alpha, alpha-Dimethyl phenethylamine (122-09-8) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dimethylphenol | | | A, A-S, AA, AA-S, B, C, D | 1,000 | H(FC) | B |
| (105-67-9) | | | SA, SB, SC, I, SD | 1,000 | H(FC) | B |
| | | | A, A-S, AA, AA-S | * | E(WS) | |
| | | | GA | * | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | E(FS) | |
| Remarks: | * | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | * | | Refer to standards for "Phenols, total unchlorinated." | | | |

SPA185

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * | | | | | |
| Dimethyl tetrachloro-terephthalate (1861-32-1) | | | GA | 50 | H(WS) | J |
| 1,3-Dinitrobenzene (99-65-0) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dinitrophenol | | | A, A-S, AA, AA-S, B, C, D | 400 | H(FC) | B |
| (51-28-5) | | | SA, SB, SC, I, SD | 400 | H(FC) | B |
| | | | A, A-S, AA, AA-S | * | E(WS) | |
| | | | GA | * | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | E(FS) | |
| Remarks: | * | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | ** | | Refer to standards for "Phenols, total unchlorinated." | | | |
| 2,3-Dinitrotoluene (602-01-7) | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4-Dinitrotoluene | | | GA | * | H(WS) | J |
| (121-14-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,5-Dinitrotoluene | | | GA | * | H(WS) | J |
| (619-15-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,6-Dinitrotoluene | | | GA | * | H(WS) | J |
| (606-20-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,4-Dinitrotoluene | | | GA | * | H(WS) | J |
| (610-39-9) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,5-Dinitrotoluene | | | GA | * | H(WS) | J |
| (618-85-9) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Diphenamid | | | GA | 50 | H(WS) | J |
| (957-51-7) | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Diphenylamine | | | GA | * | H(WS) | J |
| (122-39-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Diphenyl-hydrazines (122-66-7; 530-50-7) | | | GA | ND* | H(WS) | F |
| Remark: | * | | Applies to the sum of 1,1- and 1,2-diphenylhydrazine, CAS Nos. 530-50-7 and 122-66-7, respectively. | | | |
| Diquat | | | A, A-S, AA, AA-S | 20* | H(WS) | B |
| (2764-72-9) | | | GA | 20* | H(WS) | B |
| Remark: | * | | Applies to the concentration of diquat ion whether free or as an undissociated salt. | | | |
| Disulfoton | | | GA | * | H(WS) | |
| (298-04-4) | | | | | | |
| Remark: | * | | Refer to standards for "Phorate and Disulfoton." | | | |
| Dyphylline | | | A, A-S, AA, AA-S | 50 | H(WS) | B |
| (479-18-5) | | | | | | |
| Endosulfan | | | A, A-S, AA, AA-S, B, C | 0.009 | A(C) | |
| (115-29-7) | | | D | 0.22* | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | SA, SB, SC | 0.001 | A(C) | |
| | | | SD | 0.034 | A(A) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(d) of this Title. | | | |
| Endrin | | | A, A-S, AA, AA-S | 0.2 | H(WS) | G |
| (72-20-8) | | | GA | ND | H(WS) | F |
| | | | A, A-S, AA, AA-S, B, C, D | 0.002 | H(FC) | |
| | | | SA, SB, SC, SD | 0.002 | H(FC) | |
| | | | A, A-S, AA, AA-S, B, C | 0.036 | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | 0.086 | A(A) | |
| Endrin aldehyde | | | GA | * | H(WS) | J |
| (7421-93-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Endrin ketone | | | GA | * | H(WS) | J |
| (53494-70-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 | | | |

SPA189

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Ethylbenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (100-41-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Ethylene dibromide | | | A, A-S, AA, AA-S | $6 \times 10^{-4}$ | H(WS) | A |
| (106-93-4) | | | GA | $6 \times 10^{-4}$ | H(WS) | A |
| Ethylenethiourea | | | GA | ND | H(WS) | F |
| (96-45-7) | | | | | | |
| Ferbam | | | GA | 4.2 | H(WS) | F |
| (14484-64-1) | | | | | | |
| Fluometuron | | | GA | 50 | H(WS) | J |
| (2164-17-2) | | | | | | |
| Fluoride | | | A, A-S, AA, AA-S | 1,500 | H(WS) | H |
| (CAS No. | | | GA | 1,500 | H(WS) | F |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | D | ** | A(A) | |
| Remarks: | * | | (0.02) exp(0.907 [ln (ppm hardness)] + 7.394) | | | |
| | ** | | (0.1) exp(0.907 [ln (ppm hardness)] + 7.394) | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | | | | |
| Foaming agents | | | GA | 500$^*$ | E(WS) | U |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | $*$ | Determined as methylene blue active substances (MBAS) or by other tests as specified by the commissioner. | | | | |
| Folpet | | | GA | 50 | H(WS) | J |
| (133-07-3) | | | | | | |
| Formaldehyde | | | A, A-S, AA, AA-S | 8 | H(WS) | A |
| (50-00-0) | | | GA | 8 | H(WS) | A |
| Gross alpha | | | A, A-S, AA, AA-S | $*$ | H(WS) | G |
| radiation | | | GA | $*$ | H(WS) | G |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | $*$ | 15 picocuries per liter, excluding radon and uranium. | | | | |
| Gross beta | | | A, AA | $*$ | H(WS) | H |

SPA191

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| radiation | | | GA | * | H(WS) | H |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | 1,000 picocuries per liter, excluding strontium-90 and alpha emitters. | | | |
| Heptachlor | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| (76-44-8) | | | GA | 0.04 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $2 \times 10^{-4}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $2 \times 10^{-4}$ | H(FC) | A |
| Heptachlor epoxide | | | A, A-S, AA, AA-S | 0.03 | H(WS) | A |
| (1024-57-3) | | | GA | 0.03 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $3 \times 10^{-4}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $3 \times 10^{-4}$ | H(FC) | A |
| Hexachloro- | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| benzene | | | GA | 0.04 | H(WS) | A |
| (118-74-1) | | | A, A-S, AA, AA-S, B, C, D | $3 \times 10^{-5}$ | H(FC) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | SA, SB, SC, I, SD | $3 \times 10^{-5}$ | H(FC) | A |
| Hexachloro- | | | A, A-S, AA, AA-S | 0.5 | H(WS) | B |
| butadiene | | | GA | 0.5 | H(WS) | B |
| (87-68-3) | | | A, A-S, AA, AA-S, B, C, D | 0.01 | H(FC) | B |
| | | | SA, SB, SC, I, SD | 0.01 | H(FC) | B |
| | | | A, A-S, AA, AA-S, B, C | $1.0^{*}$ | A(C) | |
| | | | D | $10^{*}$ | A(A) | |
| | | | SA, SB, SC | 0.3 | A(C) | |
| | | | SD | 3.0 | A(A) | |
| Remark: | * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | | |
| alpha-Hexachloro- | | | A, A-S, AA, AA-S | 0.01 | H(WS) | A |
| cyclohexane | | | GA | 0.01 | H(WS) | A |
| (319-84-6) | | | A, A-S, AA, AA-S, B, C, D | 0.002 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 0.002 | H(FC) | A |

SPA193

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| beta-Hexachloro- | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| cyclohexane | | | GA | 0.04 | H(WS) | A |
| (319-85-7) | | | A, A-S, AA, AA-S, B, C, D | 0.007 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 0.007 | H(FC) | A |
| delta-Hexachloro- | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| cyclohexane | | | GA | 0.04 | H(WS) | A |
| (319-86-8) | | | A, A-S, AA, AA-S, B, C, D | 0.008 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 0.008 | H(FC) | A |
| epsilon-Hexachloro- | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| cyclohexane | | | GA | 0.04 | H(WS) | A |
| (6108-10-7) | | | A, A-S, AA, AA-S, B, C, D | 0.008 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 0.008 | H(FC) | A |
| gamma-Hexachloro- | | | A, A-S, AA, AA-S | 0.05 | H(WS) | A |

SPA194

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| cyclohexane | | | GA | 0.05 | H(WS) | A |
| (58-89-9) | | | A, A-S, AA, AA-S, B, C, D | 0.008 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 0.008 | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C, D | 0.95 | A(A) | |
| Hexachloro- | | | GA | * | H(WS) | J |
| cyclopentadiene | | | A, A-S, AA, AA-S, B, C | 0.45** | A(C) | |
| (77-47-4) | | | D | 4.5** | A(A) | |
| | | | SA, SB, SC | 0.07 | A(C) | |
| | | | SD | 0.7 | A(A) | |
| | | | A, A-S, AA, AA-S | 1.0 | E(WS) | U |
| Remarks: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| | ** | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Hexachloroethane | | | A, A-S, AA, AA-S | 5 | H(WS) | A, I |
| (67-72-1) | | | GA | * | H(WS) | J |
| | | | A, A-S, AA, | 0.6 | H(FC) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | AA-S, B, C, D | | | |
| | | | SA, SB, SC, I, SD | 0.6 | H(FC) | A |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Hexachlorophene | | | GA | * | H(WS) | J |
| (70-30-4) | | | A, A-S, AA, AA-S | ** | E(WS) | |
| | | | GA | ** | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | *** | E(FS) | |
| Remarks: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| | ** | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | *** | | Refer to standards for "Phenols, total chlorinated." | | | |
| Hexachloropropene | | | GA | * | H(WS) | J |
| (1888-71-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Hexazinone | | | GA | 50 | H(WS) | J |
| (51235-04-2) | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Hydrazine | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| (302-01-2) | | | D | ** | A(A) | |
| Remarks: | * | | 5 ug/L at less than 50 ppm hardness and 10 ug/L at greater than or equal to 50 ppm hardness. | | | |
| | ** | | 50 ug/L at less than 50 ppm hardness and 100 ug/L at greater than or equal to 50 ppm hardness. | | | |
| For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702. | | | | | | |
| Hydrogen sulfide | | | A, A-S, AA, AA-S, B, C | 2.0* | A(C) | |
| (7783-06-4) | | | SA, SB, SC | 2.0 | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Aquatic Type standards apply to undissociated form. | | | | | | |
| Hydroquinone | | | A, A-S, AA, AA-S, B, C | 2.2** | A(C) | |

SPA197

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (123-31-9) | | | D | 4.4** | A(A) | |
| | | | A, A-S, AA, AA-S | * | E(WS) | |
| | | | GA | * | E(WS) | |
| | *** | E(FS) | A, A-S, AA, AA-S, B, C, D | | | |
| Remarks: | * | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | ** | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| | *** | | Refer to standards for "Phenols, total unchlorinated." | | | |
| Iron | | | A, A-S, AA, AA-S | | E(WS) | G |
| (CAS No. Not Applicable) | | 300* | GA | F | | |
| Remark: | * | | Also see standard for "Iron and Manganese." | | | |
| Iron and Manganese | | | GA | 500* | E(WS) | F |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | Applies to the sum of these substances; also see individual standards for "Iron" and "Manganese." | | | |
| Isodecyl diphenyl | | | A, A-S, AA, AA-S, B, C | 1.7* | A(C) | |
| phosphate | | | D | 22* | A(A) | |

SPA198

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (29761-21-5) | | | | | | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Isodrin | | | GA | * | H(WS) | J |
| (465-73-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Isopropalin | | | GA | * | H(WS) | J |
| (33820-53-0) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Isopropylbenzene | | | GA | * | H(WS) | J |
| (98-82-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2-Isopropyltoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (527-84-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Isopropyltoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (535-77-3) | | | GA | * | H(WS) | J |

SPA199

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Isopropyltoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (99-87-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Isothiazolones, total | | | A, A-S, AA, AA-S, B, C | 1* | A(C) | |
| (isothiazolinones) | | | D | 10* | A(A) | |
| (includes 5-chloro- | | | | | | |
| 2-methyl-4- | | | | | | |
| isothiazolin-3-one | | | | | | |
| & 2-methyl-4- | | | | | | |
| isothiazolin-3-one) | | | | | | |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Standards apply to the sum of these substances. | | | | | | |
| Kepone | | | GA | ND | H(WS) | F |
| (143-50-0) | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Lead | | | A, A-S, AA, AA-S | 50 | H(WS) | G |
| (CAS No. | | | GA | 25 | H(WS) | F |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |
| | | | SA, SB, SC, I | 8 | A(C) | |
| | | | SA, SB, SC, I, SD | 204 | A(A) | |
| Remarks: | * | {1.46203 - [ln (hardness) (0.145712)] } exp (1.273 [ln (hardness)] - 4.297) | | | | |
| | ** | {1.46203 - [ln (hardness) (0.145712)] } exp (1.273 [ln (hardness)] - 1.052) | | | | |
| Aquatic Type standards apply to dissolved form. | | | | | | |
| Linear alkyl | | | A, A-S, AA, AA-S, B, C | 40* | A(C) | |
| benzene sul- | | | | | | |
| fonates (LAS) | | | | | | |
| (CAS No. Not Applicable) | | | | | | |
| Remarks: | * | LAS with side chains greater than 13 carbons only; applies to the sum of these substances. | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Magnesium | | | A, A-S, AA, AA-S | 35,000 | H(WS) | B |
| (CAS No. Not Applicable) | | | | | | |
| Malathion | | | GA | 7.0 | H(WS) | F |
| (121-75-5) | | | A, A-S, AA, AA-S, B, C | 0.1$^{*}$ | A(C) | |
| | | | SA, SB, SC | 0.1 | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Mancozeb | | | GA | 1.8 | H(WS) | F |
| (8018-01-7) | | | | | | |
| Maneb | | | GA | 1.8 | H(WS) | F |
| (12427-38-2) | | | | | | |
| Manganese | | | A, A-S, AA, AA-S | 300 | E(WS) | G |
| (CAS No. Not Applicable) | | | GA | 300$^{*}$ | E(WS) | F |
| Remark: | * | | Also see standards for "Iron and Manganese." | | | |
| Mercury | | | A, A-S, AA, AA-S | 0.7 | H(WS) | B |
| (CAS No. | | | GA | 0.7 | H(WS) | B |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C, D | $7 \times 10^{-4*}$ | H(FC) | B |
| | | | SA, SB, SC, I, SD | $7 \times 10^{-4*}$ | H(FC) | B |
| | | | A, A-S, AA, AA-S, B, C | $0.77^{*}$ | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | $1.4^{*}$ | A(A) | |
| | | | A, A-S, AA, AA-S, B, C, D | $0.0026^{*}$ | W | |
| | | | SA, SB, SC, I, SD | $0.0026^{*}$ | W | |
| Remark: | * | Applies to dissolved form. | | | | |
| Methacrylonitrile | | | GA | * | H(WS) | J |
| (126-98-7) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Methomyl | | | GA | * | H(WS) | |
| (16752-77-5) | | | | | | |
| Remark: | * | Refer to standard for "Aldicarb and Methomyl." | | | | |
| Methoxychlor | | | A, A-S, AA, AA-S | 35 | H(WS) | H |
| (72-43-5) | | | GA | 35 | H(WS) | F |

SPA203

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | A, A-S, AA, AA-S, B, C | 0.03$^*$ | A(C) | |
| | | | SA, SB, SC | 0.03 | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| N-Methylaniline | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (100-61-8) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Methyl chloride | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (74-87-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2-Methyl-4-chloro- phenoxyacetic acid (94-74-6) | | | GA | 0.44 | H(WS) | F |
| 4,4′-Methylene-bis- (2-chloroaniline) (101-14-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| 4,4′-Methylene-bis- | | | GA | * | H(WS) | J |
| (N-methyl)aniline | | | | | | |
| (1807-55-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4,4′-Methylene-bis- | | | GA | * | H(WS) | J |
| (N,N′-dimethyl) | | | | | | |
| aniline | | | | | | |
| (101-61-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Methylene | | | A, A-S, AA, AA-S, B, C | 1.0* | A(C) | |
| bisthiocyanate | | | | | | |
| (6317-18-6) | | | | | | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Methylene chloride | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (75-09-2) | | | GA | * | H(WS) | J |
| | | | A, A-S, AA, AA-S, B, C, D | 200 | H(FC) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | SA, SB, SC, I, SD | 200 | H(FC) | A |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Methyl iodide | | | GA | * | H(WS) | J |
| (74-88-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Methyl methacrylate | | | GA | 50 | H(WS) | J |
| (80-62-6) | | | | | | |
| Methyl parathion | | | GA | * | H(WS) | |
| (298-00-0) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| Remark: | * | | Refer to the standards for "Parathion and Methyl parathion." | | | |
| alpha-Methylstyrene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (98-83-9) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2-Methylstyrene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (611-15-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| 3-Methylstyrene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (100-80-1) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Methylstyrene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (622-97-9) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Metolachlor | | | A, A-S, AA, AA-S | 10 | H(WS) | A |
| (51218-45-2) | | | GA | 10 | H(WS) | A |
| Metribuzin | | | GA | 50 | H(WS) | J |
| (21087-64-9) | | | | | | |
| Mirex | | | A, A-S, AA, AA-S | 0.03 | H(WS) | A |
| (2385-85-5) | | | GA | 0.03 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $1 \times 10^{-6}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $1 \times 10^{-6}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C | 0.001* | A(C) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | D | 0.001$^*$ | A(A) | |
| | | | SA, SB, SC | 0.001 | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Nabam | | | GA | 1.8 | H(WS) | F |
| (142-59-6) | | | | | | |
| Naphthalene | | | A, A-S, AA, AA-S | 10 | E(WS) | U |
| (91-20-3) | | | | | | |
| Niacinamide | | | A, A-S, AA, AA-S | 500 | H(WS) | B |
| (98-92-0) | | | | | | |
| Nickel | | | A, A-S, AA, AA-S | 100 | H(WS) | B |
| (CAS No. | | | GA | 100 | H(WS) | B |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |
| | | | SA, SB, SC, I | 8.2 | A(C) | |
| | | | SA, SB, SC, I, SD | 74 | A(A) | |

SPA208

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remarks: | * | | (0.997) exp (0.846 [ln (hardness)] + 0.0584) | | | |
| | ** | | (0.998) exp (0.846 [ln (hardness)] + 2.255) | | | |
| Aquatic Type standards apply to dissolved form. | | | | | | |
| Nitralin | | | GA | 35 | H(WS) | F |
| (4726-14-1) | | | | | | |
| Nitrate (expressed as N) | | | A, A-S, AA, AA-S | 10,000$^*$ | H(WS) | G |
| (CAS No. Not Applicable) | | | GA | 10,000$^*$ | H(WS) | G |
| Remark: | * | | Also see standards for "Nitrate and Nitrite." | | | |
| Nitrate and Nitrite | | | A, A-S, AA, AA-S | 10,000$^*$ | H(WS) | G |
| (expressed as N) | | | GA | 10,000$^*$ | H(WS) | G |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | Applies to the sum of these substances; also see individual standards for " Nitrate" and "Nitrite." | | | |
| Nitrilotri- | | | A, A-S, AA, AA-S | 3$^*$ | H(WS) | A |
| acetic acid | | | GA | 3$^*$ | H(WS) | A |
| (CAS No. Not Applicable) | | | A, A-S, AA, AA-S, B, C | 5,000$^{**}$ | A(C) | |
| Remarks: | * | | Includes related forms that convert to nitrilotriacetic acid upon acidification to a pH of 2.3 or less. | | | |

SPA209

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * * | Applies to nitrilotriacetate. | | | | |
| | * * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | |
| Nitrite (expressed as N) | | | A, A-S, AA, AA-S | 1,000* | H(WS) | G |
| (CAS No. | | | GA | 1,000* | H(WS) | G |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | ** | A(C) | |
| Remarks: | * | Also see standards for "Nitrate and Nitrite." | | | | |
| | * * | Standard is 100 ug/L except 20 ug/L for trout waters (T or TS). | | | | |
| | * * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | |
| 2-Nitroaniline | | | GA | * | H(WS) | J |
| (88-74-4) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 3-Nitroaniline | | | GA | * | H(WS) | J |
| (99-09-2) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 4-Nitroaniline | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (100-01-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Nitrobenzene | | | A, A-S, AA, AA-S | 0.4 | H(WS) | A |
| (98-95-3) | | | GA | 0.4 | H(WS) | A |
| | | | A, A-S, AA, AA-S | 30 | E(WS) | U |
| 2-Nitrotoluene | | | GA | * | H(WS) | J |
| (88-72-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Nitrotoluene | | | GA | * | H(WS) | J |
| (99-08-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 4-Nitrotoluene | | | GA | * | H(WS) | J |
| (99-99-0) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 5-Nitro-o-toluidine | | | GA | * | H(WS) | J |
| (99-55-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Octachlorostyrene | | | A, A-S, AA, AA-S | 0.2 | H(WS) | B |
| (29082-74-4) | | | GA | 0.2 | H(WS) | B |
| | | | A, A-S, AA, AA-S, B, C, D | $6 \times 10^{-6}$ | H(FC) | B |
| | | | SA, SB, SC, I, SD | $6 \times 10^{-6}$ | H(FC) | B |
| Oxamyl | | | GA | 50 | H(WS) | J |
| (23135-22-0) | | | | | | |
| Paraquat | | | GA | 3.0 | H(WS) | F |
| (4685-14-7) | | | | | | |
| Parathion | | | GA | * | H(WS) | |
| (56-38-2) | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| | | | A, A-S, AA, AA-S, B, C, D | 0.065 | A(A) | |
| Remark: | * | Refer to standards for "Parathion and Methyl parathion." | | | | |
| Parathion and Methyl | | | GA | 1.5* | H(WS) | F |
| parathion | | | A, A-S, AA, AA-S, B, C | 0.008** | A(C) | |
| (56-38-2; 298-00-0) | | | | | | |
| Remarks: | * | Applies to the sum of these substances. | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * * | | Applies to the sum of these substances. For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Pendimethalin | | | GA | * | H(WS) | J |
| (40487-42-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Pentachloro- | | | GA | * | H(WS) | J |
| benzene | | | | | | |
| (608-93-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Pentachloroethane | | | GA | * | H(WS) | J |
| (76-01-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Pentachloro- | | | GA | ND | H(WS) | F |
| nitrobenzene | | | | | | |
| (82-68-8) | | | | | | |
| Pentachloro- | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| phenol | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (87-86-5) | | | A, A-S, AA, AA-S | *** | E(WS) | |
| | | | GA | *** | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | **** | E(FS) | |
| Remarks: | * | exp [1.005 (pH) - 5.134] | | | | |
| | ** | exp [1.005 (pH) - 4.869] | | | | |
| | *** | Refer to standards for "Phenolic compounds (total phenols)." | | | | |
| | **** | Refer to standards for "Phenols, total chlorinated." | | | | |
| Phenol | | | A, A-S, AA, AA-S | * | E(WS) | |
| (108-95-2) | | | GA | * | E(WS) | |
| | | | A, A-S, AA, AA-S, B, C, D | ** | E(FS) | |
| Remarks: | * | Refer to standards for "Phenolic compounds (total phenols)." | | | | |
| | ** | Refer to standards for "Phenols, total unchlorinated." | | | | |
| Phenolic compounds | | | A, A-S, AA, AA-S | 1* | E(WS) | U |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (total phenols) | | | GA | 1$^*$ | E(WS) | U |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | $^*$ | | Applies to the sum of these substances. | | | |
| Phenols, total | | | A, A-S, AA, AA-S | $^*$ | E(WS) | |
| chlorinated | | | GA | $^*$ | E(WS) | |
| (CAS No. Not Applicable) | | | A, A-S, AA, AA-S, B, C, D | 1.0$^{**}$ | E(FS) | V |
| Remarks: | $^*$ | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | $^{**}$ | | Applies to the sum of these substances. | | | |
| Phenols, total | | | A, A-S, AA, AA-S | $^*$ | E(WS) | |
| unchlorinated | | | GA | $^*$ | E(WS) | |
| (CAS No. Not Applicable) | | | A, A-S, AA, AA-S, B, C, D | 5.0$^{**}$ | E(FS) | V |
| Remarks: | $^*$ | | Refer to standards for "Phenolic compounds (total phenols)." | | | |
| | $^{**}$ | | Applies to the sum of these substances. | | | |
| 1,2-Phenylenediamine | | | GA | $^*$ | H(WS) | J |
| (95-54-5) | | | | | | |
| Remark: | $^*$ | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |

SPA215

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| 1,3-Phenylenediamine | | | GA | * | H(WS) | J |
| (108-45-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,4-Phenylenediamine | | | GA | * | H(WS) | J |
| (106-50-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Phenyl ether | | | A, A-S, AA, AA-S | 10 | E(WS) | U |
| (101-84-8) | | | | | | |
| Phenylhydrazine | | | GA | * | H(WS) | J |
| (100-63-0) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3-Phenyl-1-propene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (637-50-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| cis-1-Phenyl-1-propene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (766-90-5) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | ug/L (described elsewhere in this Table) applies to this substance. | | | |
| trans-1-Phenyl-1-propene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (873-66-5) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Phorate | | | GA | * | H(WS) | |
| (298-02-2) | | | | | | |
| Remark: | * | | Refer to standards for "Phorate and Disulfoton." | | | |
| Phorate and | | | GA | ND* | H(WS) | F |
| Disulfoton | | | | | | |
| (298-02-2; | | | | | | |
| 298-04-4) | | | | | | |
| Remark: | * | | Applies to the sum of these substances. | | | |
| Picloram | | | GA | 50* | H(WS) | J |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | Includes: related forms that convert to the organic acid upon acidification to a pH of 2 or less; and esters of the organic acid. | | | |
| Polybrominated | | | GA | * | H(WS) | J |
| biphenyls | | | | | | |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to each congener | | | |

SPA217

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | individually. | | | | |
| Polychlorinated | | | A, A-S, AA, AA-S | $0.09^*$ | H(WS) | A |
| biphenyls | | | GA | $0.09^*$ | H(WS) | A |
| (CAS No. | | | A, A-S, AA, AA-S, B, C, D | $1 \times 10^{-6*}$ | H(FC) | A |
| Not Applicable) | | | SA, SB, SC, I, SD | $1 \times 10^{-6*}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $1.2 \times 10^{-4*}$ | W | |
| | | | SA, SB, SC, I, SD | $1.2 \times 10^{-4*}$ | W | |
| Remark: | $*$ | Applies to the sum of these substances. | | | | |
| Principal organic | | | GA | 5 | H(WS) | J |
| contaminant | | | | | | |
| (CAS No. Not Applicable) | | | | | | |
| Remarks: | | This standard applies to any and every individual substance, whether listed in this Table or not, that is in one of the principal organic contaminant classes as defined in section 700.1 of this Title *except* any substance that has a H(WS) Type standard for class GA waters (other than 5 ug/L with Basic Code J) listed elsewhere in this Table. | | | | |
| For the convenience of the reader, the | | | | | | |

SPA218

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| principal organic contaminant standard of 5 ug/L (Basic Code J), is listed in this Table for some but not all substances regulated by this standard. | | | | | | |
| A less stringent guidance value for an individual substance may be substituted for this standard if so determined by the Commissioner of the New York State Department of Health. | | | | | | |
| Prometon | | | GA | 50 | H(WS) | J |
| (1610-18-0) | | | | | | |
| Propachlor | | | GA | 35 | H(WS) | F |
| (1918-16-7) | | | | | | |
| Propanil | | | GA | 7.0 | H(WS) | F |
| (709-98-8) | | | | | | |
| Propazine | | | GA | 16 | H(WS) | F |
| (139-40-2) | | | | | | |

SPA219

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Propham | | | GA | 50 | H(WS) | J |
| (122-42-9) | | | | | | |
| n-Propylbenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (103-65-1) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Quaternary ammo- | | | A, A-S, AA, AA-S, B, C | 10* | A(C) | |
| nium compounds | | | | | | |
| (including | | | | | | |
| dimethyl benzyl | | | | | | |
| ammonium chlo- | | | | | | |
| ride and dimethyl | | | | | | |
| ethyl benzyl | | | | | | |
| ammonium chloride) | | | | | | |
| (CAS No. Not Applicable) | | | | | | |
| Remarks: | * | | Applies to the sum of these substances. | | | |
| | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Radium 226 | | | A, AA | * | H(WS) | H |
| (CAS No. Not Applicable) | | | GA | * | H(WS) | H |

SPA220

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | | 3 picocuries per liter; also see standards for "Radium 226 and Radium 228." | | | |
| Radium 226 and | | | A, A-S, AA, AA-S | * | H(WS) | G |
| Radium 228 | | | GA | * | H(WS) | G |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | 5 picocuries per liter; Applies to the sum of these substances. | | | |
| Radium 228 | | | A, A-S, AA, AA-S | * | H(WS) | |
| (CAS No. Not Applicable) | | | GA | * | H(WS) | |
| Remark: | * | | Refer to standards for "Radium 226 and Radium 228." | | | |
| Selenium | | | A, A-S, AA, AA-S | 10 | H(WS) | G |
| (CAS No. | | | GA | 10 | H(WS) | G |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | 4.6* | A(C) | |
| Remark: | * | | Aquatic Type standard applies to dissolved form. | | | |
| Silver | | | A, A-S, AA, AA-S | 50 | H(WS) | G |
| (CAS No. | | | GA | 50 | H(WS) | F |
| Not Applicable) | | | A, A-S, AA, AA-S, B, C | 0.1* | A(C) | |
| | | | D | ** | A(A) | |
| | | | SD | 2.3 | A(A) | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remarks: | * | Applies to ionic silver. | | | | |
| | ** | exp(1.72 [ln (ppm hardness)] - 6.52) | | | | |
| Standards for D and SD Classes apply to acid-soluble form. | | | | | | |
| For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | | | | |
| Simazine | | | A, A-S, AA, AA-S | 0.5 | H(WS) | A |
| (122-34-9) | | | GA | 0.5 | H(WS) | A |
| Sodium | | | GA | 20,000 | H(WS) | H |
| (CAS No. Not Applicable) | | | | | | |
| Strontium 90 | | | A, A-S, AA, AA-S | * | H(WS) | G |
| (CAS No. Not Applicable) | | | | | | |
| Remarks: | * | 8 picocuries per liter. | | | | |

SPA222

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| If two or more radionuclides are present, the sum of their doses shall not exceed an annual potential dose of 4 millirems per year. | | | | | | |
| Styrene | | | GA | * | H(WS) | J |
| (100-42-5) | | | A, A-S, AA, AA-S | 50 | E(WS) | U |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Sulfate | | | A, A-S, AA, AA-S | 250,000 | H(WS) | G |
| (CAS No. Not Applicable) | | | GA | 250,000 | H(WS) | F |
| Sulfite | | | A, A-S, AA, AA-S, B, C | 200* | A(C) | |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | |
| Tebuthiuron | | | GA | 50 | H(WS) | J |
| (34014-18-1) | | | | | | |
| Terbacil | | | GA | 50 | H(WS) | J |
| (5902-51-2) | | | | | | |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Tetrachloro- | | | GA | * | H(WS) | J |
| benzenes | | | A, A-S, AA, AA-S | 10** | E(WS) | U |
| (634-66-2; 634-90-2; | | | | | | |
| 95-94-3; 12408-10-5) | | | | | | |
| Remarks: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to each isomer (1,2,3,4-, 1,2,3,5-, and 1,2,4,5-tetrachlorobenzene) individually. | | | |
| | ** | | Applies to the sum of 1,2,3,4-, 1,2,3,5-, and 1,2,4,5-tetrachlorobenzene. | | | |
| 1,1,1,2-Tetrachloroethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (630-20-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,1,2,2-Tetrachloroethane | | | GA | * | H(WS) | J |
| (79-34-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Tetrachloroethene | | | GA | * | H(WS) | J |
| (127-18-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Tetrachloroterephthalic | | | GA | 50 | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| acid | | | | | | |
| (2136-79-0) | | | | | | |
| alpha, alpha, alpha, 4-Tetrachloro- | | | GA | * | H(WS) | J |
| toluene | | | | | | |
| (5216-25-1) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| Thallium | | | A, A-S, AA, AA-S, B, C | 8* | A(C) | |
| (CAS No. Not Applicable) | | | D | 20 | A(A) | |
| Remark: | * | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | |
| Aquatic Type standards apply to acid-soluble form. | | | | | | |
| Theophylline | | | A, A-S, AA, AA-S | 40 | H(WS) | B |
| (58-55-9) | | | | | | |
| Thiram | | | GA | 1.8 | H(WS) | F |
| (137-26-8) | | | | | | |
| Toluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (108-88-3) | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | A, A-S, AA, AA-S, B, C, D | 6,000 | H(FC) | B |
| | | | SA, SB, SC, I, SD | 6,000 | H(FC) | B |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Toluene-2,4-diamine | | | GA | * | H(WS) | J |
| (95-80-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Toluene-2,5-diamine | | | GA | * | H(WS) | J |
| (95-70-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Toluene-2,6-diamine | | | GA | * | H(WS) | J |
| (823-40-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| o-Toluidine | | | GA | * | H(WS) | J |
| (95-53-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Toxaphene | | | A, A-S, AA, AA-S | 0.06 | H(WS) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (8001-35-2) | | | GA | 0.06 | H(WS) | A |
| | | | A, A-S, AA, AA-S, B, C, D | $6 \times 10^{-6}$ | H(FC) | A |
| | | | SA, SB, SC, I, SD | $6 \times 10^{-6}$ | H(FC) | A |
| | | | A, A-S, AA, AA-S, B, C | 0.005 | A(C) | |
| | | | D | $1.6^{*}$ | A(A) | |
| | | | SA, SB, SC | 0.005 | A(C) | |
| Remark: | * | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic standard if so determined under section 702.15(d) of this Title. | | | |
| 1,2,4-Tribromobenzene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (615-54-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,6-Trichloroaniline | | | GA | * | H(WS) | J |
| (634-93-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Trichloro- | | | GA | * | H(WS) | J |
| benzenes | | | A, A-S, AA, AA-S, B, C | $5^{**}$ | A(C) | |

SPA227

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (87-61-6; 120-82-1; | | | SA, SB, SC | 5$^{**}$ | A(C) | |
| 108-70-3; | | | A, A-S, AA, AA-S | 10$^{**}$ | E(WS) | U |
| 12002-48-1) | | | D | 50$^{**}$ | E(FS) | V |
| | | | SD | 50$^{**}$ | E(FS) | V |
| Remarks: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to each isomer (1,2,3-, 1,2,4- and 1,3,5-trichlorobenzene) individually. | | | | |
| | ** | Applies to the sum of 1,2,3-, 1,2,4- and 1,3,5-trichlorobenzene. | | | | |
| For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) of this Title. | | | | | | |
| 1,1,1-Trichloroethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (71-55-6) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 1,1,2-Trichloroethane | | | A, A-S, AA, AA-S | 1 | H(WS) | A |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (79-00-5) | | | GA | 1 | H(WS) | A |
| Trichloroethene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (79-01-6) | | | GA | * | H(WS) | J |
| | | | A, A-S, AA, AA-S, B, C, D | 40 | H(FC) | A |
| | | | SA, SB, SC, I, SD | 40 | H(FC) | A |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Trichlorofluoromethane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (75-69-4) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,5-Trichlorophe- | | | GA | 35 | H(WS) | F |
| noxyacetic acid | | | | | | |
| (93-76-5) | | | | | | |
| 2,4,5-Trichlorophe- | | | A, A-S, AA, AA-S | 10 | H(WS) | G |
| noxypropionic acid | | | GA | 0.26 | H(WS) | F |
| (93-72-1) | | | | | | |
| 1,1,2-Trichloropropane | | | A, A-S, AA, AA-S | 5 | H(WS) | I |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (598-77-6) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 1,2,3-Trichloropropane | | | A, A-S, AA, AA-S | 0.04 | H(WS) | A |
| (96-18-4) | | | GA | 0.04 | H(WS) | A |
| cis-1,2,3-Trichloropropene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (13116-57-9) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| trans-1,2,3-Trichloro- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| propene | | | GA | * | H(WS) | J |
| (13116-58-0) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| alpha,2,4-Trichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (94-99-5) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| alpha,2,6-Trichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (2014-83-7) | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| alpha,3,4-Trichlorotoluene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (102-47-6) | | | GA | * | H(WS) | J |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| alpha,alpha,2-Trichloro- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| toluene | | | GA | * | H(WS) | J |
| (88-66-4) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| alpha,alpha,4-Trichloro- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| toluene | | | GA | * | H(WS) | J |
| (13940-94-8) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 2,3,4-Trichlorotoluene | | | GA | * | H(WS) | J |
| (7359-72-0) | | | | | | |
| Remark: | * | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | | |
| 2,3,5-Trichlorotoluene | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (56961-86-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,3,6-Trichlorotoluene | | | GA | * | H(WS) | J |
| (2077-46-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,5-Trichlorotoluene | | | GA | * | H(WS) | J |
| (6639-30-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,6-Trichlorotoluene | | | GA | * | H(WS) | J |
| (23749-65-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,1,1-Trichloro-2,2,2- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| trifluoroethane | | | GA | * | H(WS) | J |
| (354-58-5) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,1,2-Trichloro-1,2,2- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| trifluoroethane | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (76-13-1) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Trifluralin | | | GA | 35 | H(WS) | F |
| (1582-09-8) | | | | | | |
| 1,2,3-Trimethyl- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| benzene | | | GA | * | H(WS) | J |
| (526-73-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,2,4-Trimethyl- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| benzene | | | GA | * | H(WS) | J |
| (95-63-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,3,5-Trimethyl- | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| benzene | | | GA | * | H(WS) | J |
| (108-67-8) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| sym-Trinitrobenzene | | | GA | * | H(WS) | J |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (99-35-4) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,3,4-Trinitrotoluene | | | GA | * | H(WS) | J |
| (602-29-9) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,3,6-Trinitrotoluene | | | GA | * | H(WS) | J |
| (18292-97-2) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,5-Trinitrotoluene | | | GA | * | H(WS) | J |
| (610-25-3) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 2,4,6-Trinitrotoluene | | | GA | * | H(WS) | J |
| (118-96-7) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 3,4,5-Trinitrotoluene | | | GA | * | H(WS) | J |
| (603-15-6) | | | | | | |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Triphenyl | | | A, A-S, AA, | 4* | A(C) | |

SPA234

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | | | AA-S, B, C | | | |
| phosphate | | | D | 40$^*$ | A(A) | |
| (115-86-6) | | | | | | |
| Remark: | $^*$ | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Tritium | | | A, A-S, AA, AA-S | $^*$ | H(WS) | G |
| (CAS No. Not Applicable) | | | | | | |
| Remark: | $^*$ | | 20,000 picocuries per liter; if two or more radionuclides are present, the sum of their annual dose equivalent to the total body or any organ shall not exceed 4 millirems per year. | | | |
| Uranyl ion | | | GA | 5,000 | H(WS) | H |
| (CAS No. Not Applicable) | | | | | | |
| Vanadium | | | A, A-S, AA, AA-S, B, C | 14$^*$ | A(C) | |
| (CAS No. | | | D | 190$^*$ | A(A) | |
| Not Applicable) | | | | | | |
| Remark: | $^*$ | | For the waters of the Great Lakes System, the department will substitute a guidance value for the aquatic Type standard if so determined under section 702.15(c) and (d) of this Title. | | | |
| Aquatic Type standards apply to acid-soluble form. | | | | | | |
| Vinyl chloride | | | GA | 2 | H(WS) | G |

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| (75-01-4) | | | | | | |
| 1,2-Xylene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (95-47-6) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,3-Xylene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (108-38-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| 1,4-Xylene | | | A, A-S, AA, AA-S | 5 | H(WS) | I |
| (106-42-3) | | | GA | * | H(WS) | J |
| Remark: | * | | The principal organic contaminant standard for groundwater of 5 ug/L (described elsewhere in this Table) applies to this substance. | | | |
| Zinc | | | A, A-S, AA, AA-S, B, C | * | A(C) | |
| (CAS No. | | | A, A-S, AA, AA-S, B, C, D | ** | A(A) | |
| Not Applicable) | | | SA, SB, SC, I | 66 | A(C) | |
| | | | SD | 95 | A(A) | |
| Remarks: | | | Aquatic Type standards apply to dissolved form. | | | |

SPA236

| SUBSTANCE | | | WATER CLASSES | STANDARD | TYPE | BASIS |
|---|---|---|---|---|---|---|
| (CAS NO.) | | | | (ug/L) | | CODE |
| | * | exp(0.85 [ln(ppm hardness)] + 0.50) | | | | |
| | ** | 0.978 exp(0.8473 [ln(ppm hardness)] + 0.884) | | | | |
| Zineb (12122-67-7) | | | GA | 1.8 | H(WS) | F |
| Ziram (137-30-4) | | | GA | 4.2 | H(WS) | F |

**Table 2**
BASIS OF STANDARDS
(*cf. section 703.5*)

| BASIS | BASIS |
|---|---|
| CODE | |
| A | Oncogenic, Human Health |
| B | Non-oncogenic, Human Health |
| F | Former Groundwater Regulations, 6 NYCRR § 703.5(a)(3), Human Health or Aesthetics |
| G | Specific MCL, Human Health or Aesthetics |
| H | Former Use of or Reference to 10 NYCRR Part 170, Human Health or Aesthetics |
| I | Principal Organic Contaminant Classes, Human Health |
| J | Former Groundwater Reference to 10 NYCRR Subpart 5-1, General Standards, Human Health |
| U | Potable Water, Aesthetics |
| V | Food Source, Aesthetics |

# LXXIV.    6 NYCRR § 703.6

## § 703.6 Groundwater Effluent Limitations for Discharges to Class GA waters

(a) The groundwater effluent limitations in Table 3 of subdivision (e) of this section and effluent limitations as established by section 702.16(c)(1) of this Title apply to a discharge from a point source or outlet or any other discharge within the meaning of the Environmental Conservation Law, section 17-0501 that will or may enter the waters of the State. Unless a demonstration is made to the contrary, it shall be presumed that a discharge to the ground or unsaturated zone is a discharge to groundwater. The groundwater effluent limitation is the maximum allowable concentration in micrograms per liter (ug/L), unless otherwise noted.

(b) In addition to the chemical characteristics provided in subdivision (a) of this section, coliform or pathogenic organisms shall not be discharged in amounts sufficient to render groundwaters detrimental to public health, safety or welfare.

(c) The department may establish additional groundwater effluent limitations as set forth in Part 702 of this Title.

(d) The groundwater effluent limitations shall be incorporated in SPDES permits (under Part 750 *et seq.* of this Title) for discharges to groundwaters, where applicable.

(e) Tables.
Table 3
(*cf. section 703.6*)

GROUNDWATER EFFLUENT LIMITATIONS CLASS GA

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
|---|---|---|
| Acetaldehyde | 75-07-0 | 8 |
| Alachlor | 15972-60-8 | 0.5 |
| Aldicarb and Methomyl | 116-06-3; 16752-77-5 | 0.35 |
| Aldrin | 309-00-2 | Not Detectable |

SPA238

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
| --- | --- | --- |
| Aluminum | Not Applicable | 2,000 |
| Antimony | Not Applicable | 6 |
| Arsenic | Not Applicable | 50 |
| Asbestos (fibers>10um) | Not Applicable | $1.4 \times 10^{7}$(fibers/L) |
| Atrazine | 1912-24-9 | 7.5 |
| Azinphosmethyl | 86-50-0 | 4.4 |
| Barium | Not Applicable | 2,000 |
| Benefin | 1861-40-1 | 35 |
| Benzene | 71-43-2 | 1 |
| Benzo(a)pyrene | 50-32-8 | Not Detectable |
| Bis(2-chloroethyl)ether | 111-44-4 | 1.0 |
| bis(2-ethylhexyl)phthalate | 117-81-7 | 5 |
| Bromacil | 314-40-9 | 4.4 |
| Butachlor | 23184-66-9 | 3.5 |
| Cadmium | Not Applicable | 10 |
| Captan | 133-06-2 | 18 |
| Carbaryl | 63-25-2 | 29 |
| Carbon disulfide | 75-15-0 | 120 |
| Carbon tetrachloride | 56-23-5 | 5 |
| Chloramben[1] | Not Applicable | 50 |
| Chlordane | 57-74-9 | 0.05 |

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
|---|---|---|
| Chloride | Not Applicable | 500,000 |
| Chlorinated dibenzo-p-dioxins and Chlorinated dibenzofurans[7] | Not Applicable | $7 \times 10^{-7}$ equivalents of 2, 3, 7, 8 - TCDD |
| Chloroform | 67-66-3 | 7 |
| Chromium (Hexavalent) | Not Applicable | 100 |
| Copper | Not Applicable | 400 |
| Cyanide | Not Applicable | 400 |
| p,p'-DDD | 72-54-8 | 0.3 |
| p,p'-DDE | 72-55-9 | 0.2 |
| p,p'-DDT | 50-29-3 | 0.2 |
| Diazinon | 333-41-5 | 0.7 |
| 1,2-Dibromo-3-chloropropane | 96-12-8 | 0.04 |
| Di-n-butylphthalate | 84-74-2 | 50 |
| Dicamba | 1918-00-9 | 0.44 |
| 1,2-Dichlorobenzene | 95-50-1 | 3 |
| 1,3-Dichlorobenzene | 541-73-1 | 3 |
| 1,4-Dichlorobenzene | 106-46-7 | 3 |
| 1,2-Dichloroethane | 107-06-2 | 0.6 |
| 2,4-Dichlorophenoxyacetic acid (2,4-D) | 94-75-7 | 50 |
| 1,2-Dichloropropane | 78-87-5 | 1 |

SPA240

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
|---|---|---|
| 1,3-Dichloropropene (sum of cis- and trans- isomers) | 542-75-6 (sum of 10061-01-5 and 10061-02-6) | 0.4 |
| Dieldrin | 60-57-1 | 0.004 |
| Di(2-ethylhexyl)adipate | 103-23-1 | 20 |
| N,N-Dimethylaniline | 121-69-7 | 1 |
| Diphenylhydrazine | 122-66-7 | Not Detectable |
| Diquat | 2764-72-9 | 20 |
| Endrin | 72-20-8 | Not Detectable |
| Ethylene dibromide | 106-93-4 | $6 \times 10^{-4}$ |
| Ethylenethiourea | 96-45-7 | Not Detectable |
| Ferbam | 14484-64-1 | 4.2 |
| Fluoride | Not Applicable | 3,000 |
| Foaming agents[2] | Not Applicable | 1,000 |
| Folpet | 133-07-3 | 50 |
| Formaldehyde | 50-00-0 | 8 |
| Heptachlor | 76-44-8 | 0.04 |
| Heptachlor epoxide | 1024-57-3 | 0.03 |
| Hexachlorobenzene | 118-74-1 | 0.04 |
| Hexachlorobutadiene | 87-68-3 | 0.5 |
| alpha-Hexachlorocyclohexane | 319-84-6 | 0.01 |

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
|---|---|---|
| beta-Hexachlorocyclohexane | 319-85-7 | 0.04 |
| delta-Hexachlorocyclohexane | 319-86-8 | 0.04 |
| epsilon-Hexachlorocyclohexane | 6108-10-7 | 0.04 |
| gamma-Hexachlorocyclohexane | 58-89-9 | 0.05 |
| Hexachlorophene | 70-30-4 | See Note 3 |
| Iron[4] | Not Applicable | 600 |
| Kepone | 143-50-0 | Not Detectable |
| Lead | Not Applicable | 50 |
| Malathion | 121-75-5 | 7.0 |
| Mancozeb | 8018-01-7 | 1.8 |
| Maneb | 12427-38-2 | 1.8 |
| Manganese[4] | Not Applicable | 600 |
| Mercury | Not Applicable | 1.4 |
| Methoxychlor | 72-43-5 | 35 |
| 2-Methyl-4-chlorophenoxyacetic acid | 94-74-6 | 0.44 |
| Methylene chloride (Dichloromethane) | 75-09-2 | 5 |
| Methyl methacrylate | 80-62-6 | 50 |

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
|---|---|---|
| Metolachlor | 51218-45-2 | 10 |
| Mirex | 2385-85-5 | 0.03 |
| Nabam | 142-59-6 | 1.8 |
| Nickel | Not Applicable | 200 |
| Nitralin | 4726-14-1 | 35 |
| Nitrate (expressed as N) | Not Applicable | 20,000 |
| Nitrate and Nitrite (expressed as N) | Not Applicable | 20,000 |
| Nitrilotriacetic acid[5] | Not Applicable | 3 |
| Nitrite (expressed as N) | Not Applicable | 2,000 |
| Nitrobenzene | 98-95-3 | 0.4 |
| Octachlorostyrene | 29082-74-4 | 0.2 |
| Oil and Grease | Not Applicable | 15,000 |
| Paraquat | 4685-14-7 | 3.0 |
| Parathion and Methyl parathion | 56-38-2; 298-00-0 | 1.5 |
| Pentachloronitrobenzene | 82-68-8 | Not Detectable |
| pH | Not Applicable | See Note 6 |
| Phenolic compounds (total phenols) | Not Applicable | 2 |
| Phorate and Disulfoton | 298-02-2; 298-04-4 | Not Detectable |
| Polychlorinated biphenyls | Not Applicable | 0.09 |

SPA243

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
| --- | --- | --- |
| Propachlor | 1918-16-7 | 35 |
| Propanil | 709-98-8 | 7.0 |
| Propazine | 139-40-1 | 16 |
| Selenium | Not Applicable | 20 |
| Silver | Not Applicable | 100 |
| Simazine | 122-34-9 | 0.5 |
| Styrene | 100-42-5 | 5 |
| Sulfate | Not Applicable | 500,000 |
| Sulfide | Not Applicable | 1,000 |
| Thiram | 137-26-8 | 1.8 |
| Toxaphene | 8001-35-2 | 0.06 |
| 1,1,2-Trichloroethane | 79-00-5 | 1 |
| Trichloroethene | 79-01-6 | 5 |
| 2,4,5-Trichlorophenoxyacetic acid | 93-76-5 | 35 |
| 2,4,5-Trichlorophenoxypropionic acid | 93-72-1 | 0.26 |
| 1,2,3-Trichloropropane | 96-18-4 | 0.04 |
| Trifluralin | 1582-09-8 | 35 |
| Vinyl chloride | 75-01-4 | 2 |
| Zinc | Not Applicable | 5,000 |

SPA244

| SUBSTANCE | CAS NO. | MAXIMUM ALLOWABLE CONCENTRATION (ug/L) |
| --- | --- | --- |
| Zineb | 12112-67-7 | 1.8 |
| Ziram | 137-30-4 | 4.2 |

1. Includes related forms that convert to the organic acid upon acidification to a pH of 2 or less; and esters of the organic acid.

2. Foaming agents determined as methylene blue active substances (MBAS) or other tests as specified by the commissioner.

3. Refer to groundwater effluent limitation for "Phenolic compounds (total phenols)".

4. Combined concentration of iron and manganese shall not exceed 1000 ug/L.

5. Includes related forms that convert to nitrilotriacetic acid upon acidification to a pH of 2.3 or less.

6. pH shall not be lower than 6.5 or the pH of the natural groundwater, whichever is lower, nor shall be greater than 8.5 or the pH of the natural groundwater, whichever is greater.

7. Value is for the total of the chlorinated dibenzo-p-dioxins and chlorinated dibenzofurans as equivalents of 2,3,7,8-tetrachlorodibenzo-p-dioxin (2,3,7,8-TCDD) as specified by the Class GA H(WS) standard in Table 1 of section 703.5 of this Part.

SPA245

In addition to the effluent limitations above, the following also apply in the counties of Nassau and Suffolk:

| SUBSTANCE | MAXIMUM ALLOWABLE |
|---|---|
|  | CONCENTRATION IN mg/L |
| (1) Dissolved solids, total | 1,000 |
| (2) Nitrogen, total (as N) | 10 |

### LXXV.    6 NYCRR § 703.7

**§ 703.7 Severability**

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

### LXXVI.    6 NYCRR §§ 703.8 to 703.11

**§§ 703.8 to 703.11 [Repealed]**

### LXXVII.    6 NYCRR § 704.1

**§ 704.1 Water Quality Standards for Thermal Discharges**

(a) All thermal discharges to the waters of the State shall assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water.

(b) The criteria contained in this Part shall apply to all thermal discharges and shall be complied with, except as provided in this Part.

### LXXVIII.    6 NYCRR § 704.2

**§ 704.2 Criteria Governing Thermal Discharges**

(a) General criteria.
The following criteria shall apply to all waters of the State receiving thermal discharges, except as provided in section 704.6 of this Part:

SPA246

(1) The natural seasonal cycle shall be retained.

(2) Annual spring and fall temperature changes shall be gradual.

(3) Large day-to-day temperature fluctuations due to heat of artificial origin shall be avoided.

(4) Development or growth of nuisance organisms shall not occur in contravention of water quality standards.

(5) Discharges which would lower receiving water temperature shall not cause a violation of water quality standards and section 704.3 of this Part.

(6) For the protection of the aquatic biota from severe temperature changes, routine shut down of an entire thermal discharge at any site shall not be scheduled during the period from December through March.

(b) Special criteria.
The following criteria shall apply to all waters of the State receiving thermal discharges, except as provided in section 704.6 of this Part:

(1) Nontrout waters.

(i) The water temperature at the surface of a stream shall not be raised to more than 90 degrees Fahrenheit at any point.

(ii) At least 50 percent of the cross sectional area and/or volume of flow of the stream including a minimum of one-third of the surface as measured from shore to shore shall not be raised to more than five Fahrenheit degrees over the temperature that existed before the addition of heat of artificial origin or to a maximum of 86 degrees Fahrenheit whichever is less.

(iii) At least 50 percent of the cross sectional area and/or volume of flow of the stream including a minimum of one-third of the surface as measured from shore to shore shall not be lowered more than five Fahrenheit degrees from the temperature that existed immediately prior to such lowering.

(2) Trout waters (T or TS).

SPA247

(i) No discharge at a temperature over 70 degrees Fahrenheit shall be permitted at any time to streams classified for trout.

(ii) From June through September no discharge shall be permitted that will raise the temperature of the stream more than two Fahrenheit degrees over that which existed before the addition of heat of artificial origin.

(iii) From October through May no discharge shall be permitted that will raise the temperature of the stream more than five Fahrenheit degrees over that which existed before the addition of heat of artificial origin or to a maximum of 50 degrees Fahrenheit whichever is less.

(iv) From June through September no discharge shall be permitted that will lower the temperature of the stream more than two Fahrenheit degrees from that which existed immediately prior to such lowering.

(3) Lakes.

(i) The water temperature at the surface of a lake shall not be raised more than three Fahrenheit degrees over the temperature that existed before the addition of heat of artificial origin.

(ii) In lakes subject to stratification as defined in Part 652 of this Title, thermal discharges that will raise the temperature of the receiving waters shall be confined to the epilimnion.

(iii) In lakes subject to stratification as defined in Part 652 of this Title, thermal discharges that will lower the temperature of the receiving waters shall be discharged to the hypolimnion and shall meet the water quality standards contained in Part 703 of this Title in all respects.

(4) Coastal waters.

(i) The water temperature at the surface of coastal waters shall not be raised more than four Fahrenheit degrees from October through June nor more than 1.5 Fahrenheit degrees from July through September over that which existed before the addition of heat of artificial origin.

(ii) The water temperature at the surface of coastal waters shall not be lowered more than four Fahrenheit degrees from October through June nor more than 1.5 Fahrenheit degrees from July through September from that which existed immediately prior to such lowering.

(5) Estuaries or portions of estuaries.

(i) The water temperature at the surface of an estuary shall not be raised to more than 90 degrees Fahrenheit at any point.

(ii) At least 50 percent of the cross sectional area and/or volume of the flow of the estuary including a minimum of one-third of the surface as measured from water edge to water edge at any stage of tide, shall not be raised to more than four Fahrenheit degrees over the temperature that existed before the addition of heat of artificial origin or a maximum of 83 degrees Fahrenheit whichever is less.

(iii) From July through September, if the water temperature at the surface of an estuary before the addition of heat of artificial origin is more than 83 degrees Fahrenheit an increase in temperature not to exceed 1.5 Fahrenheit degrees at any point of the estuarine passageway as delineated above, may be permitted.

(iv) At least 50 percent of the cross sectional area and/or volume of the flow of the estuary including a minimum of one-third of the surface as measured from water edge to water edge at any stage of tide, shall not be lowered more than four Fahrenheit degrees from the temperature that existed immediately prior to such lowering.

(6) Enclosed bays.
No additional temperature change except that which occurs naturally shall be permitted in enclosed bays.

## LXXIX.   6 NYCRR § 704.3

**§ 704.3 Mixing Zone Criteria**

The following criteria shall apply to all waters of the State receiving thermal discharges, except as provided in section 704.6 of this Part.

(a) The department shall specify definable, numerical limits for all mixing zones (*e.g.,* linear distances from the point of discharge, surface area involvement, or volume of receiving water entrained in the thermal plume).

(b) Conditions in the mixing zone shall not be lethal in contravention of water quality standards to aquatic biota which may enter the zone.

(c) The location of mixing zones for thermal discharges shall not interfere with spawning areas, nursery areas and fish migration routes.

## LXXX. 6 NYCRR § 704.4

### § 704.4 Additional Limitations or Modifications

(a) An applicant may apply for a modification of the criteria set forth in sections 704.2 and 704.3 of this Part.

(b) Upon receipt of such application, the commissioner shall confer with the U.S. Environmental Protection Agency and shall transmit to that agency information to enable the administrator to fulfill responsibilities under Federal Law.

(c) The applicant shall have the burden of establishing to the satisfaction of the commissioner that one or more of the criteria are unnecessarily restrictive as to a particular project in that a modification of such criterion, or criteria, as the case may be, would assure the protection and propagation of a balanced indigenous population of shellfish, fish, and wildlife in and on the body of water into which the discharge is to be made.

(d) The applicant shall consult with the Department of Environmental Conservation to determine appropriate studies which shall be conducted by the applicant. Prior approval shall be obtained by the applicant for a program of studies that will determine the impact of any proposed modification. Such studies shall include, but shall not be limited to:

> (1) A comparative analysis of environmental effects of the thermal discharge on the receiving waters when subject to the stated criteria of this Part, and when subject to the applicant's proposed modification.

(2) An analysis of the different discharge modes (*e.g.,* surface or subsurface) and the advantages and disadvantages of each mode with regard to effects on aquatic life.

(e) A public hearing shall be held upon the application.

(f) The commissioner may authorize a modification of the stated criteria, which modifications shall be conditioned upon post-operational experience. The commissioner may require additional treatment of, or change in, a thermal discharge in the event that post-operational experience shows a trend toward impairment by the discharge of the quality of the receiving waters for the protection and propagation of a balanced indigenous population of shellfish, fish and wildlife in and on the body of water.

## LXXXI.   6 NYCRR § 704.5

### § 704.5 Intake Structures

The location, design, construction and capacity of cooling water intake structures, in connection with point source thermal discharges, shall reflect the best technology available for minimizing adverse environmental impact.

## LXXXII.   6 NYCRR § 704.6

### § 704.6 Applicability of Criteria

(a) In determining that a discharge existing prior to July 25, 1969 has violated the standard for thermal discharges, as provided in section 704.1(a) of this Part, the violation of any of the criteria contained in this Part shall not constitute evidence of a violation of such standard unless it is also shown that the violation of such criteria has contributed to the violation of the standard.

(b) The provisions of subdivision (a), subparagraphs (1)(iii), (2)(iv), (3)(iii), (4)(ii), (5)(iv), and paragraph (b)(6) of section 704.2 of this Part, and section 704.3, shall apply only to thermal discharges which have been brought into existence subsequent to July 31, 1973, or to which the criteria contained in this Part were intended to apply pursuant to any certification issued by the commissioner pursuant to section 401(d) of the Federal Water Pollution Control Act amendments of 1972.

SPA251

(c) Whenever the commissioner has reason to believe that a thermal discharge, existing prior to the adoption of this Part, does not conform to section 704.1(a) of this Part, he may impose appropriate criteria contained in this Part upon such thermal discharge, unless, after public hearing, the owner or operator of any such thermal discharge establishes to the satisfaction of the commissioner that either such thermal discharge does conform to such subdivision (a) or that any such criteria are more stringent than necessary to assure conformance with such subdivision (a).

## LXXXIII.    6 NYCRR § 704.7

### § 704.7 Severability

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

## LXXXIV.    6 NYCRR § 705.1

### § 705.1 Federal Statutes or Regulations

The following Federal statutes or regulations have been referenced in Parts 700-704 of this Title:

(a) *40 CFR Part 136* means Part 136 of title 40 of the *Code of Federal Regulations,* as of July 1, 1988 (Protection of the Environment).

(b) The Federal Water Pollution Control Act of 1972, 33 USC 466 *et seq.,* effective October 18, 1972.

(c) All United States publications referenced above are available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402

## LXXXV.    6 NYCRR § 705.2

### § 705.2 [Repealed]

## LXXXVI. 6 NYCRR § 705.3

**§ 705.3 Availability**

All material referenced in Parts 700-704 of this Title is available for copying and inspection at the Department of Environmental Conservation, Division of Water, 625 Broadway, Albany, NY 12233.

## LXXXVII. 6 NYCRR § 705.4

**§ 705.4 Severability**

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

## LXXXVIII. 6 NYCRR § 706.1

**§ 706.1 Appendix for Section 702.9**

**AQUATIC LIFE PROCEDURES**

**I. INTRODUCTION**

A. This Appendix provides procedures to derive standards and guidance values to protect aquatic life from acute and chronic effects. Tier I procedures, sections III through XI, are used where the required data described in section III.B for freshwater species or section III.C for saltwater species are available. Tier II procedures, sections XII through XVI, are used where the data requirements in sections III.B or III.C are not met.

**II. APPLICABILITY**

A. These procedures will generally be used to derive statewide standards or guidance values according to the classified uses described in section 702.9 of this Title. Site-specific modifications to such statewide standards or guidance values are required or allowed as described below.

B. Site-specific modifications to chronic or acute aquatic life values may be developed where:

SPA253

(1) The local water quality characteristics such as pH, hardness, temperature, color, etc., alter the biological availability or toxicity of a pollutant; or

(2) The sensitivity of the aquatic organisms species that occur at the site differs from the species actually tested in developing the criteria. The phrase *occur at the site* includes the species, genera, families, orders, classes, and phyla that: are usually present at the site; are present at the site only seasonally due to migration; are present intermittently because they periodically return to or extend their ranges into the site; were present at the site in the past, are not currently present at the site due to degraded conditions, and are expected to return to the site when conditions improve; are present in nearby bodies of water, are not currently present at the site due to degraded conditions, and are expected to be present at the site when conditions improve. The taxa that occur at the site cannot be determined merely by sampling downstream and/or upstream of the site at one point in time. *Occur at the site* does not include taxa that were once present at the site but cannot exist at the site now due to permanent physical alteration of the habitat at the site resulting, for example, from dams, etc.

C. Site-specific modifications also may be developed to acute and chronic aquatic life values to reflect local physical and hydrological conditions.

D. Endangered species considerations.

(1) Any site-specific modifications that result in less stringent values must not be likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of such species' critical habitat.

(2) More stringent modifications shall be developed to protect endangered or threatened species where such modifications are necessary to ensure that water quality is not likely to jeopardize the continued existence of such species or result in the destruction or adverse modification of such species' critical habitat.

SPA254

**Procedures for Deriving Aquatic Life Tier I Standards and Guidance Values; Sections III-XI**

## III. REQUIRED DATA

A. Certain data should be available to help ensure that each of the major kinds of possible adverse effects receive adequate consideration.

B. To derive an acute or chronic standard or guidance value for freshwater aquatic organisms and their uses, the following must be available:

1. Results of acceptable acute tests (see section IV or VI of this Appendix) with at least one species of freshwater animal in at least eight different families such that all of the following are included:

a. The family Salmonidae in the class Osteichthyes;

b. One other family (preferably a commercially or recreationally important, warmwater species) in the class Osteichthyes (*e.g.,* bluegill, channel catfish);

c. A third family in the phylum Chordata (*e.g.,* fish, amphibian);

d. A planktonic crustacean (*e.g.,* a cladoceran, copepod);

e. A benthic crustacean (*e.g.,* ostracod, isopod, amphipod, crayfish);

f. An insect (*e.g.,* mayfly, dragonfly, damselfly, stonefly, caddisfly, mosquito, midge);

g. A family in a phylum other than Arthropoda or Chordata (*e.g.,* Rotifera, Annelida, Mollusca);

h. A family in any order of insect or any phylum not already represented.

SPA255

2. Acute-chronic ratios (see section VI of this Appendix) with at least one species of aquatic animal in at least three different families provided that of the three species:

a. At least one is a fish;

b. At least one is an invertebrate; and

c. At least one species is an acutely sensitive freshwater species (the other two may be saltwater species).

3. Results of at least one acceptable test with a freshwater alga or vascular plant is desirable but not required for standard or guidance value derivation (see section VIII of this Appendix). If plants are among the aquatic organisms most sensitive to the material, results of a test with a plant in another phylum (division) should also be available.

C. To derive a standard or guidance value for saltwater aquatic organisms and their uses, the following must be available:

1. Results of acceptable acute tests (see section IV or VI of this Appendix) with at least one species of saltwater animal in at least eight different families such that all of the following are included:

a. two families in the phylum Chordata;

b. a family in a phylum other than Arthropoda or Chordata;

c. either the Mysidae or Penaeidae family;

d. three other families not in the phylum Chordata (may include Mysida or Penaeidae, whichever was not used above);

e. any other family.

2. Acute-chronic ratios (see section VI of this Appendix) with species of aquatic animals in at least three different families provided that of the three species:

a. at least one is a fish;

b. at least one is an invertebrate; and

c. at least one is an acutely sensitive saltwater species (the other two may be freshwater species).

3. Results of at least one acceptable test with a saltwater alga or vascular plant is desirable but not required for standard or guidance value derivation (see section VIII of this Appendix). If plants are among the aquatic organisms most sensitive to the material, results of a test with a plant in another phylum (division) should also be available.

D. If all required data are available, a numerical standard or guidance value can usually be derived except in special cases. For example, derivation of a chronic standard or guidance value might not be possible if the available ACRs vary by more than a factor of 10 with no apparent pattern. Also, if a standard or guidance value is to be related to a water quality characteristic (see sections V and VII of this Appendix), more data will be required.

E. Confidence in a standard or guidance value usually increases as the amount of available pertinent information increases. Thus, additional data are usually desirable.

## IV. FINAL ACUTE VALUE

A. Appropriate measures of the acute (short-term) toxicity of the material to a variety of species of aquatic animals are used to calculate the Final Acute Value (FAV). The Final Acute Value is a calculated estimate of the concentration of a test material such that 95 percent of the genera (with which acceptable acute toxicity tests have been conducted on the material) have higher Genus Mean Acute Values (GMAVs). An acute test is a comparative study in which organisms, that are subjected to different treatments, are observed for a short period usually not constituting a substantial portion of their life span. However, in some cases, the Species Mean Acute Value (SMAV) of a commercially or recreationally important species is lower than the calculated FAV, then the SMAV replaces the calculated FAV in order to provide protection for that important species.

B. Acute toxicity tests shall be conducted using acceptable procedures.

SPA257

C. Except for results with saltwater annelids and mysids, results of acute tests during which the test organisms were fed should not be used, unless data indicate that the food did not affect the toxicity of the test material.

D. Results of acute tests conducted in unusual dilution water, *e.g.,* dilution water in which total organic carbon or particulate matter exceeded five mg/L, should not be used, unless a relationship is developed between acute toxicity and organic carbon or particulate matter, or unless data show that organic carbon or particulate matter, etc., do not affect toxicity.

E. Acute values must be based upon endpoints which reflect the total severe adverse impact of the test material on the organisms used in the test. Therefore, only the following kinds of data on acute toxicity to aquatic animals shall be used:

> 1. Tests with daphnids and other cladocerans must be started with organisms less than 24 hours old and tests with midges must be started with second or third instar larvae. It is preferred that the results should be the 48-hour EC50 based on the total percentage of organism killed and immobilized. If such an EC50 is not available for a test, the 48-hour LC50 should be used in place of the desired 48-hour EC50. An EC50 or LC50 of longer than 48 hours can be used as long as the animals were not fed and the control animals were acceptable at the end of the test. An EC50 is a statistically or graphically estimated concentration that is expected to cause one or more specified effects in 50 percent of a group of organisms under specified conditions. An LC50 is a statistically or graphically estimated concentration that is expected to be lethal to 50 percent of a group of organisms under specified conditions.

> 2. It is preferred that the results of a test with embryos and larvae of barnacles, bivalve molluscs (clams, mussels, oysters and scallops), sea urchins, lobsters, crabs, shrimp and abalones be the 96-hour EC50 based on the percentage of organisms with incompletely developed shells plus the percentage of organisms killed. If such an EC50 is not available from a test, of the values that are available from the test, the lowest of the following should be used in place of the desired 96-hour EC50: 48- to 96-hour EC50s based on percentage of organisms with incompletely developed shells plus percentage of organisms killed,

48- to 96-hour EC50s based on percentage of organisms with incompletely developed shells, and 48-hour to 96-hour LC50s.

3. It is preferred that the result of tests with all other aquatic animal species and older life stages of barnacles, bivalve molluscs (clams, mussels, oysters and scallops), sea urchins, lobsters, crabs, shrimp and abalones be the 96-hour EC50 based on percentage of organisms exhibiting loss of equilibrium plus percentage of organisms immobilized plus percentage of organisms killed. If such an EC50 is not available from a test, of the values that are available from a test the lower of the following should be used in place of the desired 96-hour EC50: the 96-hour EC50 based on percentage of organisms exhibiting loss of equilibrium plus percentage of organisms immobilized and the 96-hour LC50.

4. Tests whose results take into account the number of young produced, such as most tests with protozoans, are not considered acute tests, even if the duration was 96 hours or less.

5. If the tests were conducted properly, acute values reported as "greater than" values and those which are above the solubility of the test material should be used, because rejection of such acute values would bias the Final Acute Value by eliminating acute values for resistant species.

F. If the acute toxicity of the material to aquatic animals has been shown to be related to a water quality characteristic such as hardness or particulate matter for freshwater animals, refer to section V of this Appendix.

G. The agreement of the data within and between species must be considered. Acute values that appear to be questionable in comparison with other acute and chronic data for the same species and for other species in the same genus must not be used. For example, if the acute values available for a species or genus differ by more than a factor of 10, rejection of some or all of the values would be appropriate, absent countervailing circumstances.

H. If the available data indicate that one or more life stages are at least a factor of two more resistant than one or more other life stages of the same species, the data for the more resistant life stages must not be used in the

calculation of the SMAV because a species cannot be considered protected from acute toxicity if all of the life stages are not protected.

I. For each species for which at least one acute value is available, the SMAV shall be calculated as the geometric mean of the results of all acceptable flow-through acute toxicity tests in which the concentrations of test material were measured with the most sensitive tested life stage of the species. For a species for which no such result is available, the SMAV shall be calculated as the geometric mean of all acceptable acute toxicity tests with the most sensitive tested life stage, *i.e.,* results of flow-through tests in which the concentrations were not measured and results of static and renewal tests based on initial concentrations (nominal concentrations are acceptable for most test materials if measured concentrations are not available) of test material. A renewal test is a test with aquatic organisms in which either the test solution in a test chamber is removed and replaced at least once during the test or the test organisms are transferred into a new test solution of the same composition at least once during the test. A static test is a test with aquatic organisms in which the solution and organisms that are in a test chamber at the beginning of the test remain in the chamber until the end of the test, except for removal of dead test organisms.

*Note 1:* Data reported by original investigators must not be rounded off. Results of all intermediate calculations must not be rounded off to fewer than four significant digits.

*Note 2:* The geometric mean of N numbers is the Nth root of the product of the N numbers. Alternatively, the geometric mean can be calculated by adding the logarithms of the N numbers, dividing the sum by N, and taking the antilog of the quotient. The geometric mean of two numbers is the square root of the product of the two numbers, and the geometric mean of one number is that number. Either natural (base e) or common (base 10) logarithms can be used to calculate geometric means as long as they are used consistently within each set of data, *i.e.,* the antilog used must match the logarithms used.

*Note 3:* Geometric means, rather than arithmetic means, are used here because the distributions of sensitivities of individual organisms in toxicity tests on most materials and the distributions of sensitivities of species within a genus are more likely to be lognormal than normal. Similarly, geometric means are used for ACRs because quotients are likely to be closer to

lognormal than normal distributions. In addition, division of the geometric mean of a set of numerators by the geometric mean of the set of denominators will result in the geometric mean of the set of corresponding quotients.

J. For each genus for which one or more SMAVs are available, the GMAV shall be calculated as the geometric mean of the SMAVs available for the genus.

K. Order the GMAVs from high to low.

L. Assign ranks, R, to the GMAVs from "1" for the lowest to "N" for the highest. If two or more GMAVs are identical, assign them successive ranks.

M. Calculate the cumulative probability, P, for each GMAV as R/ (N + 1).

N. Select the four GMAVs which have cumulative probabilities closest to 0.05 (if there are fewer than 59 GMAVs, these will always be the four lowest GMAVs)

O. Using the four selected GMAVs, and Ps, calculate

$$S^2 = \frac{\sum((\ln GMAV)^2) - \frac{(\sum(\ln GMAV))^2}{4}}{\sum(P) - \frac{(\sum(\sqrt{P}))^2}{4}}$$

$$L = \frac{\sum(\ln GMAV) - S(\sum(\sqrt{P}))}{4}$$

$$A = S(\sqrt{0.05}) + L$$

$$FAV = e^A$$

P. If for a commercially or recreationally important species the geometric mean of the acute values from flow-through tests in which the concentrations of test material were measured is lower than the calculated Final Acute Value (FAV), then that geometric mean must be used as the FAV instead of the calculated FAV.

Q. See section VI of this Appendix.

## V. FINAL ACUTE EQUATION

A. When enough data are available to show that acute toxicity to two or more species is similarly related to a water quality characteristic, the relationship shall be taken into account as described in sections V.B through V.G of this Appendix or using analysis of covariance. The two methods are equivalent and produce identical results. The manual method described below provides an understanding of this application of covariance analysis, but computerized versions of covariance analysis are much more convenient for analyzing large data sets. If two or more factors affect toxicity, multiple regression analysis shall be used.

B. For each species for which comparable acute toxicity values are available at two or more different values of the water quality characteristic, perform a least squares regression of the acute toxicity values on the corresponding values of the water quality characteristic to obtain the slope and its 95 percent confidence limits for each species.

*Note:* Because the best documented relationship is that between hardness and acute toxicity of metals in fresh water and a log-log relationship fits these data, geometric means and natural logarithms of both toxicity and water quality are used in the rest of this section. For relationships based on other water quality characteristics, such as pH, temperature, no transformation or a different transformation might fit the data better, and appropriate changes will be necessary throughout this section.

C. Decide whether the data for each species are relevant, taking into account the range and number of the tested values of the water quality characteristic and the degree of agreement within and between species. For example, a slope based on six data points might be of limited value if it is based only on data for a very narrow range of values of the water quality characteristic. A slope based on only two data points, however, might be useful it (sic) it is

consistent with other information and if the two points cover a broad enough range of the water quality characteristic. In addition, acute values that appear to be questionable in comparison with other acute and chronic data available for the same species and for other species in the same genus should not be used. For example, if after adjustment for the water quality characteristic, the acute values available for a species or genus differ by more than a factor of 10, rejection of some or all of the values would be appropriate, absent countervailing justification. If useful slopes are not available for at least one fish and one invertebrate or if the available slopes are too dissimilar or if too few data are available to adequately define the relationship between acute toxicity and the water quality characteristic, return to section IV.G of this Appendix, using the results of tests conducted under conditions and in waters similar to those commonly used for toxicity tests with the species.

D. For each species, calculate the geometric mean of the available acute values and then divide each of the acute values for the species by the geometric mean for the species. This normalizes the acute values so that the geometric mean of the normalized values for each species individually and for any combination of species is 1.0.

E. Similarly normalize the values of the water quality characteristic for each species individually using the same procedure as above.

F. Individually for each species perform a least squares regression of the normalized acute values of the water quality characteristic. The resulting slopes and 95 percent confidence limits will be identical to those obtained in section V.B. of this Appendix. If, however, the data are actually plotted, the line of best fit for each individual species will go through the point 1,1 in the center of the graph.

G. Treat all of the normalized data as if they were all for the same species and perform a least squares regression of all of the normalized acute values on the corresponding normalized values of the water quality characteristic to obtain the pooled acute slope, V, and its 95 percent confidence limits. If all of the normalized data are actually plotted, the line of best fit will go through the point 1,1 in the center of the graph.

H. For each species calculate the geometric mean, W, of the acute toxicity values and the geometric mean, X, of the values of the water quality

SPA263

characteristic. (These were calculated in sections V.D and V.E of this Appendix).

I. For each species, calculate the logarithm, Y, of the SMAV at a selected value, Z, of the water quality characteristic using the equation:

$$Y = \ln W - V(\ln X - \ln Z)$$

J. For each species calculate the SMAV at X using the equation:

$$SMAV = \exp(y)$$

*Note:* Alternatively, the SMAVs at Z can be obtained by skipping step H above, using the equations in steps I and J to adjust each acute value individually to Z, and then calculating the geometric mean of the adjusted values for each species individually. This alternative procedure allows an examination of the range of the adjusted acute values for each species.

K. Obtain the FAV at Z by using the procedure described in sections IV.J through IV.O of this Appendix.

L. If, for a commercially or recreationally important species the geometric mean of the acute values at Z from flow-through tests in which the concentrations of the test material were measured is lower than the FAV at Z, then the geometric mean must be used as the FAV instead of the FAV.

M. The Final Acute Equation is written as:

$$FAV = \exp (V[\ln(\text{water quality char.})] + A - V[\ln Z])$$

where:

$V$ = pooled acute slope, and $A = \ln$ (FAV at Z).

Because V, A, and Z are known, the FAV can be calculated for any selected value of the water quality characteristic.

SPA264

## VI. FINAL CHRONIC VALUE

A. There are two methods for calculating a Final Chronic Value (FCV). Selection of the appropriate methodology is dependent upon the availability of chronic toxicity data. If chronic toxicity data for the species described in section III.B.1 for freshwater species or section III.C.1 for saltwater species are available, the FCV can be calculated in the same manner as the FAV. Otherwise, the FCV can be calculated by dividing the FAV by the Final Acute-Chronic Ratio (FACR). The data requirements for calculating the FACR are identified in sections III.B.2 and III.C.2 for freshwater and saltwater species respectively. In some cases, it might not be possible to calculate a FCV. The FCV is (a) a calculated estimate of the concentration of a test material such that 95 percent of the genera (with which acceptable chronic toxicity tests have been conducted on the material) have higher GMCVs or (b) the quotient of an FAV divided by an appropriate ACR, or (c) the SMCV of a commercially or recreationally important species, if the SMCV is lower than the calculated estimate or the quotient, whichever is applicable.

*Note:* As the name implies, the ACR is a way of relating acute and chronic toxicities.

B. A chronic standard or guidance value shall be based on results of flow-through (except renewal is acceptable for daphnids) chronic tests in which the concentrations of test material in the test solutions were properly measured at appropriate times during the test. A chronic test is a comparative study in which organisms, that are subjected to different treatments, are observed for a long period or a substantial portion of their life span.

C. Results of chronic tests in which survival, growth, or reproduction in the control treatment was unacceptably low shall not be used. The limits of acceptability will depend on the species.

D. Results of chronic tests conducted in unusual dilution water, *e.g.,* dilution water in which total organic carbon or particulate matter exceeded five mg/L, should not be used, unless a relationship is developed between chronic toxicity and organic carbon or particulate matter, or unless data show that organic carbon, particulate matter, etc., do not affect toxicity.

SPA265

E. Chronic values must be based on endpoints and lengths of exposure appropriate to the species. Therefore, only results of the following kinds of chronic toxicity tests shall be used:

1. Life-cycle toxicity tests consisting of exposures of each of two or more groups of individuals of a species to a different concentration of the test material throughout a life cycle. To ensure that all life stages and life processes are exposed, tests with fish should begin with embryos or newly hatched young less than 48 hours old, continue through maturation and reproduction, and should end not less than 24 days (90 days for salmonids) after the hatching of the next generation. Tests with daphnids should begin with young less than 24 hours old and last for not less than 21 days, and for ceriodaphnids not less than seven days. Tests with mysids should begin with young less than 24 hours old and continue until seven days past the median time of first brood release in the controls. For fish, data should be obtained and analyzed on survival and growth of adults and young, maturation of males and females, eggs spawned per female, embryo viability (salmonids only), and hatchability. For daphnids, data should be obtained and analyzed on survival and young per female. For mysids, data should be obtained and analyzed on survival, growth, and young per female.

2. Partial life-cycle toxicity tests consist of exposures of each of two more groups of individuals of a species of fish to a different concentration of the test material through most portions of a life cycle. Partial life-cycle tests are allowed with fish species that require more than a year to reach sexual maturity, so that all major life stages can be exposed to the test material in less than 15 months. A life-cycle test is a comparative study in which organisms, that are subjected to different treatments, are observed at least from a life stage in one generation to the same life-stage in the next generation. Exposure to the test material should begin with immature juveniles at least two months prior to active gonad development, continue through maturation and reproduction, and end not less than 24 days (90 days for salmonids) after the hatching of the next generation. Data should be obtained and analyzed on survival and growth of adults and young, maturation of males and females, eggs spawned per female, embryo viability (salmonids only), and hatchability.

SPA266

3. Early life-stage toxicity tests consisting of 28- to 32-day (60 days post hatch for salmonids) exposures of the early life stages of a species of fish from shortly after fertilization through embryonic, larval, and early juvenile development. Data should be obtained and analyzed on survival and growth.

*Note:* Results of an early life-stage test are used as predictions of results of life-cycle and partial life-cycle tests with the same species. Therefore, when results of a life-cycle or partial life-cycle test are available, results of an early life-stage test with the same species should not be used. Also, results of early life-stage tests in which the incidence of mortalities or abnormalities increased substantially near the end of the test shall not be used because the results of such tests are possibly not good predictions of comparable life-cycle or partial life-cycle tests.

F. A chronic value may be obtained by calculating the geometric mean of the lower and upper chronic limits from a chronic test or by analyzing chronic data using regression analysis.

  1. A lower chronic limit is the highest tested concentration:
      a. In an acceptable chronic test;
      b. Which did not cause an unacceptable amount of adverse effect on any of the specified biological measurements; and
      c. Below which no tested concentration caused an unacceptable effect.

  2. An upper chronic limit is the lowest tested concentration:
      a. In an acceptable chronic test;
      b. Which did cause an unacceptable amount of adverse effect on one or more of the specified biological measurements; and,
      c. Above which all tested concentrations also caused such an effect.

*Note:* Because various authors have used a variety of terms and definitions to interpret and report results of chronic tests, reported results should be reviewed carefully. The amount of effect that is considered unacceptable is often based on a statistical hypothesis test, but might also be defined in terms of a specified percent reduction from the controls. A small percent reduction (*e.g.,* three percent)

might be considered acceptable even if it is statistically significantly different from the control, whereas a large percent reduction (*e.g.,* 30 percent) might be considered unacceptable even if it is not statistically significant.

G. If the chronic toxicity of the material to aquatic animals has been shown to be related to a water quality characteristic such as hardness or particulate matter for freshwater animals, refer to section VII of this Appendix.

H. If chronic values are available for the species in eight families *as* described in section III.B.1 or section III.C.1 of this Appendix, respective SMCVs shall be calculated for each species for which at least one chronic value is available by calculating the geometric mean of the results of all acceptable life-cycle and partial life-cycle toxicity tests with the species; for a species of fish for which no such result is available, the SMCV is the geometric mean of all acceptable early life-stage tests. Appropriate GMCVs shall also be calculated. A GMCV is the geometric mean of the SMCVs for the genus. The FCV shall be obtained using the procedure described in sections IV.J through IV.O of this Appendix, substituting SMCV and GMCV for SMAV and GMAV respectively. See section VI.M of this Appendix.

*Note:* Section VI.I through VI.L are for use when chronic values are not available for freshwater species in eight taxonomic families as described in section III.B.1 of this Appendix, or for saltwater species in eight taxonomic families as described in section III.C.1 of this Appendix.

I. For each chronic value for which at least one corresponding appropriate acute value is available, calculate an ACR, using for the numerator the geometric mean of the results of all acceptable flow-through (except static is acceptable for daphnids and midges) acute tests in the same dilution water in which the concentrations are measured. For fish, the acute test(s) should be conducted with juveniles. The acute test(s) should be part of the same study as the chronic test. If acute tests were not conducted as part of the same study, but were conducted as part of a different study in the same laboratory and dilution water, then they may be used. If no such acute tests are available, results of acute tests conducted in the same dilution water in a different laboratory may be used. If no such acute tests are available, an ACR shall not be calculated.

J. For each species, calculate the SMACR as the geometric mean of all ACRs available for that species. If the minimum ACR data requirements for calculation of a freshwater chronic standard or guidance value (as described in section III.B.2 of this Appendix are not met with freshwater data alone, saltwater data may be used along with the freshwater data. Conversely, if the minimum ACR data requirements for calculation of a saltwater chronic standard or guidance value (as described in section III.C.2 of this Appendix) are not met with saltwater data alone, freshwater data may be used along with the saltwater data.

K. For some materials, the ACR seems to be the same for all species, but for other materials the ratio seems to increase or decrease as the SMAV increases. Thus the FACR can be obtained in three ways, depending on the data available:

> 1. If the species mean ACR seems to increase or decrease as the SMAVs increase, the FACR shall be calculated as the geometric mean of the ACRs for species whose SMAVs are close to the FAV.

> 2. If no major trend is apparent and the ACRs for all species are within a factor of ten, the FACR shall be calculated as the geometric mean of all of the SMACRs.

> 3. If the most appropriate SMACRs are less than 2.0, and especially if they are less than 1.0, acclimation has probably occurred during the chronic test. In this situation, because continuous exposure and acclimation cannot be assured to provide adequate protection in field situations, the FACR should be assumed to be two, so that the FCV is equal to the Aquatic (Acute) value A(A). (See section X.B of this Appendix.) If the available SMACRs do not fit one of these cases, a FACR may not be obtained and a Tier I FCV probably cannot be calculated.

L. Calculate the FCV by dividing the FAV by the FACR.

$$FCV = FAV \div FACR$$

If there is a Final Acute Equation rather than a FAV, see also section V of this Appendix.

SPA269

M. If the SMCV of a commercially or recreationally important species is lower than the calculated FCV, then that SMCV must be used as the FCV instead of the calculated FCV.

N. See section VIII of this Appendix.

## VII. FINAL CHRONIC EQUATION

A. A Final Chronic Equation can be derived in two ways. The procedure described in section VII.A of this Appendix will result in the chronic slope being the same as the acute slope. The procedure described in sections VII.B through N of this Appendix will usually result in the chronic slope being different from the acute slope.

    1. If ACRs are available for enough species at enough values of the water quality characteristic to indicate that the ACR appears to be the same for all species and appears to be independent of the water quality characteristic, calculate the FACR as the geometric mean of the available SMACRs.

    2. Calculate the FCV at the selected value Z of the water quality characteristic by dividing the FAV at Z (see section V.M of this Appendix) by the FACR.

    3. Use V = pooled acute slope (see section V.M of this Appendix), and L = pooled chronic slope.

    4. See section VII.M of this Appendix.

B. When enough data are available to show that chronic toxicity to at least one species is related to a water quality characteristic, the relationship should be taken into account as described in sections C through G below or using analysis of covariance. The two methods are equivalent and produce identical results. The manual method described below provides an understanding of this application of covariance analysis, but computerized versions of covariance analysis are much more convenient for analyzing large data sets. If two or more factors affect toxicity, multiple regression analysis shall be used.

C. For each species for which comparable chronic toxicity values are available at two or more different values of the water quality characteristic, perform a least squares regression of the chronic toxicity values on the corresponding values of the water quality characteristic to obtain the slope and its 95 percent confidence limits for each species.

*Note:* Because the best documented relationship is that between hardness and acute toxicity of metals in fresh water and a log-log relationship fits these data, geometric means and natural logarithms of both toxicity and water quality are used in the rest of this section. For relationships based on other water quality characteristics, such as pH, temperature, no transformation or a different transformation might fit the data better, and appropriate changes will be necessary throughout this section. It is probably preferable, but not necessary, to use the same transformation that was used with the acute values in section V of this Appendix.

D. Decide whether the data for each species are relevant, taking into account the range and number of the tested values of the water quality characteristic and the degree of agreement within and between species. For example, a slope based on six data points might be of limited value if it is based only on data for a very narrow range of values of the water quality characteristic. A slope based on only two data points, however, might be more useful if it is consistent with other information and if the two points cover a broad range of the water quality characteristic. In addition, chronic values that appear to be questionable in comparison with other acute and chronic data available for the same species and for other species in the same genus in most cases should not be used. For example, if after adjustment for the water quality characteristic, the chronic values available for a species or genus differ by more than a factor of 10, rejection of some or all of the values is, in most cases, absent countervailing circumstances, appropriate. If a useful chronic slope is not available for at least one species or if the available slopes are too dissimilar or if too few data are available to adequately define the relationship between chronic toxicity and the water quality characteristic, it might be appropriate to assume that the chronic slope is the same as the acute slope, which is equivalent to assuming that the ACR is independent of the water quality characteristic. Alternatively, return to section VI.H of this Appendix, using the results of tests conducted under conditions and in waters similar to those commonly used for toxicity tests with the species.

SPA271

E. Individually for each species, calculate the geometric mean of the available chronic values and then divide each chronic value for a species by the mean for the species. This normalizes the chronic values so that the geometric mean of the normalized values for each species individually, and for any combination of species, is 1.0.

F. Similarly, normalize the values of the water quality characteristic for each species individually.

G. Individually for each species, perform a least squares regression of the normalized chronic toxicity values on the corresponding normalized values of the water quality characteristic. The resulting slopes and the 95 percent confidence limits will be identical to those obtained in section VII.B of this Appendix. Now, however, if the data are actually plotted, the line of best fit for each individual species will go through the point 1,1 in the center of the graph.

H. Treat all of the normalized data as if they were all the same species and perform a least squares regression of all of the normalized chronic values on the corresponding normalized values of the water quality characteristic to obtain the pooled chronic slope, L, and its 95 percent confidence limits.

If all normalized data are actually plotted, the line of best fit will go through the point 1,1 in the center of the graph.

I. For each species, calculate the geometric mean, M, of the toxicity values and the geometric mean, P, of the values of the water quality characteristic. (These are calculated in sections VII.E and F of this Appendix.)

J. For each species, calculate the logarithm, Q, of the SMCV at a selected value, Z, of the water quality characteristic using the equation:

$$Q = \ln M - L(\ln P - \ln Z)$$

*Note:* Although it is not necessary, it is recommended that the same value of the water quality characteristic be used here as was used in section V of this Appendix.

K. For each species, calculate a SMCV at Z using the equation:

SPA272

SMCV = exp(Q)

*Note:* Alternatively, the SMCV at Z can be obtained by skipping section VII.J of this Appendix, using the equations in sections VII.J and K of this Appendix to adjust each chronic value individually to Z, and then calculating the geometric means of the adjusted values for each species individually. This alternative procedure allows an examination of the range of the adjusted chronic values for each species.

L. Obtain the FCV at Z by using the procedure described in sections IV.J through O of this Appendix.

M. If the SMCV at Z of a commercially or recreationally important species is lower than the calculated FCV at Z, then that SMCV shall be used as the FCV at Z instead of the calculated FCV.

N. The Final Chronic Equation is written as:

FCV = exp (L[ln(water quality characteristic)] + lnS − L[lnZ])

where:

L = pooled chronic slope and S = FCV at Z.

Because L, S, and Z are known, the FCV can be calculated for any selected value of the water quality characteristic.

## VIII. FINAL PLANT VALUE

A. A Final Plant Value (FPV) is the lowest plant value that was obtained with an important aquatic plant species in an acceptable toxicity test for which the concentrations of the test material were measured and the adverse effect was biologically important. Appropriate measures of the toxicity of the material to aquatic plants are used to compare the relative sensitivities of aquatic plants and animals. Although procedures for conducting and interpreting the results of toxicity tests with plants are not well-developed, results of tests with plants usually indicate that criteria which adequately protect aquatic animals and their uses will, in most cases, also protect aquatic plants and their uses.

SPA273

B. A plant value is the result of a 96-hour test conducted with an alga or a chronic test conducted with an aquatic vascular plant.

*Note:* A test of the toxicity of a metal to a plant shall not be used if the medium contained an excessive amount of a complexing agent, such as EDTA, that might affect the toxicity of the metal. Concentrations of EDTA above 200 ug/L should be considered excessive.

C. The FPV shall be obtained by selecting the lowest result from a test with an important aquatic plant species in which the concentrations of test material are measured and the endpoint is biologically important.

## IX. OTHER DATA

Pertinent information that could not be used in earlier sections might be available concerning adverse effects on aquatic organisms. The most important of these are data on cumulative and delayed toxicity, reduction in survival, growth, or reproduction, or any other adverse effect that has been shown to be biologically important. Delayed toxicity is an adverse effect to an organism that results from, and occurs after the end of, its exposure to one or more test materials. Especially important are data for species for which no other data are available. Data from behavioral, biochemical, physiological, microcosm, and field studies might also be available. Data might be available from tests conducted in unusual dilution water (see sections IV.D and VI.D of this Appendix), from chronic tests in which the concentrations were not measured (see section VI.B of this Appendix), from tests with previously exposed organisms, and from tests on formulated mixtures or emulsifiable concentrates. Such data might affect a criterion if the data were obtained with a commercially or recreationally important species, the test concentrations were measured, and the endpoint was biologically important.

## X. STANDARDS AND GUIDANCE VALUES, TIER I

A. Standards or guidance values to protect aquatic life include: the Aquatic (Acute) or A(A) and the Aquatic (Chronic) or A(C).

B. The A(A) is equal to one-half the FAV. The A(A) is an estimate of the highest concentration of a material in the water column to which an aquatic community can be exposed briefly without resulting in an unacceptable effect.

SPA274

C. The A(C) is equal to the lowest of the FCV or the FPV (if available) unless other data (see section IX of this Appendix) show that a lower value should be used. The A(C) is an estimate of the highest concentration of a material in the water column to which an aquatic community can be exposed indefinitely without resulting in an unacceptable effect. If toxicity is related to a water quality characteristic, the A(C) is obtained from the Final Chronic Equation or FPV (if available) that results in the lowest concentrations in the usual range of the water quality characteristic, unless other data (see section IX) show that a lower value should be used.

D. Round both the A(A) and the A(C) to two significant digits.

## XI. FINAL REVIEW

A. The derivation of the standard or guidance value should be carefully reviewed by rechecking each step of the guidance in this part. Items that should be especially checked are:
    1. If unpublished data are used, are they well documented?
    2. Are all required data available?
    3. Is the range of acute values for any species greater than a factor of 10?
    4. Is the range of SMAVs for any genus greater than a factor of 10?
    5. Is there more than a factor of 10 difference between the four lowest GMAVs?
    6. Are any of the lowest GMAVs questionable?
    7. Is the FAV reasonable in comparison with the SMAVs and GMAVs?
    8. For any commercially or recreationally important species, is the geometric mean of the acute values from flow-through tests in which the concentrations of test material were measured lower than the FAV?
    9. Are any of the chronic values used questionable?
    10. Are any chronic values available for acutely sensitive species?
    11. Is the range of acute-chronic ratios greater than a factor of 10?
    12. Is the FCV reasonable in comparison with the available acute and chronic data?
    13. Is the measured or predicted chronic value for any commercially or recreationally important species below the FCV?
    14. Are any of the other data important?
    15. Do any data look like they might be outliers?

16. Are there any deviations from the guidance in this part? Are they acceptable?

B. On the basis of all available pertinent laboratory and field information, determine if the standard or guidance value is consistent with sound scientific evidence. If it is not, another standard or guidance value, either higher or lower, shall be derived consistent with the guidance in this part.

**Procedures for Deriving Aquatic Life Tier II Standards and Guidance Values, Sections XII-XVII**

**XII. SECONDARY ACUTE VALUE**

If all eight minimum data requirements for calculating an FAV using Tier I are not met, a Secondary Acute Value (SAV) shall be calculated for a chemical as follows:

To calculate a SAV, the lowest GMAV in the database is divided by the Secondary Acute Factor (SAF) (Table 1 of this Appendix) corresponding to the number of satisfied minimum data requirements listed in the Tier I methodology (section III.B.1 of this Appendix for freshwater species and section III.C.1 for saltwater species). Data requirements contained in sections I, II, and IV shall be applied to calculation of a SAV. If all eight minimum data requirements are satisfied, a Tier I value calculation may be possible. In order to calculate a freshwater SAV, the database must contain, at a minimum, a genus mean acute value (GMAV) for one of the following three genera in the family Daphnidae - *Ceriodaphnia sp., Daphnia sp.,* or *Simocephalus sp.* In order to calculate a saltwater SAV, it would be desirable if the database contained, at a minimum: a genus mean acute value (GMAV) for a species or genus in one of the following families - Mysidae or Penaeidae; and a GMAV for a saltwater fish.

If appropriate, the SAV shall be made a function of a water quality characteristic in a manner similar to that described in Tier I.

SPA276

**Table 1. Secondary Acute Factors**

| *Number of minimum data requirements satisfied* | *Secondary Acute Factor* |
|---|---|
| 1 | 21.9 |
| 2 | 13.0 |
| 3 | 8.0 |
| 4 | 7.0 |
| 5 | 6.1 |
| 6 | 5.2 |
| 7 | 4.3 |

## XIII. SECONDARY ACUTE-CHRONIC RATIO

If three or more experimentally determined ACRs, meeting the data collection and review requirements of section VI of this Appendix, are available for the chemical, determine the FACR using the procedure described in section VI. If fewer than three acceptable experimentally determined ACRs are available, use enough assumed ACRs of 18 so that the total number of ACRs equals three. Calculate the Secondary Acute-Chronic Ratio (SACR) as the geometric mean of the three ACRs. Thus, if no experimentally determined ACRs are available, the SACR is 18.

## XIV. SECONDARY CHRONIC VALUE

Calculate the Secondary Chronic Value (SCV) using one of the following:

A. $SCV = FAV \div SACR$ (use FAV from Tier I)

B. $SCV = SAV \div FACR$

C. $SCV = SAV \div SACR$

If appropriate, the SCV will be made a function of a water quality characteristic in a manner similar to that described in Tier I.

## XV. COMMERCIALLY OR RECREATIONALLY IMPORTANT SPECIES

If for a commercially or recreationally important species the geometric mean of the acute values or chronic values from flow-through tests in which the concentrations of the test materials were measured is lower than the calculated SAV or SCV, then that geometric mean must be used as the SAV or SCV instead of the calculated SAV or SCV.

## XVI. STANDARDS AND GUIDANCE VALUES, TIER II

A. Standards or guidance values to protect aquatic life shall include: the Aquatic (Acute) or A(A) value and the Aquatic (Chronic) or A(C) value.

B. The A(A) is equal to one-half of the SAV.

C. The A(C) is equal to the lowest of the SCV or the Final Plant Value, if available, unless other data (see section IX of this Appendix) show that a lower value should be used.

If toxicity is related to a water quality characteristic, the A(C) is obtained from the Secondary Chronic Equation or FPV, if available, that results in the lowest concentrations in the usual range of the water quality characteristic, unless other data (see section IX of this Appendix) show that a lower value should be used.

D. Round both the A(A) and the A(C) to two significant digits.

## XVII. APPROPRIATE MODIFICATIONS

On the basis of all available pertinent laboratory and field information, determine if the Tier II value is consistent with sound scientific evidence. If it is not, another value, either higher or lower, shall be derived consistent with the guidance in this Appendix.

## LXXXIX.    6 NYCRR § 706.2

### § 706.2 Severability

If any provision of this Part or its application to any person or circumstance is held to be invalid, the remainder of this Part and the application of that provision to other persons or circumstances will not be affected.

SPA278

## XC.    16 NYCRR § 1000.8

**§ 1000.8 Water Quality and Coastal Certification Procedures**

(a) In accordance with Section 401 of the Clean Water Act, if construction or operation of a proposed major electric generating facility, its interconnections, or related facilities would result in any discharge into the navigable water of the United States and require a federal license or permit, the applicant is required to request and obtain a Water Quality Certification indicating that the proposed activity will be in compliance with water quality standards.

(1) Generally, the request for the Water Quality Certification shall be submitted accompanying the Article 10 application. However, in the event the related application for a federal license or permit has not been submitted on or before the date of submission of the Article 10 application, the request for the water quality certification shall be submitted to the Board when an application for a Federal license or permit is made. If the request does not accompany the Article 10 application, the applicant shall provide a statement describing its plan for making such a request, including a timetable.

(2) A copy of all pertinent state and federal permit applications related to the Water Quality Certification shall be submitted along with the request for the Water Quality Certification.

(3) In support of any request for a Water Quality Certification, an applicant shall demonstrate compliance with the provisions referenced in 6 NYCRR Section 608.9. A request for a Water Quality Certification will not be considered valid until the applicant files with the Secretary a copy of its related federal permit application.

(4) Any applicant that applies for a federal license or permit that will require a Water Quality Certification shall provide the pertinent contact information for the district engineer of the U.S. Army Corps of Engineers or other federal lead agency to use in contacting the Board as to the applicable time period or any other issue.

(5) When an applicant or certificate holder has requested both a Water Quality Certification from the Board and permits from the U.S. Army Corps of Engineers or other federal lead agency, the Board or a designee will provide information to the district engineer or other federal lead agency as to

SPA279

whether circumstances require a period of time longer than the period specified in applicable federal regulations for the certifying agency to act on the request for certification in order to avoid a waiver. The Board shall issue, waive or deny such Certification within such applicable period after the filing of the application or other document in which the request is made, taking into account whether any federal agency from which the applicant or certificate holder has sought a license or permit to conduct any activity that may result in any discharge into the navigable waters has:

(i) advised the Board that such Certification must either be issued or denied within a specified shorter period or be waived; or

(ii) determined that such Certification may either be issued or denied within a specified longer period, not to exceed one year (based on information provided by a designee of the Board), or be waived.

(6) If it appears that the review of a request for a Water Quality Certification cannot be completed within the applicable period identified in paragraph (a)(5) of this section, the Board or a designee will deny the Certification without prejudice to a later request for Certification.

(7) The DPS Director of the Office of Energy Efficiency and the Environment is designated to act as the designee referenced in this section.

(8) If the request for a Water Quality Certification does not accompany an application, it shall be filed and served and notice of it shall be given in the same manner as an application pursuant to sections 1000.6 and 1000.7 of this subchapter. If the request for a Water Quality Certification is filed after the issuance of the Article 10 Certificate, and such request proposes changes of a nature that litigated issues would need to be reopened, such request shall be treated as a request also for a revision of the Article 10 Certificate.

(b) If the proposed facility affects any land or water use or natural resource of the coastal area and federal authorization or funding is necessary, the applicant shall, contemporaneously with submitting the application, submit to DOS copies of the application, the applicant's coastal consistency certification and necessary data and information sufficient to initiate a review by DOS pursuant to the federal Coastal Zone Management Act and its regulations.

(1) The hearing shall be used to elicit, and the hearing record in the proceedings shall provide, information on which the Secretary of State may base the determination of whether or not to concur with the applicant's coastal consistency certification.

(2) The Secretary of State may use procedures established in the Article 10 proceeding to the extent that they are consistent with the federal Coastal Zone Management Act and its implementing regulations to facilitate the required concurrence. The Secretary of State is encouraged to provide such determination to the Board prior to its decision whether or not to issue a Certificate.

(c) If the proposed facility affects any land or water use or natural resource of the coastal areas and inland waterways, the Board invites DOS, pursuant to Article 42 of the Executive Law, to review, evaluate and issue recommendations and opinions to the Board concerning the potential for the proposal to affect such coastal areas and inland waterways, and policies related thereto.

<u>CERTIFICATE OF FILING AND SERVICE</u>

I, Robyn Cocho, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

July 12, 2016 the foregoing Special Appendix was filed through the CM/ECF

system and served electronically on all parties in the case:

Frederick A. Brodie, Esq.
Brian Lusignan, Assistant Attorney General
New York State Office of the Attorney General
Division of Appeals & Opinions
The Capitol
Albany, NY 12224
(518) 776-2317

Anne Marie Garti, Esq.
P.O. Box 15
Bronx, NY 10471
(718) 601-9618

Todd D. Ommen, Esq.
Pace University School of Law
Pace Environmental Law Clinic
78 North Broadway
White Plains, NY 10603
(914) 422-4343

Moneen Susan Nasmith, Esq., Staff Attorney
Christine Ernst, Esq.
Deborah Goldberg, Esq.
Earthjustice
48 Wall Street
New York, NY 10005
212-845-7385

/s/ Robyn Cocho
Robyn Cocho